**Nos. 25-8013, 26-88, 26-497, 26-525**

---

# In the United States Court of Appeals For the Ninth Circuit

---

**STATE OF CALIFORNIA, ET AL.,**
*Plaintiffs-Appellees,*

**v.**

**UNITED STATES OF AMERICA, ET AL.,**
*Defendants,*

**WESTERN STATES TRUCKING ASSOCIATION, ET AL.,**
*Movant-Intervenor Defendants-Appellants*

---

On Appeal from the U.S. District Court
for the Northern District of California
4:25-cv-04966-HSG; Hon. Haywood S. Gilliam, Jr.

---

**APPELLANTS' IN CASE NOS. 26-88, 26-497, 26-525
EXCERPTS OF RECORD VOLUME 2 of 4**

---

Raymond B. Ludwiszewski
Rachel Levick
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
Tel.: (202) 955-8500

Michael Buschbacher
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
 Suite 900
Washington, D.C. 20006
Tel.: (202) 955-0620

*Additional counsel listed inside*

2-ER-14

Sean Howell
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
 Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8355

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Tel.: (512) 693-8350

Steven P. Lehotsky
Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
 Suite 700
Washington, DC 20001
Tel.: (512) 693-8350

*Counsel for Appellants*

# Exhibit A

Steven P. Lehotsky* (DC 992765)
Michael B. Schon* (DC 989893)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW, Suite 700
Washington, DC  20001
Telephone: (512) 693-8350
Email: steve@lkcfirm.com
Email: mike@lkcfirm.com

Katherine C. Yarger* (CO 40387)
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO  80206
Email: katie@lkcfirm.com
Telephone: (512) 693-8350

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
Email: brad@benbrooklawgroup.com

*Attorneys for Proposed Intervenors American
Fuel & Petrochemical Manufacturers,
American Petroleum Institute, and the
National Association of Convenience Stores*

* Admitted *pro hac vice*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | Case No. 4:25-cv-04966 <br><br> **PROPOSED INTERVENORS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Date: January 29, 2026 <br> Time: 2:00 p.m. PST <br> Judge: Hon. Haywood S. Gilliam, Jr. |

MOTION TO DISMISS, NO. 4:25-cv-04966

2-ER-17

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ISSUES TO BE DECIDED ............................................................................................. 2

STATMEMENT OF FACTS ............................................................................................ 2

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................... 5

    I.   Plaintiffs' claims are not justiciable ................................................................. 6

        A.     Section 805 of the CRA bars judicial review. ................................................ 6

        B.     Plaintiffs' challenge presents nonjusticiable political questions. .................... 11

        C.     Plaintiffs lack standing for their statutory claims challenging EPA's
              actions under the CRA. .................................................................................... 14

        D.     The Amended Complaint seeks relief the court cannot grant. ......................... 16

    II.  The Amended Complaint fails to state a claim because the resolutions were lawfully
        enacted and constitutionally valid. .................................................................. 17

CONCLUSION ............................................................................................................. 25

**2-ER-18**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005) ................................................................................................ 12

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................................................................. 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................... 5

*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 (1936) ....................................................................................................... 15, 16

*Baker v. Carr*,
369 U.S. 186 (1962) ............................................................................................................. 12

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016) ............................................................................................................. 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................... 5

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................................................... 15, 19

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ............................................................................................................. 11

*Ctr. for Biological Diversity v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019) ..................................................................... 7, 8, 9, 10, 16, 19

*Chenoweth v. Clinton*,
181 F.3d 112 (D.C. Cir. 1999) ............................................................................................. 13

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ............................................................................................................. 15

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ................................................................................................. 5

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ............................................................................................................... 16

*Cmty. House, Inc. v. City of Boise*,
623 F.3d 945 (9th Cir. 2010) ......................................................................................... 24, 25

*Coleman v. Miller*,
    307 U.S. 433 (1939) ................................................................................................ 12

*Common Cause v. Biden*,
    748 F.3d 1280 (D.C. Cir. 2014) ............................................................................ 15

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
    482 F.3d 1157 (9th Cir. 2007) .......................................................................... 12, 13

*Corrie v. Caterpillar Inc.*,
    503 F.3d 974 (9th Cir. 2007) ................................................................................ 11

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ............................................................................................. 24

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................................................ 20, 21

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) ............................................................................ 16

*Delta Chem. Corp. v. West*,
    33 F.3d 380 (4th Cir. 1994) .................................................................................... 6

*Demore v. Kim*,
    538 U.S. 510 (2003) ............................................................................................. 11

*Effinger v. Ancient Organics LLC*,
    657 F. Supp. 3d 1290 (N.D. Cal. 2023) .................................................................. 4

*In re EPA*,
    B-334309, 2023 WL 8353888 (Comp. Gen. Nov. 30, 2023) ................................... 3

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) ................................................................................ 15

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .................................................................................. 20, 21, 24

*Gest v. Bradbury*,
    443 F.3d 1177 (9th Cir. 2006) ................................................................................ 5

*Grossman v. City of Portland*,
    33 F.3d 1200 (9th Cir. 1994) ................................................................................ 25

*INS v. Chadha*,
    462 U.S. 919 (1983) ............................................................................................. 21

*Kan. Nat. Res. Coal. v. Dep't of Interior*,
    971 F.3d 1222 (10th Cir. 2020) .......................................................................... 7, 9

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ............................................................................................ 4

*Leedom v. Kyne,*
    358 U.S. 184 (1958) .......................................................................................... 17

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .......................................................................................... 14

*Made in the USA Found. v. United States,*
    242 F.3d 1300 (11th Cir. 2001) ........................................................................ 12

*Mendoza-Linares v. Garland,*
    51 F.4th 1146 (9th Cir. 2022) ........................................................................... 10

*Metzenbaum v. Fed. Energy Regul. Comm'n,*
    675 F.2d 1282 (D.C. Cir. 1982) .................................................................. 12, 14

*Montanans for Multiple Use v. Barbouletos,*
    568 F.3d 225 (D.C. Cir. 2009) .................................................................. 7, 9, 16

*Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.,*
    651 F.3d 1066 (9th Cir. 2011) ............................................................................ 5

*Nat'l Warranty Ins. Co. RRG v. Greenfield,*
    214 F.3d 1073 (9th Cir. 2000) .......................................................................... 24

*Nevada v. Watkins,*
    914 F.2d 1545 (9th Cir. 1990) .......................................................................... 13

*Nixon v. United States,*
    506 U.S. 224 (1993) .......................................................................................... 13

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025) .................................................................................... 17, 19

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) .......................................................................................... 16

*Patchak v. Zinke,*
    583 U.S. 244 (2018) .......................................................................................... 22

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ............................................................................................ 18

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force,*
    128 F.4th 1089 (9th Cir. 2025) ......................................................................... 18

*Robertson v. Seattle Audubon Soc'y,*
    503 U.S. 429 (1992) .......................................................................................... 22

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ...........................................................................................................15

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .........................................................................................................15

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ...........................................................................................................15

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*,
    1998 WL 842181 (W.D. Tex. June 25, 1998).....................................................................8

*The Centech Grp., Inc. v. United States*,
    78 Fed. Cl. 496 (2007) .......................................................................................................6

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...........................................................................................................5

*United States v. Am. Elec. Power Serv. Corp.*,
    218 F. Supp. 2d 931 (S.D. Ohio 2002).................................................................................8

*United States v. Ballin*,
    144 U.S. 1 (1892) .............................................................................................................12

*United States v. Klein*,
    80 U.S. (13 Wall.) 128 (1872)......................................................................................22, 23

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016).............................................................................................7

*United States v. Or. State Med. Sch.*,
    343 U.S. 326 (1952) .........................................................................................................16

*United States v. Orr Water Ditch Co.*,
    600 F.3d 1152 (9th Cir. 2010).............................................................................................4

*United States v. Padelford*,
    76 U.S. (9 Wall.) 531 (1870)............................................................................................23

*United States v. S. Ind. Gas & Elec. Co.*,
    2002 WL 31427523 (S.D. Ind. Oct. 24, 2002)....................................................................8

*Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*,
    509 F.3d 1259 (10th Cir. 2007).......................................................................................8, 9

*Warren v. Fox Fam. Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003).............................................................................................5

*Wash. All. of Tech. Workers v. DHS*,
    892 F.3d 332 (D.C. Cir. 2018) .......................................................................................9, 16

*Webster v. Doe*,
   486 U.S. 592 (1988) ....................................................................................................... 10, 11

*Yesler Terrace Cmty. Council v. Cisneros*,
   37 F.3d 442 (9th Cir. 1994) .............................................................................................. 3, 18

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ................................................................................................................ 14

**Statutes and Rules**

88 Fed. Reg. 20,688 (Apr. 6, 2023) .............................................................................................. 3

90 Fed. Reg. 642 (Jan. 6, 2025) ................................................................................................... 3

90 Fed. Reg. 643 (Jan. 6, 2025) ................................................................................................... 3

5 U.S.C. § 551 ........................................................................................................................ 3, 6, 18

5 U.S.C. § 553 ................................................................................................................................. 17

5 U.S.C. § 704 ................................................................................................................................. 19

5 U.S.C. § 801 ........................................................................................ 3, 4, 6, 7, 8, 17, 22

5 U.S.C. § 802 ......................................................................................................................... 4, 5, 12

5 U.S.C. § 804 .......................................................................................................................... 3, 18, 21

5 U.S.C. § 805 ................................................................. 1, 4, 5, 6, 7, 8, 9, 10, 11, 16, 19, 21

8 U.S.C. § 1252 ............................................................................................................................... 10

42 U.S.C. § 7401 .............................................................................................................................. 2

42 U.S.C. § 7507 .............................................................................................................................. 3

42 U.S.C. § 7521 ............................................................................................................................. 17

42 U.S.C. § 7543 ....................................................................................................................... 2, 11, 23

42 U.S.C. § 7607 ............................................................................................................................. 17

Fed. R. Civ. P. 12(b)(1) ................................................................................................................ 1, 4

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 1, 5

Pub. L. No. 119-15, 139 Stat. 65 (June 12, 2025) .................................................................... 4, 7

Pub. L. No. 119-16, 139 Stat. 66 (June 12, 2025) .................................................................... 4, 7

Pub. L. No. 119-17, 139 Stat. 67 (June 12, 2025)..................................................................4, 7

**Other Authorities**

Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE)*
    *Vehicles Rule Part One: One National Program*, FRL010000-45,
    https://www.gao.gov/fedrules/196015 .................................................................... 7

Russell T. Vought, *Post-CRA Resolutions Response to GAO's March 6, 2025*
    *"Observations Regarding the Environmental Protection Agency's Submission*
    *of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under*
    *the Congressional Review Act,"* Exec. Off. Of the Pres. (June 18, 2025),
    https://perma.cc/DR9Z-CHWX.................................................................................. 7

Statement by the President (June 12, 2025), https://perma.cc/7U7Y-6EFZ .................................. 4

*Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and*
    *Nat. Res. And H. Comm. on Res.*, 105th Cong. 20 (1997) ..................................... 6, 7

U.S. Const. art. I, § 1 ............................................................................................................. 7, 13

U.S. Const. art. VI, cl. 2 ...........................................................................................................24

Valerie C. Brannon & Maeve P. Carey, *The Congressional Review Act:*
    *Determining Which "Rules" Must Be Submitted to Congress*, Congress.gov
    (Oct. 22, 2024), https://www.congress.gov/crs-product/R45248............................................. 6

**NOTICE**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 29, 2026 at 2:00 p.m. PST, or as soon thereafter as this matter may be heard in the United States District Court for the Northern District of California, 1301 Clay Street, Courtroom 2 (4th Floor), Oakland, CA 94612, Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores will move to dismiss this case pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

**RELIEF SOUGHT BY THE MOVANTS**

The Proposed Intervenors seek an order dismissing this case for lack of subject matter jurisdiction under Rule 12(b)(1) and/or for failure to state a claim under Rule 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiffs' Amended Complaint must be dismissed because this Court lacks jurisdiction to review it. Earlier this year, Congress exercised its oversight authority under the Congressional Review Act (CRA) to disapprove three Environmental Protection Agency (EPA) waivers that had exempted California from federal preemption under the Clean Air Act (CAA). These waivers had authorized California to enforce aggressive vehicle emission regulatory and sales mandate schemes—the Advanced Clean Trucks, Advanced Clean Cars II, and "Omnibus" Low NOx rules—that together aimed to reduce internal combustion engine sales and the accompanying demand for liquid fuels. Several other States had adopted the California programs, turning what were nominally state regulations into de facto national standards. Congress responded as the Constitution permits: Through bicameralism and presentment, it enacted three joint resolutions of disapproval under the CRA, and President Trump signed each into law on June 12, 2025.

The CRA squarely bars judicial review of actions taken under it: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Plaintiffs cannot evade that jurisdictional bar by dropping an explicit CRA claim while continuing to attack actions taken under the CRA.

In addition, Plaintiffs' claims seek to inject this Court into disputes over the internal workings of the Legislative and Executive branches—clear political questions that are unfit for judicial review. Finally, Plaintiffs lack Article III standing because their claimed injury is complete, no longer imminent, and cannot be redressed by this Court. The Amended Complaint thus suffers from the same fatal flaws as the original and must be dismissed in its entirety.

Even if there were jurisdiction, and there is not, dismissal would still be required. The waivers that Congress disapproved were "rules" under the Administrative Procedure Act (APA); EPA lawfully submitted them for review; and Congress, the President, and other Executive officials acted within their constitutional authority to disapprove them through duly enacted legislation.

Congress's resolutions are now binding law. Plaintiffs may not circumvent the Constitution's legislative process by challenging that outcome in court. The Amended Complaint should be dismissed.

## ISSUES TO BE DECIDED

1. Whether this Court lacks jurisdiction because:

   a. Plaintiffs' claims are barred by the CRA's jurisdiction-stripping provision;

   b. Plaintiffs' claims present nonjusticiable political questions;

   c. Plaintiffs lack standing to challenge EPA's actions; and

   d. The relief requested is unavailable.

2. Whether Plaintiffs fail to state any claim upon which relief can be granted because the challenged CRA resolutions were duly enacted and consistent with constitutional and statutory requirements.

## STATEMENT OF FACTS

The CAA creates a national framework for regulating emissions from new motor vehicles. *See* 42 U.S.C. §§ 7401, *et seq.* It gives EPA exclusive authority to set standards and bars states from regulating in this space. *Id.* § 7543(a). Congress included one narrow exception: California may request a federal waiver to enforce its own emissions standards if certain criteria are met. *Id.* § 7543(b) (detailing exception for California). After the federal waiver is granted, states may then

adopt California's standards in place of the federal standards, if certain conditions are met, but they may not create their own. *See id.* § 7507.

As relevant here, between April 2023 and January 2025, EPA granted California three waivers—authorizing the State to implement the Advanced Clean Trucks, Advanced Clean Cars II, and the "Omnibus" Low NOx programs. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023) (Advanced Clean Trucks); 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II); 90 Fed. Reg. 643 (Jan. 6, 2025) ("Omnibus" Low NOx). Each program imposed sweeping new restrictions on vehicle emissions and mandated increasing sales of electric vehicles. Because other States had, and still others could have, adopted California's rules before they were disapproved, *see* 42 U.S.C. § 7507 (authorizing other states to adopt California's standards), the waivers functionally authorized a prospective regulatory scheme that dictated what vehicles consumers and businesses may drive across a large swath of the American car and truck market—creating an alternative national regulatory framework.

In early 2025, EPA submitted the three waivers to Congress under the CRA.[1] The CRA requires, with certain exceptions, that agencies "submit to each House of the Congress and to the Comptroller General" each rule along with a report detailing the rule before it may take effect. 5 U.S.C. § 801(a)(1)(A). By contrast, agencies need not send to Congress orders, licenses, or rules of particular applicability. 5 U.S.C. § 551(6), (8); 5 U.S.C. § 804(3). The CRA defines "rule" broadly, adopting the APA definition. *Id.* § 804(3); *see also* 5 U.S.C. § 551(4); *see, e.g., Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) ("[R]ulemaking affects the rights of broad classes of unspecified individuals" and "is prospective," "hav[ing] a definitive effect on individuals only after the rule subsequently is applied."). Once a rule is submitted, Congress may

---

[1] When EPA transmitted these waivers to Congress, some Senators requested a GAO opinion on whether the submitted waivers qualified as "rules" under the CRA, and the GAO provided substantive "observations" despite the irregularity of providing guidance at that time. *See* Dkt. 157-2, Am. Compl. Ex. B (March 6, 2025 GAO Observations). The GAO's observations discuss an earlier 2023 GAO opinion, *see id.* (discussing *In re EPA*, B-334309, 2023 WL 8353888 (Comp. Gen. Nov. 30, 2023) (hereafter "B-334309")), that is neither legally compelled nor legally binding on anyone, *see infra* pp. 6–7 & n.3. There, GAO advised that EPA's March 14, 2022 Notice of Decision (waiver) for ACC I was an adjudicatory order rather than a rule under the APA, and that even if it could be considered a rule, it would fall under the CRA's exclusion for rules of particular applicability. *See* B-334309 at *6. Congress reviewed these arguments and ultimately rejected GAO's position, as Congress has the authority to do. *See infra* pp. 6–7 & n.3.

"enact[] a joint resolution of disapproval." 5 U.S.C. § 802(a). If the President signs the resolution, the rule is invalidated and "may not be reissued in substantially the same form." *Id.* § 801(b)(2). The CRA expressly bars judicial review of actions or omissions taken under the CRA: "No determination, finding, action, or omission under this chapter shall be subject to judicial review. *Id.* § 805.

Congress and the President disapproved the waivers via three joint resolutions enacted through bicameralism and presentment. *See* Pub. L. No. 119-15, 139 Stat. 65 (June 12, 2025); Pub. L. No. 119-16, 139 Stat. 66 (June 12, 2025); Pub. L. No. 119-17, 139 Stat. 67 (June 12, 2025); *see also* Statement by the President (June 12, 2025), https://perma.cc/7U7Y-6EFZ. The disapproved waivers are now without legal effect, States may not implement them, and, by operation of the CRA, EPA may not reissue similar rules without new congressional authorization.

California and ten other States now seek this Court's reversal of those duly enacted laws. They sued the United States, the President, and EPA and have now filed their Amended Complaint. Like the original complaint, the Amended Complaint concerns internal political process beyond this Court's jurisdiction. Plaintiffs nevertheless claim that the waivers are not rules under the CRA, that EPA's submission to the Congress was unlawful, and that the resolutions violate the Constitution. *See generally* Dkt. 157, Am. Compl. None of these claims can succeed.

Proposed Intervenors, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores, have sought to intervene to protect their members' rights, which are independent of and not represented by Defendants. Since Plaintiffs have now filed an Amended Complaint that removes some claims and makes other changes, Proposed Intervenors submit this new Motion to Dismiss Plaintiffs' Amended Complaint.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) tests whether the court has subject-matter jurisdiction over the claims asserted. *See Effinger v. Ancient Organics LLC*, 657 F. Supp. 3d 1290, 1295 (N.D. Cal. 2023). Plaintiffs bear the burden of establishing that jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *United States v. Orr Water Ditch Co.*, 600 F.3d 1152, 1157 (9th Cir. 2010). To satisfy Article III's standing requirement, "plaintiffs must

4

demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "[W]here, as here, [Plaintiffs] seek declaratory and injunctive relief, they must demonstrate that they are 'realistically threatened by a repetition of the violation.'" *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (cleaned up). Where jurisdiction is lacking, the court must dismiss the action. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1073 (9th Cir. 2011) (affirming district court dismissal for lack of jurisdiction).

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint. Courts must dismiss a complaint under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or sufficient facts alleged under a cognizable legal theory. *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). To survive such a motion, the complaint must also contain enough factual allegations to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts will not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citation omitted).

**ARGUMENT**

Plaintiffs' Amended Complaint must be dismissed. The CRA provides expedited procedures for Congress to review and disapprove of agency rules, and expressly prohibits judicial review of *any* "determination, finding, action, or omission" made by Congress under the statute. 5 U.S.C. §§ 802, 805. This Court simply cannot adjudicate those acts or omissions. The Amended Complaint suffers from numerous other jurisdictional defects: It presents quintessential political questions about how Congress exercises its legislative oversight; Plaintiffs lack standing to bring their claims against EPA because EPA's actions did not cause Plaintiffs' alleged injury; and the relief requested is unavailable. Even if the Court could reach the merits, the Amended Complaint fails to state any claim upon which relief could be granted. The three joint resolutions at issue reflect a lawful exercise of legislative and executive power. As explained below, the Amended Complaint should be dismissed.

5

**MOTION TO DISMISS, NO. 4:25-cv-04966**                **2-ER-29**

## I.      Plaintiffs' claims are not justiciable.

Plaintiffs' lawsuit fails because it presents nonjusticiable claims. First, Section 805 of the CRA withdraws jurisdiction over challenges to actions taken under the statute—including efforts to nullify disapproval resolutions. Second, Plaintiffs' claims raise political questions that the Constitution commits to the elected branches and that courts may not resolve. Third, Plaintiffs lack standing. And fourth, this Court cannot award the relief Plaintiffs seek. Any of these grounds independently requires dismissal.

### A.      Section 805 of the CRA bars judicial review.

Each of Plaintiffs' claims fails because the CRA prohibits courts from reviewing actions taken "under" it. Section 805 of the CRA states: "No determination, finding, action, or omission *under this chapter* shall be subject to judicial review." 5 U.S.C. § 805 (emphasis added). This bar applies where a plaintiff challenges a law passed through the CRA's process, including the agency's submission of the rule, Congress's disapproval, and the President's signature. That is the case here.

The CRA requires agencies to "submit to each House of the Congress and to the Comptroller General" each rule along with a report detailing the rule. *Id.* § 801(a)(1). The CRA broadly defines "rule" according to the APA's definition. *Id.* § 551(4).[2] Congress, however, need not rely on an agency's determination of whether the action is rules or not. It has also developed its own internal process to determine whether agency actions are reviewable as a rule under the CRA, treating certain rules as constructively submitted and therefore subject to the CRA. Ultimately, Congress is permitted to decide for itself when to take up an agency action under the CRA and when to pass laws disapproving it.[3] After all, it is Congress, not the Executive, that is responsible for making law.

---

[2] *See also* Valerie C. Brannon & Maeve P. Carey, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, Congress.gov (Oct. 22, 2024), https://www.congress.gov/crs-product/R45248.

[3] Plaintiffs have identified no authority, and there is none, for the proposition that GAO's observations or opinions as to whether an agency action is a "rule" are legally required or legally binding rather than merely advisory. *See The Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496, 507 (2007) (neither agencies nor courts are bound by GAO decisions); *Delta Chem. Corp. v. West*, 33 F.3d 380, 382 (4th Cir. 1994) ("[T]he lack of consistency in . . . GAO opinions, both internally and between opinions, renders them of little value and undeserving of judicial deference."). GAO itself recognizes that it has no power "to decide what a rule is." *Tongass Land Management: Joint*

6

*See* U.S. Const. art. I, § 1 (granting "[a]ll legislative Powers" to Congress); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016) ("It is emphatically . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." (cleaned up)).[4]

Here, EPA submitted three waivers to Congress as rules under the CRA. Both chambers passed resolutions disapproving them. The President signed each resolution. Those resolutions became law.[5] These laws voided the waivers and barred EPA from "reissu[ing] [new rules] in substantially the same form." § 801(b)(2).

Plaintiffs now seek to undo Congress's duly enacted legislation. They attack EPA's treatment of the waiver decisions as rules, *see, e.g.*, Am. Compl. ¶¶ 132, 137, 143; and its decision to send the rules to Congress, *see, e.g.*, *id.* ¶ 143; Congress's decision to take up the rules, *see, e.g.*, *id.* ¶¶ 138, 154; the procedures by which Congress did so, *see, e.g.*, *id.* ¶¶ 154–58; Congress's adoption of the resolutions, *see, e.g.*, *id.* ¶ 163; and the President's signing of the Resolutions, *see, e.g.*, *id.* ¶¶ 163, 172. None of these are reviewable.

What California seeks to have this Court review are precisely the types of actions Section 805 forecloses courts from reviewing because, at their core, each claim challenges a "determination, finding, action, or omission" under the statute.[6] In *Center for Biological Diversity v. Bernhardt*, 946

---

*Hearings Before the S. Comm. On Energy and Nat. Res. And H. Comm. on Res.*, 105th Cong. 20 (1997). In any event, GAO has previously concluded that an action revoking a preemption waiver is a "final rule." *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, FRL010000-45, https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a final rule).

[4] *See also* Russell T. Vought, *Post-CRA Resolutions Response to GAO's March 6, 2025 "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act,"* Exec. Off. Of the Pres. (June 18, 2025), https://perma.cc/DR9Z-CHWX.

[5] Pub. L. No. 119-15, 139 Stat. 65; Pub. L. No. 119-16, 139 Stat. 66; Pub. L. No. 119-17, 139 Stat. 67.

[6] Courts overwhelmingly agree that Section 805's jurisdictional bar applies equally to agency acts or omissions as it does to Congressional ones. *See Kan. Nat. Res. Coal. v. Dep't of Interior*, 971 F.3d 1222, 1235–36 (10th Cir. 2020) ("[T]he CRA unambiguously prohibits judicial review of any omission by any of the specified actors," which include "agencies, the Comptroller General, the President, and Congress."); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C.

7

F.3d 553, 563–64 (9th Cir. 2019), the Ninth Circuit rejected a nearly identical effort to circumvent the CRA's jurisdictional bar. *See id.* (rejecting plaintiff's attempt to shirk the jurisdictional bar by describing it as something other than a "'determination, finding, action or omission' under the CRA"). There, the plaintiff argued that a joint resolution was invalid because the disapproved rule had taken effect before the agency submitted it to Congress. *See id.* at 562 (arguing the rule "could not be submitted 'in accordance with' § 801(a)(1)(A), because that section requires a federal agency to submit a report to Congress '[b]efore a rule can take effect,' but the [rule] took effect . . . nearly a month before the report was submitted to Congress"). The plaintiff claimed the submission was untimely and the resolution was therefore improperly enacted. *See id.* at 562–63. But the court held that Section 805 bars judicial review of any claim that challenges a "determination, finding, action, or omission" under the CRA—including procedural challenges to the validity of a joint resolution. *Id.* at 563 (Plaintiff "challenges Congress's enactment of the Joint Resolution. Because enacting a joint resolution of disapproval is an action under the CRA, we lack jurisdiction to consider this claim."). The court explained that the plaintiff's real grievance was with Congress's act of disapproval. *See id.* at 564 (plaintiff's challenge to the agency's rescission of the rule after the CRA process was a "claim [that] necessarily involves a challenge to a congressional 'determination, finding, action or omission' under the CRA"). Because the agency acted under the CRA, and because the relief sought would nullify the resolution, Section 805 stripped the court of jurisdiction. *See id.* The court emphasized that Congress's intent to preclude judicial review was "fairly discernible" from the statutory scheme. *Id.* at 563. It does not matter if the plaintiff frames the claim

---

Cir. 2009) (holding that CRA precludes review of agency compliance with submission requirements); *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007) *overruled in part on other grounds by Azar v. Allina Health Servs.*, 587 U.S. 566, 572 (2019) (noting CRA precludes judicial review of failure to submit a rule); *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 1998 WL 842181, at *7 n.15 (W.D. Tex. June 25, 1998), *aff'd*, 201 F.3d 551 (5th Cir. 2000) (Section 805 barred judicial review of agency omission to submit rule); *United States v. Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 949 (S.D. Ohio 2002) (same); *but see United States v. S. Ind. Gas & Elec. Co.*, 2002 WL 31427523, at *4–5 (S.D. Ind. Oct. 24, 2002) (Section 805 jurisdictional bar applies only to congressional action). Even were this Court persuaded by the stand-alone, unpublished position of the Southern District of Indiana, the waivers here, unlike the action at issue in that case, have already been submitted to Congress and disapproved, making the factual circumstances inapposite.

MOTION TO DISMISS, NO. 4:25-cv-04966    **2-ER-32**

as a challenge to agency action, as Plaintiffs attempt here. *See, e.g.*, Am. Compl. ¶¶ 127, 138, 145, 163, 172; *see also id.* ¶¶ 139–40, 146–47, 159–60, 168–69, 178–79 (each of Plaintiffs' substantive counts request that actions under the CRA are declared unlawful and vacated). The challenge is still covered by the plain text of the act, and the bar applies. *See Bernhardt*, 946 F.3d at 563–64.

The D.C. and Tenth Circuits have similarly enforced Section 805's bar against CRA challenges. *See Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018) (holding that § 805 forecloses review of claim that rule was invalid for taking effect fewer than 60 days after publication, where the CRA mandates a 60-day waiting period); *Montanans for Multiple Use*, 568 F.3d at 229 (holding that § 805 bars review of claim that agency violated CRA by failing to report plan amendments, because the statute "denies courts the power to void rules on the basis of agency noncompliance"); *Kan. Nat. Res. Coal.*, 971 F.3d at 1226–28, 1235–38 (discussing legislative history of CRA and dismissing case for lack of subject-matter jurisdiction under the broad jurisdictional bar in § 805); *Via Christi Reg'l Med. Ctr., Inc.*, 509 F.3d at 1271 n.11 (explaining that CRA "specifically precludes judicial review of an agency's compliance with its terms"). These decisions underscore what the text makes plain: Courts lack power to second-guess congressional and executive actions taken under the CRA.

California cannot plead around the CRA's jurisdictional bar. Deleting the explicit CRA count from the Amended Complaint does not change what this suit is about or what it seeks to undo. Every claim still targets actions taken under the CRA and seeks relief that would nullify Congress's disapproval of the waivers. The Amended Complaint asks this Court to declare that the "Resolutions are unlawful, void, and of no effect," Am. Compl. ¶¶ 159, 168, 178–79; to vacate EPA's submissions to Congress, which is, in effect, a challenge to the Resolutions, *id.* ¶ 140; and to enjoin EPA and its Administrator from giving the resolutions "any legal effect," *id.* ¶¶ 160, 169. Each request strikes directly at the operation of the CRA and at the legislative acts taken under it. Section 805 bars judicial review of any "determination, finding, action, or omission" under the CRA, 5 U.S.C. § 805, and that prohibition cannot be evaded by repackaging a CRA challenge in other statutory or constitutional terms.

Although the Ninth Circuit has glanced at a narrow exception to Section 805's broad jurisdictional bar for constitutional claims, it did not engage with the CRA's text or its legislative history and instead merely invoked the general canon from *Webster v. Doe*, 486 U.S. 592, 603 (1988), requiring a "clear" statement before Congress can foreclose judicial review of constitutional claims. *See Bernhardt*, 946 F.3d at 561.

That principle is inapplicable here. Section 805 clearly states, "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. That language is clear. It does not differentiate between statutory and constitutional claims. Instead, it says "[t]his chapter shall apply notwithstanding any other provision of law." *Id.* § 806(a). That unmistakably indicates that Congress intended the bar to override every other source of law. If Congress wanted to exempt constitutional claims from this bar, it would have used specific language to do so. In *Mendoza-Linares v. Garland*, the Ninth Circuit held that Congress barred judicial review of an asylum-seeker's constitutional claims through similarly broad language. 51 F.4th 1146, 1161 (9th Cir. 2022); *see id.* at 1148–49. The statute at issue there stated, in part, that "no court shall have jurisdiction to review" certain immigration decisions and claims. *See id.* at 1154 (quoting 8 U.S.C. § 1252(a)(2)). The Ninth Circuit found this language clear enough to overcome the presumption of reviewability for constitutional claims. That conclusion was bolstered by other language in the statute expressly preserving constitutional claims in other contexts, showing that Congress knows how to preserve such claims when it so desires. *Id.* at 1161. Section 805 of the CRA is equally clear: "No determination, finding, action, or omission under [the CRA] shall be subject to judicial review." 5 U.S.C. § 805.

Moreover, *Webster* and its progeny's principle that courts should presume constitutional claims remain reviewable absent a clear statement to the contrary arose in cases involving individual rights, such as liberty, due process, and access to habeas relief.[7] The concern animating those

---

[7] *See Webster*, 486 U.S. at 596, 603 (individual raising, among others, due process and equal protection claims) (citing *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986) (individuals raising equal protection and due process claims)); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003) (noting that particularly clear statement is needed to bar review of habeas claims

decisions was that Congress cannot, consistent with separation of powers, deny all judicial review when a citizen-claimant asserts a fundamental personal right. That concern does not apply here. This case does not involve liberty or individual rights. It involves institutional power. California and the other Plaintiffs ask this Court to prioritize California's policy preferences over the prerogatives of Congress, which legislates for the entire nation. But California (and the other States) are only permitted to implement California's desired regulatory regime under a narrow exception to federal preemption and only if EPA concludes that certain statutory conditions are met. 42 U.S.C. § 7543(b). California has no independent constitutional right to its preferred alternative to federal standards. The CRA reflects Congress's clear legislative judgment to preclude judicial review. That judgment is not subject to judicial oversight—even when framed as a constitutional challenge.

This Court has no authority to review or reverse the outcome of the legislative process Congress used here. Section 805 requires dismissal of all of Plaintiffs' claims.

**B.      Plaintiffs' challenge presents nonjusticiable political questions.**

Plaintiffs ask this Court to pass judgment on how Congress exercised its internal legislative procedures in enacting the joint resolutions. *See, e.g.*, Am. Compl. ¶¶ 155–58, 162–67. But this Court cannot do what Plaintiffs ask. Plaintiffs present textbook political questions over which federal courts have no authority.

Where a case presents a nonjusticiable political question, the court lacks jurisdiction. *See Corrie v. Caterpillar Inc.*, 503 F.3d 974, 982 (9th Cir. 2007). To determine a political question's presence, this Court considers six equally sufficient factors:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

and indicating that the underlying constitutional concern for inability to review constitutional claims lies with particular liberty interests).

11

MOTION TO DISMISS, NO. 4:25-cv-04966                    **2-ER-35**

*Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)); *see also Corrie*, 503 F.3d at 980. If any one of these factors is "inextricable" from the case, it is nonjusticiable. *Alperin*, 410 F.3d at 544.

Here, the first factor is "inextricable" from and disposes of the challenges to Congress's internal procedures. The expedited procedures that are challenged here, *see* Am. Compl. ¶¶ 155–58, 163–64; *see also id.* ¶¶ 56, 102–06, are "an exercise of the rulemaking power of the Senate and House of Representatives, respectively," and as such are "deemed a part of the rules of each House, respectively," 5 U.S.C. § 802(g) (noting that either House may "change the rules . . . at any time"). As the Ninth Circuit has explained, a challenge "based on the asserted failure of Congress to comply with its own procedural rules" is a nonjusticiable "political question" that is "beyond [this Court's] power to review." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171–72 (9th Cir. 2007) (declining to review claim that Congress, by not holding a hearing on legislation, failed to comply with its own procedural rules).

The Supreme Court and numerous other federal courts have agreed and routinely refrain from deciding questions like those Plaintiffs ask this Court to resolve. *See, e.g.*, *United States v. Ballin*, 144 U.S. 1, 5 (1892) ("The constitution empowers each house to determine its rules of proceedings."); *Coleman v. Miller*, 307 U.S. 433, 450 (1939) (holding that Congress's treatment of state ratification of constitutional amendment as a nonjusticiable political question); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1311–12 (11th Cir. 2001) (holding that political branches' choices of how to handle an international agreement—*i.e.*, whether to have the Senate review and approve it as a "treaty"—was a nonjusticiable political question); *Metzenbaum v. Fed. Energy Regul. Comm'n*, 675 F.2d 1282, 1286–87 (D.C. Cir. 1982) (per curiam) (holding that a question that would require a court to "construe the rules of the House of Representatives [and] additionally to impose upon the House [the court's] interpretation of its rules" was "political in nature" and therefore nonjusticiable (cleaned up)); *Consejo de Desarrollo Economico de Mexicali, A.C.*, 482 F.3d at 1172 ("In short, the Constitution textually commits the question of legislative procedural rules to Congress. Thus, whether Congress decides to hold a hearing on legislation applicable to the general public is a non-justiciable political question beyond our power to review.");

12

*Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999) (holding that plaintiffs lacked standing to challenge President's decision implementing legislative program because their injury was inherently political); *Nevada v. Watkins*, 914 F.2d 1545, 1556–57 (9th Cir. 1990) (holding that challenge to composition of conference committee and resulting legislation as violating Tenth Amendment was nonjusticiable to the extent it sought to require Nevada representation on the congressional committee).

This overwhelming body of law confirms that Plaintiffs' challenges to Congress's internal procedures in enacting the joint resolutions lie beyond the Court's jurisdiction and must be dismissed.

Factors two and three also support dismissal. Plaintiffs ask this Court to decide when and how Congress must apply the Congressional Review Act. That question lacks judicially manageable standards and requires policy judgments about legislative procedure that the Constitution assigns to Congress alone. *See* U.S. Const. art. I, § 1 (granting "[a]ll legislative Powers" to Congress); *see also Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (finding that there are no judicially manageable standards for assessing the Senate's conducting of an impeachment trial because the Constitution commits impeachment trials to the Senate). Plaintiffs' challenge raises institutional concerns about how Congress exercises its own oversight powers under the CRA. *See* Am. Compl. ¶¶ 157–58. Plaintiffs do not seek review of agency action. They ask this Court to second-guess Congress's internal decision about whether and when to invoke its disapproval process. That request implicates both the absence of judicial standards and the danger of disrespecting a coordinate branch. The CRA ultimately commits the determination whether Congress's expedited procedures apply to Congress alone.

The other factors also support dismissal. Factor four supports dismissal because resolving Plaintiffs' claims would require the Court to second-guess how Congress exercised its internal procedures, effectively inviting judicial oversight of the legislative process and expressing a clear lack of respect for a coequal branch. *See Metzenbaum*, 675 F.2d at 1287–88 (Courts have declined to resolve questions about internal Congressional proceedings because it is "impossibl[e]" for them to "undertake independent resolution" in situations such as this "without expressing lack of the

13

respect due coordinate branches of government." (cleaned up)). Finally, factors five and six support dismissal because second-guessing Congress's procedure here would undermine the need for finality in legislative decisions and create a serious risk of conflicting pronouncements from the branches on a live policy issue, generating the very interbranch friction and political embarrassment the political question doctrine is meant to prevent. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 205–06 (2012) (Sotomayor, J., concurring in part) (noting that "courts properly resist calls to question the good faith with which another branch attests to the authenticity of its internal acts"). Prudential considerations should also foreclose review. *See Metzenbaum*, 675 F.2d at 1287–88.

### C. Plaintiffs lack standing for their statutory claims challenging EPA's actions under the CRA.

Even were the CRA to permit Plaintiffs to challenge EPA's submission of the waivers as rules or to claim that submission tainted the final resolutions of disapproval, *see* Am. Compl. ¶¶ 125–38, 143–44; *see also id.* ¶ 184, Plaintiffs lack standing to do so. Plaintiffs' alleged injury flows from Congress's resolutions, not EPA's actions. No relief directed at EPA would redress Plaintiffs' injury. This is because Congress's independent determinations and actions break the causal chain. The legal force and operative effects of the invalidation of the waiver decisions result directly and solely from the actions of Congress.

EPA's transmission of the waivers is neither a legal cause of the injury nor a source of redress. No remedy directed at EPA could alter the fact that Congress reviewed the waivers and enacted binding statutes that nullified them. Those statutes have the full force of law. They reflect the independent and constitutionally grounded decisions of both Houses of Congress and the President. That chain of lawful legislative action breaks any causal connection to EPA's earlier transmission and Plaintiffs' alleged injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (injury must be "fairly traceable to the challenged conduct of the defendant").

Plaintiffs cannot overcome this traceability problem by labeling EPA's submission as the cause of their harm. As the Supreme Court made clear in *Bennett v. Spear*, "it does not suffice if the injury complained of is 'the result of the independent action of some third party not before the court.'" 520 U.S. 154, 169 (1997) (cleaned up). Here, that third party is Congress itself. EPA's transmission of the waivers did not dictate or compel Congress's disapproval votes. Congress remained entirely free to act or not act. Its independent legislative choice is what triggered the legal consequences at issue here.

These interrelated causation and traceability defects are fatal to standing. *See Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014) ("[T]he causation element requires that a proper defendant be sued."). Plaintiffs cannot hold EPA responsible for an injury caused by Congress. As in *Common Cause*, Plaintiffs' "alleged injury was caused not by any of the defendants, but by an 'absent third party'"—namely, Congress. *See id.* (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)).

Nor could a court order directed at EPA redress Plaintiffs' asserted injury. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (holding that a court cannot grant relief for a past violation when the relief would not redress the plaintiff's injury and would serve only to declare a violation of law). The disapproval resolutions are valid acts of Congress. They remain binding regardless of the manner in which EPA transmitted the waivers. A declaration that EPA's submissions were improper would not undo Congress's enactments, nor would it reinstate the waivers. The requested declaration would offer no benefit. It would serve only to express judicial disapproval of a completed executive act that has no ongoing effect. Article III forbids such advisory opinions. *See, e.g.*, *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948) ("To revise or review an administrative decision, which has only the force of a recommendation . . ., would be to render an advisory opinion in its most obnoxious form . . . ."); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–46 (1936) (Brandeis, J., concurring) ("[F]ederal courts . . . have no power to give advisory opinions.").

Because the injury is not caused by or fairly traceable to EPA and cannot be redressed by relief against EPA, Plaintiffs lack standing to assert their statutory CRA claims.

15

**D.      The Amended Complaint seeks relief the Court cannot grant.**

As already explained, in each count, Plaintiffs seek relief that this Court cannot grant. Section 805's judicial-review prohibition "denies courts the power to void rules on the basis of agency noncompliance with the Act." *Montanans for Multiple Use*, 568 F.3d at 229. As such, whether or not EPA correctly submitted the rule to Congress, there is no relief this Court can grant. *See Wash. All. of Tech. Workers*, 892 F.3d at 346 (motion to dismiss may be granted if plaintiff "would not have a claim upon which relief could be granted even with [sufficiently pleaded] facts" (alteration in original) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998))).

Further, equitable relief may not be used to undo past completed acts. Injunctions prevent future harm, not past conduct. *See United States v. Or. State Med. Sch.*, 343 U.S. 326, 333 (1952); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Here, EPA has completed the submission of the waiver decisions, and the legislative process is complete. Plaintiffs do not credibly allege any imminent agency action or future resolution under the CRA that presents a real and immediate threat of harm to them. The possibility that similar waivers might be submitted to, or disapproved by, Congress in the future is speculative and too contingent to support equitable relief. *See Bernhardt*, 946 F.3d at 560. This Court could no more prevent those transmissions than it could a Congressional committee's consideration of a bill California's dislikes. The lack of concrete, ongoing harm forecloses any viable remedy.

Each of these independent grounds requires dismissal.

**II.      The Amended Complaint fails to state a claim because the resolutions were lawfully enacted and constitutionally valid.**

Even if the Court could reach the merits, Plaintiffs' claims still fail as a matter of law.

***Ultra Vires.*** The gravamen of Plaintiffs' *ultra vires* claim is that EPA's waivers are not rules and are therefore not subject to the CRA. *See* Am. Compl. ¶¶ 143–45. Plaintiffs argue that EPA and its Administrator acted beyond their authority by classifying the waivers as "rules" subject to the CRA and by labeling certain documents as a "report." *Id.* ¶ 143. Plaintiffs further contend that no

statute authorizes EPA to take these actions, that EPA failed to follow notice-and-comment procedures under 5 U.S.C. § 553 and 42 U.S.C. § 7607(d), and that EPA was required to comply with the CAA's distinct provisions governing the promulgation of federal vehicle emission standards under 42 U.S.C. § 7521. *Id.* ¶ 144.

To sustain an *ultra vires* challenge against a federal agency, a plaintiff must demonstrate that the agency acted in plain contravention of an unambiguous statutory command. As the Supreme Court explained in *Leedom v. Kyne*, *ultra vires* jurisdiction exists only where an agency acts "in excess of its delegated powers and contrary to a specific prohibition." 358 U.S. 184, 188 (1958). Setting aside for a moment Plaintiffs' lack of Article III standing (already discussed above), Plaintiffs cannot show that EPA violated any "clear and mandatory" duty, *see id.*; *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680–82 (2025), because EPA did not exceed any statutory limit. The CRA assigns EPA the task of determining how to classify its actions. 5 U.S.C. § 801 (explaining that the federal agency submits rules under the CRA). That duty presupposes agency discretion to classify its actions for CRA purposes, precisely what EPA did here. And no provision bars EPA from making such a determination after an action's effective date. Finally, Plaintiffs point to no statute that requires a distinct public process for such classification decisions, and none exists. The CRA itself contains no procedural prerequisites to the submission to Congress.

Plaintiffs' reliance on the APA's rulemaking provisions and the CAA's procedural requirements is misplaced. Those provisions govern the promulgation of substantive rules of general applicability, not the ministerial act of classifying or transmitting existing agency actions to Congress under the CRA.

Were it to matter for this Court's purposes here, and it does not for the reasons already discussed, EPA's waiver determinations nevertheless fit comfortably within the broad definition of a rule. As noted above, the CRA adopts the APA's broad definition of "rule." 5 U.S.C. § 804(3). A "rule" includes "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). Courts have construed this definition broadly. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015) (noting the "broad" scope of the rule definition); *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of*

17

*Air Force*, 128 F.4th 1089, 1107 (9th Cir. 2025) (same). In contrast, adjudicatory orders "resolve disputes among specific individuals in specific cases" and "have an immediate effect on specific individuals (those involved in the dispute)." *Yesler Terrace*, 37 F.3d at 448.

Here, EPA's grant of waivers to California establishes standards of general and prospective effect. They are not adjudicatory resolutions confined to specific parties. *Yesler Terrace* is instructive: There the Ninth Circuit explained that even decisions addressing particular parties can qualify as rules when they establish standards of general applicability that affect the rights of others. *See* 37 F.3d at 448. In *Yesler Terrace*, the United States Department of Housing and Urban Development (HUD) authorized a state housing authority to use its eviction procedures in place of federally required grievance hearings. HUD argued this was an "order," not a rule. *Id.* But the Ninth Circuit held that HUD's determination bore all the characteristics of a rule because it had a prospective effect, applied broadly, and altered the rights of a class of individuals not yet identified. *Id.* "HUD's determination had no immediate, concrete effect on anyone, but merely permitted [the housing authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.*

So too here. EPA's waivers let California use those standards (and other states that have adopted them under Section 177 of the CAA) in place of federally required emissions standards. It thereby prospectively altered the rights of automakers, constrained consumer choice, and reduced the market for gasoline, diesel, and other liquid fuels.

Put simply, Plaintiffs cannot use an *ultra vires* theory to relabel an ordinary interpretive action as unlawful conduct or a failure to follow rulemaking procedures. The doctrine of *ultra vires* review exists to police clear departures from the law. *See, e.g.*, *Nuclear Regul. Comm'n*, 605 U.S. at 680–82. Plaintiffs' failure to identify a "clear and mandatory" duty forecloses this claim.

*APA.* The APA claim fails for a similar reason. As discussed above, the waivers are rules under the APA definition of "rule." *See supra* pp. 17–18. The APA claims are unreviewable for two additional reasons. First, Plaintiffs cannot avoid the CRA's jurisdictional bar by strategic pleading. Their APA theory is that EPA violated the APA by categorizing the waivers as rules without

18

comment or following the traditional rulemaking procedure. *See* Am. Compl. ¶¶ 123–38. As *Bernhardt* explains, procedural attacks cannot circumvent the CRA's jurisdictional bar where the ultimate goal is to challenge Congress's final disapproval. *See* 946 F.3d at 564. In *Bernhardt*, the plaintiff challenged the agency's rescission of a rule as not in accord with the procedures set out in the CRA. The court held that even if that argument targeted agency conduct, it was in substance a challenge to congressional action and was barred by § 805. 946 F.3d at 563–64. Here, although Plaintiffs attempt to artfully plead their requested relief as an APA claim and frame their claim as one challenging an underlying procedural issue (EPA's "interpretation"), the requested relief would still invalidate Congress's resolution, *see* Am. Compl. ¶¶ 139–41, which means this claim is unreviewable. At bottom, Plaintiffs challenge EPA's "determination" and "action" under the CRA. As already explained, that claim is thus barred by § 805.

Second, the APA claims are unreviewable because EPA's decision to submit the waivers to Congress under the CRA is not "final agency action" reviewable under the APA. The APA provides for judicial review only of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In *Bennett v. Spear*, the Supreme Court explained that to be reviewable under the APA, an agency action must satisfy two conditions. It must mark the "consummation" of the agency's decision-making process rather than be merely tentative or interlocutory. 520 U.S. at 178. And it must be one by which "*rights or obligations have been determined or from which legal consequences will flow.*" *Id.* (cleaned up) (emphasis added).

EPA's determination to submit waivers to Congress under the CRA does not meet *Bennett*'s second requirement. Although the submission is a procedural step required by statute, it does not itself determine rights or obligations nor create binding legal consequences. Instead, legal consequences flow *only if* Congress then disapproves the rule (which is a final legislative action, not an agency action). The decision to submit is merely a conduit step. *Contra* Am. Compl. ¶ 123 (alleging that the submission to Congress was a final agency action). After all, the waivers remained in effect even after EPA submitted them and were not disapproved until the resolutions were passed and signed into law. The only final agency action was EPA's issuance of the waivers themselves,

but the later transmittal by EPA to Congress was procedural—it altered no rights and imposed no obligations. Plaintiffs do not dispute this despite labeling the submission as final agency action.

Thus, EPA's submission decision is more like the non-final agency submissions discussed in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and *Dalton v. Specter*, 511 U.S. 462 (1994). In *Franklin*, the Court held that the Secretary of Commerce's report to the President on the results of the census was not final agency action. *See* 505 U.S. at 798–99. Although the Secretary played a significant role in the apportionment process, the Court reasoned that legal consequences flowed only from the President's subsequent decision to submit the final apportionment to Congress. *See id.* at 797–99 (explaining that the legal consequences flowed from the President, not the Secretary, because the President could reject the Secretary's report). Because the President—not the "agency"—made the dispositive legal determination, the challenged report was advisory and non-final. *See id.* at 796–801. Similarly, in *Dalton*, the Court held that the Defense Secretary's recommendations under the Base Closure and Realignment Act were not final because they required presidential approval to take effect. *See* 511 U.S. at 476. Again, legal consequences attached only after the President acted. The agencies' submissions in both cases were essential procedural steps, but neither marked the end of decision-making nor carried legal force on their own. *See id.* at 468–76.

Same with EPA's submission here. It was a statutory step that triggered congressional *consideration* under the CRA. It did not create binding rights or obligations and did not determine any legal outcome. The legal consequences—the disapproval of the waiver rules and the resulting prohibition on their reissuance—were achieved by Congress and the President through duly enacted legislation—not EPA. Like the agency actions in *Franklin* and *Dalton*, EPA's decision to submit the waivers functioned as part of a larger decision-making framework in which final legal authority rested elsewhere. Accordingly, Plaintiffs' APA claims should be dismissed.

Moreover, Plaintiffs' theory—that EPA's submission of the waiver decisions to Congress was arbitrary and capricious and did not follow the procedures required by law, *see* Am. Compl. ¶ 125—would lead to an untenable result: Any time an agency submits a rule to Congress under the CRA, it would have to conduct full notice-and-comment rulemaking just to determine whether the

20

underlying action qualifies as a "rule." That would convert a ministerial statutory step, authorized by Congress, into a separate, reviewable agency rulemaking—expressly contrary to the CRA's text, purpose, and structure. Plaintiffs' reading would gut § 805's bar and create the very judicial review process that Congress expressly foreclosed.

***Separation of Powers.*** Plaintiffs argue that the CRA resolutions violate foundational separation-of-powers principles. *See* Am. Compl. ¶¶ 149–60. They advance two related theories. First, they argue Defendants violated the separation of powers by using legislative action to overturn EPA waiver adjudications, because those waivers constitute case-specific determinations applying existing law—an adjudicatory function reserved to the Executive and Judiciary, not the Legislature. *See id.* ¶¶ 151–54. Second, they claim that Congress unlawfully delegated to the Executive Branch the authority to determine whether the CRA applies at all, by relying on EPA's classification of the waivers as "rules" under 5 U.S.C. § 804(3). *See id.* ¶ 157. They contend this violated Article I, Section 5, which vests each chamber with power to determine its own rules of proceeding. *See id.* ¶¶ 155–58.

These theories are wrong at each turn. Congress did not usurp the adjudicatory function of the Executive or Judicial branch. Where Congress acts through the full legislative process, it acts squarely within its constitutional role. *INS v. Chadha*, 462 U.S. 919, 954–55 (1983). That is what happened here. Congress enacted laws under Article I; the President signed those laws. Nothing in the Constitution forbids Congress from legislating in response to agency action or considering agency submissions.

Nor did Congress intrude on Article III. Limiting judicial review in this context is not a constitutional flaw. Article III does not guarantee review of every congressional action. *See Patchak v. Zinke*, 583 U.S. 244, 254 (2018) (noting that Congress's power to restrain the courts from acting is an essential ingredient in separation of powers). And the CRA leaves untouched the courts' authority to interpret the APA in cases that do not implicate determinations, acts, or omissions under the CRA.

It does not matter that the resolutions had consequences for pending regulatory and judicial proceedings. *See* Am. Compl. ¶¶ 153–54. Congress has full authority to override agency actions by

statute. When it enacts a resolution under the CRA, it replaces the agency's decision with new law, and the action disapproved "shall not take effect (or continue)." 5 U.S.C. § 801(b)(1).

The Supreme Court has long held that Congress may enact legislation that affects the outcome of pending cases so long as it changes the law itself, rather than dictating results under preexisting law. For example, in *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 438–41 (1992), Congress replaced environmental protections with new statutory provisions that permitted certain logging operations, even though those changes affected ongoing litigation. The Court upheld the statute because it amended the governing law rather than ordering courts to reach a particular result under the old regime. *See id.* at 438. The Court reaffirmed this distinction in *Bank Markazi v. Peterson*, 578 U.S. 212, 225–26 & n.17 (2016), explaining that Congress may "amend [] applicable law" even in ways that affect pending litigation, so long as it does not "prescribe [a] rule of decision" in a specific case. That is exactly what happened here. Congress enacted a new law of general applicability through the CRA, withdrawing EPA's waivers and preempting the underlying state law. The fact that the law affects pending litigation does not make it unconstitutional. To the contrary, that is a core feature of Article I lawmaking.

Further, *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872), where the Court held that Congress acted impermissibly, and which was cited in *Bank Markazi*, makes the result here even clearer. *Klein* involved post-Civil War legislation under which persons whose property had been seized during the war could recover funds if they proved they had not aided the rebellion. *Id.* at 131, 139. After the statute was enacted, the President pardoned rebels, and the Court held that a presidential pardon operated as a substitute for the proof of loyalty required by the statute. *See United States v. Padelford*, 76 U.S. (9 Wall.) 531 (1870). In response, Congress passed a statute forbidding courts from accepting pardons as evidence of loyalty and requiring dismissal of such claims. *Klein*, 13 Wall. at 129. The Court struck down the new law because it altered the legal effect of presidential pardons—an executive power the Constitution commits solely to the President—and directed the judiciary to apply that new interpretation retroactively in pending cases. *Id.* at 147. The statute dictated outcomes under preexisting law without changing the legal rule and thereby intruded on both executive and judicial functions.

Nothing like that happened here. Congress did not redefine the legal effect of an executive act, nor did it instruct the judiciary to reach a particular result under existing law. It enacted a resolution, through constitutionally prescribed procedures, to override EPA's prior decisions and prospectively eliminate their legal effect. That is not usurpation. It is legislation. And it fits squarely within the structural design the Framers adopted to separate powers and assign legislative authority to Congress.

*Federalism.* Plaintiffs' federalism claim rest on the assertion that Congress's disapproval of California's waivers unlawfully invaded state sovereignty. They allege that the Executive and Legislative Branches ignored established procedures and expert determinations to reclassify past EPA adjudications as rules, thereby triggering CRA procedures that bypassed meaningful debate and state input. This maneuver, they argue, stripped California and other states of regulatory authority without proper process or notice, retroactively altered legal standards, and blocked judicial review. *See* Am. Compl. ¶¶ 161–69.[8]

This argument misreads the CAA and misunderstands the States' roles. Although the States play a role in protecting air quality, Congress retains ultimate control over the extent of state authority, given the nationwide implications of any regulation. The CAA expressly preempts state emission standards *unless EPA grants a waiver to California. See* 42 U.S.C. § 7543(a)–(b); *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) (noting that "state laws are preempted when they conflict with federal law" or when Congress expresses a clear intent to occupy a field). The waiver provision does not grant California an absolute right to regulate emissions or mandate sales of specific types of vehicles through a compliance credit system (the costs of which are borne by consumers nationwide). Rather, it reflects a conditional permission that *depends on* EPA approval and, by extension, congressional oversight of EPA's decisions. Congress may change, limit, or withdraw that permission at any time through valid legislation. Where Congress disapproves a waiver, it exercises its constitutional authority to regulate commerce and set national policy. It is

---

[8] California's complaint brims with colorful allegations about the process Congress and the Executive followed in enacting this legislation, but, as the old adage goes—laws are like sausages; it's better not to see them being made.

axiomatic in our federal system that Congress may preempt state law so long as it acts within its enumerated powers. *See* U.S. Const. art. VI, cl. 2; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law."); *Nat'l Warranty Ins. Co. RRG v. Greenfield*, 214 F.3d 1073, 1076 (9th Cir. 2000).

Plaintiffs mischaracterize the nature of Congress's actions here in disapproving the waivers that the three Resolutions preempted. *See* Am. Compl. ¶¶ 6–7, 165–66. Congress did not strike down state law or override state authority. It invalidated EPA's grant of waivers using procedures Congress itself enacted in the CRA to serve as a democratic check on executive power. The resolutions do not erase state regulations; they nullify federal decisions that had temporarily allowed those regulations to stand. That is an exercise of Congress's constitutional power to regulate commerce and supervise federal agencies.

Last, any attempt through federalism arguments to adjudicate Congress's own procedural rules cannot stand: Congress determines its own rules, without court interference. *See supra* pp. 11–13.

***Violations of Federal Law by Federal Officials.*** Plaintiffs also seek to hold federal officials liable for carrying out Congress's resolutions. *See* Am. Compl. ¶¶ 170–79. But implementing a duly enacted statute or performing the Executive's duties under a statute is not unlawful. *See Franklin*, 505 U.S. at 800–01 (courts lack authority to enjoin the President in the performance of discretionary duties); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010) ("[W]hen a public official acts in reliance on a duly enacted statute or ordinance, that official is entitled to qualified immunity." (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994))). This count rises or falls with the others. Because the preceding claims fail, so too does this claim.[9]

---

[9] Last, Plaintiffs' Declaratory Judgment count, which is an unreviewable challenge barred by the CRA, *see supra* p. 9, fails for an independent reason—because Plaintiffs' other claims are also unreviewable and otherwise fail, the Declaratory Judgment count cannot stand alone. *See, e.g., SVB Fin. Tr. v. Fed. Deposit Ins. Corp.*, 2025 WL 661599, at *4 (N.D. Cal. Feb. 27, 2025) ("It is well-established that declaratory judgment is not an independent cause of action, but an equitable remedy." (citing *Brown v. Transworld Sys., Inc.*, 73 F.4th 1030, 1038 (9th Cir. 2023) (noting that

**CONCLUSION**

The Proposed Intervenors' Motion to Dismiss should be granted and the Amended Complaint should be dismissed with prejudice.

Dated:    November 18, 2025         Respectfully submitted,

/s/ Steven P. Lehotsky
Steven P. Lehotsky* (DC 992765)
Katherine C. Yarger* (CO 40387)
Michael B. Schon* (DC 989893)
LEHOTSKY KELLER COHN LLP

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
BENBROOK LAW GROUP, PC

*Attorneys for Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores*

* Admitted *pro hac vice*

---

requests for declaratory and injunctive relief are not "stand-alone claims" and "do not survive the dismissal" of other claims); *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) ('[T]he Declaratory Judgment Act does not provide an affirmative cause of action where none otherwise exists.').").

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER (DC Bar #1028454)
*Deputy Assistant Attorney General*
JEFFREY HUGHES (NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 717-7067 (Stander)
(202) 532-3080 (Hughes)
robert.stander@usdoj.gov
jeffrey.hughes@usdoj.gov

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division
JOSEPH E. BORSON
*Assistant Branch Director*
Federal Programs Branch
STEPHEN M. PEZZI (FL Bar #1041279)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 305-8576
stephen.pezzi@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. 4:25-cv-04966-HSG<br><br>**UNITED STATES' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: January 29, 2026<br>Time: 2:00 p.m. PST<br>Judge: Hon. Haywood S. Gilliam, Jr.<br><br>ORAL ARGUMENT REQUESTED |

**2-ER-50**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

NOTICE OF MOTION AND MOTION TO DISMISS ......................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

BACKGROUND .................................................................................................. 3

    A.    The Congressional Review Act creates expedited legislative procedures for enacting statutes that abrogate certain administrative rules .............. 3

    B.    The Clean Air Act preempts state-level vehicle emission regulations .... 4

    C.    California promulgates three sets of vehicle emissions standards with the goal of banning sales of internal-combustion vehicles ......................... 4

    D.    Congress revokes the preemption waivers............................................ 5

    E.    California sues, claiming that EPA and Congress failed to follow proper legislative procedures under the Congressional Review Act................. 6

ARGUMENT ....................................................................................................... 6

    I.    Congress expressly precluded judicial review over Plaintiffs' statutory and ultra vires claims (Counts I, II, V, and VI) ......................................................... 6

    II.    The Court lacks subject-matter jurisdiction over Plaintiffs' claims that challenge the application or interpretation of House or Senate rules............................. 11

    III.    Plaintiffs lack Article III standing to bring several of their claims and to seek some of their requested relief......................................................................... 14

        A.    Plaintiffs' alleged injuries were neither caused by the EPA nor redressable by an order vacating any action by EPA........................... 14

        B.    Plaintiffs lack standing to challenge the possible future applicability of the CRA's reenactment provision ....................................................... 15

    IV.    Even if the Resolutions conflict with earlier-enacted statutes, they remain valid................................................................................ 16

V.      The statutory and ultra vires claims fail for several other
        threshold reasons...................................................................... 18

        A.      The APA claim fails because Plaintiffs identify no
                final agency action.................................................................. 18

        B.      Plaintiffs' claims against EPA are an improper attempt to evade the
                Clean Air Act's comprehensive review scheme................................. 19

        C.      The ultra vires claims fail as a matter of law...................................... 21

VI.     Plaintiffs' constitutional claims fail................................................. 21

        A.      The Resolutions amend the law and do not usurp Executive power..... 21

        B.      The challenge to the Senate's "second point of order" is nonjusticiable
                and otherwise fails ............................................................... 25

        C.      California and its Co-Plaintiff States were not unconstitutionally
                deprived of the right to participate in the political process................... 28

CONCLUSION .................................................................................... 30

**TABLE OF AUTHORITIES**

**U.S. Constitution**

U.S. Const. art. I, § 5 ........................................................................................ 12

U.S. Const. art. I, § 5, cl. 2 ......................................................................... 3, 12

U.S. Const. art. I, § 7 ........................................................................................ 28

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015).................................................................................. 21

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016).................................................................................. 22

*Bennett v. Spear*,
  520 U.S. 154 (1997).................................................................................. 18

*Cal. Dump Truck Owners Ass'n v. Nichols*,
  924 F. Supp. 2d 1126 (E.D. Cal. 2012) .................................................... 20

*Citizens for Const. Integrity v. United States*,
  57 F.4th 750 (10th Cir. 2023) .............................................................. 17, 27

*Common Cause v. Biden*,
  909 F. Supp. 2d 9 (D.D.C. 2012) .......................................................... 12, 13

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
  482 F.3d 1157 (9th Cir. 2007).......................................................... 1, 12, 13

*Cook Inlet Treaty Tribes v. Shalala*,
  166 F.3d 986 (9th Cir. 1999) ................................................................ 22, 24

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ......................................... 7, 9, 10, 11, 16, 17, 23

*Dalton Trucking, Inc. v. EPA*,
  808 F.3d 875 (D.C. Cir. 2015)................................................................. 20

*Dalton v. Specter*,
  511 U.S. 462 (1994)......................................................................... 18, 19, 29

*Dorsey v. United States*,
  567 U.S. 260 (2012).................................................................................. 18

*Fletcher v. Peck*,
  10 U.S. 87 (1810)...................................................................................... 25

*Foster v. USDA*,
68 F.4th 372 (8th Cir. 2023) ............................................................................ 8

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................................................................ 19

*Freeman Invs., L.P. v. Pac. Life Ins. Co.*,
704 F.3d 1110 (9th Cir. 2013) ................................................................... 11, 29

*Heckler v. Ringer*,
466 U.S. 602 (1984) ........................................................................................ 10

*INS v. Chadha*,
462 U.S. 919 (1983) .............................................................................. 16, 17, 24

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) ........................................................................ 10

*Kaiser v. Blue Cross of California*,
347 F.3d 1107 (9th Cir. 2003) ........................................................................ 10

*Kan. Nat. Res. Coal. v. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020) ..................................................................... 8, 9

*Kougasian v. TMSL, Inc.*,
359 F.3d 1136 (9th Cir. 2004) ........................................................................ 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................ 14

*Merck Sharp & Dohme Corp. v. Albrecht*,
587 U.S. 299 (2019) ........................................................................................ 24

*Metzenbaum v. FERC*,
675 F.2d 1282 (D.C. Cir. 1982) ...................................................................... 12

*Michel v. Anderson*,
14 F.3d 623 (D.C. Cir. 1994) .......................................................................... 28

*Montanans for Multiple Use v. Barbouletos*,
568 F.3d 225 (D.C. Cir. 2009) .......................................................................... 8

*Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation*,
17 F.3d 521 (2d Cir. 1994) ................................................................................ 4

*Mount Graham Coal. v. Thomas*,
89 F. 3d 554 (9th Cir. 1996) ........................................................................... 23

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ........................................................................... 29

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ......................................................................................... 16

*Nevada v. Skinner*,
    884 F.2d 445 (9th Cir. 1989) ........................................................................... 30

*Nevada v. Watkins*,
    914 F.2d 1545 (9th Cir. 1990) ............................................................. 13, 29, 30

*NFIB v. DOL*,
    595 U.S. 109 (2022) .................................................................................... 24, 27

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ......................................................................................... 24

*Nixon v. United States*,
    506 U.S. 224 (1993) ................................................................................... 12, 13

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ......................................................................................... 21

*O'Donoghue v. United States*,
    289 U.S. 516 (1933) ......................................................................................... 28

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
    584 U.S. 325 (2018) ......................................................................................... 24

*Palumbo v. Waste Techs. Indus.*,
    989 F.2d 156 (4th Cir. 1993) ........................................................................... 20

*Patchak v. Zinke*,
    583 U.S. 244 (2018) ......................................................................................... 22

*Pennsylvania v. Wheeling and Belmont Bridge Co.*,
    59 U.S. 421 (1855) ............................................................................... 22, 23, 25

*Powell v. McCormack*,
    395 U.S. 486 (1969) ......................................................................................... 13

*Pub. Citizen v. DOJ*,
    491 U.S. 440 (1989) ......................................................................................... 28

*Rangel v. Boehner*,
    20 F. Supp. 3d 148 (D.D.C. 2013) .................................................................. 13

*Robertson v. Seattle Audubon Soc'y*,
    503 U.S. 429 (1992)................................................................22, 23

*SEC v. Jarkesy*,
    603 U.S. 109 (2024)........................................................................ 24

*Sierra Club v. Wheeler*,
    No. 15-cv-1165-HSG, 2018 WL 6182748 (N.D. Cal. Nov. 27, 2018)............................ 20

*South Carolina v. Baker*,
    485 U.S. 505 (1988)................................................................ 28, 29, 30

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................ 14

*Trump v. Hawaii*,
    585 U.S. 667 (2018)........................................................................ 27

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)........................................................................ 18

*United States v. Ballin*,
    144 U.S. 1 (1892)........................................................................ 13

*Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*,
    509 F.3d 1259 (10th Cir. 2007)............................................................. 8

*Virginia v. United States*,
    74 F.3d 517 (4th Cir. 1996) ............................................................... 20

*Wash. All. of Tech. Workers v. DHS*,
    892 F.3d 332 (D.C. Cir. 2018) ............................................................. 8

*Watkins v. United States*,
    354 U.S. 178 (1957)........................................................................ 28

**Statutes**

2 U.S.C. § 641(e)(2)......................................................................... 17

5 U.S.C. § 551(4)............................................................................ 4

5 U.S.C. § 801 .............................................................................. 3

5 U.S.C. § 801(a)(1)......................................................................... 9

5 U.S.C. § 801(a)(1)(A) ..................................................................... 3

5 U.S.C. § 801(b)(1) ........................................................................ 3

5 U.S.C. § 801(b)(2) ................................................................3, 15, 16, 23-24

5 U.S.C. § 802 ................................................................................................ 3

5 U.S.C. § 802(a) ........................................................................................... 3

5 U.S.C. § 802(d)(2) ...................................................................................... 3

5 U.S.C. § 802(g) ........................................................................................... 3

5 U.S.C. § 802(g)(1) .................................................................................... 11

5 U.S.C. § 802(g)(2) ...................................................................................... 3

5 U.S.C. § 804(3) ....................................................................................... 4, 9

5 U.S.C. § 805 ............................................................................................ 1, 7

5 U.S.C. §§ 801–08 ....................................................................................... 3

42 U.S.C. § 7507 ...................................................................................... 4, 25

42 U.S.C. § 7543(a) .................................................................................. 4, 25

42 U.S.C. § 7543(b) .................................................................................. 4, 20

42 U.S.C. § 7543(b)(1) .................................................................................. 4

42 U.S.C. § 7607(b)(1) ................................................................................ 20

Pub. L. No. 89-272, § 101, 79 Stat. 992 (1965) ........................................... 4

Pub. L. No. 90-148, § 208, 81 Stat. 485 (1967) ........................................... 4

Pub. L. No. 119-15, 139 Stat. 65 (2025) ...................................................... 6

Pub. L. No. 119-16, 139 Stat. 66 (2025) ...................................................... 6

Pub. L. No. 119-17, 139 Stat. 67 (2025) ...................................................... 6

**Federal Register**

84 Fed. Reg. 51310 (Sept. 27, 2019) ............................................................ 4

88 Fed. Reg. 20688 (Apr. 6, 2023) ............................................................... 5

90 Fed. Reg. 642 (Jan. 6, 2025) .................................................................... 5

90 Fed. Reg. 643 (Jan. 6, 2025) .................................................................... 5

**Legislative History**

159 Cong. Rec. S8413 (Nov. 21, 2013) ...................................................... 17

163 Cong. Rec. S2435 (Apr. 7, 2017) ........................................................ 17

171 Cong. Rec. S3017 (May 21, 2025)......................................................25, 26, 27, 28, 30

171 Cong. Rec. S3099 (May 22, 2025)...................................................................25, 26, 27

H.R. 3126, 97th Cong., Priv. L. No. 97-27, 96 Stat. 2623 (1982).........................................24

H.R. 5826, 97th Cong., Priv. L. No. 97-55, 96 Stat. 2636 (1983).........................................24

H.R. 6228, 98th Cong., Priv. L. No. 98-46, 98 Stat. 3434 (1984).........................................24

**State Materials**

Cal. Code Regs. tit. 13, § 1956.8 (2025)......................................................................5

Cal. Code Regs. tit. 13, § 1962.4(c)(1)(B) (2025)..........................................................5

Cal. Code Regs. tit. 13, § 1963.1 (2025).....................................................................5

**Other Authorities**

Congress.gov, Statutes at Large and Private Laws, https://www.congress.gov/private-laws/.. 24

GAO, *Applicability of Congressional Review Act to Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs* (Dec. 14, 2021), https://www.gao.gov/assets/b-333501.pdf. ....................................................................4

Maeve P. Carey et al., Cong. Research Serv., R43992, *The Congressional Review Act: Frequently Asked Questions* 1 (Nov. 12, 2021)..................................................................3

Rule XXII, Standing Rules of Senate...................................................................17

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that on January 29, 2026, at 2:00 pm, in Courtroom 2, 4th Floor, United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, California, Defendants will move the Court to dismiss this action. Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for the reasons in the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Exercising its constitutional responsibility to legislate on a matter of significant public concern, earlier this year, Congress invoked the legislative procedures of the Congressional Review Act (CRA) to enact three statutes abrogating three Clean Air Act preemption waivers that the Environmental Protection Agency (EPA) had previously issued to California. As a result, the California vehicle emissions regulations premised on those waivers are now expressly preempted under § 209(a) of the Clean Air Act. Unwilling to accept the outcome of that legislative process, California and ten other states have now sued EPA, its Administrator, and the President. But even a cursory review of the Amended Complaint shows that Plaintiffs' real dispute is with Congress—not with EPA, or even the President. According to Plaintiffs, Congress was wrong to conclude that EPA's preemption waivers are "rules" instead of "orders" under the CRA. In their view, Congress thus should not have used the CRA's streamlined procedures for debating the legislation, but instead should have used non-expedited procedures, including the Senate filibuster—even though the filibuster itself is purely a creature of Senate rules. This dispute over procedures for debating legislation in Congress fails for several threshold reasons.

Plaintiffs' claims are non-justiciable as a statutory matter. The CRA expressly precludes review: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. That provision bars most of Plaintiffs' claims.

Plaintiffs' claims are also non-justiciable as a constitutional matter. Congress, after all, is the exclusive judge of its own legislative procedures. *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171-72 (9th Cir. 2007). It is not up to Plaintiffs or this Court to determine whether the waivers are best categorized as "rules" or "orders" within

**2-ER-59**

the meaning of the CRA, and therefore whether Congress should have used the CRA's expedited procedures for debating the legislation. That determination is Congress's to make, and Congress conclusively made it when it decided to enact the statutes using the CRA process.

Plaintiffs lack Article III standing for their claims against EPA because Congress, not EPA, invalidated the waivers, and enjoining any alleged EPA actions cannot redress Plaintiffs' asserted harms stemming from three statutes. Moreover, Plaintiffs have not even attempted to demonstrate standing to seek an order that EPA may, in the future, issue preemption waivers for substantially similar—and entirely hypothetical—California emissions regulations. Nor do Plaintiffs identify any EPA final agency action subject to review. Even if they had, the Clean Air Act would vest jurisdiction to challenge that action exclusively in the courts of appeals.

Even if they are subject to review, Plaintiffs' constitutional claims are meritless. Plaintiffs first say Congress usurped executive power by invalidating an adjudicatory order without amending the law. But Plaintiffs rely on cases that apply to judicial power and Article III courts, not executive power and administrative agencies. In any event, binding precedent holds that statutes enacted under the CRA amend the law. Plaintiffs next challenge a "point of order" adopted in the Senate, contending that the Senate unlawfully allowed EPA to be the "sole trigger" for deciding whether Congress would use the CRA. This presents a nonjusticiable political question that also fails for multiple reasons on the merits, most notably because the Senate voted for itself whether to use the CRA.

Finally, Plaintiffs assert that "the Federal Government" violated the Tenth Amendment because Congress did not undertake "rigorous debate," hear "state official testimony," or adhere to the filibuster before repealing California's preemption waivers. FAC ¶ 164. But no one has a constitutional right to the filibuster, or to any congressional procedure other than the constitutional requirements of bicameralism and presentment—which all agree were satisfied here. Plaintiffs' other allegations of "failings in the national political process" (FAC ¶ 162) assert a political argument, not a legal claim.

Plaintiffs lost a vote in Congress. That does not violate the law.

**2-ER-60**

## BACKGROUND

### A. The Congressional Review Act creates expedited legislative procedures for enacting statutes that abrogate certain administrative rules.

Enacted in 1996, the CRA creates a set of procedures for Congress to review and repeal agency rules. 5 U.S.C. §§ 801-08. The CRA provides that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit" a report "to each House of the Congress." 5 U.S.C. § 801(a)(1)(A). Upon receipt of such a report, Congress may enact a joint resolution "disapprov[ing] the rule." 5 U.S.C. § 802(a). The joint resolution must include the following language: "That Congress disapproves the rule submitted by the ___ relating to ___, and such rule shall have no force or effect." *Id.* If a joint resolution of disapproval passes both Houses of Congress, and is signed into law by the President, two consequences follow. First, and most immediately, the rule "shall not take effect (or continue)." *Id.* § 801(b)(1). Second, the rule "may not be reissued in substantially the same form," nor may a "new rule that is substantially the same as such a rule . . . be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(2).

The CRA also creates a set of expedited procedures for debating disapproval resolutions in Congress. *Id.* § 802. These procedures were enacted in "an exercise of the rulemaking power of the Senate and House of Representatives," *id.* § 802(g), consistent with the constitutional authority of each House of Congress to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2. Most notably, Senate debate on a joint resolution is limited to 10 hours, 5 U.S.C. § 802(d)(2), which, under current Senate rules, has the practical effect of preventing a filibuster. *See* Maeve P. Carey et al., Cong. Research Serv., R43992, *The Congressional Review Act: Frequently Asked Questions* 1 (Nov. 12, 2021); *see also* Rule XXII, Standing Rules of Senate (requiring a 60-vote supermajority to end debate). These procedures are "deemed a part of the rules of each House," and either House may "change the rules . . . at any time." 5 U.S.C. § 802(g).

As a general matter, the CRA's procedures apply to disapproval resolutions relating to an agency "rule." *Id.* §§ 801, 802. Under the CRA, "rule" "has the meaning given such term in" the Administrative Procedure Act (APA), with certain CRA-specific exceptions. *Id.* § 804(3).

**2-ER-61**

The APA, in turn, broadly defines "rule" as any "agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

Congress sometimes disagrees with the Executive Branch's assessment of whether an agency action is a "rule" subject to CRA procedures. In response to requests from legislators, the Comptroller General (through the Governmental Accountability Office (GAO)) often opines on that subject. *See, e.g.*, GAO, *Applicability of Congressional Review Act to Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs* (Dec. 14, 2021), https://www.gao.gov/assets/b-333501.pdf. GAO opinions are advisory only; they do not bind Congress, the Executive Branch, or the courts.

### B. The Clean Air Act preempts state-level vehicle emission regulations.

In 1965, Congress amended Title II of the Clean Air Act to authorize federal emission standards for motor vehicles. Pub. L. No. 89-272, § 101, 79 Stat. 992 (1965). Even so, many states continued developing their own emission programs. *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation*, 17 F.3d 521, 525 (2d Cir. 1994). Congress responded in 1967 by adding a broad preemption provision. Pub. L. No. 90-148, § 208, 81 Stat. 485 (1967). That provision, now codified at § 209(a), is the "cornerstone" of Title II. *Motor Vehicle Mfrs.*, 17 F.3d at 526. It provides: "No State . . . shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles . . . ." 42 U.S.C. § 7543(a).

Congress left only one exception for new motor vehicles to § 209(a)'s broad preemptive reach in what is now § 209(b). 42 U.S.C. § 7543(b). Section 209(b) governs applications for preemption waivers by states that adopted certain standards before March 30, 1966, which means only California. 42 U.S.C. § 7543(b); "The Safer Affordable Fuel-Efficient Vehicles Rule," 84 Fed. Reg. 51310, 51331-32 n.218 (Sept. 27, 2019). Under § 209(b), EPA shall only grant California a waiver in limited circumstances. 42 U.S.C. § 7543(b)(1). Additional states may adopt standards identical to California standards for which EPA has issued a waiver. *Id.* § 7507.

### C. California promulgates three sets of vehicle emissions standards with the goal of banning sales of internal-combustion vehicles.

Earlier this decade, the California Air Resources Board (CARB) promulgated a series of

**2-ER-62**

regulations imposing mandatory electric vehicle quotas and other stringent emissions standards on motor vehicles. CARB then requested preemption waivers from EPA. Three California regulations are relevant here.

First, CARB adopted the Advanced Clean Trucks rule. This rule required manufacturers of trucks with a gross vehicle weight rating above 8,500 pounds to meet increasing sales quotas for zero-emissions trucks beginning with model year 2024—irrespective of the pace of advances in zero-emissions power-train technology. *See* Cal. Code Regs. tit. 13, § 1963.1 (2025). CARB requested and received from EPA a Clean Air Act preemption waiver for its Advanced Clean Trucks rule. *See* Waiver of Preemption; Notice of Decision, 88 Fed. Reg. 20688 (Apr. 6, 2023).

Second, CARB adopted its Omnibus Low NOx rule. This rule requires truck manufacturers to reduce heavy-duty vehicle emissions beginning with model year 2024, and it makes extensive changes to other CARB regulations affecting heavy-duty trucks and engines. *See* Cal. Code Regs. tit. 13, § 1956.8 (2025). In December 2024, EPA granted a waiver request for this rule. *See* Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 643 (Jan. 6, 2025).

Third, CARB adopted its Advanced Clean Cars II regulations. These regulations would require that all new light-duty vehicles sold in California *must* be either zero-emission vehicles or plug-in hybrid vehicles by model-year 2035. *See* Cal. Code Regs., tit. 13, § 1962.4(c)(1)(B). EPA granted California's waiver request in December 2024. *See* Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 642, 642 (Jan. 6, 2025).

### D. Congress revokes the preemption waivers.

EPA submitted the three waivers to Congress in February 2025. FAC ¶ 78. On April 2, 2025, members of the House of Representatives introduced three CRA disapproval resolutions, each one targeting one of the three preemption waivers (the Resolutions). *Id.* ¶ 86. By May 1, 2025, a majority of the House of Representatives had voted in favor of all three Resolutions. *Id.* ¶ 96. "Leaders in the Senate also ultimately decided to proceed with votes on the Resolutions, disregarding GAO's legal conclusion and overriding the Senate Parliamentarian's determination" that the CRA was inapplicable. *Id.* ¶ 99. On May 22, 2025, the Senate voted on each of the Resolutions and passed all three with votes of 51-45 (H.J. Res. 87, Advanced Clean

**2-ER-63**

Trucks), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus). *Id.* ¶ 111. The President signed the Resolutions into law on June 12, 2025.

Each of the enacted statutes track the model language in 5 U.S.C. § 802(a). So, for example, the Advanced Clean Trucks Resolution reads as follows:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That Congress disapproves the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards . . . Advanced Clean Trucks . . . Waiver of Preemption; Notice of Decision" (88 Fed. Reg. 20688 (April 6, 2023)), and such rule shall have no force or effect.

Pub. L. No. 119-15, 139 Stat. 65 (2025); *see also* Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

### E. California sues, claiming that EPA and Congress failed to follow proper legislative procedures under the Congressional Review Act.

Plaintiffs—the State of California and ten other States—filed this suit on June 12, 2025, and filed an amended complaint on October 10, 2025. The suit names four Defendants: the United States of America, EPA, Lee Zeldin (in his official capacity as EPA Administrator), and Donald J. Trump (in his official capacity as President of the United States). Plaintiffs allege that EPA misinterpreted the CRA by labeling the waivers as "rules" in its most recent CRA submission to Congress. *See* FAC ¶¶ 74-77. Plaintiffs also allege that the Senate parliamentarian and the GAO were right, and that a majority of the Senate was wrong, in treating the waivers as subject to CRA procedures. *See id.* ¶¶ 79-110. In short, Plaintiffs assert that using the CRA's procedures for debating legislation here was unlawful, and so they "challenge" what they describe as Congress's "unlawful Resolutions, which purport to prevent these States from enforcing" state regulations that conflict with the Resolutions. *Id.* ¶ 5.

### ARGUMENT

### I.   Congress expressly precluded judicial review over Plaintiffs' statutory and ultra vires claims (Counts I, II, V, and VI).

"Congress is generally free to limit the jurisdiction of federal courts." *Ctr. for Biological*

**2-ER-64**

*Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019). In the CRA, Congress did so, providing expressly that "[n]o determination, finding, action, or omission under this chapter [*i.e.*, the CRA] shall be subject to judicial review." 5 U.S.C. § 805. That preclusion provision is fatal to Plaintiffs' statutory and ultra vires claims (Counts I, II, V, and VI), all of which depend on the theory that Defendants violated the CRA.

**a.** The Ninth Circuit first considered 5 U.S.C. § 805 six years ago, when Congress used CRA procedures "to rescind a regulation that prevented Alaska from applying certain state hunting regulations on federal wildlife refuges." *Bernhardt*, 946 F.3d at 556. The plaintiff sued "to compel" the Department of the Interior "to reinstate the rule," on the theory that the rule at issue was "not eligible for disapproval in the new session of Congress" due to certain statutory timing requirements that appear in the CRA—requirements that plaintiff argued had been violated. *Id.* at 556, 563. The plaintiff argued that because of those violations of the CRA, "the Joint Resolution was invalid and it did not authorize Interior to rescind" the rule. *Id.* at 563.

The Ninth Circuit refused to exercise jurisdiction: "Because enacting a joint resolution of disapproval is an action under the CRA," the federal courts "lack jurisdiction to consider this claim." *Id.* And in doing so, the Ninth Circuit rejected the argument that a plaintiff could get around the CRA's review bar by restyling its claims as a challenge to some agency action (rather than a congressional action) under the APA. In particular, the plaintiff in *Bernhardt* argued that, because it was "challenging *Interior*'s rescission of the Refuges Rule and not any action under [the] CRA," "its claim is not barred." *Id.* at 564 (emphasis added). But because the suit ultimately depended on the theory that "Congress did not validly enact the Joint Resolution," the Ninth Circuit held that plaintiff's "claim necessarily involve[d] a challenge to a congressional 'determination, finding, action or omission' under the CRA, and as such is subject to" the CRA's jurisdiction-stripping provision, § 805. *Id.*

The D.C. Circuit, Tenth Circuit, Eighth Circuit, and many district courts have similarly applied the plain text of § 805 to broadly foreclose judicial review of statutory claims asserting a violation of the CRA—including claims alleging agency noncompliance with the CRA. For example, in *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009), the

**2-ER-65**

D.C. Circuit declined to review a claim that agency amendments to a forest plan were invalid because the agency allegedly failed to comply with CRA reporting requirements. As then-Judge Kavanaugh explained, "[t]he language of § 805 is unequivocal and precludes review of this claim—even assuming that the plan amendments qualify as rules subject to the Act in the first place"—because it "denies courts the power to void rules on the basis of agency noncompliance with the Act." *Id.* The D.C. Circuit later reaffirmed that holding, concluding that § 805 forecloses review of a claim that an agency violated the CRA by publishing a rule fewer than 60 days before it took effect. *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018).

Similarly, the Tenth Circuit has long declined to review claims that an agency violated the CRA, noting that the statute "specifically precludes judicial review of an agency's compliance with its terms." *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007). More recently, the Tenth Circuit applied § 805 to bar review of the Department of Interior's failure to submit a rule to Congress, as required by the CRA. *Kan. Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1226 (10th Cir. 2020) (*KNRC*) (citing § 801(a)(1)(A)). The court rejected the argument that the CRA's review bar applies only to decisions, findings, acts, or omissions of Congress, rather than agencies. *Id.* at 1235-36. To the contrary, the provision applies to all conduct "under this chapter," which "unambiguously prohibits judicial review of any omission [or decision, finding, or act] by any of the specified actors," including "agencies, the Comptroller General, the President, and Congress." *Id.*; *accord Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) ("§ 805's broad language covers all omissions under the CRA, including agency omissions."), *cert. granted, judgment vacated on other grounds*, 144 S. Ct. 2707 (2024).

**b.** Plaintiffs' statutory and ultra vires claims here run directly into 5 U.S.C. § 805—as interpreted by the Ninth Circuit and every other court of appeals to consider the question.

Plaintiffs purport to challenge "EPA's relabeling (or purported reclassification) of these preemption waivers from adjudicatory orders into 'rules' and the agency's submission of those orders as 'rules' to Congress." FAC ¶ 123. But for that determination and that action, Plaintiffs say, the resolutions would not have passed. *See id.* ¶¶ 138, 145. But even if that were true, EPA's determination that the waivers are "rules" subject to the CRA is a determination "under" the

**2-ER-66**

CRA because it applies a CRA provision—the definition of a "rule"—to specific facts for purposes of the CRA. 5 U.S.C. § 804(3) (defining "rule" under the CRA). EPA's submission of a CRA report to Congress is likewise an "action" "under" the CRA—indeed, that submission is generally *required* by the CRA. *Id.* § 801(a)(1). Because Plaintiffs ask this Court to decide whether Defendants complied with the CRA, their statutory and ultra vires claims are barred. *Bernhardt*, 946 F.3d at 563; *KNRC*, 971 F.3d at 1235-36.

In Count I, for example, Plaintiffs argue that "EPA's 'rule' labels were transparently erroneous," and offer their theory as to why these waivers were not "rules"—though citing the definition in the APA, rather than the CRA. FAC ¶ 133 (citing 5 U.S.C. § 551(4) rather than 5 U.S.C. § 804(3)). Despite that attempt at artful pleading, the meaning of the term "rule" in this case is not an APA question—what EPA did (and what Plaintiffs object to in Count I) is treat its waivers as "rules" *within the meaning of the CRA.* Plaintiffs' sleight-of-hand is only possible because the definition of a "rule" in the CRA happens to incorporate (in part) the definition of a "rule" in the APA. *See* 5 U.S.C. § 804(3) (defining "rule" for purposes of the CRA as having "the meaning given such term" in the APA, with certain CRA-specific exceptions). The fact that the definition of a "rule" in the CRA looks (in part) to the APA for its content does not change that what Plaintiffs object to in Count I is EPA's interpretation *of the CRA*—not the APA.

Other allegations make this jurisdictional defect even more obvious. For example, Plaintiffs allege that "[n]othing in this text"—that is, the text of the CRA—"empowers EPA to slap a 'rule' label on any action it wishes and purport to send a 'report' to Congress . . . without any attempt to explain how the action comports with the CRA's definition of a 'rule.'" FAC ¶ 132. Even if that were true, that would mean that EPA violated *the CRA*, or failed to adequately explain its invocation *of the CRA.* All those claims are precluded by § 805.

More generally, if a litigant could bring APA claims like these—explicitly premised on alleged violations of the CRA—then it is hard to understand what Congress thought it was accomplishing in § 805. With trivial edits, every alleged CRA violation could be restyled as being "not in accordance with law" or "arbitrary and capricious" or "without observance of procedure required by law" within the meaning of the APA, like Plaintiffs try here. FAC ¶ 124.

**2-ER-67**

That result cannot be squared with *Bernhardt*, in which the Ninth Circuit held that "federal courts do not have jurisdiction over statutory claims that *arise under* the CRA," *Bernhardt*, 946 F.3d at 563 (emphasis added)—not just claims explicitly styled as CRA claims.

Plaintiffs may respond that they allege violations of *both* the CRA and the APA. But that was equally true in *Bernhardt*. *See* Am. Compl., *Ctr. For Biological Diversity v. Zinke*, 3:17-cv-91 (D. Alaska), ECF No. 104. Regardless, Plaintiffs' APA claims here are (at a minimum) "inextricably intertwined with" their allegations of CRA violations, and thus are equally "barred" by the CRA's preclusion provision. *Heckler v. Ringer*, 466 U.S. 602, 624 (1984); *see also, e.g.*, *Kaiser v. Blue Cross of California*, 347 F.3d 1107, 1112 (9th Cir. 2003) ("claims that are 'inextricably intertwined' with a Medicare benefits determination may arise under Medicare" for purposes of the Medicare Act's preclusion-of-review provisions); *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1142 (9th Cir. 2004) ("If issues presented in a federal suit are 'inextricably intertwined' with issues presented in a forbidden de facto appeal from a state court decision, *Rooker-Feldman* dictates that those intertwined issues may not be litigated."); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1033 (9th Cir. 2016) (alien's right-to-counsel claim is channeled out of federal court because it "possesses a direct link to, and is inextricably intertwined with, the administrative process that Congress so painstakingly fashioned"). In short, because Plaintiffs cannot prevail on any of their APA claims without first persuading the Court that Defendants violated the CRA, at a minimum, Plaintiffs' claims are "inextricably intertwined" with precluded determinations, and thus covered by preclusion provision in 5 U.S.C. § 805.

Counts II and V—labeled as an "Ultra Vires" claim and a (largely duplicative) "nonstatutory review" claim[1]—are likewise precluded. In Count II, Plaintiffs allege that "no statute empowers any EPA Defendant to invoke a statute that is inapplicable . . . simply because that statute would provide a faster or easier, but unlawful, means to a desired end." FAC ¶ 143. But again, when Plaintiffs say "a statute that is inapplicable," they mean the CRA. *Id*. And when

---

[1] The States' "nonstatutory review" claim asks this Court to enjoin EPA from implementing or giving legal effect to the Resolutions in light of their asserted legal and constitutional flaws alleged in Counts I-IV. *See* FAC ¶¶ 175-76. Because all those claims fail, so does Count V.

they call the government's action "unlawful," they mean it is "unlawful" because they think it *violates* the CRA. Omitting the name of the statute does not change the nature of the claim. "[P]laintiffs cannot avoid preclusion through artful pleading." *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1115 (9th Cir. 2013) (citation modified).

**c.** Having already seen Defendants' original motion to dismiss, Plaintiffs now try to avoid preclusion by arguing in their Amended Complaint that "[t]he EPA Defendants cannot claim to have acted 'under' the CRA here, as their actions are untethered from any text in that statute." FAC ¶ 132. But that question-begging assertion, if taken seriously, would nullify § 805. On Plaintiffs' reading, the preclusion provision would never apply—after all, every party challenging a CRA action alleges that Congress or an agency somehow violated the CRA.

Yet again, the Ninth Circuit has already rejected this kind of improper attempt to evade the CRA's jurisdictional bar. In *Bernhardt*, the plaintiffs claimed that the agency rule at issue was "not eligible for disapproval" under the CRA because the agency failed to comply with the CRA's timing requirements. 946 F.3d at 562-63. And those plaintiffs argued, as Plaintiffs do here, that because the rule was "not eligible for disapproval" under the CRA, "the Joint Resolution was not enacted 'under' the CRA" for purposes of § 805's jurisdictional bar. *Id.* at 563. The Ninth Circuit rejected this argument, holding that the joint resolution was "an action under CRA" that was subject to the statute's jurisdiction-stripping provision. *Id* at 564.

In sum, because "federal courts do not have jurisdiction over statutory claims that arise under the CRA," *Bernhardt*, 946 F.3d at 563, Counts I, II, V, and VI are precluded, and should be dismissed for lack of statutory subject-matter jurisdiction under Rule 12(b)(1).

**II.     The Court lacks subject-matter jurisdiction over Plaintiffs' claims that challenge the application or interpretation of House or Senate rules.**

That Congress chose to broadly preclude judicial review over CRA claims is unsurprising, because the CRA's expedited procedures were "enacted by Congress" as "an exercise of the rulemaking power of the Senate and House of Representatives, respectively, and as such it is deemed a part of the rules of each House, respectively." 5 U.S.C. § 802(g)(1). Accordingly, Plaintiffs' claims are also nonjusticiable to the extent they amount to challenges to

**2-ER-69**

House and Senate rules for debating legislation.

"A controversy is nonjusticiable—i.e., involves a political question—where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States,* 506 U.S. 224, 228 (1993) (quotation marks omitted). Here, "the Constitution textually commits the question of legislative procedural rules to Congress." *Consejo*, 482 F.3d at 1172; *see* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . ."). And "no judicially manageable standards exist against which to review the Senate's [or House's] rules governing debate." *Common Cause v. Biden*, 909 F. Supp. 2d 9, 30 (D.D.C. 2012), *aff'd on other grounds,* 748 F.3d 1280 (D.C. Cir. 2014).

There are no manageable judicial standards because the "only relevant Constitutional provision is the Rules Clause, which grants Congress exclusive power to "determine the Rules of its Proceedings." U.S. Const., art. I, § 5; *Consejo*, 482 F.3d at 1172. No other relevant constitutional provisions speak to procedures for debating legislation, and judicial review in this context would create untenable interference with legislative prerogatives. *See, e.g.*, *Common Cause*, 909 F. Supp. 2d at 31 (challenge to filibuster rule "would require an invasion into internal Senate processes at the heart of the Senate's constitutional prerogatives as a House of Congress, and would thus express a lack of respect for the Senate as a coordinate branch of government"); *Metzenbaum v. FERC*, 675 F.2d 1282, 1288 (D.C. Cir. 1982) ("To invalidate Pub. L. No. 97-93 on the ground that it was enacted in violation of House rules would be to declare as erroneous the understanding of the House of Representatives of rules of its own making, binding upon it only by its own choice. We must assume that the House acted in the belief that its conduct was permitted by its rules, and deference rather than disrespect is due that judgment.").

This case is thus governed by *Consejo* and *Nixon*, which held that challenges to disputes over congressional procedures are nonjusticiable. *Consejo*, 482 F.3d at 1171-72 ("whether Congress decides to hold a hearing on legislation . . . is a non-justiciable political question"); *Nixon*, 506 U.S. at 228-29 (challenge to Senate's procedures for impeachment was nonjusticiable political question); *see also Nevada v. Watkins*, 914 F.2d 1545, 1556-57 (9th Cir. 1990)

(challenge to statute based on State's lack of representation on Congressional committee was "not justiciable"); *Common Cause*, 909 F. Supp. 2d at 13 (challenge to Senate filibuster rule was nonjusticiable political question). This is not a case alleging that Congress failed to comply with some other constitutional provision, such as the Qualifications Clause, *see Nixon*, 506 U.S. at 236-37 (discussing *Powell v. McCormack*, 395 U.S. 486 (1969)), or the Quorum Clause, *see United States v. Ballin*, 144 U.S. 1, 6 (1892); *see also, e.g.*, *Rangel v. Boehner*, 20 F. Supp. 3d 148, 169 (D.D.C. 2013) ("The House may not, by enacting and enforcing its own rules of procedure, violate another constitutional provision or an individual's rights under the Constitution, but the exercise of its discretion under the [Rulemaking and Discipline] Clause[s] is otherwise boundless."), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015).

At a minimum, all of Plaintiffs' statutory claims—as well as constitutional claims premised on alleged CRA violations, *see infra* at 28-29—fall squarely within this "absolute," unreviewable authority of Congress, because all of them depend on an allegation that Congress violated or misapplied its own procedural rules for debating legislation. *Consejo*, 482, F.3d at 1172. Indeed, Plaintiffs' bottom-line grievance is that the Senate wrongly applied expedited procedures for debating legislation rather than adhering to the filibuster, and that the Resolutions are therefore invalid. FAC ¶¶ 6, 56, 74, 109, 138, 145, 155-58, 163-66, 173-74. That core allegation dominates the Amended Complaint and the relief it requests. The reason Plaintiffs complain about EPA's submission of the rules to Congress is only because Congress then used expedited procedures for debating the Resolutions. FAC ¶¶ 138, 145. The Amended Complaint does not try to hide that Plaintiffs are challenging internal legislative procedures. For example, the words "parliamentarian" or "GAO" appear in the Complaint over 50 times, as Plaintiffs expressly seek to elevate the Senate parliamentarian's interpretation of the CRA over that of the Senate itself. In Plaintiffs' view, "the Senate Parliamentarian agreed with the GAO" that EPA's waivers "are not subject to the CRA," and "[t]hat should have been the end of the matter." FAC ¶¶ 91-92. But with respect, the Senate parliamentarian is not mentioned in the Constitution, and does not have the last word on Senate procedure—the Senate does.

Nor, for that matter, does EPA have any constitutional role in the enactment of

legislation; Congress could have passed laws disapproving of these waivers without *any* involvement from EPA, or by explicitly disagreeing with EPA's interpretation of the CRA and passing joint resolutions without submissions from EPA. Congress does so often. *See, e.g.*, *supra* at 4 (citing GAO opinion).

Similarly, for purposes of this case, it would not matter if EPA's actions, as Plaintiffs allege, "provided a pretextual basis for Congress to use CRA-like procedures to disapprove these waivers, and the Resolutions would not have been introduced, much less enacted, without that pretextual basis." FAC ¶ 138; *see also id.* ¶ 145. This Court cannot look behind the curtain of a coordinate branch to second-guess the procedures (much less the motivations) of legislators exercising independent constitutional roles. The remedy for legislative procedures that California dislikes is not found in the federal courts, but in Congress or at the ballot box.

### III.    Plaintiffs lack Article III standing to bring several of their claims and to seek some of their requested relief.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

#### A. Plaintiffs' alleged injuries were neither caused by the EPA nor redressable by an order vacating any action by EPA.

As a general matter, Defendants do not dispute that Plaintiffs have standing to bring, for example, constitutional claims arguing that Congress's enactment of the Resolutions caused them an Article III injury by preempting State laws—though all those claims fail on the merits. *See infra*, Part VI. But some of Plaintiffs' claims seek to more narrowly challenge actions by EPA—for example, in issuing press releases or submitting CRA reports to Congress. Plaintiffs lack Article III standing to bring those claims (which in any event, are not "final agency action" within the meaning of the APA, *see infra*, Part V(a)).

**2-ER-72**

First, none of Plaintiffs' injuries was caused by any alleged action taken by the EPA. In fact, the last action by the EPA that had any legal significance here was EPA's *grant* of the waivers Plaintiffs now seek to restore. It was Congress, not the EPA, that invalidated those waivers. Whatever press releases EPA issued did not dictate Congress's own independent actions. Congress could have taken the exact same action with or without any action from EPA.

Second, for similar reasons, an order from this Court that would, for example, "[v]acate EPA's purported reclassifications of these orders as rules," FAC, Prayer for Relief ¶ 6, could not remedy any injury to Plaintiffs. Such an order would not change the fact that majorities in both Houses of Congress enacted legislation, signed by the President, which nullifies EPA's waivers. The only way Plaintiffs could obtain meaningful relief from this suit is if they could obtain review of the Resolutions themselves by prevailing on one of their constitutional arguments. So, all of Plaintiffs' claims against EPA should be dismissed for lack of Article III standing.

### B. Plaintiffs lack standing to challenge the possible future applicability of the CRA's reenactment provision.

For the first time in their Amended Complaint, Plaintiffs add a new and dramatic claim for relief (though only in the alternative) that seeks to prophylactically neuter a significant feature of the congressional enactments at issue here: Congress's prohibition on the reenactment of future rules by EPA that are "substantially the same" as the disapproved rules. 5 U.S.C. § 801(b)(2). Plaintiffs make this request in Count VI (and in their Prayer for Relief) with minimal explanation: "In the event the Resolutions remain in effect despite Plaintiffs' other claims, Plaintiffs are entitled . . . to a declaration that the Resolutions were not enacted under the CRA and that no provision of that statute, including 5 U.S.C. § 801, is triggered or otherwise rendered applicable by the Resolutions." FAC ¶ 184. In other words, even if they lose their challenge to the Resolutions, they still want an order from this Court that would allow EPA to issue *future* rules that are "substantially the same" as the rules that Congress disapproved.[2]

---

[2] Defendants do not take any position here about what sort of possible future actions by EPA, if any, would be "substantially the same" as the waivers that Congress disapproved here. 5 U.S.C. § 801(b)(2). That question is not before the Court.

**2-ER-73**

Even ignoring the lack of any legal justification for that bold request—essentially, to blue pencil three duly enacted federal statutes—Plaintiffs lack standing to seek that relief. Plaintiffs' "challenge to the Reenactment Provision is legally distinct" from its other challenges to "the Joint Resolution[s]." *Bernhardt*, 946 F.3d at 560. That means Plaintiffs "must separately establish standing for [their] argument" relating to "the Reenactment Provision." *Id*. Despite the clarity of that Ninth Circuit precedent, Plaintiffs have not even tried to do so. Nor could they succeed, as any alleged injury from application of that provision would have to be "premised on the assumption that" EPA "would reissue" these waivers "or a substantially similar rule if a court ruled that the Reenactment Provision" did not apply. *Id*. There is no basis for that kind of assumption, which the Ninth Circuit has already rejected as too "speculative" to support standing. *Id*. Ripeness principles also independently foreclose that request, for similar reasons. *See, e.g.*, *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003).

## IV. Even if the Resolutions conflict with earlier-enacted statutes, they remain valid.

Even if Defendants violated the CRA or the APA (as opposed to the Constitution), the Resolutions would still be valid—because compliance with those statutes is not necessary for Congress to pass a statute, and the Resolutions are now duly enacted statutes. Plaintiffs thus have no basis to ask this Court to "void," FAC, Prayer for Relief ¶¶ 1-2, the Resolutions based on an alleged APA or CRA violation, or an ultra vires claim. In short, it is incoherent as a matter of first principles to argue that one law (the Resolution) is unlawful for violation of another law. This elementary fact independently dooms all of Plaintiffs' non-constitutional claims.

"[T]he prescription for legislative action in Art. I, §§ 1, 7 represents the Framers' decision that the legislative power of the Federal government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *INS v. Chadha*, 462 U.S. 919, 951 (1983). So there are only two procedural requirements to enact legislation: "passage by a majority of both Houses and presentment to the President." *Id*. at 958; *see also Bernhardt*, 946 F.3d at 562 n.6. The concurrence of the Senate parliamentarian, for example, is not required. Nor is compliance with the CRA. So it does not matter to the validity of the disapproval resolutions whether the

**2-ER-74**

waivers are properly considered to be "rules" or "orders" within the meaning of the CRA.

To be sure, majorities in the House or the Senate may adopt internal procedures—such as a three-fifths supermajority threshold in the Senate to cut off debate for most votes,[3] *see* Rule XXII, Standing Rules of Senate—but those procedures are not required by the Constitution, not enforceable by any court, and have no legal significance outside of each House of Congress itself. From the perspective of a federal court, "[i]t makes no difference what internal parliamentary procedures Congress adopts" in enacting legislation, "so long as Congress complies with the fundamental constitutional requirements of bicameralism (approval by both Houses of Congress) and presentment (submission to the President for approval)." *Citizens for Const. Integrity*, 57 F.4th 750, 763-64 (10th Cir. 2023), *cert. denied* 144 S. Ct. 94 (2023). If it complies with those requirements, Congress has enacted a law of the United States.

As a set of procedural rules governing debate on legislation in Congress, "[t]he CRA streamlines Congress's typical procedure for enacting legislation." *Bernhardt*, 946 F.3d at 557. But here, all that matters is that "Congress complied with the process of bicameralism and presentment," because the "Joint Resolution[s] passed both houses of Congress and w[ere] signed by the President into law." *Id.* at 562. The Resolutions thus have the force and effect of law, like any other statute. No violation of the CRA could render those statutes "void"—only violations of the legislative procedures set forth in the Constitution.

Put another way, even if Plaintiffs were correct that there is some conflict between the Resolutions (later in time), and the CRA or the Clean Air Act or the APA (earlier in time), that would not provide grounds for this Court to invalidate the Resolutions. After all, "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to

---

[3] The CRA process is not the only exception to the filibuster rule. *See, e.g.*, 2 U.S.C. § 641(e)(2) ("Debate in the Senate on any reconciliation bill . . . shall be limited to not more than 20 hours."); 159 Cong. Rec. S8419-20 (Nov. 21, 2013) (allowing cloture to be invoked by majority vote for votes on nominations for Executive Branch positions and lower federal courts); 163 Cong. Rec. S2450-51 (Apr. 7, 2017) (extending that precedent to Supreme Court nominations).

apply the earlier statute but as modified." *Dorsey v. United States*, 567 U.S. 260, 274 (2012). And Congress need not use any "magical passwords" to do so. *Id.* Plaintiffs' statutory and ultra vires claims thus fail for that additional reason, as the only basis to strike down a federal statute is a conflict with the Constitution—not with an older federal statute, much less an internal rule of congressional procedure.

V. **The statutory and ultra vires claims fail for several other threshold reasons.**

A. **The APA claim fails because Plaintiffs identify no final agency action.**

Plaintiffs cannot maintain Count I because APA claims are limited to "final agency action," and Plaintiffs have not identified a "final" EPA agency action. Agency action is "final" only if it (1) "consummat[es] . . . the agency's decisionmaking process," and (2) determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). The touchstone of the second prong is whether the action has "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

Plaintiffs identify two "actions" they allege are subject to review under the APA, but neither determines any rights or obligations, nor do legal consequences flow from either. First, Plaintiffs allege that EPA "reclassified" the waivers from orders to rules. *See* FAC ¶ 123. Second, Plaintiffs claim that EPA's submission of the waivers in a report to Congress qualifies as final agency action. *See id.*

EPA's alleged "reclassification" and submission of a report to Congress are not "final" agency actions under *Bennett* and *Dalton v. Specter*, 511 U.S. 462 (1994). In *Dalton*, a statute required the Secretary of Defense to submit recommendations for the closure of military bases to a commission, which would submit a report to the President, who could approve or disapprove those recommendations. 511 U.S. at 465. The plaintiffs sought APA review of these recommendations, but the Court held that they were not final agency actions. *Id.* at 468. While the recommendations were necessary steps in the process, the *final* action was taken by the President: "Without the President's approval, no bases are closed under the Act . . . ." *Id.* at 470. The Court acknowledged that the President's authority was constrained by the earlier action in that he could not "pick and choose among bases" to close, but this limitation was "immaterial."

**2-ER-76**

*Id.* "What is crucial is the fact that the President, not the Commission, takes the final action that affects the military installations." *Id.* (alterations and quotation marks omitted).

So too here. Congress and the President, not EPA, "take[] the final action" of enacting the Resolutions. *Id.* The Resolutions have legal consequences; EPA's alleged reclassification and submission of the waivers to Congress did not. They "carrie[d] no direct consequences" for Plaintiffs. *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (necessary step by agency not final action when only subsequent presidential action has direct legal consequences). Even if the "reclassification" and submission could be deemed necessary predicates to the disapproval resolutions—and they were not, *see supra* at 13-14—they would still not qualify as reviewable final agency actions. The commission in *Dalton* played a critical role in identifying what bases to close but because its recommendations did not, without more, close a single base, they were not final agency actions. *See* 511 U.S. at 470. The same reasoning controls here, as EPA's "reclassification" and submission, without more, have no legal consequences for the waivers at issue in this case. That is why Plaintiffs did not (and could not) file suit until the President signed into law the Resolutions disapproving the waivers. *See* FAC ¶ 5.

Even more obviously, Plaintiffs have not stated a claim with respect to *other* preemption waivers that EPA has not submitted to Congress under the CRA. The Amended Complaint asks this Court to enter an injunction "prohibiting EPA from relabeling other Clean Air Act preemption waiver actions" as rules and submitting those actions as reports to Congress. FAC ¶ 140. But since EPA has taken *no* action with respect to these unidentified preemption waivers, Plaintiffs have not identified any final agency action by EPA with respect to those non-actions (much less any violation of any law).

### B. Plaintiffs' claims against EPA are an improper attempt to evade the Clean Air Act's comprehensive review scheme.

Even if Plaintiffs had identified final agency actions outside the jurisdiction-stripping provision of the CRA, *this* Court still could not review them. Instead, they would be reviewable only by the courts of appeals under § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), which confers exclusive "jurisdiction upon the courts of appeals" for final actions taken by EPA

**2-ER-77**

under the Clean Air Act. *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 879 (D.C. Cir. 2015).

Section 307(b)'s scope has been interpreted "broadly" to cover not only challenges to EPA's final actions but also challenges that have the "practical effect" of upsetting EPA's final action or that are "closely related to" such final action. *Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1139 (E.D. Cal. 2012), *aff'd* 784 F.3d 500 (9th Cir. 2015). And when Congress has chosen to give the circuit courts exclusive jurisdiction over agency decisions, "the district courts are without jurisdiction over the legal issues pertaining to those decisions— whether or not those issues arise from the statute that authorized the agency action in the first place." *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 161 (4th Cir. 1993).

Here, Plaintiffs seek review of alleged final actions EPA took in connection with the § 209(b) waivers issued to California. These waivers are, without question, actions taken under chapter 85 of title 42 of the U.S. Code. *See* 42 U.S.C. §§ 7607(b)(1), 7543(b); *see also* FAC ¶ 42 (acknowledging that preemption waivers are subject to review in the courts of appeals). And the alleged EPA actions challenged here—EPA's description of these waivers as rules and its submission of the waivers to Congress—are (even under Plaintiffs' theory) "closely related to" the waivers. *Nichols*, 924 F. Supp. 2d at 1139. Therefore, to the extent any court may exercise jurisdiction notwithstanding § 805, Plaintiffs' claims against EPA belong in the courts of appeals: § "307(b)(1) 'channels review of final EPA action exclusively to the courts of appeals, *regardless of how the grounds for review are framed*.'" *Nichols*, 784 F.3d at 506 (quoting *Virginia v. United States*, 74 F.3d 517, 523 (4th Cir. 1996)) (emphasis in original). So any challenges—including constitutional claims—to EPA's alleged final actions must go to the courts of appeals. *See Sierra Club v. Wheeler*, 2018 WL 6182748, at *4 (N.D. Cal. Nov. 27, 2018) (Gilliam, J.) (dismissing motion to enforce summary judgment order for lack of jurisdiction because "the 'practical objective' of [p]laintiffs' motion is to 'nullify final actions of the EPA'" (quoting *Nichols*, 784 F.3d at 506)). Indeed, Plaintiffs have already filed what they describe as "protective" petitions for review, in both the Ninth and D.C. Circuits. *California v. EPA*, No. 25-5071 (9th Cir.); *California v. EPA*, No. 25-1174 (D.C. Cir.).

### C. The ultra vires claims fail as a matter of law.

Seeking to evade statutory limitations altogether, Plaintiffs throw the "Hail Mary pass" of an "ultra vires" claim. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (*NRC*). Such claims are "strictly limited." *Id.* They may be brought "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (quotation marks omitted). "Ultra vires review is also unavailable if . . . a statutory review scheme forecloses all other forms of judicial review." *Id.*

Plaintiffs assert ultra vires or "nonstatutory" claims in Counts II and V. These claims simply "dress up a typical statutory-authority argument as an ultra vires claim." *NRC*, 605 U.S. at 682. While the Amended Complaint asserts that EPA lacked authority to take these alleged actions, Plaintiffs fail to identify any "specific prohibition" affirmatively forbidding them. *See NRC*, 605 U.S. at 681. Even more problematically for Plaintiffs, the CRA explicitly forecloses judicial review (*supra* Part I), and the Clean Air Act funnels review to the courts of appeals (*supra* Part V.B). Plaintiffs cannot use a nonstatutory ultra vires claim to circumvent those statutes' review schemes. *See NRC*, 605 U.S. at 681; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

### VI.   Plaintiffs' constitutional claims fail.

Plaintiffs assert three baseless claims that the Resolutions are unconstitutional. Among other problems, these theories lack any precedent remotely on point, ask this Court to oversee the Senate's internal procedures for debating legislation, and urge the Court to create rather than avoid constitutional conflict where none exists. Even if they are subject to any form of judicial review, each fails as a matter of law and should be dismissed.

### A. The Resolutions amend the law and do not usurp Executive power.

Plaintiffs allege that the Resolutions usurp Executive power because they "create no new substantive law," and instead dictate only "how pre-existing law applies to particular circumstances." FAC ¶ 153 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016)).

**2-ER-79**

This argument fails, both because the Resolutions amended the law and because *Bank Markazi* applies to Article III courts and judicial power, not administrative agencies and executive power, and certainly not to statutes implementing Congress's broad policy choices about the regulation of vehicle emissions affecting millions of people in states across the Nation.

**a.** First, even assuming (incorrectly) that *Bank Markazi* applies to administrative agencies, its "amend the law" test would be easily satisfied here. Under *Bank Markazi*, "Congress . . . may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative." 578 U.S. at 215. Although Congress may not "compel judicial findings or results under old law," *id.* at 231 (brackets omitted), a statute must be upheld if it does not "direct any particular findings of fact or applications of law . . . to fact." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992). Courts must afford "a high degree of judicial tolerance for an act of Congress that is intended to affect litigation so long as it changes the underlying substantive law in any detectable way." *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 991 (9th Cir. 1999).

The Supreme Court has been extremely deferential to Congress in applying these principles. In *Bank Markazi*, for example, the Court upheld a statute that identified a "District Court's docket number," "designate[d] a particular set of assets," and "render[ed] them available to satisfy the liability and damages judgments" in the specific case. 578 U.S. at 215. The Court rejected the "flawed" argument that "there is something wrong with particularized legislative action," citing valid statutes that, for example, applied to "a single bridge," a "single oil tanker," or "abrogated [a] specific settlement agreement." *Id.* at 233-34. The Court has elsewhere upheld statutes directing a federal court to "promptly dismiss[]" a pending suit over a specific piece of property, *Patchak v. Zinke*, 583 U.S. 244, 251 (2018) (plurality opinion), identifying pending cases by docket number and specifying how statutory requirements are met, *Robertson*, 503 U.S. at 434-35, and legalizing a specific bridge that the Court had previously deemed a nuisance, *Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. 421 (1855) ("*Wheeling Bridge*").

*Wheeling Bridge* is particularly instructive. It holds that Congress can nullify a specific final judgment by statute in cases involving public rights. There, a federal court had declared the

**2-ER-80**

Wheeling Bridge an unlawful obstruction of commerce and entered a permanent injunction ordering its removal. 59 U.S. at 429. After final judgment, Congress enacted a statute providing that the bridge was "declared to be lawful," thus nullifying the court's judgment and permanent injunction. *Id*. at 429. The Supreme Court upheld the statute on the grounds that it "modified" the status of the bridge "in the contemplation of law," *id*. at 430, and that the case involved a "public right," not an adjudication of a "private right to damages," *id*. at 431.

The Ninth Circuit upheld an analogous statute in *Mount Graham Coalition v. Thomas*, 89 F. 3d 554 (9th Cir. 1996). A district court had ruled that the Forest Service's approval of a site for building a telescope was inconsistent with the Arizona-Idaho Conservation Act of 1988 and therefore violated other environmental laws, and the court enjoined the project. *Id*. at 556. After final judgment, Congress enacted a statute providing that the "Forest Service approval of [the] site . . . is hereby authorized and approved and shall be deemed to be consistent with the terms of . . . the Arizona-Idaho Conservation Act." *Id*. The Ninth Circuit held that the case fell "squarely within *Wheeling Bridge*," and that it was valid because the statute constituted "a change in the [Conservation Act], which Congress is entitled to make." *Id*. at 557.

Under these cases, the Resolutions must be upheld. They do not "direct any particular findings of fact or applications of law . . . to fact." *Robertson*, 503 U.S. at 438. They instead amend the law by depriving the corresponding EPA waivers of "any force or effect." *Supra* at 3, 6. It cannot be fairly disputed that this amends the law because the Ninth Circuit has squarely held, in rejecting a separation of powers claim, that a CRA resolution "amend[s] the substantive environmental law," and is "enforceable as a change to substantive law, even though it d[oes] not state that it constitute[s] an amendment." *Bernhardt*, 946 F.3d at 562. The same reasoning applies here. Before the Resolutions, California's regulations were not preempted because California had obtained a waiver under § 209(b) of the Clean Air Act. After the Resolutions, the regulations are preempted as a matter of law, *regardless* of whether California satisfies the criteria under § 209(b). And, under the CRA's reenactment provision, 5 U.S.C. § 801(b)(2), EPA is now prohibited from issuing a waiver that is "substantially the same" as the waivers Congress repealed—regardless of whether California's request satisfies the criteria under CAA § 209(b).

**2-ER-81**

Plaintiffs' claim is thus foreclosed by *Bernhardt*, and the statute readily clears the constitutional threshold of changing the "substantive law in any detectable way." *Cook Inlet*, 166 F.3d at 991. More still, while Plaintiffs urge this Court to hunt for a constitutional problem, the bedrock principle is that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *NFIB v. Sebelius*, 567 U.S. 519, 521 (2012).

**b.** Regardless, *Bank Markazi* is inapplicable. That line of cases concerns judicial power, not executive power, and administrative agencies are fundamentally different from Article III courts. Agencies "exercise no part of th[e] judicial power." *SEC v. Jarkesy*, 603 U.S. 109, 148 (2024) (Gorsuch, J., concurring). Unlike courts, they permissibly adjudicate only "public rights," not "private rights." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). Congress's authority over administrative agencies is different from and broader than its authority over the courts. Agencies "possess only the authority that Congress has provided," *NFIB v. DOL*, 595 U.S. 109, 117 (2022), which means "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019).

Demonstrating the point, Congress routinely enacts private laws directing administrative agencies, unlike courts, to take specific actions as to specific individuals or property.[4] And the Supreme Court has already rejected the argument that such private laws are improperly "adjudicatory," concluding instead they are "legislative in purpose and effect." *Chadha*, 462 U.S. at 957 n.22. Plaintiffs cite no case extending *Bank Markazi* to the administrative context, and offer no reason for this Court to take that leap.

Nor would it make sense to do so here, as to Congress's repeal of an EPA preemption waiver. Because of the way the Clean Air Act operates, a waiver allows California to regulate

---

[4] *See, e.g.*, H.R. 5826, 97th Cong., Priv. L. No. 97-55, 96 Stat. 2636 (1983) (directing the Secretary of Interior to deem a specific oil and gas lease "not to have terminated"); H.R. 3126, 97th Cong., Priv. L. No. 97-27, 96 Stat. 2623 (1982) (directing a Secretary to document a specific ship as "a vessel of the United States"); H.R. 6228, 98th Cong., Priv. L. No. 98-46, 98 Stat. 3434 (1984) (directing the Secretary of Commerce to extend the term of five patents); *see* Congress.gov, *Statutes at Large and Private Laws*, https://www.congress.gov/private-laws/.

**2-ER-82**

an entire industry that affects millions of people, and allows other states to adopt California's regulations, as the other Plaintiff States in this case have done. *See* 42 U.S.C. §§ 7543(a), 7507. This is a classic example of public rights: Determining whether states or the federal government should regulate motor vehicle emissions is a public policy issue of nationwide importance, not a particularized adjudication of individual rights, much less an adjudication of a "private right to damages." *Wheeling Bridge*, 59 U.S. at 429, 431. Look no further than the legislative record here. The Senate debated whether there should be "a near nationwide mandate on electric vehicle sales," 171 Cong. Rec. S3099, S3140 (May 22, 2025) (Sen. Lankford), that would "affect all States," 171 Cong. Rec. S3017, S3086-87 (May 21, 2025) (Sen. Capito), "cost the economy about $100 billion a year," "bury small businesses," and harm "[e]very American citizen," *Id.* at S3018 (Sen. Barrasso). Preempting California's electric-vehicle mandate and other emissions regulations, which is what Congress did by repealing the waivers, is exactly the type of "general rule[] for the government of society" that Congress has the power to enact. *Fletcher v. Peck*, 10 U.S. 87, 136 (1810).

### B. The challenge to the Senate's "second point of order" is nonjusticiable and otherwise fails.

Plaintiffs next contend that the Senate adopted a procedural rule that unconstitutionally delegated to EPA "unbridled discretion to trigger extraordinary legislative procedures" under the CRA, giving EPA unlawful "coercive influence" "on internal legislative procedure." FAC ¶ 157. The "procedural rule" California appears to challenge is the "second point of order" the Senate adopted on May 21, 2025. *Id.* ¶ 104. This point of order provides that a joint resolution that meets the requirements of § 802 of the CRA is subject to the CRA's expedited procedures. *Id.* ¶ 104; 171 Cong. Rec. S3017, S3051. According to California, the "second point of order" is unconstitutional because its "sole purpose and effect" was to "allow the Senate to proceed" with fast-track debate procedures under the CRA "simply because EPA submitted reports labeling the waiver decisions as 'rules.'" FAC ¶ 109. This claim fails for several reasons.

**a.** To begin, this claim presents a nonjusticiable political question because it contests the Senate's procedures for debating legislation. When Plaintiffs refer to "extraordinary legislative

**2-ER-83**

procedures," FAC ¶ 157, they mean the Senate declined to adhere to the "filibuster rule requiring 60 votes" to end debate and instead used the CRA's procedures. *Id.* ¶¶ 6, 56, 74, 109. But disputes about procedures for debating legislation in Congress are nonjusticiable. *Supra*, Part II.

**b.** The claim is also wrong on the merits for multiple reasons. It ignores the votes of the full Senate, misrepresents the congressional record, and conflicts with existing precedent.

**(i).** Contrary to Plaintiffs' core assertion, the Senate did not delegate authority to EPA to decide whether to use the CRA's fast-track procedures. For each Resolution, Senator Thune put that choice to the Senate by moving to proceed with debate using the CRA's fast-track procedures, and the full Senate voted to approve those motions. 171 Cong. Rec. S3017, S3052; (H.J. Res. 88); 171 Cong. Rec. S3099, S3102, S3105 (H.J. Res. 87, 89). After debate, the full Senate then voted again to enact the Resolutions into law. *Id.* at S3101, S3105, S3109-10. These votes necessarily constitute the full Senate's independent determination that these waivers were properly subject to the CRA's fast-track debate procedures. EPA had no "unbridled discretion" and obviously did not "coerce[]" the Senate. FAC ¶ 157. The Senate voted for itself.

**(ii).** A separate problem is that the procedural rule Plaintiffs challenge does not say what Plaintiffs allege. The "second point of order" states, in full:

> Joint Resolutions that meet all the requirements of Section 802 of the Congressional Review Act or are disapproving of agency actions which have been determined to be rules subject to the Congressional Review Act by a legal decision from the Government Accountability Office [are] entitled to expedited procedures under the Congressional Review Act.

FAC ¶ 104; 171 Cong. Rec. S3017, S3051. This says nothing about EPA, nor anything about delegating EPA "unbridled discretion" to require the Senate to use the CRA. Plaintiffs cherry-pick snippets of legislative history for their assertion that EPA's submission of the waivers to Congress was "the sole trigger" for using fast-track debate procedures rather than adhering to the filibuster. FAC ¶¶ 108-09. Not only do "floor statements by individual legislators rank among the least illuminating forms of legislative history," *Trump v. Hawaii*, 585 U.S. 667, 692 (2018), but Plaintiffs' "sole trigger" allegation is incorrect as a matter of law: the trigger was the Senate's vote, without which the CRA process would never have been used. Plaintiffs would

**2-ER-84**

have this Court ignore the Senate's vote and use a smattering of inapposite floor statements to misconstrue a Senate procedural rule, all to create a supposed constitutional conflict. These arguments are woefully inadequate to strike down three statutes passed by the Senate and the House, and signed into law by the President. *See Citizens for Const. Integrity*, 57 F.4th at 768 (rejecting claim that a CRA resolution was unconstitutional because "the statements of a few legislators concerning their motives for voting for legislation is a reed too thin to support invalidation of a statute"); *NFIB*, 567 U.S. at 521 ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality"); *see also supra* Part III.

Insofar as Senate floor statements are relevant at all, the record refutes Plaintiffs' telling. The dispute in the Senate was about whether the GAO or the Senate would have the final say as to whether these preemption waivers are rules under the CRA.[5] It was not about whether the Senate would defer to EPA (an executive agency), but about whether it would defer to GAO or instead decide for itself.[6] The second point of order reflected the Senate's decision to decide for itself. As Senator Thune explained, "it [was] appropriate for the Senate to speak as a body to the question—something the Senate does when questions over application of the rules arise." 171 Cong. Rec. S3017, S3047. The full Senate would therefore "vote on what qualifies for th[e] fast-track procedure." *Id* at S3048. And the full Senate did vote, first to adopt a rule that it would not defer to "GAO staff," *id.* at S3088, then to proceed with fast-track debate on each of the Resolutions, and then again to enact each Resolution into law. Along the way, Senator Thune recorded his own independent conclusion that the waivers "are clearly rules in substance given

---

[5] 171 Cong. Rec. S3017, S3088 (Sen. Capito) ("the procedural issue before the Senate was simply whether GAO staff should be able to block resolutions of disapproval against Agency-submitted rules"); *id.* at S3047 (Sen. Thune) ("in an unprecedented move, the Government Accountability Office has inserted itself into this situation and declared that these rules submitted to Congress by the EPA as rules are not, in fact, rules").

[6] 171 Cong. Rec. S3099, S3102 (Sen. Fischer) ("GAO's role is just an advisory one and … it is up to us—it is up to Congress—to determine what constitutes a rule. . . . We are reclaiming our congressional authority under the Congressional Review Act"); 171 Cong. Rec. S3017, S3088 (Sen. Capito) ("Delegating to the unelected GAO staff the authority to determine if Members of Congress can use the CRA against Agency-submitted rules turns the statute completely on its head").

**2-ER-85**

their nationwide impact and scope." *Id.* at S3047.

(iii). Finally, even if this claim were justiciable, and even if Plaintiffs' interpretation of the legislative history were accurate and relevant, no constitutional principle or precedent bars Senators from considering EPA's submissions when deciding on procedures for debating legislation. Plaintiffs offer no case even remotely on point. FAC ¶ 156. They cite an abrogated case about judicial compensation for D.C. courts, *O'Donoghue v. United States*, 289 U.S. 516, 530 (1933), and a concurrence from a case about judicial nominations, *Pub. Citizen v. DOJ*, 491 U.S. 440, 485 (1989) (Kennedy, J., concurring). In truth, Congress has plenary power to conduct inquiries and receive reports "concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins v. United States*, 354 U.S. 178, 187 (1957). And courts have upheld far greater intrusions into legislative procedure than Plaintiffs allege here, including a rule allowing non-members to *vote* in committee. *Michel v. Anderson*, 14 F.3d 623, 624 (D.C. Cir. 1994). Here, EPA voted on nothing; it simply sent a report to Congress. Congress made its own decision to use the CRA to repeal EPA's waivers, and Congress is always free to pass legislation according to whatever procedural rules it chooses, as long as it stays within the bounds of bicameralism and presentment set by Article I, Section 7 of the Constitution.  It did so here.

### C. California and its Co-Plaintiff States were not unconstitutionally deprived of the right to participate in the political process.

Plaintiffs further allege that "extraordinary defects in the national political process" render the Resolutions "invalid under the Tenth Amendment." FAC ¶ 167 (quoting *South Carolina v. Baker*, 485 U.S. 505, 512 (1988)). They complain that Congress used "extraordinary procedures"—meaning it did not adhere to the filibuster—and it passed the Resolutions with insufficiently "rigorous debate," without hearing "state official testimony," and in disregard of "both the GAO and the Senate Parliamentarian." FAC ¶¶ 163, 164.

Again, this claim raises a nonjusticiable political question about procedures for debating legislation in Congress. *Supra* Part II. It should be dismissed on that basis. Separately, insofar as Plaintiffs assert that EPA violated the CRA and therefore failed "to faithfully execute the Nation's laws," FAC ¶¶ 163-65, that is a statutory claim dressed in constitutional language that

**2-ER-86**

should be barred by 5 U.S.C. § 805, the CRA's jurisdiction-stripping provision. *See Dalton*, 511 U.S. at 472 (claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" at all). This is not a case alleging that EPA violated the CRA *and* "independently violate[d]" another statute. *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (discussing justiciability, not jurisdiction stripping). Under *Dalton*, faux constitutional claims are barred by § 805's jurisdiction stripping provision.[7] *See Freeman Invs.*, 704 F.3d at 1115 (citation modified) ("plaintiffs cannot avoid preclusion through artful pleading").

As for the merits, Plaintiffs' argument fails as a matter of law. Their own lead case holds that, under the Tenth Amendment, "States must find their protection from congressional regulation through the national political process" not the courts. *Baker*, 485 U.S. at 512. In dicta, the Court suggested the "possibility" that "extraordinary defects in the national political process" might render a statute invalid, but it could not "identify or define the defects that might lead to such invalidation." *Id.* It then rejected the State's claim because it had "not even alleged that it was deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless." *Id.* at 513.

No court to our knowledge has invalidated any statute under *Baker*'s dictum, and the Ninth Circuit has repeatedly rejected such claims. *See Watkins*, 914 F.2d at 1556; *Nevada v. Skinner*, 884 F.2d 445, 452 (9th Cir. 1989). In *Watkins*, the Ninth Circuit rejected Nevada's claim that a statute applicable only to Yucca Mountain in Nevada was invalid because Nevada lacked representation on a congressional committee. 914 F.2d at 1549, 1556-57. In doing so, the court questioned whether establishing a "political process" claim is even "possible," noting the view that *Baker* "unequivocally repudiate[d] the suggestion that the tenth amendment requires any substantive or qualitative analysis of the national political process." *Id.* at 1556.

---

[7] To the extent California's other two constitutional theories also rely on an alleged CRA violation underlying statutory determination as to whether preemption waivers are "rules," those claims are barred by Section 805 as well.

**2-ER-87**

Plaintiffs cannot plausibly contend they were "deprived of [the] right to participate in the national political process." *Baker*, 485 U.S. at 513. For example, in the House, California's 52 representatives are more than any other state. Not only did California's representatives vote on the Resolutions, but at least 9 voted *in favor* of all of them. *See* House Roll Call Votes 111, 112, & 114 (11 California members voted in favor of disapproving the ACC II regulation waiver). In the Senate, California's senators both fully participated in debate, voted on the procedural rules, voted on each motion to proceed with debate, and voted on the final decision to enact the Resolutions into law.[8] As for Plaintiffs' argument they were deprived of the right to "participate in the Executive Branch's relabeling of the waivers," FAC ¶ 165, the political process for the Executive Branch happens every four years during a presidential election.

Nor was California "singled out in a way that left it politically isolated and powerless." *Baker*, 485 U.S. at 513. Dozens of senators and over a hundred representatives from states across the country voted against the Resolutions. California continues to be supported by 10 states as plaintiffs here, and each participated in the same political process discussed above. Far from politically isolated, California and its supporters simply lost a vote. "[T]he tenth amendment does not protect a State from being outvoted in Congress." *Watkins*, 914 F.2d at 1556.

## CONCLUSION

For these reasons, Plaintiffs' Amended Complaint should be dismissed.

---

[8] *See, e.g.*, 171 Cong. Rec. S3017, S3032 (Sen. Padilla); *id.* at S3033-34 (Sen. Schiff); *id.* at S3050-51 (roll call on points of order); 171 Cong. Rec. S3099, S3101 (roll call on Resolution disapproving ACC II waiver); *id.* at S3105 (roll call on Resolution disapproving Advanced Clean Trucks waiver); *id.* at S3109-10 (roll call on Resolution disapproving Omnibus waiver).

2-ER-88

Dated: November 17, 2025                     Respectfully submitted,

YAAKOV M. ROTH                          ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*   *Principal Deputy Attorney General*
Civil Division

                                        ROBERT N. STANDER (DC Bar
JOSEPH E. BORSON                        #1028454)
*Assistant Branch Director*             *Deputy Assistant Attorney General*
Federal Programs Branch

                                        JEFFREY HUGHES (NY Bar
/s/ Stephen M. Pezzi                    #5367214)
STEPHEN M. PEZZI (FL Bar #1041279)      United States Department of Justice
Senior Trial Counsel                    Environment and Natural Resources
United States Department of Justice     Division
Civil Division, Federal Programs Branch  P.O. Box 7611
1100 L Street NW                        Washington, D.C. 20044
Washington, DC 20005                    (202) 717-7067 (Stander)
(202) 305-8576                          (202) 532-3080 (Hughes)
stephen.pezzi@usdoj.gov                 robert.stander@usdoj.gov
                                        jeffrey.hughes@usdoj.gov


                                        *Attorneys for Defendants*

# Ex. A

Michael Buschbacher (*pro hac vice*)
James R. Conde (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

John B. Thomas (Bar No. 269538)
Jessica Wahl (Bar No. 321887)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
jthomas@hicks-thomas.com

*Counsel for Intervenor-Defendants*
(complete list on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COL-ORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>Defendants. | No. 4:25-cv-04966-HSG<br><br>**INTERVENOR-DEFENDANTS' MOTION TO DISMISS [Fed. R. Civ. P. 12(b)(1), (6)]**<br><br><br><br><br><br>Date: _____, 2025<br>Time:          2:00 p.m.<br>Courtroom: 2, 4th Floor Oakland Courthouse<br>Judge:  Hon. Haywood S. Gilliam, Jr. |

**2-ER-91**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ iii

NOTICE OF MOTION ..................................................................................1

MOTION TO DISMISS ................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................1

STATEMENT OF ISSUES ........................................................................... 2

BACKGROUND ..........................................................................................3

I.      The Clean Air Act Broadly Preempts State Regulation of Motor
        Vehicle Emissions .............................................................................3

II.     EPA Issues Waivers of Clean Air Act Preemption For Three
        California Programs ...........................................................................3

III.    Congress Repeals EPA's Waivers of Clean Air Act Preemption.......5

IV.     Procedural History ..........................................................................10

ARGUMENT ............................................................................................10

I.      The Congressional Review Act Prohibits Judicial Review................ 11

II.     This Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims .......13

        A.      Plaintiffs Lack Standing for their Statutory Claims .............13

        B.      This Court Lacks Jurisdiction Under the APA......................15

III.    Plaintiffs' Constitutional Claims Are Non-Justiciable Objections to
        Congressional Procedures................................................................17

IV.     This Court Lacks Jurisdiction Under the Declaratory Judgment Act ...18

V.      Plaintiffs Fail to State a Constitutional Claim..................................19

        A.      Plaintiffs Fail to State a Separations-of-Powers Claim..........19

        B.      Plaintiffs Fail to State a Tenth Amendment or Federalism Claim........21

        C.      Plaintiffs Lack a Cause of Action for Their Constitutional Claims........25

CONCLUSION ..........................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ....................................................................................25

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................................................18

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................16

*California v. Texas*,
   593 U.S. 659 (2021) ....................................................................................15

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
   529 F. Supp. 2d 1151 (E.D. Cal. 2007) .................................................... 24

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
   598 F.3d 1115 (9th Cir. 2010) ....................................................................10

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
   482 F.3d 1157 (9th 2007) ...................................................................... 17, 18

*Corrie v. Caterpillar, Inc.*,
   503 F.3d 974 (9th Cir. 2007) ......................................................................18

*County of San Diego v. Nielsen*,
   465 F. Supp. 3d 1073 (S.D. Cal. 2020) ......................................................16

*Ctr. for Biological Diversity v. Bernhardt*,
   946 F.3d 553 (9th Cir. 2019)...................... 2, 5, 11, 12, 13, 18, 19, 20

*Dalton v. Specter*,
   511 U.S. 462 (1994) ....................................................................................16

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ....................................................................... 8

*DeVillier v. Texas*,
   601 U.S. 285 (2024) ....................................................................................25

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025) .......................................................................... 1, 6, 13

*Foster v. USDA*,
   68 F.4th 372 (8th Cir. 2023) ...................................................................... 11

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)....................................................................................16

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) ........................................................ 24

*Havasupai Tribe v. Provencio*,
  906 F.3d 1155 (9th Cir. 2018) ............................................................... 15

*Idaho Watersheds Project v. Hahn*,
  307 F.3d 815 (9th Cir. 2002) ................................................................ 16

*INS v. Chadha*,
  462 U.S. 919 (1983) .............................................................................. 15

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) .............................................................................. 18

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
  971 F.3d 1222 (10th Cir. 2020) ........................................................... 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) .............................................................................. 10

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ............................................................... 11

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ............................................................. 11

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................. 14

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ............................................................. 11

*Mistretta v. United States*,
  488 U.S. 361 (1989) .............................................................................. 21

*Montanans for Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009) ............................................................. 11

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*,
  627 F.2d 1095 (D.C. Cir. 1979) ............................................................. 3

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................... 10, 13, 14

*NRC v. Texas*,
  605 U.S. 665 (2025) .............................................................................. 17

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) .............................................................................. 22

*Polich v. Burlington Northern, Inc.*,
  942 F.2d 1467 (9th Cir. 1991) ............................................................. 11

*Robertson v. Seattle Audubon Soc'y*,
  503 U.S. 429 (1992)................................................................................19

*Skelly Oil Co. v. Phillips Petroleum Co.*,
  339 U.S. 667 (1950) ..............................................................................19

*Smith v. L.A. Unified Sch. Dist.*,
  830 F.3d 843 (9th Cir. 2016) ................................................................ 8

*South Carolina v. Baker*,
  485 U.S. 505 (1988)..........................................................................21, 22

*Steel Co. v. Citizens for Better Env't*,
  523 U.S. 83 (1998) ................................................................................15

*United States v. Ballin*,
  144 U.S. 1 (1892) ................................................................15, 17, 18, 20

*United States v. Fla. E. Coast Ry. Co.*,
  410 U.S. 224 (1973) ..............................................................................13

*United States v. Texas*,
  599 U.S. 670 (2023) ..............................................................................15

*Utah v. Strieff*,
  579 U.S. 232 (2016) ..............................................................................15

*Wash. All. of Tech. Workers v. United States*,
  892 F.3d 332 (D.C. Cir. 2018)..............................................................11

*Webster v. Doe*,
  486 U.S. 592 (1988)..............................................................................12

*Yesler Terrace Cmty. Council v. Cisneros*,
  37 F.3d 442 (9th Cir. 1994) ..............................................................23, 24

**Constitution**

U.S. Const. art. I, § 1................................................................................14

U.S. Const. art. I, § 5, cl. 2............................................................. 2, 17, 25

U.S. Const. art. I, § 7, cl. 2–3 ..................................................................14

**Statutes**

5 U.S.C. § 551(4)...................................................................................... 6

5 U.S.C. § 551(6)...................................................................................... 6

5 U.S.C. § 551(8)...................................................................................... 6

5 U.S.C. § 701(a)(1) ..............................................................................................16

5 U.S.C. § 704 ......................................................................................................15

5 U.S.C. §§ 801–808 ..............................................................................................5

5 U.S.C. § 801 ......................................................................................................22

5 U.S.C. § 801(a)(1)(A) .......................................................................................6, 12

5 U.S.C. § 801(a)(1)(A)(ii) ...................................................................................12

5 U.S.C. § 801(a)(3)(B) ........................................................................................12

5 U.S.C. § 801(b) ...................................................................................................5

5 U.S.C. § 801(b)(1) .............................................................................................12

5 U.S.C. § 802 ......................................................................................................12

5 U.S.C. § 802(a) ...................................................................................................6

5 U.S.C. § 802(d) ...................................................................................................6

5 U.S.C. § 804(3) .............................................................................................6, 12

5 U.S.C. § 805 ...............................................................................................2, 11, 12

42 U.S.C. § 7507 .............................................................................................3, 24

42 U.S.C. § 7507(2) .............................................................................................23

42 U.S.C. § 7521(a) ...............................................................................................3

42 U.S.C. § 7521(a)(2) .....................................................................................23, 24

42 U.S.C. § 7543(a) ...........................................................................................3, 4

42 U.S.C. § 7543(b) ...............................................................................................3

42 U.S.C. § 7543(b)(1)(C) ...............................................................................23, 24

42 U.S.C. § 7543(b)(3) .........................................................................................24

Pub. L. No. 104-121, 110 Stat. 847 (1996) ...........................................................5

Pub. L. No. 119-15, 139 Stat. 65 (2025) ..........................................................8, 12

Pub. L. No. 119-16, 139 Stat. 66 (2025) ..........................................................8, 12

Pub. L. No. 119-17, 139 Stat. 67 (2025) ..........................................................8, 12

**Congressional Sources**

170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024)..................................................................7, 23

171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) ...................................................................7

171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) ..................................................................7

171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) ..................................................................7

171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) .................................................................7

*Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3 ...................................................... 8

*Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U ...................................................... 8

**Regulations**

88 Fed. Reg. 20,688 (Apr. 6, 2023)............................................................................ 4, 24

90 Fed. Reg. 642 (Jan. 6, 2025) .................................................................................. 4

90 Fed. Reg. 643 (Jan. 6, 2025) .................................................................................. 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(C) .................................................................. 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(D)................................................................... 4

Cal. Code Regs. tit. 13, § 1962.4.................................................................................3

Cal. Code Regs. tit. 13, § 1963.1 ................................................................................ 4

Cal. Code Regs. tit. 13, § 1963.2................................................................................. 4

Cal. Code Regs. tit. 13, § 1963.6(a) ............................................................................ 4

Cal. Code Regs. tit. 13, § 2016 ................................................................................... 4

**Court Rules**

Fed. R. Civ. P. 12(b)(1) ..............................................................................1, 10, 11

Fed. R. Civ. P. 12(b)(6) ....................................................................1, 10, 11, 16, 19

Fed. R. Evid. 201(b)(2) ............................................................................................ 8

Fed. R. Evid. 902(1) ............................................................................................... 8

N.D. Cal. Civ. R. 7-2 ..............................................................................................1

## Other Authorities

Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014) ................................ 6

All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* (Dec. 11, 2024), https://perma.cc/97Y3-Q869 ........................... 5

CARB, *Omnibus Program Initial Statement of Reasons* (June 23, 2020), https://perma.cc/32CP-SSV8 ................................................................................ 4

CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN .............................................................. 4

CARB, *Manufacturers Advisory Correspondence (MAC) ECCD-2025-08* (Aug. 25, 2025), https://perma.cc/ES5W-EK72 .................................................................. 13

GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* (May 29, 2014) .......................................................................................... 7, 20

GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38* (Nov. 30, 2018) .......................................... 7

GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Review Act to Staff Accounting Bulletin No. 121* (Oct. 31, 2023) .................... 23

George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/ 2F4U-F5PN ...................................................................................................... 14

Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C ............................................................................. 3

Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW ................................................................ 5

Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* (updated Nov. 12, 2021) ........................................................................................................... 7, 21

Richard H. Fallon, Jr. et al. *Hart & Wechsler's The Federal Courts and the Federal System* (7th ed. 2015) ...................................................................................... 19

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on _____, 2025 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 (4th Floor) of the above-named Court (Hon. Haywood S. Gilliam, Jr. presiding), located at 1301 Clay Street, Oakland, California 94612, American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association ("Intervenor-Defendants") will, and hereby do, move to dismiss Plaintiffs' amended complaint, ECF No. 157, in its entirety and with prejudice, as described below.

## MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Civil Local Rule 7-2, Intervenor-Defendants respectfully move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. This Motion is supported by the following Memorandum of Points and Authorities, the attached document that is properly the subject of judicial notice, and any argument that may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Congress passed a legislative repeal of waivers of Clean Air Act preemption issued by the Environmental Protection Agency ("EPA") for three California programs designed to ban or limit the sale of new internal-combustion vehicles. The President signed those repeals into law. As the Supreme Court recently noted, this "legislation … block[s] [these] California regulations." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 107 n.1 (2025). California and the ten other States that joined this amended complaint ("Plaintiffs") do not like this legislation. Having failed to persuade Congress, they ask this Court to repeal those laws by judicial decree.

To call this a reach is an understatement. Plaintiffs' amended complaint alleges a wide variety of legal theories, but at bottom Plaintiffs argue that this legislation is void because the Senate allowed the votes to proceed with the approval of a simple majority of Senators, rather than the three-

**2-ER-99**

fifths that Senate filibuster rules sometimes require. But the filibuster is not part of the Constitution, there is no private right to enforce it, and there is nothing more exclusively within the Legislative Branch's authority than "determin[ing] the Rules of its Proceedings." U.S. Const. art. 1, § 5, cl. 2. Allowing courts to second guess those determinations would make federal judges arbiters of those parliamentary procedures—a separation-of-powers nightmare. This is why the Congressional Review Act ("CRA")—the law that codifies the procedures Congress followed here—provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. As the Ninth Circuit has held, this forecloses judicial review of challenges like those Plaintiffs raise here. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560–64 (9th Cir. 2019). This Court also lacks jurisdiction over Plaintiffs' claims for multiple other reasons, including: Plaintiffs lack standing for their statutory claims, review is unavailable under the Administrative Procedure Act ("APA"), and this Court lacks authority to review challenges to congressional procedure. And, in any event, Plaintiffs' constitutional challenges fail to state a cognizable claim or cite a viable cause of action. This Court should dismiss.

## STATEMENT OF ISSUES

1.  Whether the Congressional Review Act bars judicial review of Plaintiffs' claims.

2.  Whether Plaintiffs lack standing for their statutory claims because their alleged injuries result from Acts of Congress, not from EPA's actions, and the requested relief would not redress their alleged injuries.

3.  Whether this Court lacks jurisdiction under the Administrative Procedure Act because the challenged EPA actions are not "final agency action."

4.  Whether Plaintiffs' constitutional claims are a non-justiciable challenge to House and Senate procedures.

5.  Whether the Declaratory Judgment Act fails to provide an independent basis for jurisdiction.

6.  Whether Plaintiffs' constitutional claims fail to state a legally cognizable claim or invoke a recognized cause of action.

///

///

**2-ER-100**

## BACKGROUND

### I.    The Clean Air Act Broadly Preempts State Regulation of Motor Vehicle Emissions

Section 202(a) of the Clean Air Act authorizes EPA to comprehensively regulate emissions from the Nation's new motor vehicles. 42 U.S.C. § 7521(a). The Clean Air Act also broadly preempts state law regulating new motor vehicle emissions. Section 209(a) provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." *Id.* § 7543(a). Preemption prevents "an anarchic patchwork of federal and state regulatory programs." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

The Clean Air Act allows one limited exception from federal preemption. Section 209(b) provides that EPA "shall … waive application of [preemption] to" California—and only California—if certain statutory criteria are met. 42 U.S.C. § 7543(b). Once California has a waiver, other states may follow. Under Section 177, "[n]otwithstanding" Section 209(a), other states "may adopt and enforce" emissions standards for new motor vehicles that are "identical to the California standards for which a waiver has been granted," provided that "California and such State adopt such standards at least two years before commencement of [the applicable] model year." *Id.* § 7507.

### II.    EPA Issues Waivers of Clean Air Act Preemption For Three California Programs

In 2020, in a misguided effort to address "the climate change crisis," California Governor Gavin Newsom announced a policy to ban new internal-combustion vehicles and replace them with "zero-emission" vehicles (i.e., battery-electric or fuel-cell-electric vehicles). *See* Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C. Over the next several years, California adopted several regulatory programs under this policy, three of which are relevant to this suit.

*First*, **Advanced Clean Cars II ("ACC II")** requires light-duty automakers to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet; by model year 2035, all cars and light trucks sold must be electric. Up to 20% of the required electric sales may be plug-in hybrid electric vehicles. *See* Cal. Code Regs. tit. 13, § 1962.4.

**2-ER-101**

*Second*, **Advanced Clean Trucks ("ACT")** requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. *See id.* §§ 1963.1, 1963.2.[1]

*Third*, the **Omnibus Low NO$_x$ ("Omnibus") Program**, among other things, sets emissions standards for nitrogen oxides ("NO$_x$") for model year 2024 and later medium- and heavy-duty vehicles and engines so low that, in practice, manufacturers are incentivized to sell some electric vehicles and engines to comply. *See id.* § 1956.8(a)(2)(C), (D).[2]

As California recognized, these programs "relat[e] to the control of emissions from new motor vehicles" and are preempted by Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Therefore California requested waivers from EPA. The Biden EPA issued a waiver for ACT in April 2023, 88 Fed. Reg. 20,688 (Apr. 6, 2023),[3] and waivers for ACC II and the Omnibus Program in January 2025, just weeks before President Biden left office. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Eleven other states and the District of Columbia have adopted one or more of the programs under Section 177 of the Clean Air Act.[4]

---

[1] In 2025, California amended ACT to ban sales of medium- and heavy-duty internal-combustion vehicles starting in model year 2036. Cal. Code Regs. tit. 13, §§ 1963.6(a), 2016. That amendment has not been considered by EPA, and so it remains preempted by Section 209. 42 U.S.C. § 7543(a).

[2] *See* CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (aspects of the Program are "intended to provide incentives for manufacturers to make more heavy-duty [zero-emission vehicles]").

[3] The April 2023 waiver also waived preemption for three other California programs: the Zero-Emission Airport Shuttle, Zero-Emission Power Train Certification, and Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance programs. 88 Fed. Reg. at 20,688.

[4] *See* CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.

## III.   Congress Repeals EPA's Waivers of Clean Air Act Preemption

Many members of Congress were dismayed by EPA's waivers, which greenlighted a ban on sales of new internal-combustion cars and light trucks in about 30% of the U.S. market by 2035,[5] recognizing that the ban could be catastrophic for the U.S. economy. Electric vehicles are far more expensive to manufacture (and so to purchase) than internal-combustion vehicles; their range is far shorter; and most of the country lacks sufficient infrastructure to charge them. Automakers warned that it would "take a miracle" for manufacturers to meet ACC II's car standards, and that the program "will depress economic activity, increase costs and limit vehicle choice."[6] California's truck regulations could be even more devastating. The limited range and payload of electric trucks would increase the cost of transporting everyday goods and raise prices, while the limited availability of compliant heavy-duty engine technology was already threatening supply disruptions.[7] Rather than await a recission by the Trump EPA, which would invariably be challenged in court and could be reversed by a future EPA, Congress opted for legislation to fully and finally settle the undeniable "major question" of whether EPA can mandate electrification and ban the internal combustion engine.

Specifically, Congress used the Congressional Review Act. Enacted in 1996, the CRA provides a set of expedited legislative procedures by which Congress may review, and ultimately disapprove, rules issued by federal agencies. Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996), *codified at* 5 U.S.C. §§ 801–808. If Congress passes and the President signs a "joint resolution" of disapproval, then the rule "shall not take effect (or continue)," and the rule "may not be reissued in substantially the same form" unless "specifically authorized by a law enacted after the date of the joint resolution." 5 U.S.C. § 801(b). The joint resolution is federal law, enacted in accordance with the constitutional requirements of bicameralism and presentment. *Ctr. for Biological Diversity*, 946

---

[5] All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* 2 (Dec. 11, 2024), https://perma.cc/97Y3-Q869.

[6] *Id.* at 3, 8.

[7] *See* Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW.

**2-ER-103**

F.3d at 562 & n.6 (citing U.S. Const. art. I, §§ 1, 7); *accord Diamond Alt. Energy*, 606 U.S. at 107 n.1. One feature of the CRA is that joint resolutions are put on a legislative fast track that is exempt from the Senate's ordinary filibuster rule and that limits the motions that Senators may raise. 5 U.S.C. § 802(d). Although Congress chose to codify an exception to the filibuster in the CRA, no law—let alone the Constitution—*compels* the Senate follow a filibuster rule for *any* legislation, whether or not the CRA applies. *See generally* Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014).

CRA procedures are typically triggered by an agency's transmission of a rule to Congress. The CRA requires federal agencies to "submit to each House of the Congress and to the Comptroller General" each rule it promulgates, along with a report that includes "a concise general statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). Once the rule is received, Congress generally has 60 days to introduce a joint resolution. *Id.* § 802(a).

But federal agencies need not submit every agency action because not every agency action is a "rule." The CRA defines that term by reference to the Administrative Procedure Act, *id.* § 804(3), which, in turn, defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). A "rule" is distinguished from an "order," which the APA separately defines as the "final disposition … of an agency in a matter other than rule making but including licensing," *id.* § 551(6), where a "license" is defined as "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission," *id.* § 551(8). Finally, the CRA restricts its application to exclude "any rule of particular applicability"—like ratemaking proceedings—and rules related to internal agency organization or management. *Id.* § 804(3).

Sometimes, an agency fails to submit a rule to Congress. In those circumstances, Congress has established an informal, ad-hoc process by which any member of Congress may ask the Government Accountability Office ("GAO") for an opinion on whether the agency action is a "rule" under the CRA. If GAO concludes the action is a "rule," Congress has by parliamentary convention typically deferred to that determination and treated publication of GAO's opinion in the

///

*Congressional Record* as constructive submission that starts the CRA's 60-day clock.[8] GAO's informal role, however, is entirely by custom. The CRA gives GAO no authority to determine whether an agency action is a "rule," and GAO has long acknowledged that its opinions are purely advisory because the "statutory scheme ultimately leaves it to *Congress* to decide whether CRA would apply." GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* 9 (May 29, 2014) (emphasis added) ("GAO Letter B-325553").

Moreover, the ad-hoc practice of consulting GAO applies *only when an agency has not submitted a rule* to Congress. GAO has explained that when an agency submits a rule—even if the agency "believes [the action] is exempt from the CRA" and submits it merely "out of an abundance of caution"—GAO will "take no position on whether the [submitted action] is a rule" because "an opinion by GAO would not further the purposes of [the] CRA by protecting Congress's CRA review and oversight authorities." GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018). In GAO's words, an agency's submission "obviates the need for a GAO opinion." *Id.* Agencies under presidents of both parties have thus submitted actions to Congress "out of an abundance of caution" without prompting a GAO response. *See, e.g.*, 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696).

Initially, EPA did not submit the ACT, ACC II, and Omnibus Program waivers to Congress. Under President Trump, EPA reversed course and transmitted the waivers to Congress after EPA determined that the waivers were rules subject to the CRA.[9]

Despite EPA's determination, several Senators sought an opinion from GAO on whether the submitted waivers were "rules" under the CRA. Am. Complaint, Ex. B at 1 n.2, ECF No. 157-2. Breaking with past practice, GAO provided a substantive response, and did so in just a few days. GAO acknowledged the circumstances were "not one in which [it] normally issue[s] a legal

---

[8] *See* Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 12–13 (updated Nov. 12, 2021).

[9] *See* 171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) (EC-439, EC-440, EC-441); 171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) (EC-484, EC-485, EC-486); 171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) (EC-518, EC-519, EC-520); 171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) (EC-660, EC-661, EC-662).

**2-ER-105**

decision." *Id.* at 1. But GAO went on to offer "[o]bservations" "to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures." *Id.* at 1, 9. Invoking its prior analysis of a different EPA action (the withdrawal of a waiver rescission), GAO concluded that the waivers were "not … rule[s] for purposes of [the] CRA because [they are] order[s] under [the] APA." *Id.* at 9.

Congress considered these arguments and ultimately disagreed with GAO's analysis and rejected GAO's unprecedented attempt to insert itself into the process. In early April 2025, resolutions of disapproval for all three waivers were introduced in the House (the "Resolutions"). By May 1, the House had passed all three Resolutions with bipartisan majorities, including 35 Democratic House members who voted to repeal the ACC II waiver, *Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3. Following CRA procedures, the Senate moved to consider the three Resolutions by majority—not supermajority—vote. On May 22, the Senate voted to adopt all three, with bipartisan disapproval of the ACC II waiver. *Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U. On June 12, President Trump signed the Resolutions into law. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

Congress had good reason to agree with EPA's determination that the waivers are "rules" under the CRA, and to discredit GAO's "observations." Although not required to provide an explanation, the Executive Branch set forth its objections to GAO's analysis in a June 18, 2025 letter from the Director of the Office of Management and Budget ("OMB") to the GAO Comptroller General. *See* Ex. 1 (reproducing letter).[10] OMB is home to the Office of Information and Regulatory

---

[10] The existence and contents of this letter are properly subject to judicial notice under Federal Rule of Evidence 201(b)(2) as facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The letter is an official government document publicly available through a government website. *See* https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf (last visited Nov. 13, 2025). And the letter is self-authenticating under Rule 902(1), because it is on official OMB letterhead, bears OMB's seal, and contains OMB Director Russell Vought's signature. Courts "routinely take judicial notice of letters published by the government,"

Affairs ("OIRA"), which is the "Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a 'major rule' within the meaning of the [CRA]," which includes "pars[ing] whether an action is a 'rule' at all." *Id.* at 1–2.

OMB explained that GAO failed to consider relevant case law, including a decision from the Ninth Circuit holding that an analogous "sub-delegation of regulatory authority to a State … is characteristic of a 'rule,' not an 'order,'" *id.* at 4–5 (citing *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)), and two federal district court decisions whose reasoning confirmed "that California waiver decisions are better classed as rules rather than as orders," *id.* at 4 (citing *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007), and *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007)). GAO also "overlook[ed] the most significant part of the entire statutory scheme": Section 177 of the Clean Air Act, which "allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing" and which makes waivers "nationally applicable," not "particular to California." *Id.* at 5 (cleaned up).

OMB also criticized GAO for failing to consider that a waiver "directly governs the conduct of motor-vehicle manufacturers *nationwide*," because "certification and conformance to California's alternative standards … creates a unique alternative nationwide compliance pathway … that displaces EPA's otherwise applicable federal standards." *Id.* (citing 42 U.S.C. § 7543(b)(3)). Therefore, like a rule, a waiver "creat[es] a new interstate regulator that can replace federal standards … across numerous States." *Id.* at 5–6. OMB also found puzzling GAO's conclusion that the waiver has "'immediate effect,'" because the Clean Air Act requires that waived California standards "give motor vehicle manufacturers [years of] 'lead time'" and "at least 'two years' of lead time for other States adopting" California's standards. *Id.* at 6.

---

like this one. *Smith v. L.A. Unified Sch. Dist.,* 830 F.3d 843, 851 n.10 (9th Cir. 2016); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) ("[i]t is appropriate to take judicial notice of … information … made publicly available by government entities" where the authenticity of the information is not subject to reasonable dispute).

Finally, OMB disagreed with GAO's assertion that a waiver merely "involve[s] considerations 'of particular facts, as opposed to general policy.'" *Id.* OMB observed that in issuing a waiver, EPA "considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place," including whether California's programs "give the industry sufficient lead time to transition to 100% electric vehicles," whether "the industry's compliance costs with that lead time [are] 'appropriate,'" and whether "the standards [are] 'technologically feasible.'" *Id.*

Although OMB agreed with EPA that the waivers are "rules" subject to the CRA, it recognized that the ultimate decision fell elsewhere: "Congress … is optimally positioned to *decide for itself* when to put rules submitted to it to CRA votes.… *That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic.*" *Id.* at 7.

## IV.   Procedural History

Within hours of the President's signing the Resolutions, Plaintiffs filed this suit. Complaint, ECF No. 1. Weeks later, Intervenor-Defendants moved to intervene. ECF No. 49. After the United States filed a motion to dismiss, ECF No. 118, Plaintiffs amended their complaint, Am. Complaint, ECF No. 157. In their amended complaint, Plaintiffs allege statutory and constitutional violations by EPA and its Administrator, non-party Congress, and the President. Plaintiffs ask this Court, among other things, to declare that the CRA does not apply to the waivers, to vacate EPA's "reclassification" of the waivers and enjoin EPA from "reclassify[ing]" other waivers, to "declare that the Resolutions were not enacted under the CRA," to declare the Resolutions void, and to enjoin EPA from enforcing the Resolutions. Am. Complaint at 44.

### ARGUMENT

A court must dismiss a claim under Rule 12(b)(1) when it lacks jurisdiction over the subject matter of a claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). This includes standing, which "plaintiffs must demonstrate … for each claim that they press … and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A court must dismiss a claim under

Rule 12(b)(6) "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). At the motion-to-dismiss stage, "factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (cleaned up) (Rule 12(b)(6)); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (Rule 12(b)(1) facial challenge). "Conclusory allegations of law," however, "are insufficient to defeat a motion to dismiss." *Lee*, 250 F.3d at 679.

Plaintiffs' amended complaint should be dismissed with prejudice under Rules 12(b)(1) and 12(b)(6). *See Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) (dismissal with prejudice is proper where "the complaint c[annot] be saved by any amendment").

## I.    The Congressional Review Act Prohibits Judicial Review

Congress has expressly withheld subject matter jurisdiction over Plaintiffs' claims in this suit. Section 805 of the CRA is unambiguous and expansive: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Although Plaintiffs amended their claims to avoid expressly invoking the CRA, their suit remains no more—and no less—than a challenge to the political branches' use of the CRA to enact Resolutions repealing EPA's waivers. As a result, judicial review of the suit in its entirety is barred by Section 805. *Ctr. for Biological Diversity*, 946 F.3d at 563.

"'Under this chapter' refers to duties the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020). Section 805 does not distinguish among actors, and therefore includes actions or omissions "by agencies, the Comptroller General, the President, and Congress." *Id.* at 1236; *see also Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) (Section 805 bars review of agency action or omission), *vacated on other grounds*, 144 S. Ct 2707 (2024) (mem.); *Wash. All. of Tech. Workers v. United States*, 892 F.3d 332, 346 (D.C. Cir. 2018) (same); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.) (same). The CRA requires, *inter alia*, that federal agencies "submit to each House of the Congress and to the Comptroller General a report" for each "rule," which includes "a concise general

**2-ER-109**

statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). That submission necessarily requires agencies to determine what actions are "rules" under the CRA. *See id.* § 804(3). The CRA then provides procedures for consideration of joint resolutions disapproving of rules, *id.* § 802, which necessarily requires that Congress first determine a resolution is eligible for those procedures. The CRA provides that a joint resolution adopted by Congress and signed by the President has the effect that the "rule shall not take effect (or continue)," *id.* § 801(b)(1), and it specifies when the rule takes effect if the President vetoes the resolution, *id.* § 801(a)(3)(B).

*All* of the actions that Plaintiffs challenge were taken "under" the CRA and so fall squarely within Section 805's prohibition. This includes EPA's characterization of waivers as "rules"; EPA's submission of the waivers to Congress; EPA's alleged failure to explain its reasoning in the "concise general statement relating to the rule," *id.* § 801(a)(1)(A)(ii); Congress's decision to consider the Resolutions under the CRA's expedited procedures; Congress's adoption of the Resolutions; and the President's decision to sign those Resolutions. Section 805 also precludes this Court from "declar[ing] that the Resolutions were not enacted under the CRA," as Plaintiffs request. Am. Complaint at 44; *see also id.* at 43, ¶ 184 (Count VI). Congress expressly stated that each Resolution was adopted pursuant to the CRA. Pub. L. No. 119-15, 139 Stat. at 65 ("Providing congressional disapproval under chapter 8 of title 5, United States Code"); Pub. L. No. 119-16, 139 Stat. at 66 (same); Pub. L. No. 119-17, 139 Stat. at 67 (same). That, too, is a "determination" beyond this Court's review. 5 U.S.C. § 805.

Section 805's bar on review applies equally to Plaintiffs' statutory and "constitutional" claims. *Ctr. for Biological Diversity*, 946 F.3d at 561 ("On its face, this language bars judicial review of all challenges to actions under the CRA, including constitutional challenges."). Despite the provision's clear and unambiguous text, the Ninth Circuit has held that courts may nevertheless consider some constitutional claims related to the CRA. *Id.* Even if correct, that exception does not apply to Plaintiffs' claims, which do not challenge the constitutionality of the CRA itself, but invoke far-fetched theories to cloak ordinary statutory challenges in constitutional language. *See infra* Section V (pp. 19–25); *cf. Webster v. Doe*, 486 U.S. 592, 603 (1988) (exception to prohibition on judicial review applies to protect "colorable constitutional claims"). Plaintiffs cannot slap a

constitutional label on their claims to evade the CRA's jurisdiction bar.

Congress withheld review of actions under the CRA for good reason. CRA resolutions are "legislation." *Diamond Alt. Energy*, 606 U.S. 107 n.1. Allowing courts to second-guess Congress's determination of what qualifies as a "rule" or other aspects of the CRA process would enable the judicial branch to override Congress's establishment of its own lawmaking procedures, raising serious separation-of-powers concerns. *See infra* Section III (pp. 17–18). It would also add significant uncertainty: "the line dividing" a rule from an order is "not always … a bright one." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Allowing judicial second-guessing would turn what is intended to be an expedited process for curtailing agency overreach into a protracted legal battle, leaving the status of a duly enacted law in limbo for months or years as litigation plays out. That is precisely what has happened here—complete with California making repeated threats of retroactive enforcement. *See, e.g.*, CARB, *Manufacturers Advisory Correspondence (MAC) ECCD-2025-08*, at 3 (Aug. 25, 2025), https://perma.cc/ES5W-EK72. Congress not only acted well within its authority by withholding judicial review for suits like this one, *Ctr. for Biological Diversity*, 946 F.3d at 563, it also acted wisely.

## II.   This Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims

### A.  Plaintiffs Lack Standing for their Statutory Claims

Plaintiffs also lack standing for their statutory claims (Counts I, II, and VI). Counts I and II allege that EPA's characterization of the waivers as "rules" and subsequent submission of the waivers to Congress were unlawful under the APA or outside EPA's statutory authority, and so somehow tainted the Resolutions passed by Congress and signed by the President. Am. Complaint at 31–36, ¶¶ 123–138, 143–145. Count VI invokes the Declaratory Judgment Act to request, "[i]n the event the Resolutions remain in effect despite [their] other claims," a declaration that "the Resolutions were not enacted under the CRA." *Id.* at 43, ¶ 184. Plaintiffs, however, lack standing to bring these claims because their alleged injury (i) is not traceable to EPA's actions and (ii) will not be redressed by relief directed to EPA's actions or by the requested declaration.

To establish standing, Plaintiffs "must show that [they] ha[ve] suffered … [1] an injury that is … [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Murthy*,

**2-ER-111**

603 U.S. at 57 (internal quotation marks omitted). Plaintiffs allege they are injured because they are "prevent[ed] … from enforcing laws they have chosen to adopt within their jurisdictions." Am. Complaint at 2, ¶ 5. That injury, however, does not result from the challenged EPA actions, but from Congress, which is not a party to this case, exercising its Article I authority to enact legislation nullifying EPA's prior Clean Air Act waivers, and from the President's signing of that legislation. *See* U.S. Const. art. I, §§ 1, 7 cl. 2–3. These legislative acts, not any action by EPA, repealed the Clean Air Act waivers at issue and triggered preemption under Section 209(a).

This "exercise [of] independent judgment" by Congress and the President severs any causal chain to EPA. *Murthy*, 603 U.S. at 60. Congress was not obligated to accept EPA's characterization of the waivers as rules or to pass Resolutions of disapproval once the waivers were submitted. Most rules that agencies submit under the CRA never make it to the floor of either House.[11] And Congress has the prerogative to act under the CRA even when an agency doesn't submit an action. *See supra* Section III (pp. 5–7). Nor was the President required to sign the Resolutions into law; he exercised independent judgment in doing so. These "unfettered choices made by independent actors" extinguish any link between the challenged EPA actions and Plaintiffs' alleged injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Nor can Plaintiffs manufacture injury by speculating that EPA might, at some indeterminate time in the future, submit another unidentified waiver to Congress under the CRA. Am. Complaint at 29–31, ¶¶ 114–119. As explained, Plaintiffs aren't injured by EPA's submissions, so whether any new submission occurs is irrelevant. In any event, Plaintiffs do not plead any facts showing a new submission is likely. But even if they had, their theory of injury depends entirely on Congress passing new legislation and the President signing it. As recent events have demonstrated, few things are more speculative than a belief that Congress will pass new legislation.

Plaintiffs' alleged injury also will not be redressed "by a favorable ruling" on EPA's actions, *Murthy*, 603 U.S. at 57, because a declaration or order related to *EPA's actions* would not render

---

[11] *See* George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN.

the *Resolutions* unenforceable. The Resolutions were enacted "in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President." *INS v. Chadha*, 462 U.S. 919, 958 (1983); *see also United States v. Ballin*, 144 U.S. 1, 6 (1892) (under the "federal constitution," "the act of a majority of the quorum is the act of the body"). Therefore, the Resolutions are and will remain a legitimate exercise of the federal legislative power, regardless of any alleged deficiency in EPA's non-binding characterization and submission. *See Chadha*, 462 U.S. at 951. Simply put: there is no "fruit of the poisonous tree" doctrine for legislation. *Cf. Utah v. Strieff*, 579 U.S. 232, 237 (2016). For similar reasons, a declaration that the Resolutions were not "enacted under the CRA" would provide Plaintiffs no relief. Am. Complaint at 43, ¶ 184. Setting aside that this Court has no power to make that determination, *see supra* Section I (pp. 11–13), such a declaration wouldn't render the challenged or future Resolutions unenforceable, since a constitutionally enacted law remains valid regardless of the "CRA" label, *see infra* Section III (pp. 17–18).

Nor would the persuasive effect of the Court's opinion provide redress: "Whatever a court may say in an opinion does no more to compel [Congress and the President] to change how they exercise their [lawmaking power] than an order vacating" EPA's actions or declaring the Court's opinion on the applicability of the CRA. *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring in the judgment). Nor may Plaintiffs seek "damages" or prospective relief against EPA to remedy an alleged past violation; and Plaintiffs do not "claim that they might enjoin Congress." *California v. Texas*, 593 U.S. 659, 673 (2021); *see also Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 108–09 (1998) (failure to submit mandatory reports in the past did not authorize a prospective injunction). A decision of the court related to EPA's actions or Congress's use of the CRA "would amount to 'an advisory opinion without the possibility of any judicial relief.'" *California v. Texas*, 593 U.S. at 673.

## B. This Court Lacks Jurisdiction Under the APA

For similar reasons, the challenged EPA actions are not "final agency action," 5 U.S.C. § 704, and so this Court lacks jurisdiction over Plaintiffs' APA claim, Am. Complaint at 31–35, ¶¶ 120–141 (Count I). *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018) ("Final agency

**2-ER-113**

action is a jurisdictional requirement imposed by 5 U.S.C. § 704" (cleaned up)).[12]

An agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). EPA's actions do not satisfy *Bennett*'s second criterion. EPA's characterization of the waivers as "rules" and subsequent submission to Congress created no right, imposed no obligation, and had no "direct consequences" for Plaintiffs. *Dalton v. Specter*, 511 U.S. 462, 469 (1994). Even after submission, the waivers remained effective unless and until Congress passed and the President signed resolutions of disapproval. Like other agency actions the Supreme Court has held are not final, EPA's characterization and submission of the waivers were, at most, "recommendations [that] were in no way binding on the President [and Congress], who had absolute discretion to accept or reject them." *Bennett*, 520 U.S. at 178; *see Dalton*, 511 U.S. at 469 (Secretary of Defense's base closure recommendations were not final because the "action that will directly affect the military bases is taken by the President, when he submits his certification of approval to Congress" (cleaned up)); *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (Secretary of Commerce's report of census results was not final because it "serves more like a tentative recommendation" to the President, who ultimately submits a count to Congress).[13]

Plaintiffs also cannot evade the APA jurisdictional bar by claiming that EPA's actions were "ultra vires." Am. Complaint at 35–36, ¶¶ 142–148 (Count II). The Supreme Court recently made clear that the ultra vires exception "is a narrow one": it "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in statute," not merely when "an agency has arguably reached a conclusion which does not comport with the

---

[12] Elsewhere, the Ninth Circuit has opined that "the fact that an agency decision is not final under the APA is not a defect in subject matter jurisdiction." *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 830 (9th Cir. 2002). Under that approach, lack of finality is assessed under Rule 12(b)(6). *County of San Diego v. Nielsen*, 465 F. Supp. 3d 1073, 1086 (S.D. Cal. 2020). Either way, Plaintiffs' APA claim does not challenge final agency action and so must be dismissed.

[13] Section 805's prohibition of judicial review also precludes APA review of EPA's actions here. 5 U.S.C. § 701(a)(1) (APA review does not apply "to the extent that … [other] statutes preclude judicial review"); *see supra* Section I (pp. 11–13).

law." *NRC v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). Plaintiffs' ultra vires claim identifies no specific statutory prohibition that EPA violated, but "dress[es] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. It is therefore not subject to ultra vires review.

## III. Plaintiffs' Constitutional Claims Are Non-Justiciable Objections to Congressional Procedures

Plaintiffs also claim that Congress's enactment of the Resolutions violates separations of powers, the Tenth Amendment, and structural principles of federalism. *See, e.g.*, Am. Complaint at 37–41, ¶¶ 149–169 (Counts III and IV). No matter how framed, these claims amount to a non-justiciable challenge to House and Senate procedures.

"The constitution empowers each house to determine its rules of proceedings." *Ballin*, 144 U.S. at 5. That power is "absolute and beyond the challenge of any other body or tribunal," subject to very narrow limitations: Congress may not "by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the … rule and the result which is sought to be attained." *Id.* "Neither … the advantages or disadvantages, the wisdom or folly, of … a rule [of Congress] present any matters for judicial consideration." *Id.* "In short, the Constitution textually commits the question of legislative procedural rules to Congress." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007).

Plaintiffs' claims asserting constitutional defects in the process of enacting the Resolutions are "question[s] of legislative procedural rules" that this Court lacks authority to review. *Id.* Plaintiffs allege that Congress improperly (i) ignored the non-binding advice of GAO and the Senate Parliamentarian, Am. Complaint at 40, ¶ 163; (ii) "adopted a procedural rule" that permits Congress to apply expedited procedures to agency actions determined to be "rules" by the Executive Branch and submitted to Congress, *id.* at 38, ¶ 157; (iii) applied the CRA's procedures to the Resolutions, *id.* at 39–40, ¶ 163, and (iv) adopted the Resolutions without sufficient "debate" or "state official testimony," *id.* at 40, ¶¶ 164–165. In essence, Plaintiffs complain that the Senate chose to adopt the Resolutions without applying the filibuster and without seeking Plaintiffs' advice. But selecting the procedural rules to apply to pending legislation is a matter squarely committed to each Chamber's discretion by the Constitution. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the

Rules of its Proceedings[.]"). And so determining whether to apply the CRA's "accelerated procedure is 'an exercise of the rulemaking power of the Senate and House of Representatives, respectively.'" *Ctr. for Biological Diversity*, 946 F.3d at 557 (quoting 5 U.S.C. § 802(g)). The Constitution provides no right to particular congressional procedures or participation. Allowing the Senate to vote on the Resolutions without a prior supermajority procedural vote or testimony from Plaintiffs therefore violates no "constitutional restraints or … fundamental rights." *Ballin*, 144 U.S. at 5; *see also infra* Section V (pp. 19–25). Moreover, use of expedited procedures and limited debate is "reasonabl[y] relat[ed]" to Congress's desire to expeditiously address what it viewed as EPA's error in issuing the waivers. *Ballin*, 144 U.S. at 5.

In modern parlance, whether Congress may consider the Resolutions using CRA procedures is a "political question" that "revolve[s] around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962). The "presence of a political question deprives a court of subject matter jurisdiction." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980–81 (9th Cir. 2007).

The political question doctrine applies with full force here. The role of establishing and applying procedural rules is "textually … commit[ted]" by the Constitution to each Chamber of Congress. *Baker*, 369 U.S. at 217. A court cannot "independent[ly] resol[ve]" Plaintiffs' claims "without expressing lack of the respect due" Congress in executing its lawmaking function or "without an initial policy determination"—like whether Congress should credit GAO's non-binding (and extra-statutory) observations over competing recommendations—"of a kind clearly for nonjudicial discretion." *Id.* Nor would it matter if Congress had departed from its previous practice in passing the Resolutions (although it did not), since "the asserted failure of Congress to comply with its own procedural rules" in adopting the Resolutions "is a non-justiciable political question beyond [this Court's] power to review." *Consejo de Desarrollo Economico*, 482 F.3d at 1171–72.

## IV.   This Court Lacks Jurisdiction Under the Declaratory Judgment Act

Finally, even if Plaintiffs' claim for a declaratory judgment did not fail on its own terms, *see supra* Sections I–II.A (pp. 11–15), Plaintiffs cannot bootstrap jurisdiction by seeking declaratory

**2-ER-116**

relief, *see* Am. Complaint at 43, ¶¶ 180–184 (Count VI). The Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). The "existence of jurisdiction over a declaratory action" therefore "depends on the answer to a hypothetical question: … would there have been a nondeclaratory action (i) concerning the same issue, (ii) between the same parties, (iii) that itself would have been within the federal courts' subject-matter jurisdiction?" Richard H. Fallon, Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 841 (7th ed. 2015). Because there is no nondeclaratory action concerning the same issue over which this Court has jurisdiction, *see supra* Sections I–III (pp. 11–18), this Court lacks authority to consider Plaintiffs' claim for declaratory relief.

## V.    Plaintiffs Fail to State a Constitutional Claim

Plaintiffs' constitutional claims should also be dismissed because they fail to state a cognizable claim. Fed. R. Civ. P. 12(b)(6).

### A.    Plaintiffs Fail to State a Separations-of-Powers Claim

Plaintiffs allege that Congress violated separation of powers principles by exercising judicial power, Am. Complaint at 37–38, ¶¶ 151–154, and allowing the Executive Branch to "intru[de]" on "internal legislative procedure," *id.* at 38–39, ¶¶ 155–158 (Count III). Neither theory is plausible.

*First*, Plaintiffs claim that Congress exercised judicial power because the Resolutions "'create no new substantive law' but instead determine 'how pre-existing law applies to particular circumstances.'" *Id.* at 37, ¶ 153 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016)). But that misunderstands the Resolutions, and the CRA itself. The Resolutions *do* create new substantive law, and in so doing effectuate a new legal standard: namely, that the carveout from Clean Air Act preemption for state vehicle emissions regulations does not include ACC II, ACT, and the Omnibus Program, and substantially similar regulations. "When Congress enacts legislation that directs an agency to [rescind] a particular [action], 'Congress has amended the law.'" *Ctr. for Biological Diversity*, 946 F.3d at 562. The Resolutions thus "compelled changes in law, not findings or results under old law." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992). The Resolutions are therefore "enforceable as a change to substantive law, even though [they] did not state

that [they] constituted an amendment to" the Clean Air Act or, for that matter, the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 562. And "because the [Resolutions] changed the substantive law, [they do] 'not violate the constitutional separation of powers' even though [they may] … 'chang[e] the law applicable'" to "'pending litigation.'" *Id.* (*quoting All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)).

*Second*, Plaintiffs claim that Congress improperly "allow[ed] for intrusion by, and coercive influence of, the Executive Branch on internal legislative procedure." Am. Complaint at 38–39, ¶ 157. But Plaintiffs' own account shows that both Chambers exercised their own independent judgment and applied their own rules of procedure in adopting the Resolutions under the CRA. Members of the House "introduced the Resolutions" about "a month" after GAO issued its analysis, well aware of the dispute over the waivers' characterization, *id.* at 22, 24, ¶¶ 86, 94, and "voted to adopt all three Resolutions" by majority vote, consistent with House rules, *id.* at 25, ¶ 96. Members of the Senate were also familiar with GAO's opinion, as well as with other views. *Id.* at 22–23, ¶¶ 87, 90–91. Faced with competing interpretations, a majority of the Senate agreed that rules submitted by Executive Branch agencies consistent with "Section 802 of the Congressional Review Act" should be eligible for consideration under the CRA's expedited procedures. *Id.* at 26–27, ¶ 104. The Senate then went on, by majority vote, to adopt the Resolutions. *Id.* at 29, ¶ 111. Throughout the legislative process, each Chamber of Congress—not the Executive Branch—determined how to apply its rules and procedures. Far from allowing "the Executive Branch to manipulate legislative procedure," *id.* at 38, ¶ 155, each Chamber exerted control over its own procedures to achieve the outcome it desired.

Nor does the Senate's considered decision to credit the Executive Branch's determination of which agency actions are rules give the Executive Branch "unbridled discretion to trigger" CRA procedures. *Id.* at 38, ¶ 157. The Senate remains in full control of its internal procedures and can, at any time, choose to change its procedures or disregard an Executive Branch determination under the CRA. *Ballin*, 144 U.S. at 5 (each Chamber has "a continuous power" to make its own rules); GAO Letter B-325553, *supra*, at 9 ("CRA's expedited procedure for congressional review of agency rules was enacted as an exercise of the authority of the Senate and House of Representatives

to set their own rules, with full recognition of the right of either House to change the rules."). In any event, the Constitution does not forbid Congress from consulting the Executive Branch in determining how it should proceed. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches."). That is all that the Senate did here by establishing a default practice that it will accept a determination by an Executive Branch agency that a submitted action is a "rule" under the CRA. Individual lawmakers remain free to disagree and to vote their disagreement. That is no more a violation of separation of powers than the Senate's long-standing practice of accepting a determination by GAO—an unelected body not mentioned in the Constitution—that an action that has not been submitted is a "rule," *see supra* Section III (pp. 6–7), a practice that Plaintiffs not only do not challenge but endorse, even though it is not contemplated by the CRA, *see, e.g.*, Am. Complaint at 40, ¶ 165.

### B.  Plaintiffs Fail to State a Tenth Amendment or Federalism Claim

Plaintiffs also fail to state a claim under the Tenth Amendment or federalism principles. Am. Complaint at 39–41, ¶¶ 161–169 (Count IV). Plaintiffs claim that "numerous 'extraordinary defects in the national political process'" that led to the Resolutions' enactment "render the Resolutions 'invalid under the Tenth Amendment' and the principles of federalism embedded in the Constitution's structure." *Id.* at 41, ¶ 167 (quoting *South Carolina v. Baker*, 485 U.S. 505, 512 (1988)). But Plaintiffs fail to identify any defects, much less "extraordinary" ones, "that might lead to such invalidation." *South Carolina*, 485 U.S. at 512. "Where, as here, the national political *process* did not operate in a defective manner, the Tenth Amendment is not implicated." *Id.* at 513.

Plaintiffs complain that Congress and the President targeted the waivers "through extraordinary procedures." Am. Complaint at 39–40, ¶ 163. But using the CRA to invalidate an agency action is hardly "extraordinary." It's been done over a dozen times since the CRA was enacted, with CRA resolutions of disapproval signed by Presidents of both parties. *See* Carey & Davis, *supra*, App. A (cataloging rules overturned under the CRA through Nov. 12, 2021).

Nor do Plaintiffs identify anything defective in the CRA's expedited procedures, themselves, or in Congress's application of them here. States have no constitutional right to demand "rigorous

debate" or "state official testimony" that would "inform members of Congress about the consequences of their actions." Am. Complaint at 40, ¶ 164. The Supreme Court has already rejected another State's nearly identical argument that "the political process failed" where a law was "'imposed by the vote of an uninformed Congress relying upon incomplete information.'" *South Carolina*, 485 U.S. at 513. As the Court observed, nothing in "the Tenth Amendment authorizes courts to second-guess the substantive basis for congressional legislation." *Id.* That is especially so when, as here, Congress is merely curtailing its prior decision to treat one State as more equal than the others. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("federalism concerns" require that any "departure from the fundamental principle of equal sovereignty [among the states] requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets").

Plaintiffs also complain that they "had no opportunity to participate in the Executive Branch's relabeling of the waivers as 'rules' and submission of a 'report' to Congress." Am. Complaint at 40, ¶ 165. But States have no statutory role to play in an agency submission under the CRA, *see* 5 U.S.C. § 801, nor do they have any constitutional right to influence it. Plaintiffs also were not improperly "exclu[ded] and isolat[ed]" from Congress's decision to credit the Executive Branch's characterization of the waivers as rules. Am. Complaint at 40, ¶ 165. States themselves get no votes in either Chamber, of course, but the interests of their citizens were well represented. Together, citizens of the eleven Plaintiff States are represented by 22 Senators and 130 members of the House of Representatives, accounting for nearly a quarter of the Senate and about thirty percent of the House. These members of Congress participated fully in the legislative process that resulted in the enactment of the Resolutions, including in the debate leading up to the votes.[14] Plaintiff States, therefore, had all the participation they were due.

Nor is it "extraordinary," or even unusual, for an Executive Branch agency to disagree with

---

[14] *See, e.g.*, Am. Complaint, Ex. B at 1 n.2 (Rhode Island Senator Whitehouse, and California Senators Padilla and Schiff requested opinion from GAO); Am. Complaint, Ex. C at 10–16, ECF No. 157-3 (Senator Whitehouse speaking on the Senate Floor); *id.* at 17 (Senator Padilla speaking on the Senate Floor); *id.* at 18–19 (Senator Schiff speaking on the Senate Floor); *id.* at 23, 30–32 (Massachusetts Senator Markey speaking on the Senate Floor).

GAO about whether a particular agency action is a "rule" under the CRA. Am. Complaint at 39–40, ¶ 163. Agencies often disagree with GAO's conclusions.[15] What Plaintiffs allege is a "defect" is merely their disagreement with Congress's decision in this instance to side with the agency rather than with GAO.

But Congress isn't constitutionally required to defer to GAO, and Congress's decision to depart from GAO's conclusion here wasn't arbitrary. As OMB explained, there are strong reasons to conclude that the waivers are "rules" of "general applicability" for purposes of the CRA. *See* Ex. 1 at 3–6. The Ninth Circuit has explained:

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals[.]… Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.

*Yesler*, 37 F.3d at 448 (citations omitted). The Ninth Circuit therefore held that a determination by the federal Department of Housing and Urban Development ("HUD") that the state of Washington's Public Housing Authority could substitute state eviction procedures for federal ones in federally funded housing projects was a "rule" under the APA. *Id.* at 448–49.

Like HUD's determination, EPA's waivers allowing Plaintiffs to substitute state emissions standards for federal ones have "all the hallmarks of a rule." *Id.* at 448. The waivers "had no immediate, concrete effect on anyone, but merely permitted" California and other states to enforce state emissions standards "in the future." *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C), requiring lead time for California standards); *id.* § 7507(2) (other states must "adopt such standards at least two years before commencement of [the applicable] model year").

---

[15] *See, e.g.*, GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Review Act to Staff Accounting Bulletin No. 121*, at 1 (Oct. 31, 2023) (SEC staff bulletin is a rule subject to the CRA, despite SEC's contrary conclusion); 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696) (transmitting action to Congress even though "EPA disagrees with GAO[]" and "does not believe that the … action[] is a 'rule'" under the CRA).

EPA waivers therefore have "prospective" rather than "immediate" effect. *Yesler*, 37 F.3d at 448. The waivers also "affected the rights of a broad category of individuals not yet identified": manufacturers who, in the future, may sell new motor vehicles in those states. *Id.*

As with HUD's determination, it doesn't matter "that the manner in which [EPA] made its decision[s] shares certain features with adjudications." *See id.* at 449. "The form of the proceeding is not dispositive; what counts is its effect." *Id.* And the effect of a waiver is that of a rule that implements "a unique alternative nationwide compliance pathway" governing conduct of manufacturers nationwide. Ex. 1 at 5; 42 U.S.C. § 7543(b)(3) ("compliance with [California's] standards shall be treated as compliance with applicable Federal standards"). EPA's waiver decisions "plainly involved more than applying a rule of decision to particular facts," including weighing policy-laden considerations like the standards' technological feasibility and cost appropriateness. *Yesler*, 37 F.3d at 449; 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C)).

The waivers also are "generally," not "particularly," applicable. Once EPA issues a waiver, any other state may adopt California's standards without any additional factual showing or hearing. 42 U.S.C. § 7507. A waiver therefore imposes obligations on manufacturers nationwide, which is why—until the Biden EPA's midnight January 2025 waivers—EPA regularly concluded that waivers are "nationally applicable" or of "nationwide scope [and] effect." 88 Fed. Reg. at 20,725 (ACT waiver). Two federal district courts have agreed, opining that EPA waivers give effect to standards that are equivalent to federal regulations. *Green Mountain Chrysler*, 508 F. Supp. 2d at 347 (concluding it is "beyond serious dispute … that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation"); *Cent. Valley Chrysler-Jeep*, 529 F. Supp. 2d at 1173 (finding "no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation"). EPA and Congress were thus correct to treat the waivers as "rules" under the CRA, despite GAO's contrary conclusion.

At bottom, Plaintiffs disagree with the Senate's decision to curtail California's special treatment under the Clean Air Act without applying filibuster rules. Am. Complaint at 41, ¶ 167 (describing the Resolutions as an "end-run"). But Congress's ability to choose the procedures that it

applies to any particular legislation isn't a "defect" of the legislative process, but a feature of the constitutional design. The Senate isn't limited to using procedures to which "[a]ll of the States consented." *Contra* Am. Complaint at 40, ¶ 166. "Each House," alone, "determine[s] the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. That is all that the Senate did here when deciding to treat the waivers as "rules" under the CRA. Plaintiffs have no right to the filibuster under the Tenth Amendment or any other provision of the Constitution, even for legislation in which they have a particular interest.

Because Plaintiffs have not identified any defects in the legislative process leading to the Resolutions' enactment, much less "extraordinary" ones, Plaintiffs' Tenth Amendment claim fails.

### C.  Plaintiffs Lack a Cause of Action for Their Constitutional Claims

Finally, Plaintiffs' constitutional claims also fail because they lack a cause of action. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose, *see, e.g.*, 42 U.S.C. § 1983." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation omitted). No constitutional provision, doctrine, or statute cited by Plaintiffs provides a right to sue to challenge the internal procedures of Congress, as Plaintiffs' constitutional claims do. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015). Nor can Plaintiffs successfully invoke the "inherent equitable power" of federal courts. Am. Complaint at 41, ¶ 171 (Count V). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and the CRA's jurisdiction stripping provision announces Congress's "'intent to foreclose' [the] equitable relief" that Plaintiffs seek. *Armstrong*, 575 U.S. at 327–28; *see supra* Section I (pp. 11–13).

### CONCLUSION

For the foregoing reasons, Plaintiffs' entire amended complaint should be dismissed with prejudice for lack of subject matter jurisdiction and failure to state any cognizable claim.

Dated: _____ ___, 2025          Respectfully submitted,

_____
Michael Buschbacher (*pro hac vice*)
James R. Conde (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

John B. Thomas (Bar No. 269538)
Jessica Wahl (Bar No. 321887)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
jthomas@hicks-thomas.com

*Counsel for Intervenor-Defendants
American Free Enterprise Chamber of Commerce,
Illinois Corn Growers Association, Indiana Corn
Growers Association, Iowa Corn Growers Associa-
tion, Kansas Corn Growers Association, Kentucky
Corn Growers Association, Michigan Corn Growers
Association, Missouri Corn Growers Association,
Nebraska Corn Growers Association, Tennessee
Corn Growers Association, Texas Corn Producers,
Wisconsin Corn Growers Association, and Na-
tional Corn Growers Association*

**2-ER-124**

# Ex. 1



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

June 18, 2025

Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

Re:   **Post-CRA Resolutions Response to GAO's March 6, 2025 "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act"**

Dear Mr. Comptroller General:

Late last month, the Senate voted in favor of three joint House resolutions (which by then had passed the House)[1] invalidating three waivers of preemption granted by EPA to California.[2] The analysis below buttresses Congress's legal conclusions ***both*** to substantively override those waivers ***and*** to deem the waivers to be rules subject to the Congressional Review Act ("CRA") in the first place.

More specifically, this letter provides the Office of Management and Budget's ("OMB's") response to a March 6, 2025 Government Accountability Office ("GAO") letter concerning application of the CRA to these three waivers. In preparing this letter, I have consulted with the Office of Information and Regulatory Affairs ("OIRA"), which has a statutorily assigned role in the CRA process and reports to me as part of OMB.

OMB strongly disagrees with GAO's analysis (styled as a set of "Observations") for numerous reasons falling into two basic categories—GAO's lack of authority in this area ***and*** GAO's flawed administrative law analysis of how to classify when an agency action is deemed a rule versus an adjudication. I turn first to the four reasons why GAO exceeded its authority:

---

[1] *See* H.J. Resolutions 87, 88, and 89, *available at* https://www.congress.gov/bill/119th-congress/house-joint-resolution/87; https://www.congress.gov/bill/119th-congress/house-joint-resolution/88; and https://www.congress.gov/bill/119th-congress/house-joint-resolution/89 (last visited June 17, 2025).
[2] *See* 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 642 (Jan. 6, 2025); 68 Fed. Reg. 20,688 (Apr. 6, 2023).

**2-ER-126**

## I. GAO'S LACK OF POWER IN THIS AREA

***First, GAO has no legal role whatsoever*** in deciding whether an action the Executive Branch submits to Congress for consideration under the Congressional Review Act ("CRA") is a "rule" or an "adjudication." That role is assigned instead to the Administrator of OIRA (see below for additional details) and ultimately Congress.

***Second, GAO also has no expertise in this area***, whereas OIRA routinely reviews federal actions to determine their character, consistency with law, and whether they meet the basic tests of rationality, such as producing net benefits or net costs, and at what level. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see also* Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). When performing zone-of-interests analysis, for instance, the Supreme Court considers agency expertise to be a relevant prudential factor.[3] Just so here. As a prudential matter, GAO's non-expert Observations were properly not be credited by Congress and should not be in the future because GAO lacks expertise in this area, being an agency with a different assigned role.

***Third***, GAO has reached the opposite conclusion in the past. Indeed, as Comptroller, you ***conceded*** both the lack of a GAO role here and that GAO's Observations took an unprecedented legal position when being questioned recently by Representatives Valadao (CA) and Moore (WV).[4]

***Fourth, and worst of all, GAO's "Observations" functionally attempt to interfere with the democratic process.*** Members of Congress should decide for themselves whether to apply the CRA to a particular action of the Executive Branch, not GAO. If Congress had wanted GAO to have a gatekeeping role over application of the CRA, Congress would have said so in clear terms. The silence in the statute on this point is telling. And Congress's enactment of the joint resolutions of disapproval represents an express rejection of GAO's actions.

\* \* \* \* \*

OIRA is the Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a "major rule" within the meaning of the Congressional Review Act ("CRA" or "the Act"). *See* 5 U.S.C. § 804(2). Part of that role is to parse whether an action is a "rule" at all. Given this statutory role and based as well on OIRA's experience, I explain in detail below OMB's affirmative determination that the waivers are "rules" subject to the CRA.

As GAO notes, in granting those waivers, the prior Administration summarily asserted that the actions at issue are not subject to the Act. But following the change in Administration, EPA's new Administrator reassessed the agency's evaluation and

---

[3] *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226–27 (2012) (considering Department of Interior regulations when resolving a zone-of-interests dispute); *Federal Defenders of N.Y. v. Federal Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (same as to federal BOP regulations). Zone-of-interests analysis constitutes a prudential jurisdictional analysis. *See Bennett v. Spear*, 520 U.S. 154, 162 (1994). We argue by analogy here that GAO lacks the congressional equivalent of jurisdiction over the CRA question at issue.

[4] *See* Hearing Before the House Committee on Appropriations, Subcommittee on the Legislative Branch, 119th Congress (Apr. 7, 2025), *available at* http://appropriations.house.gov/schedule/hearings/budget-hearing-government-accountability-office-congressional-budget-office-and (last visited June 17, 2025).

concluded that the waivers are best characterized as rules of general applicability within the meaning of the Act.[5]

Like Congress, OMB agrees with EPA Administrator Zeldin that the waivers are rules of general applicability subject to the CRA. And regardless, even if the question were close (which it is not), it was prudent for the EPA Administrator to submit the waivers to Congress out of an abundance of caution and out of deference to Congress's role in our constitutional Republic. This common agency practice obviates any advisory role for GAO.[6] Indeed, EPA has previously sent a prior action revoking a Clean Air Act preemption provision to Congress and that action remains listed on GAO's own website as a "final rule."[7]

OMB therefore believes that no additional information was necessary for Congress to discharge its legislative role, or for GAO to discharge its *ad hoc* advisory role. As GAO through a prior general counsel once testified before the Senate, the Act does not give GAO power "to decide what a rule is."[8] As GAO further explained in its March 6, 2025 letter concerning these waivers, *see* B-337179, GAO does not even "normally issue a legal decision" when an agency submits an action for review. *Id.* at 1. Indeed, OMB is unaware of GAO ever doing so before now. *See also supra* n.4.

As GAO notes in its letter to congressional requesters, "GAO does not issue formal decisions on actions that agencies have submitted to Congress as rules under the CRA because that submission generally obviates the need for a GAO decision on the matter." *Id.* at 1 n.3.[9] Hence, that should have marked the conclusion of GAO's involvement.

In its March informal letter to congressional requesters, however, GAO nevertheless departed from its longstanding practice and opined (albeit informally) that the submitted waivers were not rules of general applicability, citing a prior GAO opinion about a different waiver and claiming that the same legal analysis would apply to these three submitted waivers. *See* B-337179 at 7. GAO also claims that EPA has not explained

---

[5] "The Biden Administration failed to send rules on California's waivers to Congress, ***preventing Members of Congress from deciding on extremely consequential actions that have massive impacts and costs across the entire United States.*** The Trump EPA is transparently correcting this wrong and rightly following the rule of law," said Administrator Zeldin.

EPA, Press Release, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* (Feb. 14, 2025), *available at* https://www.epa.gov/newsreleases/trump-epa-transmit-california-waivers-congress-accordance-statutory-reporting (last visited June 17, 2025) (emphasis added). GAO's footnote 15 in its Observations simply reflects the prior Administration's attempt to sidestep CRA review of California waiver decisions, relying on Biden-era EPA *Federal Register* notice from 2023 and a so-called "midnight" rule issued on January 6, 2025—precisely the kind of rule that the CRA was especially designed to place under Congress's watchful eye.

The position we take here is also consistent with that of the Small Business Administration's Office of Advocacy. *See* Advocacy Submits Comments on EPA Waiver Request for California Locomotive Regulation (Apr. 23, 2024), *available at* https://advocacy.sba.gov/2024/04/23/advocacy-submits-comments-on-epa-waiver-request-for-california-locomotive-regulation/ (last visited June 17, 2025) ("The Clean Air Act allows other states to implement California's standards once they are finalized. Advocacy is concerned that the ability of other states to potentially implement the In-Use Locomotive Rule ***turns a state regulation into a de facto national regulation.*** Advocacy is concerned that California's proposed rule will disproportionately harm small locomotives [and] small businesses nationwide who rely on the country's rail system.") (emphasis added).

[6] *See, e.g.,* EC-5696, 170 Cong. Rec. S5883 (Sept. 9, 2024) (EPA "does not believe that the enclosed actions is [*sic*] a 'rule' within the meaning of 5 U.S.C. 804(3). Nevertheless, out of an abundance of caution, EPA is voluntarily submitting the action 'to each House of the Congress and the Comptroller General,' for their review under 5 U.S.C. 801(a).").

[7] *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, FRL-10000-45,* https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a "final rule.").

[8] *Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and Nat. Res. and H. Comm. On Res.,* 105th Cong. 20 (1977).

[9] *See also Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38,* B-330376 (Nov. 30, 2018).

why it disagrees with GAO. This letter provides the Executive Branch's response to GAO.

## II. GAO'S FLAWED ADMINISTRATIVE LAW ANALYSIS

In OMB's view, GAO's opinion overlooks and misrepresents important aspects of how preemption waivers under the Clean Air Act work under Section 209(b) of that statute as a matter of administrative law.

GAO's foundational claim is that a waiver of preemption is an "order" (by which it appears to mean something like a "license" particular to California, though GAO does not actually reach that conclusion) and thus is not a "rule" of general applicability. In the alternative, GAO claims that, if the waiver is a rule, it is one of particular applicability. OMB disagrees with both of these claims for five reasons.

*First*, GAO's conclusion that the waivers are "orders" is inconsistent with judicial decisions interpreting the Administrative Procedure Act, which forms the basis for the CRA's definition of a "rule."[10] Courts have been clear that sub-delegation of regulatory authority to a State—like that accomplished through the waivers—is characteristic of a "rule," not an "order." The seminal case here is *Yesler Terrace Community Council v. Cisneros*, which involved HUD's determination that Washington State's public housing authority could substitute its own eviction procedures for federally required ones. 37 F.3d 442 (9th Cir. 1994). The Ninth Circuit rejected HUD's argument that this was an "order," concluding that HUD's action "has all the hallmarks of a rule. HUD's determination has no immediate, concrete effect on anyone, but merely permitted [the Washington Public Housing Authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.* at 448.

Moreover, two separate district courts were called on to carefully analyze the Clean Air Act mobile source program including its preemption provision. And the analysis of each parallel OMB's conclusion that California waiver decisions are better classed as rules rather than as orders. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007) ("[O]nce EPA issues a waiver for a California emissions standard" it has "the same stature as a federal regulation."); *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

The *Yesler* analysis, as confirmed by the Clean Air Act-specific logic of the *Green Mountain* and *Central Valley* district courts, applies here. The waivers at issue have "no immediate, concrete effect on anyone, but merely permit[]" California (and other States) to enforce different standards "in the future." *Id.* The waivers similarly "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *Id.*

---

[10] *See* 5 U.S.C. § 804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]" with certain exceptions).

Page **4** of **7**

*Yesler* also shows why it is irrelevant that EPA styled its waivers as "decision[s]" and initially summarily disclaimed application of the CRA. As the Ninth Circuit explained, "that the manner in which [an agency] made its decision shares certain features with adjudications" is not determinative. *Id.* at 449. "The form of the proceeding is not dispositive, what counts is its *effect.*" *Id.* (emphasis added). The waivers, like the HUD determination in *Yesler*, have "legal consequences for yet-to-be-identified individuals only prospectively," *i.e.*, "the effects of a rule, not of an adjudication." *Id.*

GAO curiously cites *Yesler* on page 7 of its analysis, yet seems oblivious to the fact that *Yesler*, as applied here, leads to the opposite outcome than the one which GAO advocates. GAO does not even say anything about why waivers are distinguishable from the delegation of eviction authority at issue in *Yesler*.

***Second***, unlike an ordinary license, a waiver of Section 209(a) Clean Air Act preemption does more than grant California alone an exemption from a prohibition under the Clean Air Act. Under Section 177 of the Clean Air Act, 42 U.S.C. § 7507, a waiver allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing. As EPA explained in the Advanced Clean Trucks waiver, "[t]his final action will not only affect manufacturers of new heavy-duty vehicles and engines sold in California, but also manufacturers that sell their new heavy-duty vehicles and engines in those states that have already adopted or may choose to adopt California's regulations"—consequently, "this final action is ***nationally applicable.***"[11]

Currently, 18 States have adopted at least one of California's electric-vehicle standards under Section 177. GAO's claim that a waiver is "particular to California" thus overlooks the most significant part of the entire statutory scheme. GAO's analysis, however, does not address this provision in any form.

Nor did GAO address Section 177's prohibition on creating a "third vehicle" that could lawfully be sold in the United States. Of course, the point of the "third vehicle" prohibition confirms that there are two and only two nationally applicable automobile emissions regimes that can govern in the United States: (1) EPA's federal car standards, unmistakably issued exclusively in the form of regulations; and (2) California's standards, because those standards can "travel" under Section 177 to govern in non-California States without a separate waiver.[12] It makes no sense to imagine that federal-car States are governed via regulations but California-car States are governed by adjudication. And any such argument particularly withers once one realizes that what EPA grants preemption waivers of is California regulations, not California adjudications.

***Third***, a waiver of Section 209(a) Clean Air Act preemption does not simply govern the primary conduct of California and all other Section 177 States. Instead, such a waiver also directly governs the conduct of motor-vehicle manufacturers ***nationwide***. Under Section 209(b)(3) of the Clean Air Act, certification and conformance to California's alternative standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. § 7543(b)(3). Thus, a waiver creates a unique alternative nationwide compliance pathway for motor-vehicle manufacturers that displaces EPA's otherwise applicable federal standards. Again, OMB is not aware of any "adjudicatory order" creating a new interstate regulator that can replace federal standards and govern

---

[11] *See, e.g.*, 88 Fed. Reg. 20,688, 20,725 (Apr. 6, 2023) (emphasis added).
[12] As noted above, EPA does not conduct a separate adjudication applicable to Section 177 State borrowing decisions.

Page **5** of 7

**2-ER-130**

compliance for an entire manufacturing industry across numerous States. Yet GAO's analysis is also mum about this provision.

**Fourth**, GAO asserts that waivers of Section 209(a) Clean Air Act preemption are orders because they have "immediate effect" on California, not prospective effect. It is unclear what GAO means by "immediate effect," but Section 202(a) of the Clean Air Act, 42 U.S.C. § 7521(a), which applies to EPA directly and to waiver decisions as well through Section 209(b)(1)(C), 42 U.S.C. § 7543(b)(1)(C), requires that the waived California rules give motor vehicle manufacturers adequate "lead time," which is typically measured in years, not months. And Section 177(2) also requires at least "two years" of lead time for other States adopting these alternative standards. OMB is aware of no adjudicatory order that requires multiple years of lead time.

True adjudications are inherently retrospective in nature—that is, they describe and establish at that moment in time the law as it always has been, not the law as it is being established prospectively and only for the first time. *See, e.g., Harper v. Virginia Dep't of Tax'n,* 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). By contrast, California emissions regulations apply only prospectively, and only after the lapse of the appropriate amount of lead time. Moreover, EPA waivers are inherently prospective. Otherwise, Section 177 States would have no stability—if they could adopt the California-car standards "immediately" after California promulgated the relevant regulations, then a denied EPA waiver would automatically upset the national market for new automobiles and engines.

As the D.C. Circuit has explained, moreover, even in the agency context specifically, forward-looking obligations are a characteristic of rules, while "adjudications immediately bind parties by **retroactively** applying law to their past actions." *Safari Club In'tl. v. Zinke,* 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius,* 718 F.3d 914, 922 (D.C. Cir. 2013) ("an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking. Again, however, GAO's analysis does not discuss the Clean Air Act's lead time provisions.

**Fifth**, GAO asserts that waivers of Section 209(a) Clean Air Act preemption involve considerations "of particular facts, as opposed to general policy." Not so. In granting waivers, EPA must address the consistency of the regulations with Section 202(a), EPA's primary regulatory authority for motor vehicles. *See* 42 U.S.C. § 7543(b)(1)(C). In so doing, EPA considers the same policy-laden questions implicated in setting **by regulation** the prospective federal emission standards for motor vehicles in the first place. These questions require making predictive policy judgments, not addressing "particular facts." For example, do the California regulations give the industry sufficient lead time to transition to 100% electric vehicles? Are the industry's compliance costs with that lead time "appropriate"? Are the standards "technologically feasible"? 42 U.S.C. § 7521(a)(2). OMB is unaware of any adjudicatory order that requires addressing similarly forward-looking and policy-laden questions about any entire industry's ability to comply. As with the other points made above, however, GAO's analysis is completely silent on the lead-time and technological feasibility aspects of the statutory regime.

2-ER-131

* * * * *

Because GAO does not address any of these five points, and appears to misunderstand how these Clean Air Act waivers operate, OMB, as the Executive Branch's expert agency for regulatory matters generally, is unpersuaded by GAO's opinion and letter and instead believes that the waivers were and are best characterized as rules of general applicability. But regardless, even if a close call, the EPA Administrator's decision to submit the waivers to promote greater accountability to Congress was reasonable. That practice promotes the kind of agency accountability to Congress that the CRA—and GAO—was created to enhance, not diminish.

It is Congress that is optimally positioned to *decide for itself* when to put rules submitted to it to CRA votes, as it did in considering the three passed House Joint Resolutions 87 through 89. *That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic*. In enacting the resolutions of disapproval, Congress emphatically rejected GAO's inappropriate attempt to interfere with Congress's powers under the Constitution and CRA. EPA is thus now barred from issuing any waiver of preemption California seeks that is substantially similar to the three overridden waivers.[13]

Sincerely,

Russell T. Vought
Director

---

[13] *See* 5 U.S.C. 801(b)(2) ("A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.").

Page 7 of 7

2-ER-132

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
CECILIA D. SEGAL, State Bar No. 310935
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
EMMANUELLE S. SOICHET, State Bar No. 290754
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON** | Case No. 4:25-cv-04966-HSG |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case |
| v. | |
| **UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States, | |
| Defendants. | |

**2-ER-133**

## INTRODUCTION

1.      When Congress directed the United States Environmental Protection Agency (EPA) to regulate harmful emissions from new motor vehicles, 42 U.S.C. § 7521(a), it also preempted States from setting such standards, *id.* § 7543(a). But, recognizing that California had already developed deep expertise in vehicle emissions control and that the State suffers from severe air pollution challenges, Congress directed EPA to "waive" this preemption for California, unless record evidence supports one of three limited bases for declining to do so. *Id.* § 7543(b)(1).

2.      Congress's choice to allow California "to continue and expand its pioneering efforts" (pursuant to preemption waivers granted by EPA) has meant that the State "act[s] as a kind of laboratory for innovation" for vehicular emission controls, thereby advancing a core value of federalism while encouraging technological innovation for the protection of public health and welfare. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1111 (D.C. Cir. 1979); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 386-87 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

3.      This Clean Air Act waiver provision was enacted in 1967, and EPA has granted California more than seventy-five preemption waivers for updates to the State's new motor vehicle emissions control program. As Congress intended, these waivers have allowed California to "improve on 'its already excellent program,'" to foster technological advancements, and to protect Californians from harmful pollution. *See MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

4.      Relevant here, between April 2023 and January 2025, EPA granted California's requests for three Clean Air Act preemption waivers, authorizing enforcement of the State's latest additions to its regulatory program: the Advanced Clean Trucks, Advanced Clean Cars II, and Omnibus Low NOx ("Omnibus") regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Pursuant to Section 177 of the Clean

**2-ER-134**

Air Act, 42 U.S.C. § 7507, other States—including Plaintiffs here—have adopted some or all of these California standards as their own.

5.      On May 22, 2025, the Senate joined the House in adopting three Resolutions, purporting to "disapprove[]" these waivers.  H.J. Res. 87, 88, 89 (119th Congress) ("Resolutions").  The President signed the Resolutions on June 12, 2025.  In so doing, the Federal Government "singled out" these waivers—and the underlying California regulations—for an unprecedented attack, *South Carolina v. Baker*, 485 U.S. 505, 513 (1988), purporting to employ a statute—the Congressional Review Act (CRA)—deemed inapplicable by every nonpartisan arbiter and expert who analyzed the question.  The Plaintiff States—California, Colorado, Delaware, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington—challenge these unlawful Resolutions, which purport to prevent these States from enforcing laws they have chosen to adopt within their jurisdictions.

6.      The CRA was enacted to facilitate congressional review of certain *federal agency rules*.  5 U.S.C. § 801(a)(1)(A); *id.* § 804(3) (defining "rule").  Where it applies, it creates a narrow exception to the filibuster that enables the Senate to adopt a resolution disapproving of a federal agency's rule with a simple majority vote.  *Id.* § 802(d)(1).  The CRA also limits Senate debate over a given resolution to a maximum of five hours per side.  *Id.* § 802(d)(2).  If a CRA resolution disapproving of a federal agency's rule is enacted, the targeted rule ceases to have legal effect.  *Id.* § 801(b)(1).  And "a new rule that is substantially the same … may not be issued," absent further, specific congressional authorization.  *Id.* § 801(b)(2).

7.      While all fifty States consented—through their Senators—to these expedited procedures for congressional disapproval of *federal rules*, no State consented to the CRA as a means for Congress to negate *state rules*.  Nor would any State have done so.  States do not so easily surrender "the dignity … of sovereignty" they retain in our system of government.  *Alden v. Maine*, 527 U.S. 706, 715 (1999).

8.      Cabining the CRA to *federal rules* is also consistent with the principle that the Federal Government does not "impose its will on the States … lightly"—*e.g.*, through a process

with severely constrained debate. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). To the contrary, the Framers intentionally designed the Federal Government to "partake sufficiently of the spirit [of the States]" such that it would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985) (quoting The Federalist No. 46, p. 332).

9. By purporting to utilize the CRA's expedited procedures against preemption waivers to which the CRA does not apply, the Federal Government ran roughshod over federalism and separation of powers principles. It did so despite EPA's decades-old, consistent position—reiterated in each of the three actions at issue—that preemption waiver decisions are not "rules" and, accordingly, "the Congressional Review Act … does not apply." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023). The Federal Government also blithely disregarded the legal conclusions of every nonpartisan arbiter upon whom Congress otherwise relies for determining the CRA's applicability—all of whom concluded the CRA did not apply.

10. In fact, neither a federal agency nor Congress has ever before purported to apply the CRA or similar extraordinary procedures to any context that resembles this one.

11. The President, his EPA Administrator, and Congressional leadership took these unprecedented steps because they saw the CRA's inapplicable, expedited procedures as a quick and easy way to "take … down" California's regulations. Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[1] They appear to have agreed with the argument that such procedures should be used—despite the CRA's obvious inapplicability—because "[w]aivers take years to roll back through the administrative process" and "ordinary legislation … would have to overcome the 60-vote filibuster in the Senate." Boyden Gray PLLC, *Buschbacher, Conde Discuss How to Overturn CA's EV Mandate in the Wall Street Journal* (Jan. 9, 2025).[2]

---

[1] Available at https://perma.cc/8GQV-LQEN, last visited May 15, 2025.
[2] Available at https://perma.cc/D59T-Q7JB, last visited May 17, 2025.

12. With every step, the "workings of the National Government" failed to follow the law and likewise failed to honor the "special restraints on federal power over the States." *Garcia*, 469 U.S. at 552. The "extraordinary defects" in the "national political process" that produced these Resolutions render them unlawful and "invalid under the Tenth Amendment" and principles of structural federalism. *South Carolina*, 485 U.S. at 512. That Congress violated separation of powers principles along the way only underscores the unconstitutionality of the Resolutions.

13. This Court should declare that the Resolutions are unconstitutional and have no effect on the status or enforceability of state emissions control programs. Alternatively, if the Court concludes the Resolutions are valid, it should declare they were not enacted under the CRA because these waivers are not "rules" under that statute. This Court should also declare that EPA's post-hoc purported reclassification and submission of these waivers as supposed "rules" subject to the CRA were unlawful actions and enjoin EPA from similarly targeting other preemption waivers.

**PARTIES**

14. Plaintiff State of California is a sovereign state in the United States of America. California is represented by and through Attorney General Rob Bonta, the chief law enforcement officer of California; Governor Gavin Newsom, the chief executive officer of the State; and the California Air Resources Board (CARB), the state agency that developed and promulgated the targeted state regulations, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See, e.g.*, Cal. Code Regs., tit. 13, §§ 1961.4, 1962.4; *id.* § 1963 et seq.; *id.* §§ 1956.8, 1961.2.

15. Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action. Colorado has adopted the Advanced Clean Cars II (for model years 2027-2032), Advanced Clean Trucks, and Omnibus regulations. *See* 5 Colo. Code Regs. § 1001-24.

16.    Plaintiff State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America.  The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.  Delaware has adopted the Advanced Clean Cars II regulation.  *See* 7 Del. Admin. C.  § 1140.

17.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.  The Commonwealth of Massachusetts has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 310 C.M.R. §§ 7.40(1)(c) Tbls. 1 & 2, 7.40(1)(d)(3)-(5).

18.    Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.  New Jersey has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* N.J.A.C. 7:27-29A.7; N.J.A.C. 7:27-31.4; N.J.A.C. 7:27-28A.11.

19.    Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.  New Mexico has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 20.2.91.102 (C) New Mexico Administrative Code.

20.    Plaintiff State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York.  Attorney General Letitia James is the chief law enforcement officer for New York.  New York has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* N.Y. Comp. Codes R. & Regs., tit. 6, Part 218 and Section 200.9.

**2-ER-138**

21. Plaintiff State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield, who is Oregon's chief legal officer and is authorized to represent the State in this Court. Oregon has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* Or. Admin. R. 340-257-0020 to -0095; 340-257-0200 to -0230; 340-261-0010 to -0090.

22. Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island. Rhode Island has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* 250-RICR-120-05-37; 250-RICR-120-05-37.4(B)(1) Tbls. 1 & 2.

23. Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159. Vermont has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* Vt. Code R. § 12.030-040.

24. Plaintiff State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. *See* Chapter 43.10 RCW. Washington has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* Wash. Admin. Code § 173-423-030.

25. Defendant United States is the Federal Government of the United States of America.

26. Defendant EPA is a federal agency.

27. Defendant Lee Zeldin is the EPA Administrator. He is sued in his official capacity.

28. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

29. This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the Constitution or laws of the United States). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory relief, injunctive relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.

30. 5 U.S.C. § 805 does not strip this Court of its jurisdiction because (a) Plaintiffs challenge actions and/or determinations that fall outside the scope of that provision; (b) Plaintiffs raise constitutional issues to which that provision does not apply; and/or (c) it would be unconstitutional to apply that provision to Plaintiffs' claims. Indeed, this case presents precisely the kinds of "questions of intricacy and nicety" about federalism that the courts alone can resolve. *New York v. United States*, 505 U.S. 144, 155 (1992) (quoting The Federalist No. 82, p. 491 (C. Rossiter ed. 1961)).

31. Venue is proper in this District under 28 U.S.C. § 1391(e) because this is a judicial district in which the State of California resides for purposes of that provision.

32. Under Civil Local Rules 3-2(c) and 3-5(b), Plaintiffs allege that there is no basis for assignment of this action to any particular location or division of this Court.

**FACTUAL BACKGROUND**

**I.    Congress Enacted the Clean Air Act Waiver Provision to Allow California's Regulatory Program to Continue with Minimal Federal Oversight**

33. From the inception of efforts to limit vehicular air pollution, California led the way. The State's "interest in pollution control from motor vehicles dates to 1946," *MEMA I*, 627 F.2d at 1109 n.26, and California's legislature mandated statewide motor vehicle emission standards beginning in the 1950s, *see* 1959 Cal. Stat. 2091. By contrast, "[n]o federal statute purported to regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

**2-ER-140**

34.    When Congress took up the mantle of federal vehicle emission regulation, it recognized both California's extraordinary air pollution challenges and the value of state-level experimentation.  Congress therefore opted to allow the State to continue and "improve on 'its already excellent program.'"  *MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).  Accordingly, while it preempted other States from regulating emissions from new motor vehicles, Congress required EPA to waive that preemption for California except in narrow circumstances.  Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967).[3]  Under this waiver provision, California promulgates its own standards through a state rulemaking proceeding, determines that its state program is at least as protective as EPA's, and requests a waiver of preemption from EPA.  42 U.S.C. § 7543(b)(1); *see also* 42 U.S.C. § 7543(b)(1)(A)-(C) (identifying exclusive findings that can support EPA's denial of California's request for waiver).

35.    Consistent with the principle that Congress does not "impose its will on the States … lightly," *Gregory*, 501 U.S. at 460, the questions about whether and how to preempt state regulation of new motor vehicle emissions were heavily debated.  The precise text of the waiver provision was the subject of particularly rigorous discussion, with competing versions offered by the House and Senate.  The Senate version provided that the waiver "shall" be granted (absent certain limited findings), while the House version made waivers discretionary through the use of the word "may."  *See* 113 Cong. Rec. 30,956-57 (1967); *see also id.* at 30,950, 30,952.

36.    The Senate's use of "shall" was described as a "guarantee[]" that California could regulate, *id.* at 30,952, with the "burden … on the [agency] to show why California … should not be allowed to [do so]," H.R. Rep. No. 90-728, at 96 (1967).  By contrast, the House's use of "may" was characterized as placing California "at the mercy of" the Federal government, forcing the State "to come with hat in hand to Washington."  113 Cong. Rec. at 30,941, 30,955; *see also* H.R.

---

[3] The 1967 Act gave this authority to the Secretary of Health, Education, and Welfare.  In 1970, Congress transferred this authority to the Administrator of the newly created EPA.  Pub. L. No. 91-604, § 15(c)(2), 84 Stat. 1676, 1713 (1970).

Rep. No. 90-728, at 96 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

37.     Congress opted for "shall," 42 U.S.C. § 7543(b)(1), "consciously choos[ing] to permit California to blaze its own trail with a minimum of federal oversight," *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).[4]

38.     The decision to allow California to continue and expand its state-level program reflected a careful congressional compromise, balancing the benefits—for the State and "the entire country"—of preserving "a kind of laboratory for innovation," *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996), against automakers' fears of "having to meet fifty-one separate sets of emissions control requirements," *MEMA I*, 627 F.2d at 1109-10.  This compromise ensured that California's "government will represent and remain accountable to its own citizens," *Printz v. United States*, 521 U.S. 898, 920 (1997), while also ensuring manufacturers must meet no more than two different sets of emission standards—California's state standards and EPA's federal ones.  And, as intended, this compromise has allowed California to continue addressing the "harsh reality" of the State's pollution problems using its expertise in regulating vehicular emissions.  *See* H.R. Rep. No. 90-728, at 96-97 (1967); *see also* S. Rep. No. 90-403, at 33 (1967).

39.     As part of the 1977 Clean Air Act Amendments, Congress noted with approval that EPA had been readily granting waivers to California, consistent with Congress's intent.  H.R. Rep. No. 94-1175 at 247 (1976); *see also MEMA I*, 627 F.2d at 1110 n.32.  Congress nonetheless sought to "ratify and strengthen" the waiver provision in order "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."  H.R. Rep. No. 95-294, at 301-02 (1977).  Specifically, Congress amended the waiver provision's text, removing the original requirement that each California standard be more

---

[4] In the 1970 CAA amendments, the waiver provision (originally Section 208(b)) was recodified as Section 209(b), 42 U.S.C. § 7543(b).  Pub. L. No. 91-604, § 8(a), 84 Stat. at 1694.

stringent than its federal counterpart and allowing the protectiveness of the state's program to be measured by viewing all the "state standards, in the aggregate." 42 U.S.C. § 7543(b)(1).

40.    Congress also opted to permit other States to choose to adopt "standards … identical to the California standards for which a waiver has been granted" under certain conditions, 42 U.S.C. § 7507, thereby respecting state authority to protect residents and natural resources while maintaining the commitment that manufacturers would be subject to no more than two sets of standards.

41.    Thirteen years later, in 1990, Congress again amended Section 209 of the Clean Air Act. It made no changes to the waiver provision concerning new motor vehicle emissions (Section 209(b)). Rather, it replicated that provision in a new and nearly identical provision (Section 209(e)(2)(A)) concerning non-road vehicles and engines—i.e., mobile sources of pollution that do not operate on roads, such as bulldozers, ships, and lawnmowers. 42 U.S.C. § 7543(e)(2)(A). As with Section 209(b), under this new provision, EPA must "authorize"—i.e., waive preemption for—California's regulation of emissions from these non-road sources, unless the record supports one of three limited findings that permit denial of California's request. *Id.*

42.    EPA has granted California more than seventy-five Clean Air Act preemption waivers as the State has expanded and strengthened its requirements that manufacturers reduce emissions from the new motor vehicles they sell in the State. *See* EPA, *Vehicle Emissions California Waivers and Authorizations*.[5] EPA has likewise granted California numerous waivers for the State's increasingly rigorous regulation of non-road vehicles and engines.[6] EPA has granted such waivers under Democratic and Republican Presidents alike. *See id.* And these waivers are subject to judicial review in the appropriate Court of Appeals. 42 U.S.C. § 7607(b)(1).

---

[5] Available at https://perma.cc/9F5K-QC79, last visited May 14, 2025.

[6] *Id.* These preemption waivers for the regulation of non-road sources are sometimes referred to as "authorizations," *see* 42 U.S.C. § 7543(e)(2)(A), but both "waivers" under Section 209(b) and "authorizations" under Section 209(e)(2)(A) waive preemption. For simplicity, Plaintiffs use the term "waivers" throughout.

**2-ER-143**

43.    Among the previously granted waivers are those for California's zero-emission-vehicle (ZEV) requirements for passenger cars and light trucks.  58 Fed. Reg. 4166 (Jan. 13, 1993); 71 Fed. Reg. 78,190 (Dec. 28, 2006); 78 Fed. Reg. 2112 (Jan. 9, 2013).[7]  The State first adopted such requirements in 1990, Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991), and has made them increasingly more stringent over time.

44.    One of the three waivers targeted by the Resolutions authorized the Advanced Clean Cars II regulation, which extended and gradually strengthened California's ZEV requirements for passenger cars and light trucks such that, by model year 2035, at least 80% of such vehicles sold in California would be zero-emission, while the other 20% could be plug-in hybrids.  Cal. Code Regs., tit. 13, § 1962.4(c), (e)(1)(C).  That regulation also strengthened several emission standards for vehicles with internal combustion engines, requiring reduced emissions of fine particulate matter and smog-forming oxides of nitrogen.  *Id.* § 1961.4.

45.    Another of the targeted waivers authorized, *inter alia*, the Advanced Clean Trucks regulation—designed to build on the success of the California ZEV requirements described above (for passenger cars and light trucks) by requiring gradual increases in sales of medium- and heavy-duty ZEVs beginning with model year 2024.  Cal. Code Regs., tit. 13, § 1963.1(b).  This regulation was adopted in 2021, and manufacturers began earning early credits for ZEV sales that year.  CARB, *Advanced Clean Trucks Credits Summary as of March 31, 2022*.[8]  Indeed, manufacturers "generated enough credits to meet the estimated 2024 model year compliance obligations" before that model year even commenced.  CARB, *Advanced Clean Trucks Credit Summary through the 2023 Model Year* (May 22, 2024).[9]

46.    The third of the targeted waivers authorized California's "Omnibus" regulation, which requires manufacturers of heavy-duty (mostly diesel-fueled) trucks to reduce smog-

---

[7] A zero-emission vehicle is one that—like an electric or hydrogen vehicle—has zero tailpipe emissions of any pollutant.

[8] Available at https://perma.cc/2DHP-FUR9, last visited May 24, 2025.

[9] Available at https://perma.cc/7B5E-2RBG, last visited May 24, 2025.

2-ER-144

forming emissions beginning with model year 2024 and then further reduce those emissions in model year 2027 and beyond.  Cal. Code Regs., tit. 13, § 1956.8.

47.    Despite decades of progress, tens of millions of Californians live, study, work, or play in regions that continue to experience some of the worst air quality in the Nation.  American Lung Association, *State of the Air 2025 Report* 15-16, 18-19.[10]  California faces particularly severe challenges to meet public health standards for ozone (or smog) and fine particulate matter.  *Id.* The regulations covered by the waivers at issue are crucial parts of comprehensive plans to meet those public health standards and improve the air Californians breathe.  California Air Resources Board, *2022 State Strategy for the State Implementation Plan* 55, 65 (Sept. 22, 2022).[11]

48.    All of these regulations apply only in California and other States that have chosen to adopt one or more of the regulations, pursuant to the option provided by Congress in the Clean Air Act.  *See* 42. U.S.C. §§ 7507, 7543(e)(2)(B).

## II.    Congress Enacted the Congressional Review Act to Enhance Its Oversight of Generally Applicable *Federal Rules*

49.    When Republicans took control of both chambers of Congress after the 1994 midterm elections, they credited their election victory to the "Contract with America," which contained a promise to push for federal regulatory reform, including shrinking the size of the federal government.  *See* S. Rep. 104-15, at 3 (Mar. 16, 1995) (describing 1994 elections as sending "a clear message to Washington that [Americans] want a smaller, more efficient, and more effective government").

50.    Once in office, the Republican majority in the House attempted to impose a moratorium on all new federal regulations "to ensure economy and efficiency of Federal Government Operations."  H.R. Rep. No. 104-39, at 1 (Feb. 16, 1995).  That effort failed.

51.    The push for federal regulatory reform then evolved into what became known as the Small Business Regulatory Enforcement Fairness Act and the CRA, both of which were

[10] Available at https://perma.cc/G2RK-V9BM, last visited May 24, 2025.
[11] Available at https://perma.cc/X2Y9-LQ4N, last visited May 24, 2025.

incorporated into a broader, bipartisan bill:  the Contract with America Advancement Act of 1996.  Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996).  That Act also contained an increase to the Nation's debt limit and an increase to the limit on income Social Security recipients may earn without losing benefits.  110 Stat. at 847, 875.  That broader bill passed the House by a bipartisan vote of 328 to 91.  The House bill then passed, without amendment, by unanimous consent in the Senate.  142 Cong. Rec. S3114 (Mar. 28, 1996).

52.    The CRA requires a "Federal agency" that has promulgated a "rule" to submit the rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[b]efore a rule can take effect."  5 U.S.C. § 801(a)(1)(A) (emphasis added).

53.    Underscoring that it applies only to federal rules, the CRA defines the federal agency actions to which it applies by way of the federal Administrative Procedure Act's (APA) definition of "rule."  5 U.S.C. § 804(3) (cross-referencing 5 U.S.C. § 551); *see also id.* § 551(1) (limiting the definition of "agency" to "authorit[ies] of the Government of the United States").  The CRA then narrows the APA definition by, among other things, excluding "any rule of particular applicability."  *Id*.

54.    Congress has 60 session days from the agency's submission of a qualifying report to adopt a resolution to disapprove a particular rule.  5 U.S.C. § 802(a).  The text of such resolutions is prescribed by the statute as follows:  "That Congress disapproves the rule submitted by the __ relating to __, and such rule shall have no force or effect."  *Id.*  The first blank is filled in with the agency's name and the second is typically filled in with the title of the Federal Register notice announcing the final rule.  *E.g.,* H.J. Res. 35 (approved Mar. 14, 2025).  After a CRA joint resolution of disapproval is enacted, "a new rule that is substantially the same … may not be issued, unless [it] is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."  5 U.S.C. § 801(b)(2).

55.    If an agency fails to submit an action that one or more members of Congress believe is a "rule" subject to the CRA, those members may ask the GAO for a determination.

**2-ER-146**

Congressional Research Service, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* 23 (updated Oct. 22, 2024).[12]  In that case, if the GAO concludes the agency action is or is not subject to the CRA, Congress has treated that conclusion as dispositive.  *Id.*  ("Thus, the question of whether Congress may use the CRA's fast-track parliamentary disapproval mechanism generally hinges upon the determination reached in GAO's opinion in such cases.").

56.    In the Senate, the consideration of CRA resolutions is highly expedited.  The CRA creates an exception to the filibuster, so that resolutions of disapproval require only a simple majority to pass.  5 U.S.C. § 802(d)(1).  And motions, amendments, and even debate are all severely limited.  *Id.* §§ 802(d)(1), 802(d)(2).  Specifically, debate about the resolution and any "debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing the joint resolution."  *Id.* § 802(d)(2).  Although other motions are not "in order" and thus not permitted, "[a] motion further to limit debate"—to less than 10 hours—"is in order and not debatable."  *Id.*

57.    The CRA also provides that "no determination, finding, action, or omission under this chapter shall be subject to judicial review."  5 U.S.C. § 805.

58.    Nothing in the CRA—or the broader Contract with America Advancement Act of 1996—indicates Congress was contemplating the use of the CRA to negate *state rules* or to otherwise ease the path to greater federal limits on state authority.  To the contrary, the text of the CRA is exclusively concerned with federal rules promulgated by federal agencies.  *E.g.*, 5 U.S.C. § 801(a)(1)(B) (referring to "the Federal agency promulgating the rule").  So, too, were other parts of the broader bill that contained the CRA.  *E.g.*, Pub. L. 104-121, 110 Stat. at 857 ("fundamental changes … are needed in the regulatory and enforcement culture of Federal agencies").

---

[12] Available at The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress | Congress.gov | Library of Congress, last visited May 21, 2025.

59.     The absence of any mention of state rules or state authority is particularly telling because Congress does not lightly exercise its power to "impose its will on the States." *Gregory*, 501 U.S. at 460.  Many features of the CRA—including its constraints on debate and its barriers to judicial review—are entirely inconsistent with that principle.

60.     Moreover, the Framers intended "[t]he difficulty of legislating at the federal level … to preserve room for lawmaking by governments" like States, which are "more local and more accountable than a distant federal authority." *West Virginia v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch, J., concurring).  As the 1967 debate over the Clean Air Act's preemption and waiver provisions indicate, had Congress contemplated that the CRA could be used to hamstring state authority, that would have been the topic of fierce debate.

61.     Until these Resolutions, Congress abided by the scope of the CRA as negotiated in the bipartisan bill of which it was a part.  Congress had never purported to apply the CRA and its extraordinary and expedited procedures to an agency action that was not a "rule" as defined in the CRA.

62.     More specifically, no previous resolutions using the CRA's fill-in-the-blank language disapproved of a federal agency action that waived preemption or otherwise authorized States to proceed with their own regulatory programs.  Congress has never, for example, even considered using the CRA to disapprove EPA's actions to authorize States to implement permitting programs under the Clean Water Act—even when EPA has "rush[ed] to transfer this permitting authority to [a State] in the final days" of a presidential administration.  *See Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 11 (D.D.C.), *judgment entered*, 729 F. Supp. 3d 37 (D.D.C. 2024) (appeal pending).  Congress has likewise never even considered using the CRA to disapprove of waivers that allow individual States "to test new or existing ways to deliver and pay for health care services in Medicaid and the Children's Health Insurance Program (CHIP)."  *See* Centers for Medicare & Medicaid Services, State Waivers List.[13]

---

[13] Available at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list, last visited May 8, 2025.

63.     Likewise, Congress has never considered using the CRA to disapprove federal agency orders that, like these preemption waivers, permit conduct that would otherwise be prohibited. For example, Congress has never considered using the CRA to disapprove of a radio spectrum license, mining permit, or oil lease.

### III.    For Half a Century, and Regardless of Which Party Occupied the White House, Clean Air Act Preemption Waivers Have Been Understood to Be Adjudicatory *Orders*, Not *Rules*

64.     The text of the Clean Air Act demonstrates that Congress has always understood the difference between federal vehicle emission standards (which are federal rules) and decisions to waive preemption for state vehicle emission standards (which are not).  Where Congress delegated rulemaking power over vehicle emissions to EPA, it directed the agency to "prescribe … standards," 42 U.S.C. § 7521(a)(1), consistent with the APA's definition of rules as agency actions that "prescribe law," 5 U.S.C. § 551(4).  By contrast, Congress "sharply restricted [EPA's] role in a waiver proceeding."  *MEMA I*, 627 F.2d at 1121.  Far from delegating rulemaking authority to EPA, the waiver provision anticipates that *California* will prescribe "State standards" and determine whether its standards "will be, in the aggregate, at least as protective" as EPA's.  42 U.S.C. § 7543(b)(1).  Thus, the waiver provision only empowers EPA to "waive application" of the preemption provision to law California has adopted, not to prescribe California law or otherwise make rules.  *Id.*

65.     Congress confirmed as much when it omitted waiver decisions from the list of EPA Clean Air Act actions to which the Act's "[r]ulemaking" requirements apply.  42 U.S.C. § 7607(d)(1).

66.     Until its post-hoc actions challenged here, EPA had likewise consistently maintained that its waiver decisions are not rules and therefore are not subject to a host of requirements that apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. § 601(2)), and the CRA.  This had been EPA's position through Administrations of both parties, regardless of whether EPA granted a waiver request or denied it.  Thus, EPA's waiver decisions have consistently specified "this action is not a rule."  75 Fed. Reg. 70,237, 70,241 (Nov. 17,

**2-ER-149**

2010); *see also, e.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The CRA does not apply … because this action is not a rule."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past waiver decisions, this action is not a rule…."). EPA maintained this position when the first Trump Administration purported to withdraw parts of a waiver EPA had granted six years earlier. 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent with its previous actions on waiver requests….").[14]

67.    The GAO—the entity on which Congress relies for CRA applicability determinations—has agreed. When asked by members of Congress whether a 2022 waiver action was a "rule" subject to the CRA, the GAO concluded that the action "meets the statutory definition of an order," rather than a rule. GAO Decision B-334309, *Environmental Protection Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* 5 (Nov. 30, 2023) (Exh. A). Specifically, the GAO determined that a waiver decision "mak[es] a 'final disposition' granting California a 'form of permission' which meets the definition of order under APA." *Id.* (quoting 5 U.S.C. § 551(6), (8), (9)).

68.    Members of both the Senate and the House also indicated—as recently as last year—that they understood that EPA's preemption waiver decisions are not rules. When he introduced a bill to repeal the Clean Air Act's waiver provision, in September 2024, Senator Mike Lee expressly acknowledged that Clean Air Act preemption waivers "cannot be reviewed under the Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the CRA." Mike Lee, *Stop CARB Act One Pager* (118th Congress) (emphasis omitted).[15] That bill—S.5038, 118th Cong. (2024)—had five co-sponsors in the Senate.[16] Representative Troy Nehls likewise acknowledged that "none of [California's waivers] are subject to congressional

---

[14] This Federal Register notice was submitted to the Office of Management and Budget under Executive Order 12866, and to Congress and the GAO for CRA consideration, because it contained a separate action by the National Highway Traffic Safety Administration that was a "rule." 84 Fed. Reg. at 51,352, 51,353. For its part, however, EPA repeatedly reaffirmed its position that the waiver portion of the notice was not a rule. *Id.* at 51,352, 51,353, 51,360.

[15] Available at https://perma.cc/LNG5-45AW, last visited May 4, 2025.

[16] *See* https://www.congress.gov/bill/118th-congress/senate-bill/5038/cosponsors.

review" when he introduced the companion bill in the House. Rep. Troy Nehls Introduces the Stop CARB Act (Sept. 12, 2024).[17] That bill—H.R. 9574, 118th Cong. (2024)—had nine co-sponsors in the House.[18]

69. Consistent with those understandings (including its own longstanding view), EPA did not follow rulemaking procedures when considering these California waiver requests. It did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment. *Cf.* 5 U.S.C. § 553(b). Instead, EPA followed its traditional practice, providing notice to the public that it had received a waiver request from California and would provide "opportunity for public hearing and comment" on the three, limited findings the waiver provision empowers EPA to make. *E.g.*, 88 Fed. Reg. 88,908, 88,909 (Dec. 26, 2023).

70. When it finalized the waiver decisions at issue here, EPA reiterated its longstanding position that "the Congressional Review Act, 5 U.S.C. 801 et seq., … does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3)." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023).

71. EPA did not submit these waivers to Congress before they took effect or when they were published in the Federal Register (one in April 2023 and two in January 2025). Any member of Congress could have asked the GAO to determine whether these unsubmitted actions were rules subject to the CRA, following the ordinary congressional procedure concerning unsubmitted agency actions. No member of Congress did so.

**IV. The Trump Administration Purports to Invoke the CRA, Without Providing Any Legal Rationale and Without Any Administrative Process**

72. President Trump took aim at parts of California's vehicle emission program, from the very beginning of his second term. He signed a day-one Executive Order that declared "state emissions waivers that function to limit sales of gasoline-powered automobiles" should be "terminat[ed]."[19]

---

[17] Available at https://perma.cc/55TB-737M, last visited May 4, 2025.
[18] *See* https://www.congress.gov/bill/118th-congress/house-bill/9574/cosponsors.
[19] *Unleashing American Energy* Executive Order (Jan. 20, 2025), available at

73. That Executive Order directed federal agencies (including EPA) to "identify … agency actions … inconsistent with" the Order and to "develop and begin implementing action plans to suspend, revise, or rescind all [such] agency actions." *Id.* Upon first blush, this Executive Order appeared to direct EPA (and other agencies) to take *administrative* action. Thus, at the outset, it appeared that the second Trump Administration intended to follow the path of the first Trump Administration by seeking to administratively rescind certain waivers (or parts thereof). *See* 84 Fed. Reg. 51,310 (Sept. 27, 2019) ("EPA announces its decision to withdraw the waiver" for certain California emission standards).

74. This new Administration, however, had a different "action plan"—to invoke the (inapplicable) CRA. This "plan[] to suspend, revise, or rescind" certain waivers, *see supra* n.19, was revealed on February 14, 2025, when President Trump and EPA Administrator Zeldin "announced in the Oval Office … that the EPA [would] transmit[] to Congress" the three waiver decisions at issue, as though the decisions were "rules" subject to the CRA.[20] The President and EPA Administrator appeared to be following a plan first publicized a month earlier as to "how the incoming Trump administration" could purportedly use the CRA to "stop" the State's efforts to reduce vehicular pollution, without following "the administrative process" which could "take years" and without employing "ordinary legislation [which] would have to overcome the 60-vote filibuster in the Senate." *See supra* n.2.

75. The Administration's announcement provided no explanation for EPA's about-face from its longstanding and consistent position that waiver decisions are not rules, much less rules of general applicability subject to the CRA. *See supra* n.19. Indeed, the announcement did not even acknowledge that EPA had always treated waiver decisions as adjudicatory orders, including in the very actions at issue when they were finalized. *See id.* Nor did EPA provide any public

---

https://perma.cc/33NL-LQKE, last visited May 5, 2025.
[20] EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirement* (Feb. 14, 2025), available at https://perma.cc/GDF5-HVM2, last visited May 5, 2025.

process leading up to the announcement of the purported reclassification of these waivers from orders to rules.

76.    The Administration's announcement likewise did not explain how the submission of these waiver decisions could be consistent with the CRA, given that all of the waivers had already "take[n] effect" and one of the waivers had been published in the Federal Register almost two years earlier.  *See* 5 U.S.C. § 801(a)(1)(A).

77.    Nonetheless, some members of Congress indicated they, too, were prepared to implement the Administration's plan (again without establishing CRA applicability or explaining their change in position on that issue).  They responded to the Administration's announcement by crediting "the Trump EPA['s]" submission of these waivers for "giving Congress the opportunity to reject California's effort to impose its EV mandate on all Americans."[21]  They also asserted "Chairman Capito [of the Senate Environment and Public Works Committee] will work with her colleagues to use the Congressional Review Act process to protect consumers from these unrealistic requirements that were approved by the Biden administration."[22]  The only "rules" or "requirements" referenced were California's, not federal ones, and these statements failed to acknowledge that California's regulations only apply in California (and other States that so choose), much less to accurately describe California's regulations, including the many provisions that require reduced emissions from gasoline- or diesel-fueled vehicles.

78.    EPA then submitted the three waivers at issue to the GAO and Congress on February 19, 2025.  *See* GAO Letter B-337179, *Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* 1 & n.1 (March 6, 2025) (Exh. B).  Neither EPA nor the President made those submissions public, although Administrator Zeldin claimed EPA was taking these actions to "transparently correct[]" prior errors.  *See supra* n.19.

---

[21] @EPWGOP ("EPW Republicans"), X, https://perma.cc/5WMM-DQVJ (Feb. 14, 2025), last visited May 11, 2025.

[22] *Id.*

2-ER-153

**V.    The GAO Determines (Again) that Waiver Decisions Are Not Subject to the CRA**

79.    Upon receipt of EPA's submissions, the GAO observed that the waiver "notices themselves stated that CRA did not apply" and that EPA had not explained "why the agency was submitting the notices under the CRA." Exh. B at 2, 6. In fact, EPA's February 19 submissions described the waiver decisions as "actions" and "Notice[s] of Decisions," rather than rules. The GAO thus "reached out to EPA on February 20, 2025, for clarification." *Id.* at 2.

80.    On February 21, 2025, three Senators—including both Senators from California—requested that the GAO provide its legal opinion about whether these three waivers were rules subject to the CRA. *See id.* at 1.

81.    On February, 25, 2025, the GAO followed up on its initial outreach to EPA, sending "a formal letter … seeking factual information and the agency's legal views on this matter." *Id.* at 2.

82.    Some members of Congress welcomed EPA's submissions but, like EPA, failed to articulate a legal basis for treating waiver decisions as rules. Rather, they asserted that the agency's submission—by itself—could transform into *rules* these actions that had been considered and finalized by EPA as *orders*: "Once they submitted it to us, it's a rule. … [And] we can take it down." Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[23]

83.    EPA later resubmitted the notices of decision to Congress and GAO, relabeling them as "rules." But EPA "still did not address the statements in the notices regarding the inapplicability of the CRA" or otherwise explain its new labels. Exh. B at 2.

84.    On March 6, 2025, the GAO issued its legal analysis, concluding (as before) that waiver actions are not subject to the CRA. Exh. B at 9. Again, the GAO concluded that these three waiver decisions meet "the APA definition of an order," not of a rule, because they make

---

[23] Available at https://perma.cc/9VHE-RTB4, last visited May 11, 2025.

preemption determinations—i.e., "'final disposition[s]' granting California a 'form of permission' as described in the APA definition" of "order." *Id.* at 6 (quoting 5 U.S.C. § 551(6)).

85.    The GAO also reiterated its prior conclusion that, even if waiver decisions were rules, they would still not be subject to the CRA because they are not rules of general applicability. Instead, the GAO concluded, waiver decisions "concern[] a specific entity—California—and address[] a statutory waiver specific to California's [program]." *Id.*

## VI.    Some Members of Congress Prepare to Plow Ahead, Regardless of GAO's Reasoned Conclusions

86.    About a month later, and despite the GAO's reaffirmation that the CRA does not apply to Clean Air Act preemption waivers, members of the House introduced the Resolutions—each targeting one of the three preemption waivers at issue. H.J. Res. 87, 88, 89 (introduced April 2, 2025).

87.    Some Senate leaders also signaled an interest in disregarding the GAO's determination. For example, Senator Capito—Chairman of the Senate Committee on Environment and Public Works—responded to the GAO's determination by stating "that these waivers are rules, and subject to a resolution of disapproval under the Congressional Review Act." Alex Nieves, *There's hope for the waivers still* (Mar. 20, 2025).[24]

88.    No legal justification for this position was provided, however. No public statements identified any errors in the GAO's reasoning or otherwise articulated a legal rationale for concluding that these waivers fit the CRA's statutory definition of a rule.

89.    Meanwhile, industry advocates—including those who first publicized the CRA playbook—maintained that the GAO's determination and, indeed, the statutory definition of "rule," were all irrelevant. Buschbacher & Conde, *Congress Has the Authority to Review EPA "Waivers" of Clean Air Act Preemption*, Yale J. Reg. (Mar. 5, 2025) (arguing "that the CRA's text … do[es] not bind").[25] Under that view, the only thing that mattered was EPA's submission

---

[24] Available at https://www.politico.com/newsletters/california-climate/2025/03/20/theres-hope-for-the-waivers-still-00242123, last visited May 11, 2025.

[25] Available at https://perma.cc/C8V5-9KFY, last visited May 11, 2025.

of the waiver decisions to Congress because "the CRA gives Congress unchallengeable power to invalidate any action that an agency submits for review." *Id.*

## VII.  The Senate Parliamentarian Also Concludes that these Waiver Decisions Are Not Properly Subject to the CRA

90.    The question of the CRA's applicability was then presented to the Senate Parliamentarian, "the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber.  Congressional Research Service, *The Congressional Review Act (CRA):  Frequently Asked Questions*, 18 (Updated Nov. 12, 2021);[26] *see also* Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1959 (2020) ("The parliamentarians are the primary interpreters of the rules governing Congress.").

91.    After hearing arguments on both sides, the Senate Parliamentarian agreed with the GAO that waiver decisions are not subject to the CRA.  Although her decision was not made public, it was widely reported as occurring on April 4, 2025.  Lisa Friedman, *Republican Plan to Kill California's E.V. Policies Hits Senate Snag* (April 4, 2025).[27]

92.    That should have been the end of the matter because "in the ordinary course of business, Congress's procedural rules—and the parliamentarians' interpretations of those rules— are as good as binding." *Law Within Congress* at 1958.  Senate Majority Leader John Thune had agreed as recently as January 2025, responding to questions about possibly overriding the Senate Parliamentarian with "[w]e can't go there."  Russell Payne, *The Senate parliamentarian could block some of Trump's agenda — and be a scapegoat for Republicans* (January 9, 2025).[28]

93.    But some members of Congress remained intent on attempting to use the CRA to invalidate these three waivers.  Indeed, some immediately started "weighing whether to defy the parliamentarian [in order] to reject California's plans…."  Kelsey Brugger, *Senators weigh next*

---

[26] Available at https://www.congress.gov/crs-product/R43992, last visited May 21, 2025.
[27] Available at https://www.nytimes.com/2025/04/04/climate/california-ev-waiver-senate.html, last visited May 22, 2025; *see also* https://perma.cc/A47L-KQEJ, last visited May 21, 2025.
[28] Available at https://perma.cc/B8K5-CLCZ, last visited May 10, 2025.

*moves on California clean car rules* (April 10, 2025).[29]  The attack continued to focus on the parts of California's program that allegedly "ban gas-powered cars and trucks," again failing to acknowledge that other parts of the state program were authorized by these waivers.  *See supra* n.26.

**VIII. Congress Adopts the Resolutions, Using Extraordinary Procedural Maneuvers**

94.    Despite the GAO and Senate Parliamentarian determinations, House members proceeded to consider the Resolutions.  Kelsey Brugger, *House plows ahead with assault on California EPA waivers* (Apr. 4, 2025).[30]  The public statements around this action again failed to address the fact that state emission regulations only apply in States that have chosen to adopt them.  *Id.* ("The American people should choose what vehicle is right for them, not California bureaucrats.").  These statements likewise failed to reconcile claims about the impacts of these waivers with EPA's position—in the very reports it submitted to Congress—that these were not "major rules," meaning EPA did not expect these waiver decisions to cause "major increase[s] in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions" or "significant adverse effects on competition, employment, investment, productivity, [or] innovation."  *See* 5 U.S.C. § 804(2).

95.    The only explanation provided by House members for departing from the practice that "the GAO … has historically decided what can be considered a rule under the CRA" was the fact that EPA submitted the waivers to Congress.  *Id.* ("'By submitting the three California waivers to Congress, Administrator Zeldin is ensuring that Congress has oversight of these major rules that impact every American,' [Energy and Commerce Chair] Guthrie said."); *see also Chairman Guthrie, Vice Chairman Joyce, and Energy and Commerce Republicans Introduce Legislation to Stop California EV Mandates.*[31]

---

[29] Available at https://perma.cc/SX9T-AAQK, last visited May 11, 2025.
[30] Available at https://perma.cc/AD9Z-P7W7, last visited May 11, 2025.
[31] Available at https://perma.cc/3UAM-QWWL, last visited May 21, 2025.

96.     The House later voted to adopt all three Resolutions, targeting the Advanced Clean Trucks and Omnibus waivers on April 30, 2025, and the Advanced Clean Cars II waiver on May 1, 2025.  Camila Domonoske, *The House Strikes a Blow Against California in the Fight over EVs* (May 1, 2025).[32]

97.     No member or committee of the House provided any legal rationale suggesting that waiver decisions are federal agency rules of general applicability that could be subject to the CRA. Nor did any members of the House who had previously expressed the opposite view explain their change of position.  Instead, after the House votes, the sponsors of the Resolutions continued to attribute Congress's purported use of the CRA here solely to the actions of the Executive Branch. *E.g.*, Congressmen Brett Guthrie, John Joyce, John James, and Jay Obernolte, *How Congress Is Fighting Biden's Disastrous EV Mandate* (May 2, 2025).[33]

98.     At least one press outlet described the House's decision to "hold[] the votes anyway"—despite the GAO and Senate Parliamentarian determinations—as "demonstrating that they are willing to carry out their agenda regardless of whether the nonpartisan arbiter deems them legal."  Rachel Frazin, *House votes to overturn California gas car ban — again defying internal watchdog*.[34]

99.     Leaders in the Senate also ultimately decided to proceed with votes on the Resolutions, disregarding GAO's legal conclusion and the Senate Parliamentarian's determination but without identifying any errors or other basis for disagreement.  E&E News, *Senate GOP Plots Demise of California Clean Car Rules* (May 20, 2025).[35]

100.    Senate Majority Leader Thune asserted that "'widespread effects'" make preemption waivers rules, without reference to the definition of a rule, without acknowledging that any "widespread effects" result from choices by *state governments*, and without explaining how waiver decisions do anything other than dispose of a request from California.  *Id.*  Senate

---

[32] Available at https://perma.cc/63NY-2KR9, last visited May 21, 2025.
[33] Available at https://perma.cc/DUL5-3VQS, last visited May 21, 2025.
[34] Available at https://perma.cc/W7UY-CLGA, last visited May 11, 2025.
[35] Available at https://perma.cc/PKF2-4386, last visited May 22, 2025.

2-ER-158

Majority Whip John Barrasso likewise disregarded the limited applicability of California's standards, alleged nationwide effects, and also ignored the conventional vehicle provisions of these state regulations, claiming California's laws would somehow "force-feed electric vehicles to every man and woman who drives in this country." *Id.*

101.  When Senate Majority Leader Thune announced that he would proceed with the Resolutions under extraordinary, expedited procedures, he did not explain the basis for doing so, underscoring the unprecedented nature of this step. *See id.* ("It's a little early to sketch and lay that out.  But we have a process.  We're moving forward.").

102.  The extraordinary process became clear two days later when—during debate on a totally different resolution concerning an unrelated Department of Transportation (DOT) safety rule—Senate Majority Leader Thune introduced a point of order for the Senate to determine "that points of order are in order under the Congressional Review Act given sections 802(d)(1), 802(d)(2), and 802(d)(4) are in conflict with one another."[36]  That point of order was agreed to by a narrow vote of 51 to 46.

103.  Notably, section 802(d)(1) provides that "all points of order against the joint resolution (and against consideration of the joint resolution) are waived," meaning no such points of order are permitted as to CRA resolutions.  5 U.S.C. § 802(d)(1).  This text seems quite clear, and the alleged textual "conflict" was never explained.  But the passage of Senator Thune's point of order purportedly made any point of order permissible as a matter of Senate procedure.

104.  That change was necessary only to allow Senate Majority Leader Thune to introduce a second point of order—one that would seemingly have been impermissible without approval of the first.  This second point of order sought to establish that "Joint Resolutions that meet all the

---

[36] *See* Recent Floor Activity, May 21, 2025, *available at* https://perma.cc/4RK3-L4ZU, last visited May 23, 2025.  "Points of order" are the mechanism by which "Senators may enforce the Senate's legislative rules and precedents."  Congressional Research Service, *Points of Order, Rulings, and Appeals in the Senate* 1 (updated Nov. 15, 2018), available at Points of Order, Rulings, and Appeals in the Senate | Congress.gov | Library of Congress, last visited June 8, 2025.  When a member "believe[s] that one of those rules or precedents is, or is about to be, violated," they introduce a point of order to obtain a decision whether or not the action of another member would violate or have violated the Senate's internal rules.  *Id.*

2-ER-159

requirements of Section 802 of the Congressional Review Act or are disapproving of agency actions which have been determined to be rules subject to the Congressional Review Act by a legal decision from the Government Accountability Office [are] entitled to expedited procedures under the Congressional Review Act." *See supra* n.36 ("Recent Floor Activity").  Under this second point of order, the Senate could proceed to consider and vote on joint resolutions via CRA-like extraordinary procedures so long as a federal agency had submitted a report purporting to be a Section 801(a)(1)(A) report concerning a "rule," regardless of whether anyone identified any reason to doubt the contrary conclusions of the GAO and the Senate Parliamentarian.  In other words, the purpose of Majority Leader Thune's second point of order was to change the trigger for the Senate's extraordinary procedures so that agency labeling and submission alone sufficed.  Notably, neither of these two points of order was necessary for the proceeding into which they were introduced—i.e., the proceeding concerning the DOT CRA resolution.  In fact, neither was relied upon to introduce or vote on *that* resolution.

107. The purpose of these points of order was, in fact, unrelated to the DOT CRA resolution.  Indeed, their sole purpose and effect was to enable the Senate to later vote on the waiver Resolutions—using extraordinary, expedited procedures—without having to directly address the Parliamentarian's contrary determination.  *E.g.,* 117 Cong. Rec. S3025 (May 21, 2025) (Exh. C).

106. The Presiding Officer—Senator Capito—confirmed the point when the Senate proceeded to consider the Resolutions concerning the preemption waivers.  She explicitly stated that the Senate could only do so "[p]ursuant to the precedent just established by the Senate"—i.e., the second point of order which was only permitted because of the first point of order, both of which were introduced and voted on during proceedings concerning the unrelated DOT resolution. 117 Cong. Rec. S3052 (May 21, 2025) (Exh. C).

107. Those in favor of the Resolutions continued to mischaracterize California's regulations and the waivers that authorized their enforcement.  For example, Senate Majority Whip Barrasso asserted that "the Biden administration gave California—the liberal State of

California—permission to export its far-left electric vehicle mandate to the entire country."  117 Cong. Rec. S3017 (May 21, 2025) (Exh. C); *see also, e.g., id.* at S3086-87 (Senator Capito inaccurately describing Advanced Clean Cars II as an "EV mandate").  All of these statements made clear that the regulatory requirements disfavored by the speakers were those designed and promulgated *by California*.  No regulatory requirement or other rule designed or promulgated by any federal agency was ever mentioned.

108.   Those in favor of the Resolutions also made clear they were relying on the "submission by the Trump EPA" as the sole trigger for expedited and extraordinary procedures.  117 Cong. Rec. S3087 (May 21, 2025) (Exh. C) (Senator Capito describing agency submission as sufficient to "trigger[] my right as a Senator to introduce this resolution to block California's EV mandate"); *see also id.* at S3088 (repeatedly using the phrase "Agency-submitted rules" rather than "rules").  Indeed, Senate leadership exclusively credited "President Trump and EPA Administrator Lee Zeldin … submitting the approved California waiver[s]" for the opportunity to enact the Resolutions.  *Id.* at S3087; *see also* 171 Cong. Rec. S3140 (May 22, 2025) (Exh. D) (Senator Lankford) ("So we worked to make sure that we were clarifying one simple thing . . . this one simple question: When an Agency says it is a rule, is it a rule? . . . . The answer is, yes, it is a rule. And then we acted on that.").

109.   As noted, that was the sole purpose and effect of Senate Majority Leader Thune's second point of order:  to allow the Senate to proceed on the Resolutions simply because EPA submitted reports labeling the waiver decisions as "rules," without regard to contrary conclusions in the Federal Register notices of final agency action and from the GAO and Senate Parliamentarian.  171 Cong. Rec. S3047 (May 21, 2025) (Exh. C) (Senator Thune) (asserting agency actions "submitted to Congress[ as] rules" *are* in fact rules "eligible for consideration under the [CRA]"); *accord* 171 Cong. Rec. S3140 (May 22, 2025) (Exh. D) (Senator Lankford) (stating that this had always been the Senate's approach); *id.* at S3106 (Senator Whitehouse) ("Before dinner yesterday, these bills to gut California's Clean Air Act authority were recognized as regular bills, subject to the filibuster rule requiring 60 votes to move forward, open to full

**2-ER-161**

debate and amendments, but somehow, after dinnertime yesterday, once Senate Republicans were done with overruling the Parliamentarian, these bills were now not subject to the filibuster.").

110.   Nonetheless, throughout the Senate proceedings, advocates for the Resolutions continued to acknowledge that, by its plain terms, the CRA "applies only to allow for disapproval of Federal Agency rules and only during a prescribed time defined by the statute."  117 Cong. Rec. S3088 (May 21, 2025) (Exh. C).  They also described the expedited Senate procedures as established "by law," *id.* at S3087, although they had purported to alter the trigger for those procedures by a mere point of order.

111.   The next day, May 22, 2025, the Senate voted on each of the Resolutions and passed all three with votes of 51-45 (H.J. Res. 87, Advanced Clean Trucks), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus).

112.   EPA "hail[ed]" the Resolutions with a press release indicating that President Trump would sign them and again mischaracterizing the California regulations as an "EV Mandate." EPA, *EPA Hails Congressional Disapproval of Biden EPA's California EV Mandate Rule* (May 22, 2025).[37]  EPA described the Resolutions as "maintaining a consistent national approach to vehicle standards"—an approach the Clean Air Act explicitly rejects—and as preventing a "single state" from imposing "its radical agenda."  *Id.*

113.   The President signed the Resolutions on June 12, 2025.

## IX.   THE ADMINISTRATION PLANS TO TARGET ADDITIONAL WAIVERS

114.   Unfortunately, these Resolutions likely do not mark the end of the Federal Government's unlawful targeting of California emission regulations and preemption waivers.

115.   EPA's unprecedented actions with respect to the three targeted waivers has laid the groundwork for EPA to relabel other waivers EPA previously issued as orders, claiming they are suddenly rules—without process or justification—and thereby subjecting them to extraordinary and expedited consideration for congressional disapproval.

---

[37] Available at https://perma.cc/WW4C-Z4P7, last visited May 23, 2025.

116.   This prospect is far from speculative.  A Presidential Executive Order directed EPA to develop and implement an "action plan[] to suspend, revise, or rescind" the "state emissions waivers" this Administration finds objectionable.  *Supra* n.19.  EPA's action plan has never been made public.  On information and belief, State Plaintiffs allege this action plan—and other EPA documents—indicate that EPA plans to target other Clean Air Act preemption waivers granted to California.

117.   In fact, in cases challenging previously issued preemption waivers, EPA has sought abeyances, representing that it "could take further action that may obviate the need for judicial resolution of some or all the disputed issues"—i.e., that EPA plans to invalidate the waiver at issue.  *E.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA* (9th Cir. Case No. 25-1615), Dkt. 15.1 at 3-4 (April 11, 2025).  EPA was even more definitive in one waiver challenge, asserting that it "has determined that the agency should reassess the basis for and soundness of" a waiver decision EPA made in 2022 (the reinstatement of parts of a 2013 waiver the first Trump Administration purported to withdraw in 2019).[38]  EPA has thus been clear that it intends to target at least some additional preemption waivers previously issued (or reinstated) to California.

118.   Moreover, at least one industry group has met with EPA to urge the agency to relabel an additional California preemption waiver in an effort to subject it to extraordinary disapproval procedures.  On information and belief, Plaintiffs allege that other industry groups have done the same and that EPA has not rejected such requests.

119.   The Federal Government has also (erroneously) asserted that EPA alone may regulate new motor vehicle emissions, indicating a desire to eliminate California's program entirely (not just to prevent enforcement of the specific California regulations underlying the targeted waivers).  On information and belief, Plaintiffs allege that eliminating California's new motor vehicle emission program is an objective of this Administration (including EPA and its Administrator).  That objective would require invalidation of prior, extant waivers that allow California (and other

---

[38] Motion of Fed. Respondents to Hold Briefing Schedule in Abeyance at 3 (January 24, 2025), *Diamond Alternative Energy, LLC v. EPA* (Supreme Court Case No. 24-7).

**2-ER-163**

States) to enforce earlier-adopted state regulations. EPA and its Administrator are thus likely—if not certain—to target additional preemption waivers.

## CLAIMS FOR RELIEF

### COUNT I

### Violations of the Administrative Procedure Act
### (Against the United States, EPA and Its Administrator)

120. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

121. Congress "enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (internal quotation marks and citation omitted).

122. EPA is an "agency" as defined in 5 U.S.C. § 551(1).

123. EPA's relabeling (or purported reclassification) of these preemption waivers from adjudicatory orders into "rules" and the agency's submission of those orders as "rules" to Congress are final agency actions.

124. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

125. The actions of EPA and its Administrator ("EPA Defendants") here were transparently arbitrary and capricious. 5 U.S.C. § 706(2)(A). An agency must always "offer[] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). Moreover, the agency must "provide a more detailed justification … when, for example, its new

**2-ER-164**

policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

126. Yet here, EPA Defendants offered no explanation at all for the change in position between finalization of the waiver decisions and EPA's purported reclassification, despite the substantial reliance interests that attach to those waiver decisions. No explanation was provided in the press release in which Administrator Zeldin first referred to waiver decisions as "rules"; nor was any explanation included in the (second) submissions to Congress where EPA relabeled the decisions as "rules"—despite an explicit request for such an explanation from GAO. "An agency may not … depart from a prior policy *sub silentio*," *Fox Television*, 556 U.S. at 515. Nor may an agency supplant earlier conclusions with "impermissible post hoc rationalization." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020) (internal quotation marks and citation omitted). Yet, that is exactly what EPA did.

127. The EPA Defendants also took these actions "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Indeed, EPA and its Administrator observed no public process at all when they changed positions on the nature of already finalized actions.

128. EPA Defendants' actions were also "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), because no statute authorizes these actions.

129. EPA and its Administrator are "creatures of statutes" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus v. Dep't of Labor, Occupational Safety & Health Admin.,* 595 U.S. 109, 117 (2022). No law authorizes EPA or its Administrator to declare by fiat—and without process or reasoning—that actions already finalized as "orders" through adjudicatory procedures are instead "rules" of general applicability subject to the CRA.

130. The waiver provision of the Clean Air Act—Section 209(b)—only empowers EPA to "waive application" of Section 209(a) preemption to California through review of a request from

that State.  42 U.S.C. § 7543(b)(1).  It provides no authority to declare post hoc changes in the nature of the action, much less authority to slap a new and unexplained label on an already finalized action as part of an effort to trigger a wholly separate statute.

131.  The APA likewise does not provide EPA with authority to relabel already finalized agency actions, without any process or explanation.  Indeed, as noted above, such conduct epitomizes violations of the APA's reasoned decision-making requirements.

132.  Nor does the CRA authorize EPA's actions here.  That statute establishes a definition of "rule," borrowing from, and then narrowing, the APA's definition.  5 U.S.C. § 804(3).  The CRA requires agencies to submit to Congress and the GAO a "report" for each "rule" the agency promulgates "[b]efore [the] rule can take effect."  *Id.* § 801(a)(1)(A).  Nothing in this text empowers EPA to slap a "rule" label on any action it wishes and purport to send a "report" to Congress, despite GAO and EPA conclusions to the contrary and without any attempt to explain how the action comports with the CRA's definition of a "rule."  Nor does the CRA empower EPA to submit "report[s]" months—or, in the case of the Advanced Clean Trucks waiver, years— *after* its actions have taken effect.  The EPA Defendants cannot claim to have acted "under" the CRA here, as their actions are untethered from any text in that statute.

133.  EPA Defendants' actions were also "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C), because EPA's "rule" labels were transparently erroneous.  EPA's waiver decisions do not "implement, interpret, or prescribe law or policy" as rules do.  5 U.S.C. § 551(4).  Rather, such decisions "orders" because they constitute "a final disposition," *id.* § 551(6), of a request from California that either grants or denies California "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission" to engage in a course of conduct (i.e., enforcement of its regulatory program), *id.* § 551(8) (defining "license"). *See also id.* § 551(6) (defining "order" to include "licensing").

134.  That is clear from the nature of waiver proceedings which, pursuant to the Clean Air Act's text, do not begin with notices of proposed rulemaking.  Rather, by congressional design, a

**2-ER-166**

waiver proceeding commences with a request from California that includes its finding that the State's new motor vehicle emission standards "will be, in the aggregate, at least as protective of public health and welfare" as EPA's federal standards. 42 U.S.C. § 7543(b)(1). EPA then has no discretion. It must grant California's waiver request, unless evidence supports one of three factual determinations that could support a denial. *Id.* § 7543(b)(1)(A)-(C).

135. In contrast with its power to "prescribe" federal vehicle emission standards under a separate provision of the Clean Air Act (42 U.S.C. § 7521(a)(1)), EPA's role "in a waiver proceeding" is thus "sharply restricted." *MEMA I*, 627 F.2d at 1121. EPA does not determine the pollutants to be regulated, the stringency of the standards, or the speed with which standards increase in stringency. California makes all those choices in a state rulemaking proceeding, before it submits a waiver request to EPA. For its part, EPA determines only whether any "parties favoring denial of the waiver" have met their evidentiary burden to obtain that result. *Id.*

136. Put another way, it is California's regulations (not any action by EPA) that are "designed to prescribe law"—namely, the emission standards and other requirements vehicle manufacturers must meet in the State. 5 U.S.C. § 551(4) (defining "rule"). An EPA waiver is a form of permission for California to enforce its laws—a statutory exemption from otherwise applicable preemption. As such, an EPA waiver decision is an "order"—"a final disposition" of a request (here, from California), including a "licensing request[]," *id.* at 551(6), where "licensing," in turn, includes such actions as "permit[s]," "approval[s]," and "*statutory exemption[s] or other form[s] of permission*," *id.* § 551(8) (emphasis added).

137. EPA Defendants' relabeling is without merit and is entitled to no deference. For one thing, EPA has no "special duty … to administer" the APA or CRA definitions of a "rule." *Loper Bright*, 603 U.S. at 389 (internal quotation marks omitted). For another, EPA's entirely unexplained departure from its decades-old and consistently held position that Clean Air Act preemption waivers are not rules lacks any of the "factors which [could] give it power to persuade." *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1940)) (looking to

"the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements").

138. The EPA Defendants' APA violations provided a pretextual basis for Congress to use CRA-like procedures to disapprove these waivers, and the Resolutions would not have been introduced, much less enacted, without that pretextual basis.

139. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the purported reclassification and submission actions are unlawful, that these three waivers are not "rules," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

140. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of EPA Defendants' purported reclassification and submission actions. Plaintiffs are also entitled to an injunction prohibiting EPA from relabeling other Clean Air Act preemption waiver actions, taken under 42 U.S.C. § 7543(b)(1), (e)(2)(A), as "rule[s]" subject to the CRA and submitting documents claiming to be "report[s]" of those actions under 5 U.S.C. § 801(a)(1)(A).

141. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll v. Safford,* 44 U.S. (3 How.) 441, 463 (1845)).

## COUNT II
### *Ultra Vires* – Conduct in Excess of Statutory Authority
### (Against the United States, EPA and Its Administrator)

142. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

143. EPA Defendants acted in excess of the agency's delegated powers when they purported to reclassify these waiver decisions as "rules" after the actions had already been finalized and had gone into effect. They likewise acted in excess of the agency's delegated powers when they submitted a document to Congress and the GAO labeling the waiver decisions "rules" and claiming the document was a "report" under 5 U.S.C. § 801(a)(1)(A). No statute

**2-ER-168**

empowers EPA Defendants to take those actions, much less to do so without any public process or explanation for their change in positions. Certainly, no statute empowers any EPA Defendant to invoke a statute that is inapplicable—as declared expressly in EPA's own actions—simply because that statute would provide a faster or easier, but unlawful, means to a desired end.

144. In fact, EPA Defendants are prohibited from promulgating rules without following statutory rulemaking procedures. *E.g.,* 5 U.S.C. § 553; 42 U.S.C. § 7607(d). EPA Defendants are also prohibited from promulgating generally applicable federal vehicle emission rules without meeting the relevant requirements of 42 U.S.C. § 7521. Those procedures were not followed, those requirements were not addressed, and EPA Defendants' purported reclassification and submission of these waivers as "rules" was ultra vires.

145. The EPA Defendants' ultra vires conduct provided a pretextual basis for Congress to use CRA-like procedures to disapprove these waivers, and the Resolutions would not have been introduced, much less enacted, without that pretextual basis.

146. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the purported reclassification and submission actions are ultra vires, that these three waivers are not "rules," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

147. Plaintiffs are also entitled to an injunction prohibiting EPA from relabeling other Clean Air Act preemption waiver actions, taken under 42 U.S.C. § 7543(b)(1), (e)(2)(A), as "rule[s]" subject to the CRA and submitting documents claiming to be "report[s]" of those actions under 5 U.S.C. § 801(a)(1)(A).

148. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll*, 44 U.S. at 463).

**COUNT III**
**Violation of Separation of Powers**
**(Against All Defendants)**

149.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

150.  "[T]he separation of powers is designed to preserve the liberty of all the people.  So whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."  *Collins v. Yellin*, 594 U.S. 220, 245 (2021) (citations omitted).  The Resolutions, and the process Congress used to enact them, each violated the separation of powers.

151.  A waiver proceeding is an adjudication of whether, based on particular facts, a set of California laws is exempted from the preemptive effect of section 209 of the Clean Air Act.  The Clean Air Act leaves EPA no discretion but to grant every waiver to which a single named party (the State of California) is entitled by the statute's terms.

152.  In issuing a waiver, EPA exercises "the type of nonpolicymaking adjudicatory power[] typically exercised by a court in the agency-review context."  *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 154 (1991).  Indeed, Congress directed EPA to apply the "arbitrary and capricious" standard to California's determination "that [its] standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards," 42 U.S.C. § 7543(b)(1), (b)(1)(A)—the same legal standard Congress directed courts to apply to agency actions, 5 U.S.C. § 706(2)(A). And an EPA waiver of preemption operates much like a court judgment finding no preemption:  it allows for enforcement of the relevant state law.

153.  EPA waivers "create no new substantive law" but instead determine "how pre-existing law applies to particular circumstances."  *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016).  The same is true of the Resolutions, which did no more or less than countermand three EPA waivers.

154.  Congress lacks constitutional power to declare, in the first instance or on review, the rights of an individual party under a preexisting federal statute.  *See Fletcher v. Peck*, 10 U.S. 87,

**2-ER-170**

136 (1810) ("[T]he legislature [is] to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.").

155.   The procedure that Congress used to pass the Resolutions violated the separation of powers in a second, independent respect.  Courts must strike down legislation that was enacted through procedures that "ignore[d] constitutional restraints."  *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (cleaned up).  Under the guise of changing an internal procedural rule, the Senate twisted the reporting requirement in 5 U.S.C. § 801(a)(1)(A) into a vehicle for the Executive Branch to manipulate legislative procedure in a manner contrary to the separation of powers.

156.   The Constitution states that "[e]ach House [of Congress] may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.  The Executive Branch is not assigned a role in the proceedings of either House of Congress.  The power to determine internal procedural rules "only empowers Congress to bind itself," *INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983), but for that reason the power must remain "independent … of the President," *id.* at 955.  Because "the Constitution by explicit text commits the power at issue to the exclusive control of" each House, courts cannot "tolerate *any* intrusion by" the Executive Branch in this arena and must act "to prevent any other Branch from undertaking to alter" that textual commitment.  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 485, 487 (1989) (Kennedy, J., concurring in the judgment).  Internal legislative procedures "shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other [Branches]."  *O'Donoghue v. United States*, 289 U.S. 516, 530 (1933).

157.   To pass the Resolutions, the Senate adopted a procedural rule that applies CRA-like legislative procedures to a joint resolution introduced to disapprove of an action by an Executive Branch agency whenever the agency denominates the action as a "rule" in a submission labeled as a report under section 801(a)(1)(A) of the CRA.  That procedural rule gives the Executive Branch unbridled discretion to trigger extraordinary legislative procedures for the disapproval of a federal administrative action that is *not* a rule as defined in the CRA.  The Senate's procedural rule

allows for intrusion by, and coercive influence of, the Executive Branch on internal legislative procedure.

158.   The Senate's procedure violated the separation of powers.  That violation was not rendered harmless by the House's passage of, and the President's signature on, the Resolutions. *Cf. United States v. Munoz-Flores*, 495 U.S. 385, 397 (1990) ("A law passed in violation of the Origination Clause" is "no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than … a law passed in violation of the First Amendment."). The Resolutions, as the fruit of an unconstitutional Senate process, are incurably unconstitutional.

159.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

160.   Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect.

## COUNT IV

### Violation of the Tenth Amendment and Structural Principles of Federalism
### (Against All Defendants)

161.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

162.   A "fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process." *Garcia*, 469 U.S. at 554.  Thus, courts may—and indeed must—intervene "to compensate for possible failings in the national political process" that infringe on the States as States.  *Id.*  And that is not the only "affirmative limit[] *the constitutional structure* might impose on federal action affecting the States under the Commerce Clause." *South Carolina*, 485 U.S. at 528 (Scalia, J, concurring in part) (quoting *Garcia*, 469 U.S. at 556).

163.   These Resolutions were enacted only because both the Executive and Legislative Branches made unprecedented decisions to target specific California regulations through extraordinary procedures, purporting to employ a statute that no one credibly contended was

applicable. The Executive Branch began these unprecedented maneuvers when, without any process or explanation, it issued a blatantly unlawful post-hoc declaration that these three adjudicatory orders were suddenly rules and submitted a document claiming to report such "rules" to Congress and the GAO. In so doing, the Executive Branch neither exercised care nor even attempted to faithfully execute the Nation's laws or the Constitution's structural limits on federal intrusion. *See* U.S. Const. art. II, § 3. Congress then carried out the rest of this extraordinarily defective national political process, disregarding the reasoned decisions of both the GAO and the Senate Parliamentarian and treating the Executive Branch's unexplained and unlawful "rule" relabeling as determinative of congressional procedure.

164. The Federal Government thus blasted gaping holes in state regulatory programs without any of the procedural mechanisms—such as rigorous debate and state official testimony—that serve to inform members of Congress about the consequences of their actions. In the push to end the alleged "electric vehicle fantasy," for example, state regulations that require crucial emission reductions from gasoline- and diesel-fueled vehicles got swept in too. And all of this was done with no regard for Plaintiff States' needs to reduce air pollution to meet federal air quality standards and protect public health and welfare or for the fact that some of the affected state regulations had already been operating *for years* and others continued *decades-old* state programs.

165. Plaintiff States had no opportunity to participate in the Executive Branch's relabeling of the waivers as "rules" and submission of a "report" to Congress and the GAO because the Executive Branch provided *no process at all* for those actions. The House and Senate's decisions to rely entirely on the Executive Branch's unjustified position—despite contrary, reasoned conclusions from the nonpartisan entities upon which Congress ordinarily relies—compounded Plaintiff States' exclusion and isolation. Moreover, Defendants also hoped their chosen action plan would deprive Plaintiff States of judicial review.

166. All of the States consented to the use of the extraordinary disapproval procedures of the CRA for certain *federal rules* and on certain timelines. No State has ever consented to the use

of those or similar procedures to upend their state laws, much less longstanding state programs on which they rely to protect their residents. Nor has Congress ever used such extraordinary procedures to this effect prior to these Resolutions.

167. The Framers designed a Federal Government that would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia*, 469 U.S. at 551 (quoting The Federalist No. 46, at 332 (B. Wright ed. 1961)). These Resolutions required an end-run around that design. The numerous "extraordinary defects in the national political process" reflected in that end-run render the Resolutions "invalid under the Tenth Amendment" and the principles of federalism embedded in the Constitution's structure. *South Carolina*, 485 U.S. at 512.

168. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

169. Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect and from relabeling other Clean Air Act preemption waiver actions, taken under 42 U.S.C. § 7543(b)(1), (e)(2)(A), as "rule[s]" subject to the CRA and submitting documents claiming to be "report[s]" of those actions under 5 U.S.C. § 801(a)(1)(A). *See also Armstrong*, 575 U.S. at 326–27.

**COUNT V**

**Nonstatutory Review: Violations of Federal Law by Federal Officials
(Against All Defendants)**

170. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

171. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, among them violations that themselves contravene the structural principles of the Constitution, *see Free Enter. Fund*, 561 U.S. at 491–92 n.2, or actions premised on legislation that does.

**2-ER-174**

172. The President, EPA, and its Administrator have stated definitely that the state regulations underlying the waivers at issue here, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, became preempted and unenforceable upon enactment of the respective Resolutions and are now preempted and unenforceable.

173. Each of the Resolutions is unlawful and unconstitutional.

174. Because the Resolutions are unlawful, unconstitutional and void, the preemption waivers granted for California's addition of these state regulations, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, to the State's regulatory program are valid and in effect.

175. Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit the rejection of certifications of vehicle or engine manufacturer compliance with these state regulations—including the Advanced Clean Cars II, Advanced Clean Trucks, and/or Omnibus regulations—as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3).

176. Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit their taking other actions to implement or give legal effect to the Resolutions.

177. Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit interference with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law.

178. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

179. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that any action by Defendants premised on validity of the unconstitutional Resolutions is itself unlawful, void, and of no effect.

**2-ER-175**

## COUNT VI

### Declaratory Judgment
### (Against All Defendants)

180. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

181. As discussed above, the waiver decisions targeted by the Resolutions are outside the scope of the CRA because these decisions are not "rules" as defined by the APA or CRA, much less "rules" of general applicability subject to the CRA.

182. Defendants have nonetheless asserted that the Resolutions and 5 U.S.C. § 801 together operate to preempt or otherwise preclude certain activities Plaintiffs may undertake. The United States has previously brought such challenges against state programs adopted to reduce air pollution. *E.g., United States v. California*, 444 F. Supp. 3d 1181, 1183 (E.D. Cal. 2020). And the current Administration has clearly stated an intent to pursue such challenges again. *See Protecting American Energy from State Overreach* Executive Order (Apr. 8, 2025).[39]

183. "A person may seek declaratory relief in federal court if the one against whom he brings his action could have asserted his own rights there." *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997); *see also City of Reno v. Netflix, Inc.*, 52 F.4th 874, 879 (9th Cir. 2022) (recognizing "the well-established availability of the [Declaratory Judgment] Act for defensive use against anticipated claims"). Federal district courts have "original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress," 28 U.S.C. § 1345, against Plaintiffs.

184. In the event the Resolutions remain in effect despite Plaintiffs' other claims, Plaintiffs are entitled, pursuant to 28 U.S.C. § 2201, to a declaration that the Resolutions were not enacted under the CRA and that no provision of that statute, including 5 U.S.C. § 801, is triggered or otherwise rendered applicable by the Resolutions.

---

[39] Available at https://perma.cc/SE5W-PG8Q, last visited October 9, 2025.

**2-ER-176**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs State of California, et al. respectfully request that this Court

1. Declare the Resolutions unconstitutional, unlawful, void, and of no effect;

2. Declare that any action by Defendants premised on validity of the Resolutions is unlawful, void, and of no effect;

3. Enjoin EPA and its Administrator from taking any action to implement or give legal effect to the Resolutions, including rejecting certifications of vehicle or engine manufacturer compliance with the state regulations for which EPA waived Clean Air Act preemption in the decisions at issue (e.g., the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations), as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3);

4. Enjoin EPA and its Administrator from interfering with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law;

5. Declare the purported reclassification of the three preemption waiver decisions as federal agency "rules" and the submission of those waivers decisions in documents purporting to be "reports" under 5 U.S.C. § 801(a)(1)(A) unlawful;

6. Vacate EPA's purported reclassifications of these orders as rules;

7. Declare that the CRA does not apply to EPA waiver decisions under 42 U.S.C. § 7543(b)(1);

8. Enjoin EPA and its Administrator from purporting to reclassify these or other Clean Air Act waiver decisions under 42 U.S.C. § 7543(b)(1) or 42 U.S.C. § 7543(e)(2)(A) as "rules" and submitting them to Congress in documents claiming to be "reports" under 5 U.S.C. § 801(a)(1)(A);

9. In the event the Resolutions remain in effect despite Plaintiffs' other claims, declare that the Resolutions were not enacted under the CRA and that no provision of that statute, including 5 U.S.C. § 801, is triggered or otherwise rendered applicable by the Resolutions.

10. Grant such other relief as the Court deems just and proper.

**2-ER-177**

Dated:  October 10, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Plaintiff State of California*


**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov


**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov


**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov


**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov


**2-ER-178**

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

*/s/ William Grantham*
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmdoj.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

2-ER-179

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

*/s/ M. Elaine Meckenstock*
M. Elaine Meckenstock
Counsel for Plaintiff State of California

Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice*)
Rachel Levick (*pro hac vice*)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036
Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-Intervenors*
*The Alliance for Automotive Innovation and*
*The National Automobile Dealers Association*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.    4:25-cv-04966-HSG |
| Plaintiffs, | **REPLY IN SUPPORT OF MOTION TO INTERVENE BY THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | Administrative Procedure Act Case |
| | Action Filed: June 12, 2025 |
| | Trial Date: none |
| | Hearing Date: October 23, 2025 |
| | Judge:  Honorable Haywood S. Gilliam |

Gibson, Dunn &
Crutcher LLP

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ....................................................... 2

ARGUMENT ............................................................................................................ 2

    I.    Proposed Intervenors Are Entitled to Intervention as of Right .............................. 2

        A.    Proposed Intervenors Claim a Significant, Protectable Interest in the Legality of the CRA Resolutions ........................................... 3

        B.    Disposition of this Action May Impair Proposed Intervenors' Interests, Including Preventing Retroactive Enforcement of Preempted Standards ........................................................................ 5

        C.    Proposed Intervenors' Interests Are Not Adequately Represented by Federal Defendants, Who Do Not Face Potential Compliance Burdens If the CRA Resolutions Are Invalidated .............................................................................. 6

    II.    In the Alternative, this Court Should Grant Proposed Intervenors' Request for Permissive Intervention ............................................................................. 8

    III.    Many of Plaintiffs' Proposed Conditions on Intervention Are Neither Efficient Nor Reasonable ..................................................................................... 9

CONCLUSION ......................................................................................................... 9

i

REPLY IN SUPPORT OF MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG

**2-ER-182**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Diamond Alternative Energy, LLC v. EPA,*
    145 S. Ct. 2121 (2025) ..................................................................................7

*Finjan, Inc. v. Symantec Corp.,*
    2017 WL 6610081 (N.D. Cal. Sept. 29, 2017) ...........................................4

*Forest Conservation Council v. U.S. Forest Serv.,*
    66 F.3d 1489 (9th Cir. 1995).......................................................................8

*Freedom from Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011).......................................................................7

*Kleissler v. U.S. Forest Serv.,*
    157 F.3d 964 (3d Cir. 1998).........................................................................7

*California ex rel. Lockyer v. United States,*
    450 F.3d 436 (9th Cir. 2006)................................................................1, 5, 6

*Missouri v. Harris,*
    2014 WL 2506606 (E.D. Cal. June 3, 2014)..............................................4

*Sagebrush Rebellion, Inc. v. Watt,*
    713 F.2d 525 (9th Cir. 1983)........................................................................5

*Sw. Ctr. for Biological Diversity v. Berg,*
    268 F.3d 810 (9th Cir. 2001)................................................................2, 3, 7

*Util. Air Regul. Grp. v. EPA,*
    744 F.3d 741 (D.C. Cir. 2014) ....................................................................4

*Wilderness Soc'y v. U.S. Forest Serv.,*
    630 F.3d 1173 (9th Cir. 2011)......................................................................5

*Winston v. United States,*
    2015 WL 9474284 (N.D. Cal. Dec. 29, 2015) ...........................................4

**Statutes**

5 U.S.C. § 801 ...................................................................................................4

42 U.S.C. § 7543 ...........................................................................................1, 3

**Rules**

Civil L.R. 7-4 ....................................................................................................2

ii

Gibson, Dunn &
Crutcher LLP

Fed. R. Civ. P. 12 ...................................................................................................8

Fed. R. Civ. P. 24 ...............................................................................1, 2, 4, 5, 6, 8

iii

Gibson, Dunn &
Crutcher LLP

## INTRODUCTION

The Alliance for Automotive Innovation ("Auto Innovators") and the National Automobile Dealers Association ("NADA") (collectively, "Proposed Intervenors") filed a timely motion to intervene to defend their significant interests in this action, the outcome of which may impair Proposed Intervenors' interests, as no existing party would adequately protect those interests. As Plaintiffs recognize, Rule 24 is construed broadly in favor of intervention. Pls.' Opp. to Mot. to Intervene. ("Pls.' Opp."), Dkt. 117, at 3. And here, Proposed Intervenors easily satisfy that deferential standard.

Plaintiffs fail to refute any element of Proposed Intervenors' entitlement to intervention as of right. Rather, Plaintiffs' opposition is based almost entirely on a mischaracterization of Proposed Intervenors' interest in this litigation as concerning the validity of the underlying EPA waivers, rather than the validity of the Congressional Review Act ("CRA") resolutions invalidating those waivers. That is simply false. Nowhere does Proposed Intervenors' motion suggest that they intend to contest whether the waivers at issue satisfied the strictures of Section 209(b) of the Clean Air Act. 42 U.S.C. § 7543(b). That is an entirely different legal question and one that is not before this Court. Instead, this litigation will determine whether the CRA resolutions passed by both the houses of Congress and signed into law by the President are valid, which in turn will dictate whether or not Plaintiffs can enforce California's ACC II and other standards.[1] Plaintiffs do not (and cannot) dispute that Proposed Intervenors have significant economic, compliance, and regulatory interests that will be directly affected by a decision invalidating the CRA resolutions. These interests readily satisfy Rule 24.

Plaintiffs also seek to substitute Rule 24's requirement that an intervenor have a significant, protectable interest for a much higher standard, turning on whether Proposed Intervenors could (or should) have filed their own challenge to the underlying waiver actions by EPA. But Proposed Intervenors need only show that they have an "interest that is protected under some law" and that "there is a relationship between [that] legally protected interest and the plaintiff[s] claims." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (citation omitted). Proposed Intervenors

---

[1] Plaintiffs' mischaracterization is exceptionally transparent because they have no intrinsic interest in the CRA resolutions—they only bring this action to reverse the invalidation of the underlying Clean Air Act preemption waivers. *See, e.g.*, Pls.' Opp. at 4 ("And while Plaintiffs seek to have the three waivers declared valid, that simply follows from a ruling invalidating the Resolutions.").

1

Gibson, Dunn & Crutcher LLP

satisfy that standard. And even if Plaintiffs' heightened bar was applicable—and it is not—the Court of Appeals has repeatedly explained that Rule 24(a) is "construe[d] … liberally in favor of potential intervenors," "guided primarily by practical considerations, not technical distinctions." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (citation omitted). Abundant practical—and economic, compliance, and regulatory—considerations counsel strongly in favor of granting intervention here.

Finally, Plaintiffs fail to engage with Proposed Intervenors' unique interest in preventing retroactive enforcement of preempted standards and with the possibility that the federal government might—as it has in the past—change policy positions concerning the EPA waivers (and, relatedly, the validity of the CRA resolutions) before this litigation finally concludes. As explained in the intervention motion, Proposed Intervenors have demonstrated that their interests are thus not adequately represented by the federal Defendants.

Plaintiffs' arguments against permissive intervention are substantively identical to their arguments concerning intervention as of right, and should be rejected for the same reasons. And while Proposed Intervenors are willing and ready to coordinate with other parties to avoid duplication or delay, not all of Plaintiffs' proposed case-management conditions are necessary or efficient.

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Civil L.R. 7-4, Proposed Intervenors submit that the issues to be decided on this Motion are:

1.    Whether Proposed Intervenors, which have significantly protectable interests that are affected by the outcome of this litigation, meet the requirements set forth in Rule 24(a) to intervene in this action as a matter of right.

2.    Alternatively, whether Proposed Intervenors, which have significantly protectable interests that are affected by the outcome of this litigation, meet the requirements for permissive intervention set forth in Rule 24(b).

**ARGUMENT**

**I.    Proposed Intervenors Are Entitled to Intervention as of Right.**

Plaintiffs do not dispute that Proposed Intervenors' motion was timely. Instead, Plaintiffs argue

2

that Proposed Intervenors lack a protectable interest that could be impeded by the disposition of this action, and that Proposed Intervenors have failed to overcome the presumption that they will be adequately represented by the federal Defendants.  Each of Plaintiffs' arguments fails.

**A.    Proposed Intervenors Claim a Significant, Protectable Interest in the Legality of the CRA Resolutions.**

Plaintiffs mischaracterize Proposed Intervenors' interest as focused on the "legality of the EPA waivers," rather than the validity of the CRA resolutions invalidating those waivers.  Pls.' Opp. at 4. But while Proposed Intervenors undoubtedly have a significant interest in the legality of the EPA waivers, that is not a question before this Court and is not the interest upon which Proposed Intervenors premised their intervention motion.[2]  Each of the interests raised by Proposed Intervenors—including compliance and economic interests as directly regulated parties, business interests in the ability to meet consumer demand, and regulatory interests in stable regulations with achievable mandates that provide for consumer choice—hinge on whether Plaintiffs can validly enforce the ACC II program and the other preempted standards.  Those interests will be protected if the CRA resolutions are upheld in this action—and imperiled if those resolutions are invalidated.  Plaintiffs recognize as much, describing their own action as "seek[ing] to have the three waivers declared valid," which would "simply follow[] from a ruling invalidating the Resolutions."  Pls.' Opp. at 4.  And in any event, Plaintiffs' attempt to separate Proposed Intervenors' interests in the validity of the CRA resolutions and the validity of the underlying EPA waivers revoked by those laws is precisely the kind of "technical distinction[]" that cannot defeat intervention.  *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 818.

Further, while Proposed Intervenors do have an interest in the legality of the underlying EPA waivers, that does not mean Proposed Intervenors cannot *also* have a valid and substantial interest in the legality of the CRA resolutions themselves.  Indeed, the economic interests raised by Proposed

---

[2] Whether California is entitled to a preemption waiver under Section 209(b) turns on the application of the three prongs set forth in that statute—*i.e.*, whether California's protectiveness determination was arbitrary and capricious, whether California "need[s] such State standards to meet compelling and extraordinary conditions," and whether the standards are consistent with Section 202(a) of the Clean Air Act.  42 U.S.C. § 7543(b)(1)(A)–(C).  That question is not before this Court, and, more importantly, the legality of the CRA resolutions at issue here does not turn on whether the underlying waivers should have been granted in the first place.

3

Gibson, Dunn & Crutcher LLP

Intervenors will be *better* vindicated if the CRA resolutions are upheld in this action. If the Proposed Intervenors were to file a lawsuit challenging EPA's action to grant the ACC II waiver, that would at best result in a vacatur of the waiver action. *See Util. Air Regul. Grp. v. EPA*, 744 F.3d 741, 747 (D.C. Cir. 2014). Such relief would not prevent a future EPA from reissuing the waiver and attempting to fix any procedural or statutory violations that led to the vacatur. In contrast, the CRA resolutions prevent EPA from reissuing these waivers in "substantially the same form," meaning EPA cannot issue a waiver for ACC II or the other preempted standards unless Congress subsequently authorizes such an action by law. *See* 5 U.S.C. § 801(b)(2). Proposed Intervenors thus have a substantial interest in the legality of the CRA resolutions themselves because they permanently and conclusively prevent Plaintiffs from enforcing the ACC II program and the other preempted standards—now and in the future.

Beyond seeking to misrepresent Proposed Intervenors' interest in this action, Plaintiffs do not meaningfully dispute that the economic interests identified by Proposed Intervenors are sufficient to justify intervention. Plaintiffs have thus forfeited any response to this argument, and these economic interests are sufficient on their own to establish this element. *See, e.g.*, *Missouri v. Harris*, 2014 WL 2506606, at *8 (E.D. Cal. June 3, 2014) (finding "economic interest in the outcome of th[e] action" to be a significantly protectable interest sufficient to support intervention); *Winston v. United States*, 2015 WL 9474284, at *2 (N.D. Cal. Dec. 29, 2015) (same); *Finjan, Inc. v. Symantec Corp.*, 2017 WL 6610081, at *2 (N.D. Cal. Sept. 29, 2017) (same); *see also* Mot. to Intervene ("Mot."), Dkt. 92, at 10, 12–13.

Further, Plaintiffs artificially heighten Rule 24(a)'s requirements. Plaintiffs mistake the protectable interest requirement for something akin to a "best cause-of-action" requirement, arguing that Proposed Intervenors "could have filed a petition for review challenging the waiver for [ACC II] on the grounds complained of here or else moved to intervene in any such suits filed by others" but "chose[] not to" and that "[s]uch a suit similarly would be the more appropriate forum for any claims against CARB's future potential enforcement of [ACC II]." Pls.' Opp. at 5. But whether Proposed Intervenors could have filed petitions for review under the Clean Air Act to challenge the waiver actions is simply not relevant to the Rule 24(a) inquiry. "[A] prospective intervenor's asserted interest

4

need not be protected by the statute under which the litigation is brought to qualify as 'significantly protectable' under Rule 24(a)(2)." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011).

Rule 24(a)(2) requires only that an intervenor have an "interest that is protected under some law" and that "there is a 'relationship between [that] legally protected interest and the plaintiff[s]' claims." *Lockyer*, 450 F.3d at 441 (citation omitted). Proposed Intervenors' asserted compliance, economic, and regulatory interests are more than sufficient to satisfy Rule 24(a)(2)'s standard, *see* Mot. at 10–13, and Plaintiffs arguments to the contrary should be rejected.

**B.     Disposition of this Action May Impair Proposed Intervenors' Interests, Including Preventing Retroactive Enforcement of Preempted Standards.**

Should Plaintiffs prevail in this litigation, Plaintiffs are explicit that they will seek to enforce the now-preempted standards pursuant to the previously granted preemption waivers—both prospectively and retroactively.[3] That outcome would dramatically and negatively affect Proposed Intervenors' members' interests by obliging them to comply with the costly ACC II regulations—after potentially years of production decisions made while those regulations were preempted by federal law.[4] This explicit and repeated threat of retroactive enforcement of the ACC II standards by the California Air Resources Board ("CARB") confirms that "without intervention," the interests of Proposed Intervenors—whose members are either directly regulated by CARB or whose economic interests are bound up in the enforceability of CARB's certification standards and requirements—may be impaired "as a practical matter" by the outcome of this litigation. *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527–28 (9th Cir. 1983).

Plaintiffs' self-serving description of CARB's potential retroactive enforcement of ACC II as "speculative" and "unripe" is belied by CARB's recent actions. Pls.' Opp. at 5. Since this lawsuit was commenced, CARB has *twice* stated that it intends to retroactively enforce ACC II regulations against

---

[3] *See, e.g.*, Manufacturers Advisory Correspondence ECCD-2025-08, CARB (August 25, 2025) (Mot. Ex. A) ("August 2025 MAC").

[4] As explained in the Motion to Intervene, the joint resolutions have the same force and effect as legislation. *See* Mot. at 6.

5

Gibson, Dunn &
Crutcher LLP

Proposed Intervenors' members should the CRA resolutions at issue be invalidated as a result of this litigation. The first instance was in the August 2025 MAC, in which CARB explicitly reserved the ability, if successful here, to retroactively enforce ACC II regulations against manufacturers who certify their vehicles under the federal standards or to CARB's prior, less stringent standards while this litigation is ongoing. August 2025 MAC at 3. And CARB is even more explicit in its September 15, 2025 notice of emergency rulemaking. After providing that manufacturers can seek certification under either ACC II or CARB's earlier 2013 regulations, CARB states that "[r]egulated parties … assume the risk if they choose to certify only to the [2013] provisions, and the congressional resolutions … are declared invalid" as a result of this litigation. Notice of Emergency Rulemaking at 6, CARB (September 15, 2025) (Ex. 1). Because the burden of prospective and retroactive enforcement of California's now-preempted standards will fall squarely upon Proposed Intervenors' members, Proposed Intervenors' interests in the continuing validity of the CRA resolutions—and all the consequences that flow from those resolutions—are clear, and sufficient to support intervention under Rule 24(a).

**C.    Proposed Intervenors' Interests Are Not Adequately Represented by Federal Defendants, Who Do Not Face Potential Compliance Burdens If the CRA Resolutions Are Invalidated.**

Plaintiffs contend that Proposed Intervenors have not carried their burden of proof that they are not adequately represented by the federal Defendants. Pls.' Opp. at 5–6. But Plaintiffs incorrectly discount Proposed Intervenors' unique economic interests and compliance considerations—none of which are borne by the federal Defendants. For example, should the CRA resolutions be invalidated, the federal Defendants will not face retroactive enforcement of ACC II or the other preempted standards, nor will the federal Defendants bear the costs of compliance therewith. Proposed Intervenors thus "bring a point of view to the litigation not presented" by the existing parties that goes far beyond mere "differences in litigation strategy." *Lockyer*, 450 F.3d at 444–45.

In other words, even if Proposed Intervenors and federal Defendants share the ultimate goal of defending the CRA resolutions, CARB's threat of retroactive enforcement highlights precisely why Proposed Intervenors' interests in the outcome of this litigation would not be adequately represented

6

Gibson, Dunn & Crutcher LLP

by the federal Defendants.  Only regulated parties like Auto Innovators' members (and parties like NADA, whose members' economic interests are directly impacted by whether vehicle supply and consumer demand are aligned) have an interest in the continuing validity of the CRA resolutions for *the specific purpose* of preventing retroactive enforcement of ACC II and the other preempted standards.  The EPA "cannot be expected under the circumstances presented to protect these private interests." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823.  The retroactive-enforcement issue alone is sufficient to demonstrate that Proposed Intervenors have an interest and objective in this litigation that is distinct from the federal Defendants.

Plaintiffs further insist that Proposed Intervenors "present[] no evidence that federal defendants would take an inconsistent position or abandon key arguments."  Pls.' Opp. at 6 (citing *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841–42 (9th Cir. 2011)).  This is counterfactual, as the waivers have been the subject of a long history of federal policy reversals, as the Supreme Court recently observed.  *See Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2130 (2025) ("[A]s Presidential administrations have come and gone, EPA has repeatedly altered its legal position on whether the Clean Air Act authorizes California regulations targeting greenhouse-gas emissions from new motor vehicles.").[5]  And it is precisely because of this history that Proposed Intervenors have a unique interest in the litigation that no other party is equally suited to protect—ensuring that the CRA resolutions are upheld in order to prevent California from retroactively enforcing the preempted standards, even if the federal government was to change position in the future.  *See* Mot. at 15.

Indeed, Plaintiffs fail to contend with any of the Ninth Circuit and other precedent cited by Proposed Intervenors in which courts have repeatedly allowed intervention as of right for regulated parties even where the government is also a party, in particular because government parties' legal and policy positions are not fixed.  "Although it is unlikely that the [Proposed Intervenors'] economic interest will change, it is not realistic to assume that the [EPA] will remain static or unaffected by unanticipated policy shifts." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 974 (3d Cir. 1998).  Indeed,

---

[5] *See also* Tr. of Oral Argument at 50, *Diamond Alternative Energy*, No. 24-7 (Apr. 23, 2025) (Alito, J.) ("By my count, the EPA has now changed its mind on this [waiver] four times. *** So what is the probability that there will not be a fifth?"); *id.* at 51 (Sotomayor, J.) ("You're not a betting man that you don't want to guess that there's going to be a fifth change? *** (Laughter.)").

7

as demonstrated in previous litigation over California's standards and EPA preemption waivers, changed priorities and policies between presidential administrations on the question of California's preemption waivers is now standard fare. Proposed Intervenors must have a seat at the table in order to protect their critical and unique interests at issue in this litigation—interests that are not shared by the federal Defendants.

**II.    In the Alternative, this Court Should Grant Proposed Intervenors' Request for Permissive Intervention.**

With respect to permissive intervention, Plaintiffs only dispute whether Proposed Intervenors meet one of the elements of permissive intervention: a common question of law and fact with the main action. Plaintiffs argue that Proposed Intervenors do not qualify for permissive intervention because "their interests focus on the lawfulness of EPA's waiver for [ACC II]," which would be "more properly vindicated through petitions for review filed under the Clean Air Act." Pls.' Opp. at 6. For all the reasons already explained, *supra* at 3–4, that argument is beside the point, and it fails in any event. Plaintiffs further argue that Proposed Intervenors may "attempt to raise those issues [regarding the lawfulness of the EPA waivers] here, even though they are irrelevant to Plaintiffs' claims." Pls.' Opp. at 6. But as Proposed Intervenors expressly stated in their intervention motion, Proposed Intervenors assert "strong interest[s] in intervening to defend the *joint resolutions* of disapproval at issue in this litigation," and do not intend to raise any new claims or seek additional relief beyond that sought by the federal Defendants. Mot. at 3–4, 16 (emphasis added). Plaintiffs' claim that Proposed Intervenors might attempt to challenge the validity of the underlying waivers themselves in this litigation is both speculative and incorrect.

Nor do Proposed Intervenors "risk[] prejudicing Plaintiffs by introducing duplication and delay." *Contra* Pls.' Opp. at 7. To start, granting Rule 24 intervention to parties with significant, protectable interests affected by the litigation promotes efficiency in the federal courts. *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) ("A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." (citation omitted)). Here, Proposed Intervenors intend to file a motion to dismiss upon intervention being granted, Mot. at 1, and as noted, do not intend to add new claims or to seek different relief than

8

Gibson, Dunn &
Crutcher LLP

the federal Defendants, Mot. at 16. And as Plaintiffs acknowledged, Proposed Intervenors have committed to "undertake reasonable efforts to avoid duplicative briefing and to confer on a coordinated briefing schedule for any Rule 12 motions." Pls.' Opp. at 7 (emphasis omitted). In sum, this Court can be assured that Proposed Intervenors do not seek to complicate the litigation, but only to ensure that their interests are adequately protected throughout.

**III.     Many of Plaintiffs' Proposed Conditions on Intervention Are Neither Efficient Nor Reasonable.**

Plaintiffs have proposed a series of conditions they assert should be imposed, should this Court grant intervention, in order to promote judicial efficiency. Pls.' Opp. at 7–8. Proposed Intervenors fully intend to limit the scope of their arguments and defenses to the validity of the CRA resolutions and will agree to meet and confer before the filing of any dispositive motion and to confer with the parties in an effort to submit a joint proposed briefing schedule to the Court at least one week before the motion's filing. But because Proposed Intervenors are, so far, the only movants who are directly regulated parties and have a unique interests as such, *see supra* at 3–8, it is neither efficient nor reasonable to require Proposed Intervenors to jointly brief and argue all dispositive motions with other movant-intervenors, nor to be subject to the restrictive collective page limit proposed by Plaintiffs.

## CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that this Court grant their motion to intervene in the above-captioned proceeding.

Gibson, Dunn &
Crutcher LLP

9

Dated: September 26, 2025

Respectfully submitted,

/s/    *Rachel Levick*
Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice*)
Rachel Levick (*pro hac vice*)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036
Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-Intervenors The Alliance for Automotive Innovation and The National Automobile Dealers Association*

10

REPLY IN SUPPORT OF MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG

**2-ER-194**

Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice*)
Rachel Levick (*pro hac vice*)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036
Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-Intervenors*
*The Alliance for Automotive Innovation and*
*The National Automobile Dealers Association*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, et al., <br><br> Defendants. | Case No.   4:25-cv-04966-HSG <br><br> **DECLARATION OF RACHEL LEVICK IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO INTERVENE BY ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION** |

DECLARATION OF RACHEL LEVICK IN SUPPORT OF REPLY IN SUPPORT OF MOTION TO INTERVENE BY
ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS
ASSOCIATION
CASE No. 4:25-cv-04966-HSG

**2-ER-195**

Gibson, Dunn &
Crutcher LLP

I, hereby, declare and state as follows:

1.      I am an attorney duly licensed to practice law before the courts of the District of Columbia and the State of Maryland.  By order of this Court, I am able to practice *pro hac vice* in this matter.  I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, and am one of the attorneys representing the Alliance for Automotive Innovation and the National Automobile Dealers Association in the above-entitled action.  Unless otherwise stated, I have personal knowledge of the facts stated in this declaration and, if asked to testify to them, I would do so competently.

2.      Attached as **Exhibit 1** is a true and correct copy of the California Air Resources Board's September 15, 2025 Notice of Emergency Rulemaking, last accessed on September 26, 2025, at https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2025/emergencyvehemissions/notice.pdf.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26th day of September, 2025, in New York, New York.

By:   */s/ Rachel Levick*

Rachel Levick

1

Gibson, Dunn & Crutcher LLP

# Exhibit 1

# Title 13 and Title 17, California Code of Regulations
# California Air Resources Board

## 5-Day Public Notice and Comment Period
### Emergency Amendment and Adoption of Vehicle Emissions Regulations

The California Air Resources Board (CARB or Board) proposes to adopt emergency vehicle emissions regulations (the "Emergency Vehicle Emissions Regulation") that will amend California Code of Regulations, titles 13 and 17, and adopt new sections into California Code of Regulations, titles 13 and 17. The amendments would confirm that, until a court resolves the uncertainty created by the federal government's actions, certain antecedent regulations (displaced by Advanced Clean Cars II and Omnibus) remain operative (as previously adopted) with the caveat that CARB may enforce Advanced Clean Cars II and Omnibus, to the extent permitted by law, in the event a court of law holds invalid the resolution purporting to disapprove those waivers. The Emergency Vehicle Emissions Regulations will become effective upon filing with the Office of Administrative Law.

## Written Comment Period and Submittal of Comments

Government Code section 11346.1(a)(2) requires that at least five working days prior to submission of the proposed emergency rulemaking to the Office of Administrative Law (OAL), CARB provides a notice of the proposed emergency rulemaking to every person who has filed a request for notice of regulatory action. After submission of the proposed emergency rulemaking to OAL, interested parties will be provided five calendar days to submit comments on the proposed emergency regulations, as set forth in Government Code section 11349.6.

CARB intends to submit the Emergency Vehicle Emissions Regulation to OAL on September 22, 2025. The submitted action will appear on the list of "Emergency Regulations Under Review" on OAL's website at:
*https://oal.ca.gov/emergency_regulations/Emergency_Regulations_Under_Review/*.

Comments must be submitted in writing directly to OAL:

Postal mail:   OAL Reference Attorney
              300 Capitol Mall, Suite 1250
              Sacramento, California 95814
              Fax Number: (916) 323-6826

Electronic submittal:  *staff@oal.ca.gov*

CARB requests that comments submitted via email include a carbon copy ("cc") to *cotb@arb.ca.gov*. Additionally, CARB requests but does not require that interested parties

submit written comments reference the title of the proposal in their comments to facilitate review.

Please note that under the California Public Records Act (Government Code section 7920.000 et seq.), your written and oral comments, attachments, and associated contact information (e.g., your address, phone, email, etc.) become part of the public record and can be released to the public upon request.

# Finding of Emergency

On January 6, 2025, U.S. EPA published its notices of decision granting California's requests for Clean Air Act preemption waivers, authorizing the enforcement of the LEV IV regulations (as part of the Advanced Clean Cars II regulation) and the Omnibus regulation.[1] On June 12, 2025, President Trump signed congressional resolutions that purported to disapprove these and one other waiver not at issue here.[2] California and a coalition of states promptly filed suit to challenge these resolutions targeting three waiver actions granted to California.[3] That case remains pending.

The congressional resolutions have introduced an unprecedented degree of uncertainty into the California market for new motor vehicles. Specifically, the resolutions purported to invalidate preemption waivers authorizing enforcement of more recently adopted (and more stringent) vehicle emission standards, which themselves had displaced earlier-adopted regulations (applicable to all future model years), for which preemption had also been waived. That has left questions about which regulations apply.

Most recently, in an exhibit to a court filing on September 4, 2025, vehicle manufacturers argued that CARB's earlier-adopted vehicle certification requirements—for which CARB has received separate waivers not affected by the congressional resolutions and not at issue in the litigation described above—are invalid because those requirements became "defunct" when the more recent, more stringent standards displaced them.[4] Thus, according to the vehicle manufacturer challengers, "amending state law" would be required to revive the earlier-adopted standards even if the displacing standards are ultimately found to be unenforceable on account of Congress's actions. CARB disagrees.

Nevertheless, in the event the vehicle manufacturer's claim were to be deemed correct—that CARB must affirmatively revive its earlier-adopted emissions requirements before it can resume enforcement of them—then CARB must take immediate action to maintain a stable vehicle market in the state and prevent the sale of vehicles into the state that would not be certified to *either* set of standards—*neither* the more recent ones that are subject to the recent congressional action *nor* the earlier-adopted ones that are undisputedly authorized by a federal waiver. Otherwise, in light of these unprecedented circumstances, there may remain questions—for the first time since CARB's program began decades ago—as to whether *any* California standard is in effect. There is therefore an emergency need to clarify the law to confirm that, at a minimum, CARB's earlier-adopted standards, which have extant federal

---

[1] 90 Fed. Reg. 642 (Jan. 6, 2025), 90 Fed. Reg. 643 (Jan. 6, 2025).

[2] H.J. Res. 88 (119th Congress), H.J. Res. 89 (199th Congress).

[3] *State of California, et al., v. United States of America, et al.,* (ND Cal., case no. 3:25-cv-04966).

[4] Pl. Mot. For Leave to File Reply in Support of Mot. For Admin. Relief to Expedite, *Daimler Truck North Am. LLC v. CARB*, Case No. 2:25-cv-02255-DC (Sep. 4, 2025), at Exh. 1, page 2 n.3.

preemption waivers not subject to the recent congressional resolutions, are operative. This emergency regulation thus responds to an unprecedented and unanticipated set of circumstances: the suggestion by a regulated party that, for the first time in half a century, CARB has *no* operative emissions standards to which it can certify new motor vehicles to be sold in the State.

Every day that passes without clarity in this matter risks the health of millions of Californians, CARB's ability to enforce its long-standing vehicle emissions certification program (including its ability to ensure vehicles meet emission requirements as sold into California and over their full useful lives), and the stability of the California vehicle market. There are currently over 27 million light-, medium-, and heavy-duty vehicles that operate on California roads, traveling an estimated 305 billion miles annually. Each day, these vehicles emit 290 tons of nitrogen oxides (NOx) and over 200 tons of reactive organic gases (this includes evaporative emissions, if just exhaust emissions the number is 83 tons/day)—both of which are smog precursors—and 11.9 tons of particulate matter smaller than 2.5 microns (Fine PM or PM2.5).

To clarify and ensure that new vehicles and engines can continue to be sold in California, despite the ongoing uncertainty created by the federal government's actions, CARB has taken several steps, including its proposal here to adopt the Emergency Vehicle Emissions Regulations. The amendments proposed here would confirm that, until a court resolves the uncertainty created by the federal government's actions, then at a minimum certain earlier-adopted regulations (displaced by Advanced Clean Cars II and Omnibus) remain operative (as previously adopted) with the caveat that CARB may enforce Advanced Clean Cars II and Omnibus, to the extent permitted by law, in the event a court of law holds invalid the resolutions purporting to disapprove the waivers for those more recent regulations.

## Authority and Reference

This emergency regulation is proposed under the authority granted in California Health and Safety Code, sections 38501, 38505, 38510, 38560, 39002, 39003, 39010, 39500, 39600, 39601, 39602.5, 39614, 39658, 39667, 40000, 43000.5, 43013, 43016, 43018, 43100, 43101, 43102, 43104, 43105, 43105.5, 43106, 43154, 43200, 43200.1, 43204, 43205, 43205.5, 43210, 43211, 43212, 43214, 43600 and 43806, and Vehicle Code sections 27156 and 28114. This action is proposed to implement, interpret, and make specific sections 38501, 38505, 38510, 38560, 38562, 38580, 39002, 39003, 39010, 39500, 39600, 39601, 39602.5, 39614, 39658, 39667, 40000, 43000, 43000.5, 43013, 43016, 43018, 43018.5, 43100, 43101, 43102, 43104, 43105, 43105.5, 43106, 43107, 43154, 43200, 43200.1, 43204, 43205, 43205.5, 43211, 43212, 43214, 43600 and 43806 of the California Health and Safety Code; and California Vehicle Code section 28114.

## Informative Digest of Proposed Action and Policy Statement Overview (Gov. Code, § 11346.5, subd. (a)(3))

### Sections Affected:

Proposed amendments to California Code of Regulations, title 13, sections: 1900, 1956.8, 1961.2, 1961.3, 1962.2, 1962.3, 1965, 1968.2, 1968.5, 1969, 1971.1, 1971.5, 1976, 1978, 2035, 2036, 2037, 2038, 2040, 2111, 2112, 2113, 2114, 2115, 2116, 2117, 2118, 2119, 2121, 2123, 2125, 2126, 2127, 2128, 2129, 2130, 2131, 2133, 2137, 2139, 2139.5, 2140, 2141,

**2-ER-200**

2142, 2143, 2144, 2145, 2146, 2147, 2148, 2149, 2166, 2166.1, 2167, 2168, 2169, 2169.1, 2169.2, 2169.3, 2169.4, 2169.5, 2169.6, 2169.7, 2169.8, 2170, 2317, 2423, 2485, and 2903.

Proposed adoption of new sections 1900.0.1, 1956.8.1, 1961.2.1, 1961.3.1, 1962.2.1, 1962.3.1, 1965.0.1, 1968.2.1, 1968.5.1, 1969.0.1, 1971.1.1, 1971.5.1, 1976.0.1, 1978.0.1, 2035.0.1, 2036.0.1, 2037.0.1, 2038.0.1, 2040.0.1, 2111.0.1, 2112.0.1, 2113.0.1, 2114.0.1, 2115.0.1, 2116.0.1, 2117.0.1, 2118.0.1, 2119.0.1, 2121.0.1, 2123.0.1, 2125.0.1, 2126.0.1, 2127.0.1, 2128.0.1, 2129.0.1, 2130.0.1, 2131.0.1, 2133.0.1, 2137.0.1, 2139.0.1, 2140.0.1, 2141.0.1, 2142.0.1, 2143.0.1, 2144.0.1, 2145.0.1, 2146.0.1, 2147.0.1, 2148.0.1, 2149.0.1, 2317.0.1, 2423.0.1, 2485.0.1, 2903.0.1 in title 13 of the California Code of Regulations.

Proposed amendments to California Code of Regulations, title 17, sections 95300, 95301, 95302, 95303, 95304, 95305, 95306, 95307, 95308, 95309, 95310, 95311, 95312, 95660, 95661, 95662, 95663, and 95664.

Proposed adoption of new sections 95300.0.1, 95301.0.1, 95302.0.1, 95303.0.1, 95304.0.1, 95305.0.1, 95306.0.1, 95307.0.1, 95308.0.1, 95309.0.1, 95310.0.1, 95311.0.1, 95312.0.1, 95660.0.1, 95661.0.1, 95662.0.1, 95663.0.1, and 95664.0.1.

## Documents Incorporated by Reference (Cal. Code Regs., tit. 1, § 20, subd. (c)(3)):

See APPENDIX A: Documents Incorporated by Reference.

# Background and Effect of the Proposed Emergency Regulatory Action

## Existing Advanced Clean Cars and Medium- and Heavy-Duty Vehicle and Engine Regulatory Requirements

Passenger cars and light trucks are a significant source of NOx, other smog-forming emissions and PM2.5 in California, with over 26 million such vehicles on the road, which are estimated to travel over 285 billion miles in 2025. Heavy-duty vehicles add approximately 1 million additional vehicles and an additional 15+ billion miles.

California's Low Emission Vehicle III (LEV III) regulations, adopted on January 26, 2012, and subsequently updated, tightened light-duty and chassis-certified medium-duty vehicle criteria pollutant standards for 2015 through 2025 and subsequent model years.[5] The U.S. EPA granted California's request for a Clean Air Act preemption waiver, authorizing enforcement of these regulations, in 2013.[6] As part of the Advanced Clean Cars II (ACC II) regulations adopted on June 9, 2022, more stringent criteria-emission standards known as Low Emission

---

[5] The LEV III regulations were subsequently amended in 2012 (Register 2012, No. 32 and Register 2013, No. 1), 2015 (Register 2015, No. 41) and 2018 (Register 2018, No. 50).

[6] 78 Fed. Reg. 2,113 (Jan. 9, 2013)Other parts of this waiver—covering other standards than those at issue here—were purportedly withdrawn in 2019 but reinstated in 2022.; 87 Fed. Reg. 14,332 (Mar. 14, 2022) [restoring waiver].

**2-ER-201**

Vehicle IV (LEV IV) established new requirements for 2026 and subsequent model years, thereby displacing the LEV III criteria pollutant regulation beginning with the 2026 model year.

California first regulated heavy-duty vehicle exhaust emissions in 1969. In 2005 and 2010, U.S. EPA granted waivers for California's medium- and heavy-duty engine and vehicle regulations for diesel and Otto-cycle engine standards.[7] In 2017, the U.S. EPA granted California a waiver of federal preemption for several sets of amendments to CARB's emission standards for medium- and heavy-duty vehicles adopted in 2011, 2008, 2007, and 2006.[8] In 2016, the U.S. EPA granted California's requests for waivers for its on-board diagnostic (OBD) systems for light-, medium-, and heavy-duty vehicles adopted in 2013 (the OBD II and HD OBD regulations).[9] California's Omnibus regulations, adopted in 2020 and amended in 2023, tightened CARB's criteria pollutant standards for medium- and heavy-duty vehicles.[10] Omnibus and Advanced Clean Cars encompass OBD requirements. In 2016, U.S. EPA also granted California a waiver for its Phase 1 Greenhouse Gas emission standards adopted in 2013.[11]

On January 6, 2025, U.S. EPA published its notices of decision granting California's requests for Clean Air Act preemption waivers, authorizing the enforcement of the LEV IV regulations and amendments to OBD requirements (as part of the ACC II regulation) and the Omnibus regulation (including its amendments to OBD requirements).[12] On June 12, 2025, President Trump signed congressional resolutions that purported to disapprove these and one other waiver not at issue here.[13] California and a coalition of states promptly filed suit to challenge these resolutions targeting three waiver actions granted to California.[14] That case remains pending.

The congressional resolutions have introduced an unprecedented degree of uncertainty into the California market for new motor vehicles. Specifically, the resolutions purported to invalidate preemption waivers authorizing enforcement of recently adopted, more stringent vehicle emission standards that had displaced earlier standards that themselves were applicable to all future model years and for which preemption has been waived. That has left questions for at least some regulated parties about which regulations apply, as evinced in the court filing by a manufacturer described above. To clarify and ensure that new vehicles and engines can continue to be sold in California, despite the ongoing uncertainty created by the federal government's actions, CARB has taken several steps, including this proposed adoption of the Emergency Vehicle Emissions Regulations.

[7] 70 Fed. Reg. 50,322 (Aug. 26, 2005); 75 Fed. Reg. 70,238 (Nov. 17, 2010).

[8] 82 Fed. Reg. 4,867 (Jan. 17, 2017).

[9] 81 Fed. Reg. 78,143 (Nov. 7, 2016), 81 Fed. Reg. 78,149 (Nov. 7, 2016).

[10] *See* Register 2020, No. 4 (26-Z), and Register 2024, No. 22 (31-Z).

[11] The Proposed Greenhouse Gas (GHG) Regulations For Medium- And Heavy-Duty Engines And Vehicles, Optional Reduced Emission Standards For Heavy-Duty Engines, And Amendments To The Tractor-Trailer GHG Regulation, Diesel-Fueled Commercial Motor Vehicle Idling Rule, And The Heavy-Duty Hybrid-Electric Vehicles Certification Procedures, adopted 2014, Register 2014, No. 49; 81 Fed. Reg. 52,680 (June 9, 2016).

[12] 90 Fed. Reg. 642 (Jan. 6, 2025), 90 Fed. Reg. 643 (Jan. 6, 2025).

[13] H.J. Res. 88 (119th Congress), H.J. Res. 89 (199th Congress).

[14] *State of California, et al., v. United States of America, et al.,* (ND Cal., case no. 3:25-cv-04966).

## Summary of the Proposed Regulatory Actions

CARB is proposing its Emergency Vehicle Emissions Regulations to clarify that protective emission standards for vehicles and engines remain operative, while ensuring manufacturers can sell vehicles and engines into California despite the emergency the federal government has created through unconstitutional congressional resolutions targeting certain preemption waivers.

To ensure that new motor vehicles can continue to be sold in California, despite the ongoing uncertainty introduced by the federal government into the State's longstanding regulatory program, CARB staff is proposing to amend its regulations to clarify that the criteria pollution provisions of the LEV III regulation (adopted as part of ACC I) and associated on-board diagnostic requirements remain operative, with the caveat that CARB may enforce the more recently adopted LEV IV requirements (adopted as part of ACC II) to the extent permitted by law, in the event a court of law holds invalid the resolution purporting to disapprove that waiver.

CARB staff is similarly proposing to amend its medium- and heavy-duty regulations to clarify that the provisions antecedent to Omnibus[15] remain operative, with the caveat that CARB may enforce the Omnibus regulation, to the extent permitted by law, in the event a court of law holds invalid the resolution purporting to disapprove that waiver.

CARB continues to accept and process certification applications for the LEV IV and Omnibus emission standards. Hence, both sets of standards will be present in the California Code of Regulations during this period of unprecedented uncertainty. Regulated parties may choose to follow either the LEV IV or Omnibus standards or the antecedent LEV III and pre-Omnibus provisions. Regulated parties, however, assume the risk if they choose to certify only to the antecedent provisions, and the congressional resolutions disapproving the waivers of federal preemption under the Clean Air Act are declared invalid.

CARB may also consider other changes to the sections affected, as listed on page 3 of this notice, or other sections within the scope of this notice, during this rulemaking process.

## Objectives and Benefits of the Proposed Regulatory Action:

The goal of the Emergency Vehicle Emissions Regulations is to clarify and ensure that new motor vehicles can be sold in California despite the unprecedented uncertainty introduced by the federal government into CARB's longstanding regulatory program. These amendments will ensure that new vehicles and engines sold in California will, at a minimum, meet the emission standards and requirements for which U.S. EPA has granted a waiver that was not targeted by the congressional resolutions.

## Environmental and Health Benefits

CARB's Emergency Vehicle Emissions Regulations will provide clarity and ensure that, at a minimum, the pollutant emission standards for new passenger cars, light trucks, and chassis-certified medium-duty vehicles up to 14,000 pounds, which had become status quo starting with the 2017 model year, remain operative. The Regulations will also clarify that the standards

---

[15] These regulations encompass provisions for OBD systems for light-, medium-, and heavy-duty engines and vehicles, greenhouse gas emissions from medium- and heavy-duty vehicles, and related requirements in the sections of titles 13 and 17 listed as encompassed in this proposal.

**2-ER-203**

antecedent to the Omnibus regulations also remain operative. CARB has enforced LEV III and pre-Omnibus standards, or stricter standards, since those standards went into effect, and thus the proposed regulatory action has no adverse environmental or health impact.

## Economic Impacts

CARB does not anticipate any cost or economic impacts from its Emergency Vehicle Emissions Regulations because the compliance pathways available to manufacturers have already been understood for years; and manufacturers have either already achieved or planned to achieve one or more of the compliance pathways.

## Comparable Federal Regulations:

Both California and U.S. EPA have authorities to set emissions standards for new motor vehicles and for new motor vehicle engines. U.S. EPA's authority is contained in Section 202(a)(1) of the Clean Air Act.[16]

The California Legislature has placed the responsibility of controlling vehicular air pollution on CARB, and has designated CARB as the state agency that is "charged with coordinating efforts to attain and maintain ambient air quality standards, to conduct research into the causes of and solution to air pollution, and to systematically attack the serious problems caused by motor vehicles, which is the major source of air pollution in many areas of the State."[17] CARB is authorized to adopt standards, rules and regulations needed to properly execute the powers and duties granted to and imposed on CARB by law.[18] Health and Safety Code sections 43013 and 43018 broadly authorize and require CARB to achieve the maximum feasible and cost-effective emission reductions from motor vehicles, including the adoption and implementation of vehicle emission standards and in-use performance standards[19] and by improving emission system durability and performance,[20] resulting in an expeditious reduction of NOx emissions from diesel vehicles, "which significantly contribute to air pollution problems."[21]

CARB is further authorized to adopt and implement emission standards for new motor vehicles and new motor vehicle engines that are necessary and technologically feasible.[22] CARB also has the authority to adopt test procedures and any other procedures necessary to determine whether vehicles and engines are in compliance with the emission standards established under Part 5 of the Health and Safety Code.[23] Finally, CARB has the authority to not certify a new motor vehicle or motor vehicle engine unless the vehicle or engine meets the emission standards adopted by CARB pursuant to Part 5 of the HSC under test procedures adopted pursuant to section 43104[24]

---

[16] 42 U.S.C. § 7521.
[17] Cal. Health & Saf. Code, §§ 39002, 39003.
[18] Cal. Health & Saf. Code, §§ 39600 and 39601.
[19] Cal. Health & Saf. Code, §43013(a).
[20] Cal. Health & Saf. Code, § 43018(c)(2)
[21] Cal. Health & Saf. Code, § 43013(h).
[22] Cal. Health & Saf. Code, §43101.
[23] Cal. Health & Saf. Code, § 43104.
[24] Cal. Health & Saf. Code, § 43102.

On January 24, 2023, U.S. EPA adopted the EPA-NOx rule which established criteria pollutant emissions standards and test procedures for 2027 and subsequent MY HDEs that are comparable in stringency to the 2027 MY HD Omnibus requirements.

For 2026 model year, U.S. EPA's Tier 3 criteria pollutant standards are similar to the LEV III requirements for non-methane organic gas (NMOG) plus NOx, but not as stringent for particulate matter. On March 20, 2024, U.S. EPA adopted their Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles Rule, that sets new Tier 4 standards to further reduce harmful air pollutant emissions from light-duty and medium-duty vehicles starting with model year 2027. Portions of this rule are identical to elements of the LEV IV requirements for those model years but are more stringent once they are fully phased in by the 2033 model year than the LEV III requirements would be.

On August 1, 2025, U.S. EPA published a notice of reconsideration and proposed repeal of its greenhouse has emission standards for light-, medium-, and heavy-duty vehicles.[25]

## An Evaluation of Inconsistency or Incompatibility with Existing State Regulations (Gov. Code, § 11346.5, subd. (a)(3)(D)):

During the process of developing the proposed regulatory action, CARB conducted a search of similar regulations on this topic and concluded these regulations are neither inconsistent nor incompatible with existing state regulations.

# Other Statutory Requirements (Gov. Code, § 11346.5 subd. (a)(4))

The Emergency Vehicle Regulations proposal would clarify that certain antecedent regulations remain operative. When these regulations were adopted, any other matters prescribed by statute applicable to CARB or these specific regulations or class or regulations were identified. These antecedent regulations were identified in OAL File Numbers:

- Z-00-1010-10 [Consider Requiring Certain California Light-and Medium-Duty Vehicles to be Subject to Federal Tier 2 Exhaust Standards, and Adopting Additional Exhaust Emission Standards for Heavy-Duty Gasoline Vehicles and Engines],
- Z-01-0828-14 [Amendments Adopting More Stringent Emission Standards for 2007 and Subsequent Model Year New Heavy-Duty Diesel Engines],
- Z-02-0917-02 [Consider the Incorporation of Federal Exhaust Emission Standards for 2008 and Later Model-Year Heavy-Duty Gasoline Engines and the Adoption of Minor Amendments to the Low-Emission Vehicle Regulations],
- Z-2011-1129-12 [Amendments To The California Greenhouse Gas And Criteria Pollutant Exhaust And Evaporative Emission Standards And Test Procedures And To The On-Board Diagnostic System Requirements For Passenger Cars, Light-Duty Trucks, And Medium-Duty Vehicles, And To The Evaporative Emission Requirements For Heavy-Duty Vehicles],
- Z-2012-0626-07 [Proposed Revisions to On-Board Diagnostic System Requirements for Heavy-Engines, Passenger Cars, Light-Duty Trucks, Medium-Duty Vehicles and Engines],

[25] 90 Fed. Reg. 36,288, Aug. 1, 2025.

- Z-2012-0831-01 [Proposed Amendments To The New Passenger Motor Vehicle Greenhouse Gas Emission Standards For Model Years 2017-2025 To Permit Compliance Based On Federal Greenhouse Gas Emissions Standards And Additional Minor Revisions To The LEV III And ZEV Regulations],
- Z-2013-1015-07 [Proposed Greenhouse Gas (GHG) Regulations For Medium- And Heavy-Duty Engines And Vehicles, Optional Reduced Emission Standards For Heavy-Duty Engines, And Amendments To The Tractor-Trailer GHG Regulation, Diesel-Fueled Commercial Motor Vehicle Idling Rule, And The Heavy-Duty Hybrid-Electric Vehicles Certification Procedures],
- Z-2014-0819-06 [Proposed Amendments To The LEV III Criteria Pollutant Requirements For Light- And Medium-Duty Vehicles, The Hybrid Electric Vehicle Test Procedures, And The Heavy-Duty Otto-Cycle And Heavy-Duty Diesel Test Procedures],
- Z-2018-0724-07 [Proposed Amendments to the Low-Emission Vehicle III Greenhouse Gas Emission Regulation], and
- Z-2018-0821-02 [Amendments to California Specification for Fill Pipes and Openings Of Motor Vehicle Fuel Tanks].

## Disclosure Regarding the Proposed Regulation

## Fiscal Impact/Local Mandate Determination Regarding the Proposed Action (Gov. Code, § 11346.5, subds. (a)(5)&(6)):

The determinations of the Board's Executive Officer concerning the costs or savings incurred by public agencies and private parties and businesses in reasonable compliance with the proposed regulatory actions are presented below.

Under Government Code sections 11346.5, subdivision (a)(5) and 11346.5, subdivision (a)(6), the Executive Officer has determined that the proposed regulatory actions would not create costs or savings to any State agency, would not create costs or savings in federal funding to the State, would not create costs or mandates to any local agency or school district, whether or not reimbursable by the State under Government Code, title 2, division 4, part 7 (commencing with section 17500), or other nondiscretionary cost or savings to State or local agencies.

Cost to any Local Agency or School District Requiring Reimbursement under Gov. Code section 17500 et seq.:

The Emergency Vehicle Emissions Regulations proposal is not expected to result in a cost to any local agency or school district requiring reimbursement under Government Code section 17500 et seq. (state-mandated costs under California Constitution Article XIII B, section 6, i.e., "unfunded mandate"), where the proposal is clarifying that regulations that have been in place for years remain operative, in light of the unusual circumstances here, and manufacturers were planning to achieve, or already were achieving, compliance with more stringent standards..

Cost or Savings for State Agencies:

The Emergency Vehicle Emissions Regulations proposal is not expected to result in a change to fiscal impacts on state government, where the proposal is clarifying that regulations that have been in place for years remain operative in light of the unusual

**2-ER-206**

circumstances here, and manufacturers were planning to achieve, or already achieving, compliance with more stringent standards.

Other Non-Discretionary Costs or Savings on Local Agencies:

The Emergency Vehicle Emissions Regulations proposal is not expected to have non-discretionary costs or savings on local agencies, where the proposal is clarifying that regulations that have been in place for years remain operative in light of the unusual circumstances here, and manufacturers were planning to achieve, or already achieving, compliance with more stringent standards.

Cost or Savings in Federal Funding to the State:

The Emergency Vehicle Emissions Regulations proposal is not expected to impose any costs or savings in federal funding to the state.

# Environmental Analysis

CARB, as the lead agency under the California Environmental Quality Act (CEQA), has reviewed the proposed Emergency Vehicle Emissions Regulation and concluded that it is exempt pursuant to CEQA Guidelines, section 15061(b)(3). The proposed regulatory action will provide clarity and confirm that, until a court resolves the uncertainty created by the federal government's actions, certain antecedent regulations (displaced by Advanced Clean Cars II and Omnibus) remain operative (as previously adopted) with the caveat that CARB may enforce Advanced Clean Cars II and Omnibus, to the extent permitted by law, in the event a court of law holds invalid the resolutions purporting to disapprove those waivers.

CARB has also determined this proposal is exempt pursuant to CEQA Guidelines sections 15307 (actions for protection of natural resources) and 15308 (actions for protection of the environment).

# Agency Contact Persons

Inquiries concerning the substance of the proposal to make permanent CARB's Emergency Vehicle Emissions Regulations may be directed to the agency representative Michelle Buffington, Ph.D., Chief, Mobile Source Control Division, California Air Resources Board, (279) 208-7982 (VOIP), *Michelle.Buffington@arb.ca.gov*.

# Availability of Documents

Copies of the emergency rulemaking documents, including the full text of the proposed regulatory language, in underline and strikeout format to allow for comparison with the existing regulations, and proposed new text, may be accessed on CARB's website listed below, on Monday, September 15, 2025. Please contact Lindsay Garcia, Regulations Coordinator, at *Regulations@arb.ca.gov* or (916) 546-2286 if you need physical copies of the documents. Pursuant to Government Code section 11346.5, subdivision (b), upon request to the Regulations Coordinator, physical copies would be obtained from the Public Information Office, California Air Resources Board, 1001 I Street, Visitors and Environmental Services Center, First Floor, Sacramento, California, 95814.

2-ER-207

Further, the agency representative to whom non-substantive inquiries concerning the proposed administrative action may be directed is Lindsay Garcia, Regulations Coordinator, (916) 546-2286. CARB staff has compiled a record for this rulemaking action, which includes all the information upon which the proposal is based. This material is available for inspection upon request to the contact persons.

## Internet Access

This Notice and the proposed regulatory text, and all subsequent regulatory documents, when completed, are available on CARB's website for this rulemaking at
*https://ww2.arb.ca.gov/rulemaking/2025/emergencyvehemissions*

California Air Resources Board

_____
Steven S. Cliff, Ph.D.,
Executive Officer

Date: September 15, 2025

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption. For a list of simple ways you can reduce demand and cut your energy costs,* see *CARB's website* (ww2.arb.ca.gov).

2-ER-208

**APPENDIX A: Documents Incorporated by Reference**

The Emergency Vehicle Emissions Regulations previously incorporated documents by reference as identified in OAL File Numbers:

- Z-00-1010-10 [Consider Requiring Certain California Light-and Medium-Duty Vehicles to be Subject to Federal Tier 2 Exhaust Standards, and Adopting Additional Exhaust Emission Standards for Heavy-Duty Gasoline Vehicles and Engines],
- Z-01-0828-14 [Amendments Adopting More Stringent Emission Standards for 2007 and Subsequent Model Year New Heavy-Duty Diesel Engines],
- Z-02-0917-02 [Consider the Incorporation of Federal Exhaust Emission Standards for 2008 and Later Model-Year Heavy-Duty Gasoline Engines and the Adoption of Minor Amendments to the Low-Emission Vehicle Regulations],
- Z-2011-1129-12 [Amendments To The California Greenhouse Gas And Criteria Pollutant Exhaust And Evaporative Emission Standards And Test Procedures And To The On-Board Diagnostic System Requirements For Passenger Cars, Light-Duty Trucks, And Medium-Duty Vehicles, And To The Evaporative Emission Requirements For Heavy-Duty Vehicles],
- Z-2012-0626-07 [Proposed Revisions to On-Board Diagnostic System Requirements for Heavy-Engines, Passenger Cars, Light-Duty Trucks, Medium-Duty Vehicles and Engines],
- Z-2012-0831-01 [Proposed Amendments To The New Passenger Motor Vehicle Greenhouse Gas Emission Standards For Model Years 2017-2025 To Permit Compliance Based On Federal Greenhouse Gas Emissions Standards And Additional Minor Revisions To The LEV III And ZEV Regulations],
- Z-2013-1015-07 [Proposed Greenhouse Gas (GHG) Regulations For Medium- And Heavy-Duty Engines And Vehicles, Optional Reduced Emission Standards For Heavy-Duty Engines, And Amendments To The Tractor-Trailer GHG Regulation, Diesel-Fueled Commercial Motor Vehicle Idling Rule, And The Heavy-Duty Hybrid-Electric Vehicles Certification Procedures],
- Z-2014-0819-06 [Proposed Amendments To The LEV III Criteria Pollutant Requirements For Light- And Medium-Duty Vehicles, The Hybrid Electric Vehicle Test Procedures, And The Heavy-Duty Otto-Cycle And Heavy-Duty Diesel Test Procedures],
- Z-2018-0724-07 [Proposed Amendments to the Low-Emission Vehicle III Greenhouse Gas Emission Regulation], and
- Z-2018-0821-02 [Amendments to California Specification for Fill Pipes and Openings Of Motor Vehicle Fuel Tanks].

The following documents are incorporated in the Emergency Vehicle Emissions regulatory action by reference as specified by the following sections of emergency regulations or by the original regulatory section in which they were adopted and are noted here for completeness.

- "California 2015 And Subsequent Model Criteria Pollutant Exhaust Emission Standards and Test Procedures And 2017 And Subsequent Model Greenhouse Gas Exhaust Emission Standards and Test Procedures For Passenger Cars, Light-Duty Trucks, And Medium-Duty Vehicles", amended December 6, 2012, incorporated by reference in title 13, CCR, sections 1961.2.1, 1965.0.1, 2037.0.1, and 2038.0.1.

- "California Evaporative Emission Standards and Test Procedures For 2001 And Subsequent Model Motor Vehicles", amended December 2012, incorporated by reference in title 13, CCR, section 1976.0.1.

**2-ER-209**

- "California Refueling Emission Standards and Test Procedures For 2001 And Subsequent Model Motor Vehicles", amended March 22, 2012[Insert Date of Adoption], re-incorporated by reference to reflect new amended date in title 13, CCR, section 1978.0.1.

- "California Non-Methane Organic Gas Test Procedures for 2017 And Subsequent Model Year Vehicles", adopted September 2015, incorporated by reference in title 13, CCR, section 1961.2.1.

- "California Test Procedures For Evaluating Substitute Fuels and New Clean Fuels In 2015 and Subsequent Years" adopted March 2012, incorporated by reference in title 13, CCR, section 2317.0.1.

- "California Exhaust Emission Standards and Test Procedures For 2018 and Subsequent Model Zero-Emission Vehicles and Hybrid Electric Vehicles, In The Passenger Car, Light-Duty Truck And Medium-Duty Vehicle Classes", amended September 3, 2015, incorporated by reference in title 13, CCR, sections 1961.2.1 and 1962.2.1.

- "California Exhaust Emission Standards and Test Procedures For 2004 and Subsequent Model Heavy-Duty Diesel-Engines and Vehicles", amended October 21, 2014, incorporated by reference in title 13, CCR, section 1956.8.1(b).

- "California Exhaust Emission Standards and Test Procedures For 2004 and Subsequent Model Heavy-Duty Otto-Cycle Engines", amended October 21, 2014, incorporated by reference in title 13, CCR, section 1956.8.1(d).

- "California Greenhouse Gas Exhaust Emission Standards and Test Procedures for 2014 and Subsequent Model Heavy-Duty Vehicles", adopted October 21, 2014, incorporated by reference in title 17, CCR, section 95663(c).

- "California Interim Certification Procedures For 2004 and Subsequent Model Hybrid-Electric and Other Hybrid Vehicles in the Urban Bus and Heavy-Duty Vehicle Classes", amended October 21, 2014, incorporated by reference in title 13, CCR, section 1956.8.1(b).

- "California Non-Methane Organic Gas Test Procedures for 1993 Through 2016 Model Year Vehicles", amended September 2, 2015, incorporated by reference in title 13, CCR, section 1956.8.1(d).

- Society of Automotive Engineers (SAE) J1979 "E/E Diagnostic Test Modes," incorporated by reference in title 13, CCR, section 1968.2.1(c).

- SAE J1939 "Recommended Practice for a Serial Control and Communications Vehicle Network," incorporated by reference in title 13, CCR, section 1968.2.1(c).

- The evaporative emission standards and test procedures incorporated by reference in title 13, CCR, section 1976, as referenced in title 13, CCR, section 1968.2.1(c).

- The exhaust emission levels to which an engine family is certified under the averaging, banking, and trading program incorporated by reference in title 13, CCR, section 1956.8, as referenced in title 13, CCR, section 1968.2.1(c).

- The certification requirements and test procedures incorporated by reference in title 13, CCR, section 1961(d), as referenced in title 13, CCR, section 1968.2.1(c).

2-ER-210

- The certification exhaust emission standards and test procedures applicable to the SET cycle incorporated by reference in title 13, CCR, section 1956.8(b) and section 1956.8(d), as referenced in title 13, CCR, section 1968.2.1(c).

- "Speed Versus Time Data for California's Unified Driving Cycle", dated December 12, 1996, incorporated by reference in title 13, CCR, section 1968.2.1(c).

- 40 CFR 86, Appendix 1, section (g) "EPA US06 Driving Schedule for Light-Duty Vehicles and Light-Duty Trucks," amended July 13, 2005, incorporated by reference in title 13, CCR, section 1968.2.1(c).

- Air Resources Board (ARB) Manufacturers Advisory Correspondence (MAC) No. 99-06, adopted December 20, 1999, incorporated by reference in title 13, CCR, section 1968.2.1(e)(14.1.2)(A).

- SAE J1930 "Electrical/Electronic Systems Diagnostic Terms, Definitions, Abbreviations, and Acronyms – Equivalent to ISO/TR 15031-2:April 30, 2002", incorporated by reference in title 13, CCR, section 1968.2.1(e)(14.1.2)(B).

- SAE J1930 "Electrical/Electronic Systems Diagnostic Terms, Definitions, Abbreviations, and Acronyms – Equivalent to ISO/TR 15031-2", October 2008, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.1).

- SAE J1962 "Diagnostic Connector – Equivalent to ISO/DIS 15031-3:December 14, 2001", April 2002, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.2).

- SAE J1978 "OBD II Scan Tool – Equivalent to ISO/DIS 15031-4:December 14, 2001", April 2002, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.3).

- SAE J1979 "E/E Diagnostic Test Modes", May 2007, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.4).

- SAE J1979-DA, "Digital Annex of E/E Diagnostic Test Modes", October 2011, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.4.1).

- SAE J1850 "Class B Data Communications Network Interface", May 2001, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.5).

- SAE J2012 "Diagnostic Trouble Code Definitions – Equivalent to ISO/DIS 15031-6", December 2007, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.6).

- ISO 9141-2:1994 "Road Vehicles-Diagnostic Systems-CARB Requirements for Interchange of Digital Information", February 1994, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.7).

- ISO 14230-4:2000 "Road Vehicles-Diagnostic Systems-KWP 2000 Requirements for Emission-related Systems", June 2000, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.8).

- ISO 15765-4:2005 "Road vehicles-Diagnostics on Controller Area Network (CAN) - Part 4: Requirements for emissions-related systems", January 2005, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.9).

- SAE J1939 "Recommended Practice for a Serial Control and Communications Vehicle Network" March 2009, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.1).

**2-ER-211**

- SAE J1939/1 "Recommended Practice for Control and Communications Network for On-Highway Equipment", September 01, 2000, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.2).

- SAE J1939/11 "Physical Layer, 250K bits/s, Twisted Shielded Pair", September 18, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.3).

- SAE J1939/13 "Off-Board Diagnostic Connector", March 11, 2004, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.4).

- SAE J1939/15 "Reduced Physical Layer, 250K bits/sec, UN-Shielded Twisted Pair (UTP)", August 21, 2008, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.5).

- SAE J1939/21 "Data Link Layer", December 22, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.6).

- SAE J1939/31 "Network Layer", April 02, 2004, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.7).

- SAE J1939/71 "Vehicle Application Layer (Through February 2008)", January 20, 2009, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.8).

- SAE J1939/73 "Application Layer - Diagnostics", September 08, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.9).

- SAE J1939/81 "Network Management", May 08, 2003, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.10).

- SAE J1939/84 "OBD Communications Compliance Test Cases For Heavy Duty Components and Vehicles", December 2008, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.10.11).

- SAE J1699-3 – "OBD II Compliance Test Cases", May 2006, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.11).

- SAE J2534-1 – "Recommended Practice for Pass-Thru Vehicle Programming", December 2004, incorporated by reference in title 13, CCR, section 1968.2.1(g)(1.12).

- Attachment E: CAL ID and CVN Data of ARB Mail-Out #MSC 06-23, December 21, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(g)(4.7.4).

- Attachment A of ARB Mail-Out #95-20, May 22, 1995, incorporated by reference in title 13, CCR, section 1968.2.1(i)(2.2).

- Attachment A: Misfire Disablement and Detection Chart of ARB Mail-Out #06-23, December 21, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(i)(2.5.1)(C).

- Attachments F and G of ARB Mail-Out #MSC 06-23, December 21, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(i)(2.16).

- Attachment D: Rate Based Data of ARB Mail-Out #06-23, December 21, 2006, incorporated by reference in title 13, CCR, section 1968.2.1(j)(3.2).

- Health and Safety Code section 39010 et seq., incorporated by reference in title 13, CCR, section 1968.5.1(a)(3).

**2-ER-212**

- Title 13, CCR, sections 1900(b) and 1968.2(c), incorporated by reference in title 13, CCR, section 1968.5.1(a)(3).

- EMFAC2000 "Public Meeting to Consider Approval of Revisions to the State's On-Road Motor Vehicle Emissions Inventory: Technical Support Document, Section 7.1, 'Estimation of Average Mileage Accrual Rates from Smog Check Data,'" May 2000, incorporated by reference in title 13, CCR, section 1968.5.1(b)(3)(A)(iv).

- SAE J1979 as incorporated by reference in title 13, CCR section 1968.2(g)(1) and section 1968.2.1(g)(4.1).

- SAE J1979 "E/E Diagnostic Test Modes," February 2012, incorporated by reference in title 13, CCR, section 1971.1.1(c).

- The evaporative emission standards and test procedures incorporated by reference in title 13, CCR, section 1976, as referenced in title 13, CCR, section 1971.1.1(c).

- The exhaust emission levels to which an engine family is certified under the averaging, banking, and trading program incorporated by reference in title 13, CCR, section 1956.8, as referenced in title 13, CCR, section 1971.1.1(c).

- The certification exhaust emission standards and test procedures applicable to the SET cycle incorporated by reference in title 13, CCR, section 1956.8(b) and section 1956.8(d), as referenced in title 13, CCR, section 1971.1.1(c).

- SAE J1930 "Electrical/Electronic Systems Diagnostic Terms, Definitions, Abbreviations, and Acronyms – Equivalent to ISO/TR 15031-2", October 2008, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.1).

- SAE J1930-DA "Electrical/Electronic Systems Diagnostic Terms, Definitions, Abbreviations, and Acronyms Web Tool Spreadsheet", March 2012, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.1.1).

- SAE J1962 "Diagnostic Connector – Equivalent to ISO/DIS 15031-3:December 14, 2001", April 2002, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.2).

- SAE J1978 "OBD II Scan Tool – Equivalent to ISO/DIS 15031-4:December 14, 2001", April 2002, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.3).

- SAE J1979 "E/E Diagnostic Test Modes", May 2007, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.4).

- SAE J1979-DA, "Digital Annex of E/E Diagnostic Test Modes", October 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.4.1).

- SAE J2012 "Diagnostic Trouble Code Definitions – Equivalent to ISO/DIS 15031-6", December 2007, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.5).

- SAE J2012-DA "Digital Annex of Diagnostic Trouble Code Definitions and Failure Type Byte Definitions", July 2010, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.5.1).

- ISO 15765-4 "Road Vehicles-Diagnostics Communication over Controller Area Network (CAN) - Part 4: Requirements for emission-related systems", February 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.6).

**2-ER-213**

- SAE J1939 "Recommended Practice for a Serial Control and Communications Vehicle Network", April 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.1).

- SAE J1939/1 "On-Highway Equipment Control and Communication Network", May 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.2).

- SAE J1939/11 "Physical Layer, 250K bits/s, Twisted Shielded Pair", September 2006, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.3).

- SAE J1939/13 "Off-Board Diagnostic Connector", October 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.4).

- SAE J1939/15 "Reduced Physical Layer, 250K bits/sec, UN-Shielded Twisted Pair (UTP)", August 2008, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.5).

- SAE J1939/21 "Data Link Layer", December 2010, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.6).

- SAE J1939/31 "Network Layer", May 2010, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.7).

- SAE J1939/71 "Vehicle Application Layer (Through May 2010)", March 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.8).

- SAE J1939/73 "Application Layer - Diagnostics", February 2010, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.9).

- SAE J1939/81 "Network Management", June 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.10).

- SAE J1939/84 "OBD Communications Compliance Test Cases For Heavy Duty Components and Vehicles", December 2010, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.7.11).

- SAE J2403 "Medium/Heavy-Duty E/E Systems Diagnosis Nomenclature," February 2011, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.8).

- SAE J1699-3 – "OBD II Compliance Test Cases", December 2009, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.9).

- SAE J2534-1 – "Recommended Practice for Pass-Thru Vehicle Programming", December 2004, incorporated by reference in title 13, CCR, section 1971.1.1(h)(1.10).

- Attachment F of ARB Mail-Out #MSC 09-22, July 7, 2009, incorporated by reference in title 13, CCR, section 1971.1.1 (h)(4.7.6).

- Attachments G and H of ARB Mail-Out #MSC 09-22, July 7, 2009, incorporated by reference in title 13, CCR, section 1971.1.1 (j)(2.17).

- Health and Safety Code section 39010 et seq., incorporated by reference in title 13, CCR, section 1971.5.1(a)(3).

- Title 13, CCR, section 1900(b) and section 1971.1(c), incorporated by reference in title 13, CCR, section 1971.5.1(a)(3).

**2-ER-214**

- EMFAC2007, incorporated by reference in title 13, CCR, section 1971.5.1(b)(3)(A)(iv).

- Society of Automotive Engineers J1979 (SAE J1979) or J1939 (SAE J1939) as incorporated by reference in Cal. Code Regs., title 13, section 1971.1.1(h)(1) and section 1971.1.1(h)(4.1).

**2-ER-215**

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER (DC Bar #1028454)
*Deputy Assistant Attorney General*
JEFFREY HUGHES (NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel:    (202) 717-7067 (Stander)
         (202) 532-3080 (Hughes)
Email: robert.stander@usdoj.gov
         jeffrey.hughes@usdoj.gov

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division
JOSEPH E. BORSON
*Assistant Branch Director*
Federal Programs Branch
STEPHEN M. PEZZI (FL Bar #1041279)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel:    (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. 4:25-cv-04966-HSG<br><br>**UNITED STATES' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: October 30, 2025<br>Time: 2:00 p.m. PST<br>Judge: Hon. Haywood S. Gilliam, Jr.<br><br>ORAL ARGUMENT REQUESTED |

**2-ER-216**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    The Congressional Review Act contains a set of expedited legislative procedures
        for enacting statutes that abrogate certain administrative rules. ..................................... 3

    B.    The Clean Air Act preempts state-level vehicle emission regulations. .......................... 5

    C.    California promulgates three sets of vehicle emissions standards with the goal of
        banning sales of internal-combustion vehicles. .............................................. 6

    D.    Congress revokes the preemption waivers........................................................ 7

    E.    California sues, claiming that EPA and Congress failed to follow proper legislative
        procedures under the Congressional Review Act. ........................................... 8

ARGUMENT.......................................................................................................... 8

    I.    Congress expressly precluded judicial review in 5 U.S.C. § 805. ..................................... 8

    II.    The Court independently lacks subject-matter jurisdiction because this suit amounts
        to a challenge to House or Senate rules. ........................................................ 13

    III.    Even if the Resolutions conflict with earlier-enacted statutes, they remain valid. ........... 15

    IV.    The statutory and ultra vires claims fail for several other threshold reasons.................... 17

        A.    The APA claim fails because Plaintiffs identify no final agency action. ................ 17

        B.    Plaintiffs' claims against EPA are an improper attempt to evade the Clean
            Air Act's comprehensive review scheme. ............................................... 18

        C.    The ultra vires claims fail as a matter of law.......................................... 20

    V.    Plaintiffs' constitutional claims fail. ............................................................ 20

        A.    The Take Care Clause is not judicially enforceable. ................................. 21

        B.    Plaintiffs' nondelegation and judicial power theories fail. ....................... 22

        C.    Plaintiffs fail to identify any interest protected by the Tenth Amendment.............. 24

CONCLUSION………………………………………………………………………………..25

## TABLE OF AUTHORITIES

**U.S. Constitution**

U.S. Const. art. I, § 5............................................................................................4, 13

U.S. Const. art. II, § 3 .............................................................................................12

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ...........................................................................................20

*Bank Markazi v. Peterson,*
   578 U.S. 212 (2016) ......................................................................................23, 24

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...........................................................................................17

*Cal. Dump Truck Owners Ass'n v. Nichols,*
   924 F. Supp. 2d 1126 (E.D. Cal. 2012) .............................................................19

*Cal. Dump Truck Owners Ass'n v. Nichols,*
   784 F.3d 500 (9th Cir. 2015)..............................................................................19

*Citizens for Const. Integrity v. United States,*
   57 F.4th 750 (10th Cir. 2023)........................................................................15, 16

*City of Reno v. Netflix, Inc.,*
   52 F.4th 874 (9th Cir. 2022)................................................................................11

*Common Cause v. Biden,*
   748 F.3d 1280 (D.C. Cir. 2014) .........................................................................15

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,*
   482 F.3d 1157 (9th Cir. 2007).....................................................................2, 14, 15

*Cook Inlet Treaty Tribes v. Shalala,*
   166 F.3d 986 (9th Cir. 1999)..............................................................................23

*Ctr. for Biological Diversity v. Bernhardt,*
   946 F.3d 553 (9th Cir. 2019)................................................8, 9, 10, 11, 12, 16, 24

*Dalton Trucking, Inc. v. EPA,*
   808 F.3d 875 (D.C. Cir. 2015) ...........................................................................19

*Dalton v. Specter,*
   511 U.S. 462 (1994) ......................................................................................12, 18

*DeVillier v. Texas,*
   601 U.S. 285 (2024) ................................................................................................21

*Dorsey v. United States,*
   567 U.S. 260 (2012) ................................................................................................17

*Engine Mfrs. Ass'n v. EPA,*
   88 F.3d 1075 (D.C. Cir. 1996) ..................................................................................5

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
   541 U.S. 246 (2004) ................................................................................................25

*Foster v. USDA,*
   68 F.4th 372 (8th Cir. 2023) ....................................................................................10

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..........................................................................................18, 21

*Freeman Invs., L.P. v. Pac. Life Ins. Co.,*
   704 F.3d 1110 (9th Cir. 2013) ..................................................................................13

*Gonzaga Univ. v. Doe,*
   536 U.S. 273 (2002) ................................................................................................11

*INS v. Chadha,*
   462 U.S. 919 (1983) ................................................................................................16

*Kan. Nat. Res. Coal. v. Dep't of Interior,*
   971 F.3d 1222 (10th Cir. 2020) ............................................................................9, 10

*Metzenbaum v. FERC,*
   675 F.2d 1282 (D.C. Cir. 1982) ..............................................................................14

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1866) ....................................................................................21

*Montanans for Multiple Use v. Barbouletos,*
   568 F.3d 225 (D.C. Cir. 2009) ..................................................................................9

*Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation,*
   17 F.3d 521 (2d Cir. 1994) ........................................................................................5

*Nat'l Fed'n of Indep. Bus. v. DOL,*
   595 U.S. 109 (2022) ................................................................................................24

*New York v. United States,*
   505 U.S. 144 (1992) ................................................................................................25

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ...........................................................................................13

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ...........................................................................................20

*Palumbo v. Waste Techs. Indus.*,
   989 F.2d 156 (4th Cir. 1993) ..............................................................................19

*Patchak v. Zinke*,
   583 U.S. 244 (2018) ...........................................................................................23

*Rangel v. Boehner*,
   20 F. Supp. 3d 148 (D.D.C. 2013) ......................................................................13

*Sierra Club v. Wheeler*,
   No. 15-cv-1165-HSG, 2018 WL 6182748 (N.D. Cal. Nov. 27, 2018) ....................19

*South Carolina v. Baker*,
   485 U.S. 505 (1988) ...........................................................................................25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ...........................................................................................17

*UFO Chuting of Haw., Inc. v. Young*,
   380 F. Supp. 2d 1166 (D. Haw. 2005) .................................................................23

*United States v. Ballin*,
   144 U.S. 1 (1892) ....................................................................................13, 14, 15

*Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*,
   509 F.3d 1259 (10th Cir. 2007)..............................................................................9

*Virginia v. United States*,
   74 F.3d 517 (4th Cir. 1996)..................................................................................19

*Wash. All. of Tech. Workers v. DHS*,
   892 F.3d 332 (D.C. Cir. 2018) ...............................................................................9

*Watkins v. United States*,
   354 U.S. 178 (1957) ...........................................................................................23

**Statutes**

2 U.S.C. § 641(e)(2).................................................................................................16

5 U.S.C. § 551(4) ......................................................................................................4

5 U.S.C. § 801 ....................................................................................................................4

5 U.S.C. § 801(a)(1) ........................................................................................................10

5 U.S.C. § 801(a)(1)(A) ....................................................................................................3

5 U.S.C. § 801(b)(1) ..........................................................................................................3

5 U.S.C. § 801(b)(2) ..........................................................................................................4

5 U.S.C. § 802 ....................................................................................................................4

5 U.S.C. § 802(a) ...............................................................................................................3

5 U.S.C. § 802(c) ...............................................................................................................4

5 U.S.C. § 802(d)(2) ..........................................................................................................4

5 U.S.C. § 802(g) ..........................................................................................................4, 14

5 U.S.C. § 802(g)(1) .........................................................................................................13

5 U.S.C. § 802(g)(2) .........................................................................................................15

5 U.S.C. § 804(3) ...................................................................................................4, 10, 11

5 U.S.C. § 805 ...........................................................................................................2, 8, 13

5 U.S.C. §§ 801–08 ...........................................................................................................3

42 U.S.C. § 7416 ...............................................................................................................5

42 U.S.C. § 7507 ...............................................................................................................6

42 U.S.C. § 7521(a)(1) ......................................................................................................5

42 U.S.C. § 7543(a) ...........................................................................................................5

42 U.S.C. § 7543(b) .......................................................................................................5, 19

42 U.S.C. § 7543(b)(1) ......................................................................................................5

42 U.S.C. § 7607(b)(1) .................................................................................................18, 19

Pub. L. No. 89-272, § 101, 79 Stat. 992 (1965) ...............................................................5

Pub. L. No. 90-148, § 208, 81 Stat. 485 (1967) ...............................................................5

Pub. L. No. 104-121, § 251, 110 Stat. 847 (1996) ...........................................................3

Pub. L. No. 119-15, 139 Stat. 65 (2025) ..........................................................................7

Pub. L. No. 119-16, 139 Stat. 66 (2025) ..........................................................................7

Pub. L. No. 119-17, 139 Stat. 67 (2025)..............................................................................7

**Federal Register**

84 Fed. Reg. 51310 (Sep. 27, 2019) ...................................................................................5

88 Fed. Reg. 20688 (Apr. 6, 2023) .....................................................................................6

88 Fed. Reg. 88908 (Dec. 26, 2023) ...................................................................................6

90 Fed. Reg. 642 (Jan. 6, 2025) ..........................................................................................7

90 Fed. Reg. 643 (Jan. 6, 2025) ..........................................................................................6

**Legislative Materials**

159 Cong. Rec. S8419 (Nov. 21, 2013) .............................................................................16

163 Cong. Rec. S2450 (Apr. 7, 2017).................................................................................16

171 Cong. Rec. S3025 (May 21, 2025) .........................................................................22, 23

**State Materials**

Cal. Code Regs. tit. 13, § 1956.8 (2025).............................................................................6

Cal. Code Regs. tit. 13, § 1962.4(c)(1)(B) (2025) .............................................................7

Cal. Code Regs. tit. 13, § 1963.1 (2025).............................................................................6

**Other Authorities**

CARB, Final Regulation Order, Title 13, https://www.regulations.gov/document/EPA-HQ-OAR-2022-0332-0005 .................................................................................................................6

GAO, *Applicability of Congressional Review Act to Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs* (Dec. 14, 2021), https://www.gao.gov/assets/b-333501.pdf. ..................................................................4

Maeve P. Carey et al., Cong. Research Serv., R43992, *The Congressional Review Act: Frequently Asked Questions* 1 (Nov. 12, 2021) ...........................................................4

Rule XXII, Standing Rules of Senate ..............................................................................4, 16

U.S. Census Bureau, Apportionment Population and Number of Representatives by State: 2020 Census, *available at* https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table01.pdf............................................................................................25

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on October 30, 2025 at 2:00 pm, in Courtroom 2, 4th Floor, United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, California, Defendants will move the Court to dismiss this action.

## MOTION TO DISMISS

Defendants hereby move to dismiss this action in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for the reasons more fully set forth in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This lawsuit asks this Court to invalidate three federal statutes that received majority votes in both Houses of Congress, and that were signed into law by the President of the United States. Primarily, Plaintiffs request that bold relief not because of any violation of the Constitution, but because of alleged violations of another, earlier enacted statute: the Congressional Review Act (CRA). That theory is incoherent as a matter of first principles; a federal law cannot "violate" an earlier-enacted law. And as long as Congress satisfies constitutional requirements like bicameralism and presentment, Congress's procedures are for Congress alone to decide—not California and, respectfully, not the federal courts.

Exercising its constitutional responsibility to legislate on a matter of significant public concern, earlier this year, Congress invoked the procedures of the CRA to abrogate three Clean Air Act preemption waivers that the Environmental Protection Agency (EPA) had previously issued to California. As a result of that unambiguous legislation, California's vehicle emissions regulations are now preempted. Unwilling to accept the outcome of that legislative process, California and ten other states have now sued EPA, its Administrator, and the President. But even a cursory review of the Complaint shows that California's real dispute is with Congress—not with EPA, or even the President. According to California, Congress was wrong to conclude that EPA's preemption waivers are "rules" instead of "orders" under the CRA. On California's view, Congress thus should not have adhered to the CRA's streamlined legislative procedures, but instead

**2-ER-223**

subjected the statutes to other legislative processes, including the Senate filibuster—even though the filibuster itself is purely a creature of Senate rules.

This dispute over internal Congressional procedures fails for several threshold reasons. Plaintiffs' claims are non-justiciable as a statutory matter. The CRA expressly precludes review: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. That jurisdiction-stripping provision disposes of this case in full.

Plaintiffs' claims are also non-justiciable as a constitutional matter. Congress, after all, is the exclusive judge of its own legislative procedures as a matter of constitutional prerogative. *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171–72 (9th Cir. 2007).

Even if there were a conflict between the resolutions and the CRA, the latter-in-time statutes—here, the resolutions—are still valid. In other words, at least for purposes of this lawsuit, it makes no difference whether the waivers are best categorized as "rules" or "orders" within the meaning of the CRA. Either way, they have now been invalidated by Congress.

These claims also fail on multiple other levels. The Administrative Procedure Act (and ultra vires) claims fail because vacating an EPA action would not void a federal statute that satisfied the Constitution's requirements of bicameralism and presentment. Nor do Plaintiffs identify any EPA final agency action, and even if they had, the Clean Air Act would vest jurisdiction to challenge that action exclusively in the courts of appeals.

Plaintiffs' constitutional claims also fail on the merits. Their nondelegation claim asserts that Congress unconstitutionally delegated authority to EPA to determine whether EPA waivers are rules under the CRA. In truth, Congress directly shouldered legislative power and responsibility by voting on whether to abrogate the waivers. That is the antithesis of a nondelegation problem. California then reverses course, claiming that Congress usurped judicial or executive power, but no constitutional principle prohibits Congress from amending the law to preempt California's vehicle emissions regulations. California follows that up by asserting a claim under the Take Care Clause, notwithstanding the lack of any cause of action or judicially enforceable standards. In any event, any obligation under the Take Care Clause would require the

President to faithfully execute the disapproval resolutions.

Finally, California asserts that "the Federal Government" violated the Tenth Amendment because Congress did not undertake "rigorous debate," hear "state official testimony," or adhere to "the filibuster" before repealing California's preemption waivers. Compl. ¶¶ 173, 175. But no one has a constitutional right to the filibuster or any congressional procedure other than the constitutional requirements of bicameralism and presentment, which all agree were satisfied here. California insists that "Defendants provided no opportunity for California, or the public, to participate in crucial parts of this scheme," and that "congressional leadership" "prevented" California from "defending [its] own state laws in the political process." *Id.* ¶ 175. That is a political argument, not a legal claim.

California lost a vote in Congress. That does not violate the law.

## BACKGROUND

### A.    The Congressional Review Act contains a set of expedited legislative procedures for enacting statutes that abrogate certain administrative rules.

In 1996, Congress enacted the CRA, 5 U.S.C. §§ 801–08, as part of a package of regulatory reforms collectively known as the Small Business Regulatory Enforcement Fairness Act. *See* Pub. L. No. 104-121, § 251, 110 Stat. 847, 868 (1996). With some exceptions, the CRA provides that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit" a report "to each House of the Congress and to the Comptroller General." 5 U.S.C. § 801(a)(1)(A). The report must include "a copy of the rule," "a concise general statement relating to the rule, including whether it is a major rule," and its proposed effective date. *Id.*

Upon receipt of such a report, Congress may enact a joint resolution "disapprov[ing] the rule." 5 U.S.C. § 802(a). The joint resolution must include the following language: "That Congress disapproves the rule submitted by the ___ relating to ___, and such rule shall have no force or effect." *Id.* If a joint resolution of disapproval passes both Houses of Congress, and is signed into law by the President, two consequences follow. First, and most immediately, the rule "shall not take effect (or continue)." *Id.* § 801(b)(1). Second, the rule "may not be reissued in substantially the same form," nor may a "new rule that is substantially the same as such a rule . . . be issued,

**2-ER-225**

unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(2).

Congress also specified various procedures for consideration of CRA disapproval resolutions, in "an exercise of the rulemaking power of the Senate and House of Representatives," 5 U.S.C. § 802(g), consistent with the constitutional authority of each House of Congress to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2. The CRA modifies default legislative procedures to allow for expedited consideration of joint resolutions of disapproval. For example, if a Senate committee has been considering a CRA resolution for at least 20 days, 30 Senators may file a petition to discharge and place the joint resolution on the calendar for consideration by the full Senate. 5 U.S.C. § 802(c). In addition, Senate debate on the joint resolution is limited to 10 hours, *id.* § 802(d)(2), which, under current Senate rules, has the practical effect of preventing a filibuster. *See* Maeve P. Carey et al., Cong. Research Serv., R43992, *The Congressional Review Act: Frequently Asked Questions* 1 (Nov. 12, 2021); *see also* Rule XXII, Standing Rules of Senate. These procedures are "deemed a part of the rules of each House," and either House may "change the rules . . . at any time." 5 U.S.C. § 802(g).

As a general matter, the CRA's procedures apply to disapproval resolutions relating to an agency "rule." *Id.* §§ 801, 802. For purposes of the CRA, "rule" "has the meaning given such term in" the Administrative Procedure Act (APA), with certain CRA-specific exceptions. *Id.* § 804(3). The APA, in turn, defines "rule" broadly to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

Congress sometimes disagrees with the Executive Branch's assessment of whether an agency action is a "rule" subject to CRA procedures. In response to requests from legislators, the Comptroller General (through the Governmental Accountability Office (GAO)) often opines on that subject. *See, e.g.*, GAO, *Applicability of Congressional Review Act to Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs* (Dec. 14, 2021) (although "CDC did not submit a CRA report to Congress," "conclud[ing] that the Mask Requirement meets the definition of a rule for purposes of CRA and, therefore, is subject to CRA's

**2-ER-226**

requirements for submission and congressional review"), https://www.gao.gov/assets/b-333501.pdf. GAO opinions—issued by an agent of the legislative branch—are not binding on the Executive Branch, nor on Congress itself.

### B. The Clean Air Act preempts state-level vehicle emission regulations.

In 1965, Congress amended Title II of the Clean Air Act to authorize federal emission standards for motor vehicles. Pub. L. No. 89-272, § 101, 79 Stat. 992 (1965). As currently codified, Section 202 governs federal emission standards for air pollutants emitted from any class or classes of new motor vehicles or new motor vehicle engines, "which in [the EPA Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1).

After Section 202's enactment, many states continued developing their own emission programs. *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env'tl. Conservation*, 17 F.3d 521, 525 (2d Cir. 1994). Congress responded in 1967 by adding a broad preemption provision. Pub. L. No. 90-148, § 208, 81 Stat. 485 (1967). That provision, now codified at Section 209(a), is the "cornerstone" of Title II. *Motor Vehicle Mfrs.*, 17 F.3d at 526. It provides: "No State. . . shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles . . . ." 42 U.S.C. § 7543(a). This framework differs from the approach the statute takes for some other programs. For example, Congress chose a greater focus on cooperative federalism in Title I (which regulates stationary sources), while putting greater emphasis on national uniformity for mobile source standards in Title II. *Compare id.* § 7416 (retention of state authority with certain enumerated exceptions including section 209), *with id.* § 7543(a) (preemption of state emission regulations); *see Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996).

Congress left only one exception for new motor vehicles to Section 209(a)'s broad preemptive reach in what is now Section 209(b). Pub. L. No. 90-148, § 208(b); *see* 42 U.S.C. § 7543(b). Section 209(b) governs applications for preemption waivers by states that adopted certain standards before March 30, 1966, which means only California. 42 U.S.C. § 7543(b); 84 Fed. Reg. 51310, 51331/3 & n.218 (Sept. 27, 2019). Under Section 209(b), EPA shall only grant California a waiver in limited circumstances. 42 U.S.C. § 7543(b)(1). Certain additional States

**2-ER-227**

may adopt standards identical to California standards for which EPA has issued a waiver for the applicable model years. *Id.* § 7507.

      **C.**      **California promulgates three sets of vehicle emissions standards with the goal of banning sales of internal-combustion vehicles.**

Earlier this decade, the California Air Resources Board (CARB) promulgated a series of regulations imposing stringent emissions standards on motor vehicles. CARB then requested preemption waivers from EPA. Three California regulations are relevant here.

First, CARB adopted the Advanced Clean Trucks rule. *See* Cal. Code Regs. tit. 13, § 1963.1 (2025). This rule required manufacturers of trucks with a gross vehicle weight rating above 8,500 pounds to meet increasing sales quotas for zero-emissions trucks beginning with model year 2024—irrespective of the pace of advances in zero-emissions power-train technology. *Id.* CARB requested and received from EPA a Clean Air Act preemption waiver for its Advanced Clean Trucks rule. *See* California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision**,** 88 Fed. Reg. 20688 (Apr. 6, 2023).

Second, CARB adopted its Omnibus Low NOx rule. This rule requires truck manufacturers to reduce heavy-duty vehicle nitrogen-oxide and particulate emissions beginning with model year 2024, and it makes extensive changes to other CARB regulations affecting heavy-duty trucks and engines. *See* Cal. Code Regs. tit. 13, § 1956.8 (2025); *see* CARB, Final Regulation Order, Title 13, at 3, https://www.regulations.gov/document/EPA-HQ-OAR-2022-0332-0005. In December 2024, EPA granted a waiver request for this rule. *See* California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The "Omnibus" Low NOx Regulation; Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 643 (Jan. 6, 2025).

Third, CARB adopted its Advanced Clean Cars II regulations. *See* California State Motor Vehicle Pollution Control Standards; Advanced Clean Cars II Regulations; Request for Waiver of Preemption; Opportunity for Public Hearing and Public Comment, 88 Fed. Reg. 88908 (Dec. 26, 2023). These regulations would require that, starting with model-year 2035, all new light-duty

**2-ER-228**

vehicles sold in California *must* be either zero-emission vehicles or plug-in hybrid vehicles. *See* Cal. Code Regs., tit. 13, § 1962.4(c)(1)(B). EPA granted California's waiver request in December 2024. *See* California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 642, 642 (Jan. 6, 2025).

### D.   Congress revokes the preemption waivers.

EPA submitted the three waivers to Congress in February 2025. Compl. ¶ 77. On April 2, 2025, members of the House of Representatives introduced three CRA disapproval resolutions, each one addressing one of the three preemption waivers. Compl. ¶ 85. By May 1, 2025, a majority of the House of Representatives had voted in favor of all three disapproval resolutions. *Id.* ¶ 95. "Leaders in the Senate also ultimately decided to proceed with votes on the Resolutions, disregarding GAO's legal conclusion and overriding the Senate Parliamentarian's determination that the CRA was inapplicable." *Id.* ¶ 98. On May 22, 2025, the Senate voted on each of the resolutions and passed all three with votes of 51-45 (H.J. Res. 87, Advanced Clean Trucks), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus). *Id.* ¶ 111. The President signed the joint resolutions into law on June 12, 2025.

Each of the enacted statutes track the model language in 5 U.S.C. § 802(a). So, for example, the full text of Public Law 119-15 (Advanced Clean Trucks) reads as follows:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That Congress disapproves the rule submitted by the Environmental Protection Agency relating to ''California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision'' (88 Fed. Reg. 20688 (April 6, 2023)), and such rule shall have no force or effect.

Pub. L. No. 119-15, 139 Stat. 65 (2025); *see also* Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

**E.    California sues, claiming that EPA and Congress failed to follow proper legislative procedures under the Congressional Review Act.**

Plaintiffs—the State of California, joined by ten other States—filed this suit on June 12, 2025. The suit names four Defendants: the United States of America, EPA, Lee Zeldin (in his official capacity as EPA Administrator), and Donald J. Trump (in his official capacity as President of the United States). Plaintiffs allege that EPA misinterpreted the CRA by labeling the California waivers as "rules" in its most recent CRA submission to Congress. *See* Compl. ¶¶ 73–77. Plaintiffs also argue that the Senate parliamentarian and the GAO were right, and that a majority of the Senate was wrong, in treating the waivers as subject to CRA procedures. *See id.* ¶¶ 78–113. In short, Plaintiffs assert "that use of the CRA here [was] unlawful," and so they "challenge" what they describe as Congress's "unlawful Resolutions, which purport to prevent these States from enforcing" state laws that conflict with the joint resolutions that have now been enacted into law. *Id.* ¶¶ 5, 9. Defendants now move to dismiss.

## ARGUMENT

**I.    Congress expressly precluded judicial review in 5 U.S.C. § 805.**

"Congress is generally free to limit the jurisdiction of federal courts." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019). In the CRA, Congress did so, providing expressly that "[n]o determination, finding, action, or omission under this chapter [*i.e.*, the CRA] shall be subject to judicial review." 5 U.S.C. § 805. That preclusion provision is fatal to this suit.

**a.** The Ninth Circuit first considered 5 U.S.C. § 805 six years ago, when Congress used the CRA "to rescind a regulation that prevented Alaska from applying certain state hunting regulations on federal wildlife refuges." *Bernhardt*, 946 F.3d at 556. In *Bernhardt*, the plaintiff sued "to compel" the Department of the Interior "to reinstate the rule," on the theory that the rule at issue was "not eligible for disapproval in the new session of Congress" due to certain statutory timing requirements that appear in the CRA—requirements that plaintiff argued had been violated. *Id.* at 556, 563. The plaintiff argued that because of those violations of the CRA, "the Joint Resolution was invalid and it did not authorize Interior to rescind" the rule—even though it had been disapproved through a CRA resolution that passed both Houses of Congress and was signed into

**2-ER-230**

law by the President. *Id.* at 563.

The Ninth Circuit refused to exercise jurisdiction: "Because enacting a joint resolution of disapproval is an action under the CRA," the federal courts "lack jurisdiction to consider this claim." *Id.* And in doing so, the Ninth Circuit rejected the argument that a plaintiff could get around the CRA's review bar by restyling its claims as a challenge to some agency action (rather than a congressional action) under the APA. In particular, the plaintiff in *Bernhardt* argued that, because it was "challenging *Interior*'s rescission of the Refuges Rule and not any action under [the] CRA," "its claim is not barred." *Id.* at 564 (emphasis added). But because the suit ultimately depended on the theory that "Congress did not validly enact the Joint Resolution," the Ninth Circuit held that plaintiff's "claim necessarily involve[d] a challenge to a congressional 'determination, finding, action or omission' under the CRA, and as such is subject to" 5 U.S.C. § 805. *Id.*

The D.C. Circuit, Tenth Circuit, Eighth Circuit, and many district courts have similarly enforced § 805 as written, to broadly foreclose judicial review of all claims asserting a violation of the CRA—including claims alleging agency noncompliance with the CRA. For example, in *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009), the D.C. Circuit declined to review a claim that agency amendments to a forest plan were invalid because the agency allegedly failed to comply with CRA reporting requirements. As then-Judge Kavanaugh explained, "[t]he language of § 805 is unequivocal and precludes review of this claim—even assuming that the plan amendments qualify as rules subject to the Act in the first place"—because it "denies courts the power to void rules on the basis of agency noncompliance with the Act." *Id.* The D.C. Circuit later reaffirmed that holding, concluding that § 805 forecloses review of a claim that an agency violated the CRA by publishing a rule fewer than 60 days before it took effect. *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018).

Similarly, the Tenth Circuit has long declined to review claims that an agency violated the CRA, noting that the statute "specifically precludes judicial review of an agency's compliance with its terms." *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007). And more recently, the Tenth Circuit applied § 805 to bar review of the Department of Interior's failure to submit a rule to Congress, as required by the CRA. *Kan. Nat. Res. Coal. v.*

*Dep't of Interior*, 971 F.3d 1222, 1226 (10th Cir. 2020) (*KNRC*) (citing § 801(a)(1)(A)). The Tenth Circuit rejected the argument that the CRA's review bar applies only to decisions, findings, acts, or omissions of Congress, rather than agencies. *Id.* at 1235–36. To the contrary, the provision applies to all conduct "under this chapter," which "unambiguously prohibits judicial review of any omission [or decision, finding, or act] by any of the specified actors," including "agencies, the Comptroller General, the President, and Congress." *Id.*; *accord Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) ("§ 805's broad language covers all omissions under the CRA, including agency omissions."), *cert. granted, judgment vacated on other grounds*, 144 S. Ct. 2707 (2024).

**b.** Plaintiffs' statutory and ultra vires claims here run directly into 5 U.S.C. § 805—as interpreted by the Ninth Circuit and every other court of appeals to consider the question.

In general, the Plaintiffs purport to challenge (1) EPA's "reclassification" of the waivers as rules under the CRA, and (2) EPA's "submission of these waivers to Congress as 'rules' subject to the CRA." Compl. ¶¶ 73, 77, 117–18, 126, 139. But for that determination and that action, the Plaintiffs say, the joint resolutions would not have passed. Compl. ¶¶ 119, 132. But even if that is true, EPA's determination that the waivers are "rules" subject to the CRA is a determination "under" the CRA because it applies a CRA provision—the definition of a "rule"—to specific facts for purposes of the CRA. 5 U.S.C. § 804(3) (defining "rule" under the CRA). EPA's submission of a CRA report to Congress is likewise an act "under" the CRA—indeed, that submission is generally *required* by the CRA. *Id.* § 801(a)(1). Because Plaintiffs ask this Court to decide whether Defendants complied with the CRA, their claims are barred. *Bernhardt*, 946 F.3d at 563; *KNRC*, 971 F.3d at 1235–36.

The complaint confirms this result. Most obviously, Count III is explicitly styled as a challenge to an alleged "Violation of the Congressional Review Act," Compl. at 31, in which Plaintiffs allege that "[b]y its own plain terms, the CRA does not apply to these waiver decisions." Compl. ¶ 137. That claim is plainly barred by § 805, as the Ninth Circuit held in *Bernhardt*.

Count I—labeled as an "Ultra Vires" claim—is likewise precluded. There, Plaintiffs allege that Defendants may not "intentionally utilize a statute that is inapplicable to these waiver decisions . . . simply because it provides a faster or easier, but unlawful, means to a desired end."

Compl. ¶ 115. But when Plaintiffs say "a statute," they mean the CRA. *Id.* And when they call the government's action "unlawful," they mean it is "unlawful" because they think it violates the CRA. Omitting the name of the statute does not change its applicability.

Count II is labeled as a "Violation of the Administrative Procedure Act," Compl. at 28, but it ultimately suffers from the same jurisdictional defect. There, once again, in Plaintiffs' words, the alleged APA violation was "predicated on a new (albeit implicit) interpretation of the APA term 'rule,'" and Plaintiffs' assertion that "that interpretation is contrary to the statute's text." Compl. ¶ 128. But in fact, "rule" was not an "APA term" at all—what EPA did (and what Plaintiffs object to in Count II) is treat its waivers as a "rule" *within the meaning of the CRA*. Plaintiffs' sleight-of-hand is only possible because the definition of a "rule" in the CRA happens to (in part) incorporate by reference the definition of a "rule" in the APA. *See* 5 U.S.C. § 804(3) (defining "rule" for purposes of the CRA as having "the meaning given such term" in the APA, with certain CRA-specific exceptions). But the fact that the definition of a "rule" in the CRA looks (in part) to the APA for its content does not change the fact that what Plaintiffs are really objecting to in Count II is EPA's interpretation *of the CRA*—not the APA.

In sum, because "federal courts do not have jurisdiction over statutory claims that arise under the CRA," *Bernhardt*, 946 F.3d at 563, Counts I, II, and III are straightforwardly precluded.[1]

**c.** That leaves Plaintiffs' constitutional claims. In *Bernhardt*, the United States did not argue that the plaintiff's constitutional claims were precluded. Even so, the Ninth Circuit acknowledged that, "[o]n its face," the text of 5 U.S.C. § 805 "bars judicial review of all challenges to actions under the CRA, including constitutional challenges." 946 F.3d at 561. Ultimately,

---

[1] Plaintiffs' CRA claim in Count III also fails because they lack a cause of action. In addition to expressly forbidding lawsuits by stripping courts of jurisdiction, the CRA creates no private rights and no cause of action. A claim directly under the CRA is thus squarely foreclosed by the statute's text and binding precedent. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) ("a plaintiff suing under an implied right of action … must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*") (quotation marks omitted). Plaintiffs cannot avoid this by gesturing to the Declaratory Judgment Act. Compl. ¶¶ 142-43. "The Declaratory Judgment Act does not provide a cause of action." *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022).

relying on principles of constitutional avoidance, the Ninth Circuit stated that "the Jurisdiction-Stripping Provision does not include any *explicit* language barring judicial review of constitutional claims," so it "presume[d] that Congress did not intend to bar such review." *Id.* (emphasis added). The Ninth Circuit then went on to consider and reject a constitutional claim on the merits—in which the plaintiff had challenged the facial constitutionality of the CRA itself, as well as the relevant joint resolution of disapproval.

The constitutional claims in this case, however, bear little resemblance to the constitutional claim that the Ninth Circuit rejected on the merits in *Bernhardt*—which was, primarily, an argument that the CRA *itself* impermissibly modified the legislative process set forth in Article I, Section 7 of the Constitution. Here, by contrast, what Plaintiffs label as constitutional claims are simply allegations that EPA, the President, Congress, or some combination thereof all misinterpreted *the CRA*. But not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated, for example, if executive officers rely on a statute that itself violates the Constitution, *see id.* at 473 & n.5—which is essentially what the plaintiffs argued in *Bernhardt*, 946 F.3d at 559. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" at all. *Dalton*, 511 U.S. at 473.

For example, when Plaintiffs argue that Defendants failed to "take care that the laws be faithfully executed," U.S. Const. art. II, § 3, the "law" they have in mind is the CRA. *See, e.g.*, Compl. ¶ 150 ("The Executive Branch Defendants' failure to honor their constitutional duties were deliberate efforts to use—and enable Congress's use—of the CRA to disapprove of these waivers."); *see also id.* ¶¶ 146, 147 ("All Executive Branch Defendants were aware that the three waiver decisions at issue are not rules, much less rules of general applicability, subject to the CRA."). Plaintiffs' "Separation of Powers" claim ultimately depends on the theory that "Congress expressly cabined the CRA so it applies only to certain rules promulgated by federal agencies," and that that limitation, in the CRA, was violated. *Id.* ¶ 156. And Plaintiffs' Tenth Amendment

claim is likewise premised on the allegation that the disapproval resolutions "were enacted only because both the Executive and Legislative Branches opted to flout settled procedures and the plain text of the CRA." *Id.* ¶ 172. Even if formally labeled as constitutional claims, all those claims, in substance, challenge a "determination, finding, action, or omission under" the CRA—as a violation *of* the CRA—so they too are not "subject to judicial review." 5 U.S.C. § 805. And "plaintiffs cannot avoid preclusion through artful pleading . . . ." *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1115 (9th Cir. 2013) (cleaned up).

II.    **The Court independently lacks subject-matter jurisdiction because this suit amounts to a challenge to House or Senate rules.**

That Congress chose to preclude judicial review of CRA claims is unsurprising, because the CRA was "enacted by Congress" as "an exercise of the rulemaking power of the Senate and House of Representatives, respectively, and as such it is deemed a part of the rules of each House, respectively." *Id.* § 802(g)(1). Accordingly, this suit is also nonjusticiable for the independent reason that it amounts to an as-applied challenge to House and Senate rules, which are constitutionally committed to each House of Congress to "determine." U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . ."). Judicial intrusion into the interpretation or application of those rules is forbidden in all but the rarest of circumstances, which are not present here.

"The constitution empowers each house to determine its rules of proceedings." *United States v. Ballin*, 144 U.S. 1, 5 (1892). In doing so, neither House of Congress may "ignore constitutional restraints or violate fundamental rights," but otherwise the power of each house to set its internal rules is "absolute and beyond the challenge of any other body or tribunal." *Id.*; *accord NLRB v. Noel Canning*, 573 U.S. 513, 550–51 (2014) ("[W]e have held that 'all matters of method are open to the determination' of the Senate, as long as there is 'a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained' and the rule does not 'ignore constitutional restraints or violate fundamental rights.'" (quoting *Ballin*, 144 U.S. at 5)); *see also, e.g.*, *Rangel v. Boehner*, 20 F. Supp. 3d 148, 169 (D.D.C. 2013) ("The House may not, by enacting and enforcing its own rules of procedure,

**2-ER-235**

violate another constitutional provision or an individual's rights under the Constitution, but the exercise of its discretion under the [Rulemaking and Discipline] Clause[s] is otherwise boundless."), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015).

All of Plaintiffs' claims (including their constitutional claims) fall squarely within this "absolute," unreviewable authority of Congress, because all of them depend on an allegation that Congress violated or misapplied its own procedural rules. *Ballin*, 144 U.S. at 5. Indeed, Congress has specified that the disapproval process set forth in § 802 is "an exercise of the rulemaking power of the Senate and House of Representatives, respectively, and as such it is deemed a part of the rules of each House, respectively." 5 U.S.C. § 802(g). And either House may "change the rules . . . at any time." *Id.* As the Ninth Circuit has squarely held, a challenge "based on the asserted failure of Congress to comply with its own procedural rules" is "a non-justiciable political question" that is "beyond [this Court's] power to review." *Consejo*, 482 F.3d at 1171–72 (declining to review claim that Congress, by not holding a hearing, failed to comply with its own procedural rules); *accord Metzenbaum v. FERC*, 675 F.2d 1282, 1288 (D.C. Cir. 1982) ("To invalidate Pub. L. No. 97-93 on the ground that it was enacted in violation of House rules would be to declare as erroneous the understanding of the House of Representatives of rules of its own making, binding upon it only by its own choice. We must assume that the House acted in the belief that its conduct was permitted by its rules, and deference rather than disrespect is due that judgment.").

Again, were there any doubt about this obstacle to review, it is dispelled by Plaintiffs' own filings—which are replete with complaints about internal congressional procedures. For example, the word "parliamentarian" appears in the complaint 113 times, as Plaintiffs expressly seek to elevate the Senate parliamentarian's interpretation of the CRA over that of the Senate itself. In Plaintiffs' view, "the Senate Parliamentarian agreed" that EPA's waivers "are not subject to the CRA," and "[t]hat should have been the end of it." Compl. ¶¶ 90–91. But with respect, the Senate parliamentarian is not mentioned in the Constitution, and thus does not have the last word on Senate procedure—the Senate does. Nor, for that matter, does EPA have any constitutional role in the enactment of legislation; Congress could have passed laws disapproving of these waivers without *any* involvement from EPA, or by explicitly disagreeing with EPA's interpretation of the

**2-ER-236**

CRA. Congress does so routinely. *See, e.g.*, *supra* at 4–5 (citing GAO opinion in which Congress concluded that CDC action was a "rule," not an "order," and thus subject to CRA procedures).

By the same token, at any time, the House or the Senate could amend their rules relating to the process by which it considers all legislation, or all climate-related legislation, or all legislation related to agency rules. *See* 5 U.S.C. § 802(g)(2) (recognizing "the constitutional right of either House to change the rules . . . at any time, in the same manner, and to the same extent as in the case of any other rule"); *Ballin*, 144 U.S. at 5 ("The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house."). And even without the CRA, Congress could have, at any time, passed a law that (1) prohibited California's Clean Air Act waivers, and (2) prohibited the issuance of any similar future waivers. *See, e.g.*, *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 763 (10th Cir. 2023) ("If Congress disagrees with an agency rule, then Congress may pass a law overriding it; such a course of events is not a usurpation of *executive* power but instead a legitimate exercise of *legislative* power."), *cert. denied*, 144 S. Ct. 94 (2023). The fact that such a law (at least, under current Senate rules) might have been subject to a filibuster is of no constitutional significance, as the Senate filibuster is not required by the Constitution, and did not exist at all until 1917, *see Common Cause v. Biden*, 748 F.3d 1280, 1283 (D.C. Cir. 2014). What Plaintiffs challenge, therefore, is not the substance of the joint resolutions, but the process by which Congress considered them. Under settled precedent, such challenges are "not subject to judicial review." *Consejo*, 482 F.3d at 1172.

**III.      Even if the Resolutions conflict with earlier-enacted statutes, they remain valid.**

Even if Congress or the EPA violated the CRA, the Resolutions would still be valid—because compliance with CRA procedures is not necessary for Congress to pass a statute, and the Resolutions are now duly enacted statutes. Plaintiffs therefore have no basis to ask this Court to "void" (Compl. ¶¶ 120, 133) the joint resolutions based on an alleged CRA violation, an APA violation, or an ultra vires claim. In short, it is incoherent as a matter of first principles to argue that one law (the joint resolution) is unlawful for violation of another law (the CRA).

"[T]he prescription for legislative action in Art. I, §§ 1, 7 represents the Framers' decision that the legislative power of the Federal government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *INS v. Chadha*, 462 U.S. 919, 951 (1983). So there are only two procedural requirements to enact legislation: "passage by a majority of both Houses and presentment to the President." *Id.* at 958; *see also Bernhardt*, 946 F.3d at 562 n.6. The concurrence of the Senate parliamentarian, for example, is not required. Nor is compliance with the CRA. So it does not matter to the validity of the disapproval resolutions whether the waivers are properly considered to be "rules" or "orders" within the meaning of the CRA.

To be sure, majorities in the House or the Senate may adopt internal procedures—such as a three-fifths supermajority threshold in the Senate to cut off debate for most votes, [2] *see Standing Rules of the Senate*, Rule XXII—but those procedures are not required by the Constitution, not enforceable by any court, and have no legal significance outside of each House of Congress itself. From the perspective of a federal court, "[i]t makes no difference what internal parliamentary procedures Congress adopts" in enacting legislation, "so long as Congress complies with the fundamental constitutional requirements of bicameralism (approval by both Houses of Congress) and presentment (submission to the President for approval)." *Citizens for Const. Integrity*, 57 F.4th at 763–64. If it complies with those requirements, Congress has enacted a law of the United States, like any other.

As a set of procedural rules governing consideration of bills about agency rules, "[t]he CRA streamlines Congress's typical procedure for enacting legislation." *Bernhardt*, 946 F.3d at 557. But here, all that matters is that "Congress complied with the process of bicameralism and presentment," because the "Joint Resolution[s] passed both houses of Congress and w[ere] signed by the President into law." *Id.* at 562. The Resolutions thus have the force and effect of law, like

---

[2] The CRA process is not the only exception to normal filibuster rules. *See, e.g.*, 2 U.S.C. § 641(e)(2) ("Debate in the Senate on any reconciliation bill . . . shall be limited to not more than 20 hours."); 159 Cong. Rec. S8419-S8420 (Nov. 21, 2013) (allowing cloture to be invoked by majority vote for votes on nominations for Executive Branch positions and lower federal courts); 163 Cong. Rec. S2450-S2451 (Apr. 7, 2017) (extending that precedent to Supreme Court nominations).

any other statute. No violation of the CRA could render those statutes "void"—only violations of the legislative procedures set forth in the Constitution. Compl. ¶¶ 120, 133.

Put another way, even if Plaintiffs were correct that there is some conflict between the joint resolutions (enacted later in time), and the CRA or the Clean Air Act or the APA (enacted earlier in time), the latest-in-time statute controls. After all, "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *Dorsey v. United States*, 567 U.S. 260, 274 (2012). And Congress need not use any "magical passwords" to do so. *Id.* Plaintiffs' statutory and ultra vires claims thus fail for that additional reason, as the only basis to strike down a federal statute is a conflict with the Constitution—not with an older federal statute, much less an internal rule of congressional procedure.

## IV.    The statutory and ultra vires claims fail for several other threshold reasons.

### A.    The APA claim fails because Plaintiffs identify no final agency action.

Plaintiffs cannot maintain Count II because APA claims are limited to "final agency action," and Plaintiffs have not identified a "final" EPA agency action. Agency action is "final" only if it (1) "consummat[es] . . . the agency's decisionmaking process," and (2) determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The touchstone of the second prong is whether the action has "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

Plaintiffs identify two "actions" they allege are subject to review under the APA, but neither determines any rights or obligations, nor do legal consequences flow from either "action." First, Plaintiffs allege that EPA "reclassified" the waivers from orders to rules. *See* Compl. ¶¶ 126, 133. More specifically, the Complaint asserts that the Administrator "referred to the waiver decisions as 'rules' in a press release." *Id.* ¶ 127. Second, Plaintiffs claim that EPA's submission of the waivers in a report to Congress qualifies as final agency action. *See* Compl. ¶¶ 126, 133.

EPA's alleged "reclassification" and submission of a report to Congress are not "final" agency actions under *Bennett* and *Dalton*. In *Dalton*, a statute required the Secretary of Defense to submit recommendations for the closure of military bases to a commission, which would submit a

<strong>2-ER-239</strong>

report to the President. 511 U.S. at 465. The President then had two weeks to approve or disapprove the commission's recommendations. *Id*. The plaintiffs sought APA review of these recommendations, but the Court held that they were not final agency actions. *Id*. at 468. While the recommendations were necessary steps in the process, the *final* action was taken by the President: "Without the President's approval, no bases are closed under the Act . . . ." *Id*. at 470. The Court acknowledged that the President's authority was constrained by the earlier action in that he could not "pick and choose among bases" to close, but this limitation was "immaterial." *Id*. "What is crucial is the fact that the President, not the Commission, takes the final action that affects the military installations." *Id*. (alterations and quotation marks omitted).

So too here. Congress and the President, not EPA, "take[] the final action" of enacting the joint resolutions. *Id.* The joint resolutions have legal consequences; EPA's alleged reclassification and submission of the waivers to Congress did not. They "carrie[d] no direct consequences" for Plaintiffs. *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (necessary step by agency not final action when only subsequent presidential action has direct legal consequences). Even if the "reclassification" and submission could be deemed necessary predicates to the disapproval resolutions—and they were not, *see supra* Part II—they would still not qualify as reviewable final agency actions. The commission in *Dalton* played a critical role in identifying what bases to close but because its recommendations did not, without more, close a single base, they were not final agency actions. *See* 511 U.S. at 470. The same reasoning controls here, as EPA's "reclassification" and submission, without more, have no legal consequences for the waivers at issue in this case. That is why Plaintiffs did not (and could not) file suit until the President signed into law the joint resolutions disapproving the waivers, *see* Compl. ¶ 5 (resolutions signed June 12, 2025, the same day Plaintiffs filed the Complaint).

### B.     Plaintiffs' claims against EPA are an improper attempt to evade the Clean Air Act's comprehensive review scheme.

Even if Plaintiffs had identified final agency actions that were outside the jurisdiction-stripping provision of the CRA, this Court still could not review them. They would be reviewable only by the courts of appeals under § 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1),

**2-ER-240**

which confers exclusive "jurisdiction upon the courts of appeals" for final actions taken by EPA under the Clean Air Act. *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 879 (D.C. Cir. 2015).

Section 307(b)'s scope has been interpreted "broadly" to cover not only challenges to EPA's final actions but also challenges that have the "practical effect" of upsetting EPA's final action or that are "closely related to" such final action. *Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1139 (E.D. Cal. 2012), *aff'd* 784 F.3d 500 (9th Cir. 2015). And when Congress has chosen to give the circuit courts exclusive jurisdiction over agency decisions, "the district courts are without jurisdiction over the legal issues pertaining to those decisions—whether or not those issues arise from the statute that authorized the agency action in the first place." *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 161 (4th Cir. 1993).

Here, Plaintiffs seek review of alleged final actions EPA took in connection with the Section 209(b) waivers issued to California. These waivers are, without question, actions taken under chapter 85 of title 42 of the United States Code. *See* 42 U.S.C. §§ 7607(b)(1), 7543(b). And the alleged final EPA actions challenged here—EPA's description of these waivers as rules in a press release and its submission of the waivers to Congress—are (even under Plaintiffs' theory) "closely related to" the waivers. *Nichols*, 924 F. Supp. 2d at 1139. Therefore, to the extent this Court may exercise jurisdiction notwithstanding § 805, the States' claims against EPA belong in the courts of appeals: Section "307(b)(1) 'channels review of final EPA action exclusively to the courts of appeals, *regardless of how the grounds for review are framed.*'" *Nichols*, 784 F.3d at 506 (quoting *Virginia v. United States*, 74 F.3d 517, 523 (4th Cir. 1996)) (emphasis in original). So any challenges—including constitutional ones—to EPA's alleged final actions would have to go to the courts of appeals. *See Sierra Club v. Wheeler*, No. 15-cv-1165-HSG, 2018 WL 6182748, at *4 (N.D. Cal. Nov. 27, 2018) (Gilliam, J.) (dismissing motion to enforce summary judgment order for lack of jurisdiction because "the 'practical objective' of [p]laintiffs' motion is to 'nullify final actions of the EPA'" (quoting *Nichols*, 784 F.3d at 506)). Indeed, the States have already filed what they describe as "protective" petitions for review, in both the Ninth and D.C. Circuits. *California v. EPA*, No. 25-5071 (9th Cir.); *California v. EPA*, No. 25-1174 (D.C. Cir.).

Therefore, if the Court concludes that the jurisdiction-stripping provision of the CRA does

2-ER-241

not apply, and the Court finds the alleged actions to be final agency actions, all claims against EPA must be dismissed in full for lack of jurisdiction.

### C.    The ultra vires claims fail as a matter of law.

Seeking to evade statutory limitations altogether, Plaintiffs throw the "Hail Mary pass" of an "ultra vires" claim. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (*NRC*). Such claims are "strictly limited." *Id.* They may be brought "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (quotation marks omitted). "Ultra vires review is also unavailable if . . . a statutory review scheme forecloses all other forms of judicial review." *Id.*

Plaintiffs assert ultra vires or "nonstatutory" claims in Counts I and VII. Count I asserts that EPA could not "reclassify" the waivers from orders to rules, nor could the agency submit the waivers to Congress under the CRA. Compl. ¶¶ 115–20. Count VII claims that, because EPA violated the CRA, it must consider the waivers as in effect. *Id.* ¶¶ 181–86. These claims simply "dress up a typical statutory-authority argument as an ultra vires claim." *NRC*, 605 U.S. at 682. While the Complaint asserts that EPA lacked authority under the Clean Air Act or CRA to take these alleged actions, they fail to identify any "specific prohibition" affirmatively forbidding them. *See NRC*, 605 U.S. at 681. Even more problematically for Plaintiffs, the CRA explicitly forecloses judicial review (*supra* Part I), and the Clean Air Act funnels review to the courts of appeals (*supra* Part IV.C). Plaintiffs cannot use a nonstatutory ultra vires claim to circumvent those statutes' judicial review schemes. *See NRC*, 605 U.S. at 681; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

### V.    Plaintiffs' constitutional claims fail.

Even if this Court had jurisdiction to hear Plaintiffs' grab bag of constitutional claims, they would still fail as a matter of law. First, Plaintiffs lack a cause of action under the Take Care Clause. Second, the Complaint's separation-of-powers claim fails because (a) Congress did not delegate its authority to prescribe internal rules to EPA and (b) the joint resolutions amended the applicable law, rather than directing how old law should be applied to particular facts, and so do

**2-ER-242**

not encroach on the judiciary's power. Third, Plaintiffs do not allege an interest protected by the Tenth Amendment or a defect in the political process that would give rise to such a claim. Therefore, if the Court concludes that it has jurisdiction with respect to these claims, they must nevertheless be dismissed under Rule 12(b)(6), for failure to state a claim.

### A.    The Take Care Clause is not judicially enforceable.

Count IV fails because the Take Care Clause does not provide a cause of action and is not judicially enforceable in any court. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). Rather, "constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *Id.* The Take Care Clause is an especially poor fit for a private right of action. The Supreme Court has held that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" is not judicially enforceable, adding that any attempt by the judiciary to oversee the President's Take Care authority "might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'" *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866). Of course, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in the judgment). But the Take Care Clause, which speaks to the President alone, provides no means for courts to review the actions of subordinate Executive officials like the EPA Administrator. A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws, and a court cannot direct the actions of subordinate officers on the basis of the Take Care Clause without exercising authority that the Clause commits to the President himself rather than to courts.

Of course, even if this claim were subject to any form of judicial review, the President's Article II duty is to faithfully execute *all* of the laws—not just the ones that the Plaintiff States agree with. That includes the joint resolutions of disapproval at issue here, which definitively resolve the question of the ongoing validity of EPA's previous waivers.

**2-ER-243**

### B.    Plaintiffs' nondelegation and judicial power theories fail.

Plaintiffs assert two theories in Count V that the resolutions violate separation-of-powers principles. First, they allege that Congress unlawfully delegated its authority to EPA "to determine the Rules of its Proceedings" by allowing EPA exclusively to decide whether the preemption waivers are rules under the CRA. Compl. ¶ 158. Second, they assert that the resolutions usurp judicial power by directing the specific application of old law to particular circumstances. *Id.* ¶ 164. Both arguments fail.

**1.** Plaintiffs' nondelegation theory turns the doctrine on its head. Congress's enactment of the joint resolutions is the opposite of delegation. Congress voted. Congress decided. The decision to use CRA procedures to enact legislation disapproving EPA's preemption waivers was Congress's alone.

That EPA first submitted the waivers to Congress does not change the result. Indeed, Congress often rejects agency assessments of whether an agency action qualifies as a rule. *See, e.g.*, *supra* at 4–5. More to the point, Congress made its own decision to subject its consideration of these joint resolutions to the more streamlined CRA procedures—because Congress is always free to pass legislation according to whatever procedural rules it chooses, as long as it stays within the bounds set by Article I, Section 7 of the Constitution. *See supra* Parts II, III.

Purporting to read the minds of Senators and Representatives, Plaintiffs assert that Congress "relied exclusively on the submission of a report from EPA characterizing the waiver decisions as rules as a sufficient trigger for application of the CRA" and that the "Senate did so explicitly in its second point of order" prior to passage of the resolutions. Compl. ¶ 157. But litigation over the meaning of the Senate's "second point of order," as with the Senate's other procedures, is foreclosed. *Supra* Part II. Regardless, the text of the second point of order did no such thing, *see* 171 Cong. Rec. S3025, S3051 (May 21, 2025), Compl. Ex. C. Rather, the second point of order states that "joint resolutions that meet all the requirements of section 802 of the Congressional Review Act . . . are entitled to expedited procedures under the Congressional Review Act." *Id.* And if, as Plaintiffs suggest, the subjective views of individual Senators are at issue, then the record shows Senate leadership agreeing the waivers are "rules" within the meaning

**2-ER-244**

of the CRA. For example, Senator Thune, Majority Leader of the Senate, stated that the waivers "are clearly rules in substance given their nationwide impact and scope." 171 Cong. Rec. S3025, S3047. Finally, even if Plaintiffs' interpretation of the legislative history were sound, no constitutional principle or precedent bars Senators from relying on EPA's submissions when they made decisions about voting on joint resolutions. *Cf. Watkins v. United States*, 354 U.S. 178, 187 (1957) (Congress may conduct inquiries "concerning the administration of existing laws as well as proposed or possibly needed statutes").

**2.** Plaintiffs' theory of judicial usurpation similarly fails. Plaintiffs contend that Congress usurped judicial power because (1) EPA's preemption waivers "were the subject of pending litigation" when Congress enacted the joint resolutions, and (2) the resolutions "create[d] no new substantive law," but "instead direct[ed] the court how pre-existing law applies to particular circumstances." Compl. ¶¶ 164–65. This theory fails because the joint resolutions did not direct any court to take any action, and they also amended the law.

"Congress does not violate Article III when it changes the law," even if that change has a direct effect on pending litigation. *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (cleaned up) (plurality opinion). Courts must afford "a high degree of judicial tolerance for an act of Congress that is intended to affect litigation so long as it changes the underlying substantive law in any detectable way." *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 991 (9th Cir. 1999) (quotation marks omitted). In *Bank Markazi v. Peterson*, for example, the Supreme Court upheld a statute that identified a "District Court's docket number," "designate[d] a particular set of assets," and "render[ed] them available to satisfy the liability and damages judgments" in the specific case. 578 U.S. 212, 215 (2016). The Court rejected the "flawed" argument that "legislation must be generally applicable," and that "there is something wrong with particularized legislative action." *Id.* at 233. And it cited multiple cases upholding particularized statutes, including a "law that abrogated [a] specific settlement agreement between [the] U.S. Forest Service and environmental groups." *Id.* at 234; *see also Patchak*, 583 U.S. at 251 (plurality opinion) (statute stripping federal courts of jurisdiction to hear suits related to specific piece of property "is well within Congress' authority"); *UFO Chuting of Haw., Inc. v. Young*, 380 F. Supp. 2d 1166, 1169 (D. Haw. 2005) (statute "alters

the substantive law by changing the preemptive effect" of the previously governing statute).

Here, the resolutions do not simply direct a court to hold in a specific case that "Smith wins." *Bank Markazi*, 578 U.S. at 231. The resolutions instead change the law by depriving EPA's preemption waivers of "any force or effect." Indeed, the Ninth Circuit has squarely held, in rejecting a separation-of-powers claim, that a CRA joint resolution "amend[s] the substantive law." *Bernhardt*, 946 F.3d at 562. As *Bernhardt* explains, because joint resolutions under the CRA comply with "bicameralism and presentment," a "Joint Resolution is enforceable as a change to substantive law." *Id.* The same reasoning applies here. By disapproving the three waivers, the joint resolutions amended the substantive law. Before the resolutions, the Clean Air Act did not preempt these vehicle emissions standards because they had received waivers from EPA. After the resolutions, it does. This change to the substantive law is well within Congress's constitutional prerogative. And especially now that significant agency rules are virtually always subject to *some* sort of litigation, Plaintiffs' novel understanding would disempower Congress to act on large swaths of federal policy issues. That can't be right.

The analysis does not change even if Plaintiffs' challenge is interpreted to imply that Congress invaded the Executive's "adjudicatory power." *See* Compl. ¶ 165 ("EPA exercised 'the type of nonpolicymaking adjudicatory power[] typically exercised by a court in the agency-review context' by pronouncing that particular laws are not preempted by the Clean Air Act"). Administrative agencies "are creatures of statute" and "accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. DOL*, 595 U.S. 109, 117 (2022). Here, Congress has vindicated, not transgressed, separation-of-powers principles, by enacting new federal law on an important issue of public policy—exactly what Congress is supposed to be doing.

### C.    Plaintiffs fail to identify any interest protected by the Tenth Amendment.

Plaintiffs assert that by employing the CRA, "the Federal Government" evaded "procedural mechanisms—such as rigorous debate and state official testimony—that serve to inform members of Congress about the consequences of their actions." Compl. ¶ 173. And so, according to Plaintiffs, "extraordinary defects in the national political process" render the resolutions "invalid under the Tenth Amendment." *Id.* ¶ 176. Not so.

**2-ER-246**

The Tenth Amendment confirms the allocation of power between the Federal and state governments and prevents Congress from trenching on "the province of state sovereignty." *New York v. United States*, 505 U.S. 144, 155 (1992). But Plaintiffs do not allege that vehicle air emissions regulation is exclusively "the province of state sovereignty." *Id.* They also do not challenge Congress's power under the Commerce Clause and the Supremacy Clause to preempt California's emissions regulations. Nor could they. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (affirming preemption of California regulations).

Plaintiffs instead rely on dicta from *South Carolina v. Baker*, 485 U.S. 505, 512–13 (1988). There, the Court reflected on the "possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment," but concluded that it could not "identify or define the defects that might lead to such invalidation." *Id.* Here, while the Complaint asserts that use of the CRA precluded the use of procedural devices "that serve to inform members of Congress of the consequences of their actions," Compl. ¶ 173, *Baker* rejected claims that the political process failed because Congress acted with insufficient information, 485 U.S. at 512. Nor have Plaintiffs alleged that they were deprived of any judicially enforceable rights to participate in the national political process or that they were singled out in a way that left them politically isolated and powerless. *See id.* at 513. Rather, they claim that Congress did not follow congressional rules, *see* Compl. ¶¶ 173, 175, which are not subject to judicial review or constitutionally required, *see supra* Part II. And Plaintiffs cannot seriously contend that they could not participate in the national political process; after all, California alone has (by far) more representatives in Congress than any other state. *See* U.S. Census Bureau, Apportionment Population and Number of Representatives by State: 2020 Census, *available at* https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment /apportionment-2020-table01.pdf. Therefore, Count VI fails.

## CONCLUSION

For these reasons, Plaintiffs' Complaint should be dismissed in full.

**2-ER-247**

Dated: September 19, 2025          Respectfully submitted,

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER (DC Bar #1028454)
*Deputy Assistant Attorney General*
JEFFREY HUGHES (NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel:    (202) 717-7067 (Stander)
        (202) 532-3080 (Hughes)
Email:  robert.stander@usdoj.gov
        jeffrey.hughes@usdoj.gov


YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division

JOSEPH E. BORSON
*Assistant Branch Director*
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (FL Bar #1041279)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:    (202) 305-8576
Email:  stephen.pezzi@usdoj.gov

*Attorneys for Defendants*

**2-ER-248**

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
CECILIA D. SEGAL, State Bar No. 310935
EMMANUELLE S. SOICHET, State Bar No. 290754
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone:  (510) 879-0299
Fax:  (510) 622-2270
E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE BY ALLIANCE FOR AUTOMOTIVE INNOVATION AND NATIONAL AUTOMOBILE DEALERS ASSOCIATION**<br><br>(Administrative Procedure Act, 5 U.S.C. § 701 et seq.; 5 U.S.C. § 801 et seq.)<br><br>**Date:** **October 23, 2025**<br>**Time:** **2:00pm**<br>**Judge:** **Hon. Haywood S. Gilliam, Jr.** |

**2-ER-249**

Case: 25-8013, 02/25/2026, DktEntry: 26.3, Page 237 of 278

Case 4:25-cv-04966-HSG    Document 117    Filed 09/19/25    Page 2 of 12

**STATEMENT OF ISSUES TO BE DECIDED**

Should the Court deny the motion filed by the Alliance for Automotive Innovation and National Automobile Dealers Association (collectively, Movants) to intervene either as of right or permissively in the above-captioned matter? If the Court grants the motion, should it nonetheless place reasonable conditions on Movants' participation and on this litigation to ensure Plaintiffs are not prejudiced and the case proceeds efficiently?

**INTRODUCTION**

Movants' grounds for intervention are deficient for substantially the same reasons as the grounds raised by American Free Enterprise Chamber of Commerce et al. (AmFree), American Fuel & Petrochemical Manufacturers et al. (AFPM), and the State of Texas in each of their motions to intervene as defendants: their asserted protectable interest lies in the lawfulness of the U.S. Environmental Protection Agency's (EPA) decision to grant California's requests for Clean Air Act preemption waivers that authorize enforcement of three sets of state vehicle emissions standards. That legal question is not relevant to this suit, and is better protected via petitions for review under the Clean Air Act challenging the waivers themselves—such as those filed by AmFree and AFPM. Movants thus cannot show that their interest would be impaired by the Court's resolution of Plaintiffs' claims here. Nor can Movants overcome the presumption that the federal government will adequately represent their interests. Intervention as of right is not warranted.

Furthermore, and again as with AmFree, AFPM, and Texas, Movants' intervention threatens to expand the scope of the litigation to encompass extraneous issues and facts, prejudicing Plaintiffs. That those three other groups have also moved to intervene defensively, and that more groups have filed and may still do so, adds to the risk of prejudice from undue duplication and delay. The Court should therefore deny Movants' permissive intervention and instead allow Movants to air their views in an amicus brief.

Alternatively, if the Court is inclined to grant intervention, Plaintiffs respectfully request that the Court exercise its discretion to place reasonable limitations on Movants' participation along with certain procedural conditions on all parties to ensure the case proceeds efficiently.

**2-ER-250**

## BACKGROUND

Earlier this year, Congress took the unprecedented and unlawful step of targeting, with resolutions of "rule" disapproval (Resolutions), three Clean Air Act orders that waived preemption of certain emissions standards set by California for new motor vehicles sold in the State. Compl. (ECF 1) ¶¶ 5-7. California has been setting such standards for more than half a century. *Id.* ¶ 33. Since 1967, when Congress generally preempted States from setting new motor vehicle standards, California has done so pursuant to the preemption waivers that EPA must grant, subject to certain limited conditions. *See* 42 U.S.C. § 7543(b)(1).

Each of the three waivers targeted by the Resolutions permits California to enforce specific amendments to its regulatory program, adopted to reduce harmful pollution and protect public health and welfare. These waivers similarly allow other States to adopt and enforce California's regulations as their own. *Id.* § 7507. The first waiver, published in April 2023 (88 Fed. Reg. 20,688 (Apr. 6, 2023)), authorizes the Advanced Clean Trucks (ACT) regulation which requires gradual increases in sales of medium- and heavy-duty zero-emission vehicles in California beginning with model year 2024. Compl. ¶ 44. The second and third waivers, published in early January 2025, authorize the Advanced Clean Cars II (ACCII) and Omnibus regulations, respectively. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). ACCII gradually strengthens California's longstanding emission standards for light-duty vehicles (passenger cars and light trucks), including the State's zero-emission-vehicle sales requirements and the exhaust emission standards for criteria pollutants, requiring reductions in smog-forming oxides of nitrogen (NOx) and particulate matter. Compl. ¶ 43. The Omnibus regulation likewise strengthens longstanding state emission standards, requiring substantial reductions in NOx exhaust emissions from new medium- and heavy-duty vehicles. *Id.* ¶ 45. All three of these regulations are crucial parts of California's comprehensive plan to improve the air Californians breathe and meet state and federal air quality standards. *Id.* ¶ 46 (noting tens of millions of Californians are affected by some of the worst air quality in the Nation).

The unlawful targeting of these waivers began months (or, in the case of ACT, years) after the waivers were granted. EPA reversed the view it had consistently held for decades—shared by

**2-ER-251**

the Government Accountability Office—and suddenly declared, without any explanation, that waivers were "rules" within the meaning of the Congressional Review Act (CRA). *Id.* ¶¶ 65, 68-70, 73-77. Relying on EPA's misinterpretation, Congress enacted the Resolutions that purport to invalidate the three waivers. *Id.* ¶¶ 94, 103, 108. The President signed the Resolutions on June 12, 2025. *Id.* ¶ 113. Plaintiff States sued the United States the same day. Plaintiffs seek, *inter alia*, to have the Resolutions declared unconstitutional for violation of separation of powers and federalism principles and, correspondingly, to have the three waivers declared valid and in effect. *Id.* ¶¶ 153-178 & Prayer for Relief.

## LEGAL STANDARD

To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), a movant must show that: (1) the motion is timely; (2) the movant has a "significantly protectable interest" in the subject of the action; (3) disposition of the action may, as a practical matter, impair or impede the movant's ability to protect that interest; and (4) the movant's interest is inadequately represented by the existing parties. *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024). "Failure to satisfy any one of the requirements is fatal to the application." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011).

To intervene permissively under Federal Rule of Civil Procedure 24(b)(1), a movant must show that: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) the movant's claim or defense shares a common question of law or fact with the main action. *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002). Even if a movant satisfies those "threshold requirements," a court "has discretion to deny permissive intervention," *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002), particularly if intervention would "unduly delay or prejudice" the existing parties, Fed. R. Civ. P. 24(b)(3).

Though courts construe Rule 24 broadly in favor of intervention, the movant bears the burden of establishing that the Rule's requirements are met. *See E. Bay Sanctuary Covenant*, 102 F.4th at 1001 & n.2. Conclusory allegations will not suffice. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

**2-ER-252**

## ARGUMENT

**I.     MOVANTS DO NOT MEET THE STANDARD FOR INTERVENTION AS OF RIGHT**

### A.     Movants lack a protectable interest that could be impeded by disposition of this case

As with AmFree, AFPM, and Texas, Movants' asserted interests concern the legality of the EPA waivers—in particular, EPA's waiver for ACCII. That is not at issue in this suit. For example, Movants appear to believe that EPA's waiver decision for ACCII was unlawful because, in their view, that standard was "never achievable." Mot. 11:23-12:8. That claim could be appropriately raised in a petition for review of a waiver pursuant to the Clean Air Act's judicial review provision, 42 U.S.C. § 7607(b). *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 463 (D.C. Cir. 1998) ("technological feasibility" at issue "in the waiver context"). But whether particular waiver decisions satisfy the Clean Air Act is a step removed from the legal issue presented here: whether the *Resolutions* are lawful and have any legal effect. And while Plaintiffs seek to have the three waivers declared valid, that simply follows from a ruling invalidating the Resolutions. *See, e.g.*, Compl. ¶ 183 ("Because the Resolutions are unlawful, unconstitutional and void, the preemption waivers granted for" ACCII, ACT, and Omnibus "are valid and in effect."). That has no bearing on whether EPA's waiver decision for ACCII satisfied the specific criteria set out in the Clean Air Act's waiver provision, 42 U.S.C. § 7543(b). Movants' failure to demonstrate a "relationship between [its] legally protected interest and the claims at issue" is fatal to its intervention as of right. *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1088 (9th Cir. 2022) (cleaned up); *id.* at 1087-88 & n.8 (clarifying Ninth Circuit interpretation of interest test).[1]

---

[1] Movants' cited cases, by contrast, involve no such gap. *See Sierra Club v. EPA*, 995 F.2d 1478, 1481-83, 1485 (9th Cir. 1993) (Clean Water Act permit holder had protectable interest in defending against suit under that Act to tighten permit's terms); *Fresno Cnty. v. Andrus*, 622 F.2d 436, 437-38 (9th Cir. 1980) (group of farmers who would benefit from regulations had protectable interest in suit seeking to suspend those regulations' promulgation); *Am. Rivers v. Wheeler*, No. 20-cv-04636, 2020 WL 5993229, at *1-2 (N.D. Cal. Oct. 9, 2020) (industry groups regulated by, and benefiting from, Clean Water Act rule had (uncontested) protectable interest in suit under that Act to invalidate the rule); *Missouri v. Harris*, No. 2:14-cv-00341, 2014 WL 2506606, at *8 (E.D. Cal. June 3, 2014) (egg farmers benefitting from bill regulating out-of-state egg production had protectable interest in suit to invalidate that bill).

Movants also fail to demonstrate how the disposition of this case will impair their interest in the lawfulness of the waiver for ACCII. "Th[is] litigation does not prevent any individual from initiating suit" to challenge a particular waiver. *City of Los Angeles*, 288 F.3d at 402. Movants could have filed a petition for review challenging the waiver for ACCII on the grounds complained of here or else moved to intervene in any such suits filed by others. *See, e.g.*, Pls.' Opp'n to AFPM et al.'s Mot. to Intervene 5:19-6:3 (ECF 85) (citing petitions for review of all three waivers filed by trade associations). They have chosen not to. Movants should not be permitted to instead intervene and unduly complicate this suit to safeguard the same interests that are more appropriately vindicated in a petition for review under the Clean Air Act. Such a suit similarly would be the more appropriate forum for any claims against CARB's future potential enforcement of ACCII, *see* Mot. 11:8-10 (citing August advisory letter), which in any event is speculative and unripe. And even if Movants had opted to protect their interests by filing such a petition, this suit would not impede it: should Plaintiffs prevail—*e.g.*, should they obtain a determination that the Resolutions are invalid—that disposition would have no legal effect on distinct claims filed against a waiver decision under a separate statute. Any conclusory assertions to the contrary are misplaced. *Cf. N. Arapaho Tribe v. LaCounte*, No. 16-cv-11, 2016 WL 8710178, at *2 (D. Mont. Apr. 4, 2016) (an "interest in the outcome of the case" should not be "confused" with "a legally protectable interest in the subject of the action").

## B.    Movants' interests are adequately represented by Federal Defendants

Movants fail to show that Federal Defendants will not adequately represent their interests. They suggest that, because Federal Defendants do not have to comply with the ACCII standards, their defense of the Resolutions may somehow be constrained. Mot. 15:13-21 (citing *Conservation L. Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992)). But neither Movants nor the case they cite account for the presumption of adequacy that arises where, as here, "the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment." *Freedom from Religious Found., Inc.*, 644 F.3d at 841; *contra Mosbacher*, 966 F.2d at 44 (Secretary of Commerce's decision not to file answer to complaint and instead accept a consent decree "which provides for virtually all the relief sought"

**2-ER-254**

demonstrated that it was "less than wholeheartedly dedicated to opposing the [plaintiff's] aims"). Movants may rebut that presumption only by making a "very compelling showing," *California ex rel. Lockyer v. United States*, 450 F.3d 436, 443-44 (9th Cir. 2006), which they have not done. Though they maintain that their interests are more "parochial" than Federal Defendants and that their ultimate objectives "might diverge" (*see, e.g.*, Mot. 14:16, 14:22-25), they fail to explain how that translates into a potential conflict rendering Federal Defendants' representation inadequate. *See Freedom from Religious Found., Inc.*, 644 F.3d at 841-42 (presumption not rebutted where proposed intervenor merely speculated that interests might diverge, presenting no evidence that federal defendants would take an inconsistent position or abandon key arguments).

## II.   MOVANTS DO NOT MEET THE STANDARD FOR PERMISSIVE INTERVENTION

Movants do not qualify for permissive intervention under Rule 24(b). As described above, their interests focus on the lawfulness of EPA's waiver for ACCII. Those interests are more properly vindicated through petitions for review filed under the Clean Air Act. Movants may nonetheless attempt to raise those issues here, even though they are irrelevant to Plaintiffs' claims. For example, Movants assert, without evidence, that the ACCII standard was "never achievable." *Supra* at 4:6-8. Movants also assert an interest in "single, national emissions standards," signaling again that they may seek to litigate here the lawfulness of EPA's waiver decision or of the Clean Air Act's decades-old preemption waiver provision more broadly. Mot. 3:17-19. But "[i]ntervention cannot be used as a means to inject collateral issues into an existing action." *Apple Inc. v. Iancu*, No. 5:20-cv-06128-EJD, 2021 WL 411157, at *5 (N.D. Cal. Feb. 5, 2021); *accord Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). To allow otherwise would unduly prejudice the adjudication of Plaintiffs' case. *See* Fed. R. Civ. P. 24(b)(3); *see also S. Cal. Edison Co.*, 307 F.3d at 803 (court has discretion to deny permissive intervention even where Rule 24(b)'s threshold elements are met).[2]

---

[2] Movants further allege that California's emission standards are "*de facto* national emissions standards." Mot. 5:14-17. But as they elsewhere acknowledge (*id.* at 4:4-9, 4:20-5:2), EPA's standards, not California's, apply in all States unless and until a State chooses to adopt California's standards. Plaintiff States have done so, but those independent choices by separate sovereigns do not make California a national vehicle regulator.

**2-ER-255**

Movants' participation as an intervenor-defendant further risks prejudicing Plaintiffs by introducing duplication and delay. As this Court is aware, Texas and two sets of industry trade associations moved to intervene defensively in August. Another set of industry trade associations moved to intervene defensively on September 15. *See* W. States Trucking Ass'n (WSTA) et al.'s Mot. to Intervene (ECF 112). More putative intervenors may still follow. Plaintiffs thus face the prospect of having to respond to multiple motions involving complex legal questions from six or more sets of adverse parties, all of which could significantly slow down the case. Movants assert that they would undertake reasonable efforts to avoid duplicative briefing and to confer on a coordinated briefing schedule *for any Rule 12 motions* (Mot. 9:27-28), but do not address the potential for duplication and delay beyond that. Nor is there any countervailing efficiency gained by Movants' participation; Movants seek to intervene as defendants, not plaintiffs, and do not contend that there is a "separate action that [they] may bring" that could instead be "part of this action," promoting judicial economy. *In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*, No. 22-cv-05173-TLT, 2023 WL 4536883, at *4 (N.D. Cal. July 13, 2023). To prevent this already complex case from becoming unmanageable, this Court should exercise its discretion and decline to permit Movants' intervention. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 380 (1987) ("[I]n a complex case . . . a district judge's decision on how best to balance the rights of the parties against the need to keep the litigation from becoming unmanageable is entitled to great deference."). At most, Movants should instead be permitted to present their views in an amicus brief. *See United States v. De Leon Guerrero*, 4 F.3d 749, 756 (9th Cir. 1993) (affirming district court decision to deny permissive intervention but allow movant to participate as amicus curiae).[3]

## III. IF THE COURT GRANTS INTERVENTION, IT SHOULD EXERCISE ITS DISCRETION TO IMPOSE REASONABLE CASE MANAGEMENT CONDITIONS

If the Court nonetheless intends to grant Movants intervention, and in light of the concerns identified above, Plaintiffs respectfully request that the Court impose reasonable limitations on

---

[3] Indeed, counsel for the State of Iowa recently contacted counsel for Plaintiffs informing them that a group of States intend to move for leave to file an amicus brief in support of the United States' motion to dismiss.

**2-ER-256**

Movants' participation. Such conditions are authorized under Federal Rule of Civil Procedure 24(a) and 24(b), are routinely applied, and will help promote judicial efficiency. *See Stringfellow*, 480 U.S. at 382-83 & n.2 (Brennan, J., concurring in part and concurring in the judgment) (confirming district courts have discretion to limit intervention as of right and even more discretion to limit permissive intervention (citing Advisory Committee Notes, Fed. R. Civ. P. 24)); *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-cv-00344-JSW, 2021 WL 4552144, at *3 (N.D. Cal. May 3, 2021) (barring defendant-intervenors from initiating discovery and directing parties to meet and confer on case schedule allowing for efficient adjudication of anticipated motion to dismiss and motions for summary judgment); *California v. Health & Human Servs.*, No. 17-cv-05738-HSG, 2017 WL 6731640, at *9 (N.D. Cal. Dec. 29, 2017) (limiting issues in the case to those raised by the original parties).

In particular, Plaintiffs request the following conditions:

(1) Movants shall not initiate discovery;

(2) Movants' arguments and defenses shall be limited to those claims and issues raised in any operative complaints; and

(3) if two or more sets of private movant-intervenor-defendants—Movants, AmFree, AFPM, and WSTA—are granted intervention, they shall be required to jointly brief and argue all dispositive motions.

In addition, Plaintiffs respectfully request that the Court impose the following procedural conditions on all parties, including all intervenors:

(1) the parties must meet and confer at least two weeks before the filing of any dispositive motion and submit a joint proposed briefing schedule to the Court at least one week before the motion's filing; and

(2) the combined total page limit of any intervenor briefs on any dispositive motion must be limited to two-thirds of the page limit allowed to the original parties that the intervenor is supporting. In other words, defendant-intervenors would, collectively, be limited to two-thirds the pages available to Federal Defendants, and plaintiff-intervenors would, collectively, be limited to two-thirds the pages available to Plaintiff States.

**2-ER-257**

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motion to intervene. In the alternative, Plaintiffs respectfully request that the Court impose the case management conditions described above to avoid prejudice to Plaintiffs.

Dated:  September 19, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102
Telephone:  (415) 510-3545
Fax:  (510) 622-2270
E-mail: Cecilia.Segal@doj.ca.gov
*Attorneys for Plaintiff State of California*


**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: /s/ Vanessa L. Kassab
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

2-ER-258

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD *
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

*/s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmdoj.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

2-ER-259

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

/s/ *Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

*Admitted pro hac vice

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

/s/ *Cecilia D. Segal*
Cecilia D. Segal
Counsel for Plaintiff State of California

**2-ER-260**

Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice* forthcoming)
Rachel Levick (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036
Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-Intervenors*
*The Alliance for Automotive Innovation and*
*The National Automobile Dealers Association*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.   4:25-cv-04966-HSG |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION TO INTERVENE BY THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | Administrative Procedure Act Case |
| | Action Filed: June 12, 2025 |
| | Trial Date: none |
| | Hearing Date: November 13, 2025 |
| | Judge: Honorable Haywood S. Gilliam |

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 1

MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE ............................................ 2

STATEMENT OF INTEREST ......................................................................................... 2

BACKGROUND ........................................................................................................... 4

    I.    Clean Air Act Preemption ................................................................. 4

    II.   California's ACC II Program ............................................................. 5

    III.  EPA Waivers and Congressional Actions ....................................... 5

    IV.  The CRA Litigation ......................................................................... 7

LEGAL STANDARD .................................................................................................... 8

GROUNDS FOR INTERVENTION .................................................................................. 8

    I.    Intervention as of Right ..................................................................... 9

        A.    The Motion is Timely ................................................................. 9

        B.    Proposed Intervenors Claim a Significant, Protectable Interest in This Action .................................................................... 10

        C.    Disposition of this Action May Impair Proposed Intervenors' Interest ................................................................. 13

        D.    Proposed Intervenors' Interests Are Not Adequately Represented ................................................................................. 13

    II.   Permissive Intervention .................................................................. 16

CONCLUSION ........................................................................................................... 16

MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG

**2-ER-262**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Rivers v. Wheeler*,
  2020 WL 5993229 (N.D. Cal. Oct. 9, 2020).................................................................11

*In re California Micro Devices Sec. Litig.*,
  168 F.R.D. 276 (N.D. Cal. 1996).................................................................................10

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,
  152 F.3d 1184 (9th Cir. 1998).....................................................................................14

*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
  647 F.3d 893 (9th Cir. 2011).......................................................................................10

*Conservation L. Found. of New England, Inc. v. Mosbacher*,
  966 F.2d 39 (1st Cir. 1992).........................................................................................15

*County of Fresno v. Andrus*,
  622 F.2d 436 (9th Cir. 1980)..................................................................................10, 11

*Donnelly v. Glickman*,
  159 F.3d 405 (9th Cir. 1998).......................................................................................10

*Finjan, Inc. v. Symantec Corp.*,
  2017 WL 6610081 (N.D. Cal. Sept. 29, 2017) ............................................................10

*Forest Conservation Council v. U.S. Forest Serv.*,
  66 F.3d 1489 (9th Cir. 1995).......................................................................................14

*Freedom from Religion Found., Inc. v. Geithner*,
  644 F.3d 836 (9th Cir. 2011)....................................................................................8, 16

*Kalbers v. U.S. Dep't of Justice*,
  22 F.4th 816 (9th Cir. 2021) .........................................................................................9

*Kleissler v. U.S. Forest Serv.*,
  157 F.3d 964 (3d Cir. 1998).........................................................................................15

*California ex rel. Lockyer v. United States*,
  450 F.3d 436 (9th Cir. 2006).......................................................................................10

*May v. Google, Inc.*,
  2025 WL 1735671 (N.D. Cal. June 23, 2025) .............................................................10

*Missouri v. Harris*,
  2014 WL 2506606 (E.D. Cal. June 3, 2014).................................................................12

ii

**2-ER-263**

Gibson, Dunn &
Crutcher LLP

*Perry v. Schwarzenegger*,
630 F.3d 898 (9th Cir. 2011)..................................................................................................9

*Sagebrush Rebellion, Inc. v. Watt*,
713 F.2d 525 (9th Cir. 1983)................................................................................................13

*Sierra Club v. EPA*,
995 F.2d 1478 (9th Cir. 1993).........................................................................................8, 11

*Sierra Club v. Espy*,
18 F.3d 1202 (5th Cir. 1994)................................................................................................15

*Sw. Ctr. for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001)...............................................................................8, 9, 13, 14

*Trbovich v. United Mine Workers*,
404 U.S. 528 (1972) ............................................................................................................14

*United States v. Alisal Water Corp.*,
370 F.3d 915 (9th Cir. 2004)...............................................................................................10

*United States v. Oregon*,
913 F.2d 576 (9th Cir. 1990)..................................................................................................9

*Washington v. U.S. Food & Drug Admin.*,
108 F.4th 1163 (9th Cir. 2024) ...........................................................................................16

*Wilderness Soc'y v. U.S. Forest Serv.*,
630 F.3d 1173 (9th Cir. 2011)........................................................................................2, 8, 9

*Winston v. United States*,
2015 WL 9474284 (N.D. Cal. Dec. 29, 2015) ....................................................................10

**Statutes**

5 U.S.C. § 801 ........................................................................................................................6

5 U.S.C. § 802 ........................................................................................................................6

42 U.S.C. § 7507 ....................................................................................................................5

42 U.S.C. § 7521 .................................................................................................................4, 11

42 U.S.C. § 7543 ....................................................................................................................4

Public Law No. 119-16 ...........................................................................................................6

**Rules**

Civil L.R. 7-4 .........................................................................................................................1

iii

Gibson, Dunn &
Crutcher LLP

Fed. R. Civ. P. 12 .................................................................................................................1

Fed. R. Civ. P. 24 .............................................................................1, 2, 8, 9, 10, 12, 16

**Regulations**

13 C.C.R. § 1956.8 .............................................................................................................5

13 C.C.R. § 1962.4 .............................................................................................................5

13 C.C.R. § 1963.1 .............................................................................................................5

13 C.C.R. § 2036 ................................................................................................................5

13 C.C.R. § 2139 ................................................................................................................5

88 Fed. Reg. 20,688 (Apr. 6, 2023) ...................................................................................6

90 Fed. Reg. 642 (Jan. 6, 2025) .........................................................................................6

90 Fed. Reg. 643 (Jan. 6, 2025) .........................................................................................6

**Other Authorities**

Alliance for Automotive Innovation, *Automaker Statement on Senate Repeal of California Gas Vehicle Ban* (May 21, 2025), https://www.autosinnovate.org/posts/press-release/senate-repeal-california-gas-vehicle-ban ...................................................................................................................11

Alliance for Automotive Innovation, California State Motor Vehicle Pollution Control Standards; Advanced Clean Cars II Regulations; Request for Waiver of Preemption; Docket ID # EPA-HQ-OAR-2023-0292 (February 27, 2024) .................................12

California Air Resources Board, "Section 177 States Regulation Dashboard" (last visited June 29, 2025), *available at* https://ww2.arb.ca.gov/our-work/ programs/advanced-clean-cars-program/states-have-adopted-californias-vehicle-regulations ...................................................................................................................5

H.J. Res. 87 (119th Congress) ............................................................................................6

H.J. Res. 88 (119th Congress) ............................................................................................6

H.J. Res. 89 (119th Congress) ............................................................................................6

H. Rep. No. 728, 90th Cong., 1st Sess. (1967) .................................................................4

Manufacturers Advisory Correspondence ECCD-2025-03, CARB (May 23, 2025) .........6

Manufacturers Advisory Correspondence ECCD-2025-08, CARB (August 25, 2025) ...6, 7, 10, 11, 13

S. Rep. No. 403, 90th Cong., 1st Sess. (1967) ..................................................................4

iv

S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967) ..................................................................4

The White House, "Statement by the President" (June 12, 2025), *available at* https://www.whitehouse.gov/briefings-statements/2025/06/statement-by-the-president/ ..............................................................................................................................6

v

Gibson, Dunn & Crutcher LLP

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on November 13, 2025, or as soon as the matter may be heard[1] in the courtroom of the Honorable Haywood S. Gilliam, Jr. of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California 94612, the Alliance for Automotive Innovation and the National Automobile Dealers Association (collectively, "Proposed Intervenors") will and hereby do move to intervene as Defendant-Intervenors in this action.

Proposed Intervenors seek an order granting them leave to intervene as Defendant-Intervenors pursuant to Rule 24 of the Federal Rules of Civil Procedure (FRCP). In accordance with Rule 24(c), Proposed Intervenors have attached a Proposed Answer in Intervention as Exhibit A solely to comply with the technical requirements of Rule 24(c). Should the Count grant the motion to intervene, Proposed Intervenors will first file a motion under Rule 12(b) to comply with the requirement that such a motion come before a responsive pleading. Proposed Intervenors will undertake all reasonable efforts to avoid duplicative briefing and would propose that the parties confer on a coordinated briefing schedule for any Rule 12 motions.

This Motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, all pleadings and papers filed in this action, and such other written and oral argument or evidence as may be presented at or before the time this Motion is taken under submission.

Plaintiffs have reserved their right to oppose or otherwise respond to this motion to intervene after it has been filed. Defendants take no position on the motion.

# STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Civil L.R. 7-4, Proposed Intervenors submit that the issues to be decided on this Motion are:

1.    Whether Proposed Intervenors, which have significantly protectable interests that are affected by the outcome of this litigation, meet the requirements set forth in Rule 24(a) to intervene in

---

[1] Proposed Intervenors observe that the hearing on the motions to intervene filed by three other parties is currently set for October 23, 2025. *See* Dkt. 87. Proposed Intervenors would respectfully request that this motion be heard at the same hearing to avoid undue delay.

Gibson, Dunn & Crutcher LLP

MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG

**2-ER-267**

this action as a matter of right.

2.    Alternatively, whether Proposed Intervenors, which have significantly protectable interests that are affected by the outcome of this litigation, meet the requirements for permissive intervention set forth in Rule 24(b).

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

Plaintiffs filed a complaint in this Court challenging the legality and constitutionality of three joint resolutions passed by Congress and signed by the President. The joint resolutions, passed pursuant to the Congressional Review Act ("CRA"), invalidated Clean Air Act ("CAA") waivers of preemption for three sets of California vehicle emissions standards. The Alliance for Automotive Innovation ("Auto Innovators") and the National Automobile Dealers Association ("NADA") (collectively, "Proposed Intervenors") respectfully move to intervene as of right in support of the Defendants pursuant to Federal Rule of Civil Procedure 24(a)(2), or alternatively, to intervene by permission under Rule 24(b)(1)(B).

Auto Innovators represents automobile manufacturers who collectively produce and sell over ninety percent of the new passenger vehicles and light-duty trucks sold in the United States. NADA is a trade association of new car and truck dealerships. Proposed Intervenors' members have a vital stake in this litigation and will be significantly harmed if the Court grants Plaintiffs their requested relief. Proposed Intervenors should be granted intervention as of right because (1) this motion is timely; (2) Proposed Intervenors' members have sufficient interest in this litigation because Plaintiffs challenge the invalidation of California regulations that directly affect Proposed Intervenors' members; (3) Proposed Intervenors' ability to protect that interest, absent intervention, would be impaired by disposition of the case; and (4) the existing parties do not adequately represent Proposed Intervenors' members' interests in this case. *See Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (*en banc*). Alternatively, permissive intervention is proper under Rule 24(b).

## STATEMENT OF INTEREST

Auto Innovators is a trade association that represents nearly all of the full-line automakers producing and selling motor vehicles in the United States. Each of Auto Innovators' members does business in California. Auto Innovators collaborates with industry leaders, legislators, regulators, and

2

Gibson, Dunn & Crutcher LLP

other stakeholders in Washington, D.C. and across the country to develop public policy that promotes innovation, vehicle safety, and environmental responsibility. Auto Innovators carries out its mission by participating in actions, such as rulemaking and litigation, to protect the rights and interests of automobile manufacturers and the other automotive-related stakeholders. Among other goals, Auto Innovators seeks to protect its members' interests in clear, feasible, harmonized regulations addressing the automobile industry, including greenhouse gas emissions and zero-emission vehicle requirements. Auto Innovators' members have a significant interest in clear, common-sense regulations that include realistic, achievable mandates while still providing for consumer choice. They also must make production decisions years in advance for future models, and they rely upon regulatory and legal clarity and certainty in making these costly production decisions. Accordingly, Auto Innovators has a strong interest in intervening to defend the joint resolutions of disapproval at issue in this litigation.

NADA is the voice of franchised new car and truck dealers in the United States, representing more than 16,000 vehicle dealers that engage in the sale of new vehicles throughout the country, including 1,178 new car dealers in California. NADA's members employ more than 1,200,000 people nationwide, and most are small businesses as defined by the Small Business Administration. NADA partners with a broad range of leaders—including lawmakers, agencies, and other stakeholders—at both the federal and state levels to influence policies that promote dealer interests. To that end, NADA has long supported single, national emissions standards that are technologically feasible, economically practicable, and do not restrict consumer choice. NADA seeks to protect its members' interests by opposing unrealistic zero-emission vehicle mandates that will directly impact the fleet mix available to its dealer members and their corresponding ability to satisfy their customers' demands. The American Truck Dealers ("ATD"), a division of NADA, represents over 3,800 franchised commercial truck dealers, all located in the United States, who sell new and used trucks, tractors and trailers, and engage in service, repair, and parts sales. ATD's dealer members are on the front line working with truck owners and operators every day to support the movement of our nation's freight. They collectively employ more than 144,000 people and have a total U.S. payroll of $9.9 billion. In 2024, ATD dealers sold $130 billion of goods and services across the country. Based on the foregoing, NADA also unquestionably has a strong interest in intervening to defend the joint resolutions of disapproval at issue

3

Gibson, Dunn & Crutcher LLP

MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG

2-ER-269

in this litigation.

## BACKGROUND

**I.      Clean Air Act Preemption**

When Congress authorized the U.S. Environmental Protection Agency ("EPA") to regulate emissions from new motor vehicles, 42 U.S.C. § 7521(a), it preempted States from setting their own vehicle emissions standards, *id.* § 7543(a).  It did so to prevent the automotive industry from having to comply with numerous, separate standards, thereby minimizing economic strain on the industry and reducing costs for consumers.[2]  Congress gave EPA the authority to "waive" this preemptive effect for California—and only California—under certain conditions.  *Id.* § 7543(b)(1).[3]  If EPA determines that those conditions are met, EPA is authorized to permit California to adopt and enforce vehicle emissions standards, even if they are more stringent than the federal standards.  EPA has considerable discretion in determining whether those conditions have been met.  *See, e.g.*, *id.* § 7543(b)(1)(a) ("No such waiver shall be granted if [EPA] finds that the determination of [California] is arbitrary and capricious" or if California "does not need such State standards to meet compelling and extraordinary conditions").  California received this exemption to preemption in part because it regulated vehicle emissions before Congress gave EPA regulatory authority to do so, and also because the state experienced smog-related air quality issues in local regions.  *See* S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967).  California's unique ability to be granted a preemption waiver is also the result of a legislative compromise between California congressional representatives and industry.  *See id.*

Congress later enacted Section 177 of the CAA, which permits any other State to adopt and

---

[2] *See* S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967) ("The auto industry [] was adamant that the nature of their manufacturing mechanism required a single national standard in order to eliminate undue economic strain on the industry. . . .  The industry, confronted with only one potential variation, will be able to minimize economic disruption and therefore provide emission control systems at lower costs to the people of the Nation."); H. Rep. No. 728, 90th Cong., 1st Sess., 21–23 (1967) ("The committee feels that the problems faced by the automobile manufacturing industry arising out of identical Federal and State standards, separately administered, would be difficult for the industry to meet since different administration could easily lead to different answers to identical questions.").

[3] To qualify to seek a waiver, a State must have "adopted standards … for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966."  42 U.S.C. § 7543(b)(1).  The only State that qualifies to seek a waiver under § 7543(b)(1) is California.  S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967).

4

Gibson, Dunn & Crutcher LLP

enforce vehicle emissions standards if those standards "are identical to the California standards for which a waiver has been granted for such a model year." 42 U.S.C. § 7507. In recognition of the automotive industry's lengthy fleet planning and production timeline, Section 177 requires the States to adopt the standards at least two years before they apply to a given model year. *Id.*

## II. California's ACC II Program

At issue in this dispute is California's Advanced Clean Cars II ("ACC II") program. Among other requirements which ramped up in stringency over the next decade, ACC II expressly required 100 percent of new passenger vehicles and light trucks sold in California to be zero-emissions vehicles ("ZEVs") by model year 2035. 13 C.C.R. § 1962.4(c)(1)(B). Pursuant to Section 177 of the CAA, 42 U.S.C. § 7507, 11 additional States—including Plaintiff States—have adopted California's ACC II regulations. Combined, these States are estimated to account for approximately 40 percent of new light-duty vehicle registrations in the country. California Air Resources Board, "Section 177 States Regulation Dashboard" (last visited June 29, 2025), *available at* https://ww2.arb.ca.gov/our-work/programs/advanced-clean-cars-program/states-have-adopted-californias-vehicle-regulations. Because of this large share of registrations and the challenges posed to industry in planning product and fleet mixes that vary across states, California's emissions standards become *de facto* national emissions standards.

Also at issue in this case are California's Advanced Clean Trucks regulations and Omnibus Low NOx ("Omnibus") regulations. The Advanced Clean Trucks regulations require medium- and heavy-duty vehicle manufacturers to sell zero-emission vehicles as an increasing percentage of their annual sales in the state from 2024 to 2035. 13 C.C.R. § 1963.1(b). The Omnibus regulations include more stringent NOx and particulate matter emission standards for new heavy-duty engines and vehicles, including enhanced in-use testing and longer warranty periods. 13 C.C.R. §§ 1956.8, 2036, 2139.

## III. EPA Waivers and Congressional Actions

Pursuant to Section 209(b), between April 2023 and January 2025, EPA granted California's requests for the three preemption waivers at issue in this case, authorizing California to enforce three sets of regulatory standards: ACC II regulations, Advanced Clean Trucks regulations, and Omnibus

5

regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). In February 2025, EPA transmitted these three EPA actions granting California's waivers for those programs to Congress for review under the Congressional Review Act ("CRA").

The CRA was enacted to facilitate congressional review of federal agency rules. 5 U.S.C. § 801(a)(1)(A). It requires federal agencies to submit rules to Congress for review and gives Congress 60 days to introduce a resolution of disapproval. *Id.* § 802(a). The CRA creates an exception to the filibuster that enables the Senate to adopt a resolution disapproving of a federal agency's rule with a simple majority vote. *Id.* § 802(d)(1). If a joint resolution passes both houses and is signed into law by the President, the rule in question shall have no legal effect and may not be reissued in substantially the same form. *Id.* § 801(b)(1), (2).

On May 22, 2025, the Senate joined the House in adopting three joint resolutions disapproving the three CAA preemption waivers, with the joint resolution concerning the ACC II waiver passing both chambers with *bipartisan* majorities. H.J. Res. 87, 88, 89 (119th Congress). President Trump signed the resolutions into law on June 12, 2025. The White House, "Statement by the President" (June 12, 2025), *available at* https://www.whitehouse.gov/briefings-statements/2025/06/statement-by-the-president/; *see also* Public Law No. 119-16. The joint resolutions have the same force and effect as legislation.

Notwithstanding Congress' and the President's actions, on May 23, 2025, the California Air Resources Board ("CARB") issued an industry directive (in the form of a Manufacturers Advisory Correspondence or "MAC") providing that light-duty engine manufacturers must continue to follow CARB's now-preempted ACC II standards. Manufacturers Advisory Correspondence ECCD-2025-03, CARB (May 23, 2025). The MAC noted that continued certification to ACC II "is necessary to . . . ensure the requirements of certification are met to enable lawful vehicle sales in California," indicating that a failure to certify to the preempted standards would render sales of such vehicles illegal. *Id.*

On August 25, 2025, "in response to uncertainty and to address concerns raised at the time by vehicle manufacturers about the potential effects" of the joint resolutions on CARB's certification authority and process, CARB issued a revised MAC superseding the May 2025 MAC. Manufacturers Advisory Correspondence ECCD-2025-08, CARB (August 25, 2025) (Ex. A) ("August 2025 MAC")

6

Gibson, Dunn &
Crutcher LLP

at 1. The August 2025 MAC encourages light-duty engine manufacturers to continue to certify to ACC II. *Id.* at 2. But the August 2025 MAC also allows manufacturers to certify with CARB by means of two alternative pathways: either (1) certifying current and future model years to the Low-Emission Vehicle III regulations adopted by CARB in 2012, or (2) submitting an EPA certification to CARB. *Id.*

Importantly, the August 2025 MAC *explicitly threatens* industry with retroactive enforcement of the ACC II standards should manufacturers choose to comply with federal law and decline to certify to California's now-preempted standards. The August 2025 MAC provides that "[m]anufacturers who seek certification through the alternative pathways . . . should be advised, however, that ***CARB reserves its right to enforce the regulations covered by the waivers*** targeted by the congressional resolutions in the event a court of law holds those resolutions invalid, ***including with respect to model years that such manufacturers ask CARB to certify under these alternative pathways***." *Id.* at 3 (emphasis added). "Whether CARB opts to pursue such enforcement would be decided if and when that question becomes ripe." *Id.*

## IV. The CRA Litigation

California and 10 other States filed this lawsuit on June 12, 2025. Plaintiffs allege that the Defendants—the United States of America, EPA, EPA Administrator Lee Zeldin, and President Trump—acted contrary to the CRA because, as Plaintiffs argue, EPA's actions to grant the waivers in question were adjudicatory orders, not rules, and are therefore not subject to the CRA. Dkt. 1, Compl. ¶ 137. Plaintiffs also allege that EPA improperly reclassified the waiver actions from adjudicatory orders to rules after the actions were already complete, and that such a reclassification is arbitrary and capricious under the Administrative Procedure Act. Compl. ¶ 116, 126.

Plaintiffs also raise three constitutional claims, first asserting that President Trump, Administrator Zeldin, and EPA violated the Take Care Clause of Article II of the Constitution because they knew the waiver actions were not rules subject to the CRA and therefore exercised no care in faithfully executing the Nation's laws by submitting them to Congress for CRA review. Compl. ¶ 145. Second, Plaintiffs claim that the *Defendants* violated separation of powers principles, while pointing not to an action of the Executive branch but to Congress' actions, asserting in part that *Congress*

7

improperly delegated its authority to the Executive Branch to "determine the Rules of its Proceedings" under Article I, Section 5 of the Constitution. Compl. ¶ 158. Finally, Plaintiffs allege that Defendants violated the Tenth Amendment and principles of federalism because the use of the CRA to overturn *EPA's* waiver actions is an improper attempt to target *State* regulations. Compl. ¶ 175. Building from these claims, Plaintiffs also assert that by engaging in this conduct, the federal Defendants acted *ultra vires*, Compl. ¶ 119, and violated federal law such that this Court can use its equitable power to enjoin the conduct, Compl. ¶ 180.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 24(a)(2), a movant has a right to intervene when "(1) the motion [is] timely; (2) the applicant [claims] a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant [is] so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest [is] inadequately represented by the parties to the action." *Wilderness Soc'y*, 630 F.3d at 1177 (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993)). Rule 24(a) is generally "construe[d] … liberally in favor of potential intervenors," "guided primarily by practical considerations, not technical distinctions." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (quotation marks omitted).

Permissive intervention is proper under Rule 24(b) where there is "(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (quotation marks omitted).

## GROUNDS FOR INTERVENTION

This Court should grant Proposed Intervenors' motion to intervene because Proposed Intervenors are entitled to intervene under Rule 24(a)(2) for the reasons set forth herein, most notably because Proposed Intervenors—as the industry most directly regulated by the underlying California regulatory program at issue—possess a sufficient, protectable interest in the outcome of this litigation that is not adequately represented by the existing parties. In the alternative, this Court should permit Proposed Intervenors to intervene under Rule 24(b) for the same reasons.

8

## I.    Intervention as of Right

Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2) because (1) this motion is timely; (2) Proposed Intervenors' members have sufficient interest in this litigation because Plaintiffs challenge the invalidation of three sets of EPA waivers allowing the enforcement of California regulations that directly affect Proposed Intervenors' members; (3) Proposed Intervenors' ability to protect that interest, absent intervention, would be impaired by disposition of the case; and (4) the Defendants do not adequately represent Proposed Intervenors' members' interests in this case.[4] *Wilderness Soc'y*, 630 F.3d at 1177.

### A.    The Motion is Timely.

The first requirement for intervention under Rule 24(a)(2), timeliness, "is the threshold requirement for intervention." *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990).  The Ninth Circuit evaluates timeliness according to "three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 822 (9th Cir. 2021).

All three factors favor intervention here.  This action was filed on June 12, 2025, and is in its early stages.  The federal defendants have not yet filed a responsive pleading, and the intervention motions filed to date have been briefed but not yet heard nor decided.  Indeed, the hearing on the proposed interventions is currently set for October 23, 2025, Dkt. 87, meaning that Proposed Intervenors' motion could be fully briefed in time to be heard at that same hearing.  Further, no dispositive motions have yet been filed on the docket.  As a result, Proposed Intervenors' early intervention will cause no prejudice to the existing parties.[5]

---

[4] Proposed Intervenors are not required to separately demonstrate standing *see Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir. 2011) (per curiam), but their interests in the validity of the CRA resolutions, and the impairment they will experience if Plaintiffs prevail, satisfy the standing requirement, *see Sw. Ctr. for Biological Diversity*, 268 F.3d at 821 n.3.

[5] "[P]rejudice must be connected in some way to the timing of the intervention motion—and the fact that including another party in the case might make resolution more difficult does not constitute prejudice." *Kalbers*, 22 F.4th at 825–26 (quotation marks and citation omitted).  In any event, to further ensure no prejudice to the existing parties, the Proposed Intervenors will undertake all reasonable efforts to avoid duplicative briefing and would propose that the parties confer on a coordinated briefing schedule for any Rule 12 motions.

9

There has also been no delay; less than three months have elapsed since Plaintiffs filed their original complaint. Dkt. 1. Courts in this circuit routinely find motions filed on similar timeframes to be timely. *See, e.g.*, *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (motion to intervene filed "less than three months after the complaint was filed" was timely); *May v. Google, Inc.*, 2025 WL 1735671, at *4 (N.D. Cal. June 23, 2025) (motion to intervene filed when case was "still in the pleading stage" was timely); *In re California Micro Devices Sec. Litig.*, 168 F.R.D. 276, 277 (N.D. Cal. 1996) (motion to intervene filed "at the pleading stage" was timely).

Further supporting the timeliness of Proposed Intervenors' motion is the recent issuance of the August 2025 MAC, which contains CARB's explicit threat that it will seek retroactive enforcement of ACC II should it be successful in this litigation. *See* Ex. A at 3. Proposed Intervenors have moved swiftly to vindicate and protect their interests in response to this statement that CARB is reserving its option to enforce ACC II, "including [retroactively] with respect to model years that such manufacturers ask CARB to certify under the[] alternative pathways." *Id.*

**B.    Proposed Intervenors Claim a Significant, Protectable Interest in This Action.**

An aspiring intervenor meets Rule 24(a)'s legal interest requirement "if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (*quoting Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998)). The legal interest requirement is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *County of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (citation omitted). As such, the Ninth Circuit has rejected the notion that Rule 24(a) requires the prospective intervenor to demonstrate a "specific legal or equitable interest." *Id.* An "economic interest," if sufficiently "concrete and related to the underlying subject matter of the litigation," can "easily establish[] a cognizable, legally protectable interest" to trigger the right to intervene. *See Winston v. United States*, 2015 WL 9474284, at *2 (N.D. Cal. Dec. 29, 2015) (citing *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004)); *see also Finjan, Inc. v. Symantec Corp.*, 2017 WL 6610081, at *2 (N.D. Cal. Sept. 29, 2017).

Both legal interest requirement factors are met here. First, Proposed Intervenors represent a

10

Gibson, Dunn &
Crutcher LLP

substantial portion of the industry that was most directly affected by EPA's action to provide a waiver for California's ACC II regulations, and would be the industry directly regulated by those standards if the waiver is reinstated. Auto Innovators' members are thus directly impacted by EPA's grant of a waiver for California's ACC II regulations, and their interests are directly protected by the preemptive effect of Section 209(a), 42 U.S.C. § 7521(a), which was authorized by Congress in part to minimize economic strain on the automotive industry and to reduce costs for consumers. *See Sierra Club*, 995 F.2d at 1485 ("permit-holding property owners" had the right to intervene where the law "directly regulates their conduct"). CARB has "reserve[d] its right to enforce" ACC II "in the event a court of law holds [Congress's] resolutions invalid"—meaning that whether CARB will seek to enforce ACC II is directly tied to the outcome of this litigation. Ex. A at 3.

NADA similarly represents a significant portion of the industry that was directly impacted by EPA's action to allow California to proceed with the zero-emission vehicle mandates in its ACC II regulations. Those requirements—if reinstated through invalidation of the CRA action challenged here—would fundamentally alter the fleet mix of NADA's dealer members and hinder their ability to satisfy their customers' demands for internal combustion and hybrid vehicles. *See Sierra Club*, 995 F.2d at 1485; *cf.*, *e.g.*, *Andrus*, 622 F.2d at 437 (holding that an association of farmers had a sufficient interest to intervene in a case seeking to enjoin the Secretary of the Interior from issuing regulations governing excess land sales); *Am. Rivers v. Wheeler*, 2020 WL 5993229 (N.D. Cal. Oct. 9, 2020) (granting oil and gas associations' motion to intervene to defend EPA's final rule streamlining Clean Water Act permitting timeframes and requirements).

Second, Auto Innovators' members have a significant interest in clear, common-sense regulations that include realistic, achievable mandates while still providing for consumer choice. But as Auto Innovators has observed, aspects of the ACC II requirements—like the mandate for 100 percent ZEV sales by 2035—were simply "never achievable." Alliance for Automotive Innovation, *Automaker Statement on Senate Repeal of California Gas Vehicle Ban* (May 21, 2025), https://www.autosinnovate.org/posts/press-release/senate-repeal-california-gas-vehicle-ban. And while automakers are working diligently to increase ZEV sales, other elements of the ACC II program would be extremely challenging to meet—especially in the other states beyond California that have

11

adopted those standards.  Compliance with these mandates would require adjustments to vehicle and fleet mix production choices of Auto Innovators' members in a way that is out of step with consumer demand and available infrastructure.  *See* Alliance for Automotive Innovation, California State Motor Vehicle Pollution Control Standards; Advanced Clean Cars II Regulations; Request for Waiver of Preemption; Docket ID # EPA-HQ-OAR-2023-0292 (February 27, 2024).

If Plaintiffs' requested relief is granted and the waiver is reinstated, Auto Innovators' members would be subjected to highly complex emission standards and requirements, compliance with which was either never achievable in the first place or which will significantly drive up costs and regulatory burdens.  Indeed, the overall cost of ZEVs exceeds the cost of gasoline-fueled vehicles with similar attributes due to costs unique to ZEVs, such as the battery, fuel cell stack, and/or on-board hydrogen storage.  *Id.* at 4.  This fact will result in increased costs not just to Auto Innovators' members, but to the American consumer, as well.  In addition, if Plaintiffs' requested relief is awarded, Auto Innovators' members will be required to make additional substantial alterations to their fleet mix, affecting both their production costs and their ability to provide consumers with their choice of vehicle.  Auto Innovators' members who produce light-duty passenger cars and trucks for sale in California and Section 177 states must make forward-looking production decisions *now* for model years well into the future, and so they require regulatory clarity and certainty regarding the current and future validity of EPA's waiver for California's ACC II regulations.  These economic and compliance interests are sufficient to satisfy the requirements of Rule 24(a).  *See, e.g.*, *Missouri v. Harris*, 2014 WL 2506606, at *8 (E.D. Cal. June 3, 2014) (ACEF had significantly protectable interest in litigation because "ACEF members' participation in the egg industry through the production and sale of egg products within California demonstrate an economic interest in the outcome of this action.").

EPA's waiver of preemption for the ACC II standards, if reinstated, would similarly cause significant harm to NADA's members' business interests.  The now-preempted regulations will fundamentally alter the vehicle and fleet mix choices of NADA's members, inherently limiting the supply of internal-combustion engine vehicles that dealers can purchase and requiring dealers to purchase ZEVs at a rate that exceeds consumer demand.  And unlike many other regulated goods, prospective purchasers of new light-duty vehicles have other options, such as buying used vehicles,

repairing their existing vehicles or using alternatives such as public transit. Affordability is one of the most important factors in that assessment, and EPA's action to waive preemption for the ACC II regulations, if reinstated, will increase the cost of new vehicles, driving away prospective customers.

Proposed Intervenors and their members will suffer direct and substantial economic harm if EPA's preemption waiver is reinstated despite Congress' adoption and the President's enactment of the CRA disapproval resolution, and if California is consequently able to enforce its now-preempted ACC II regulations. This interest is especially stark given that the burden of complying with the preempted regulations rests squarely on industry, and in light of California's threat that it will *retroactively* enforce the ACC II regulations as to vehicles already sold and as to model years already past, should it be successful in this litigation.

## C.    Disposition of this Action May Impair Proposed Intervenors' Interests.

The Ninth Circuit requires an aspiring intervenor to show that it is "so situated that without intervention the disposition of the action may, as a practical matter, impair or impede his ability to protect [its] interest." *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983); *see also Sw. Ctr. for Biological Diversity*, 268 F.3d at 822 ("[I]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.").

Proposed Intervenors' interest in this case is clear: they represent the industry members that will face increased costs and negative business ramifications if Congress' action to preempt California's ACC II regulations were to be overturned. As CARB has just now made explicit, *see* Ex. A at 3, this interest will be substantially affected by this Court's resolution of this action. Plaintiffs seek a declaration that California's preemption waivers are valid and in effect, and they seek an injunction prohibiting any interference with the enforcement of California's regulations against automakers, even retroactively. Compl. at 39–40. For the same reasons as set forth above, *see* Section I.B, *supra*, such an outcome would directly affect Proposed Intervenors' members' interests by obliging them to comply with the costly—and now preempted—ACC II regulations.

## D.    Proposed Intervenors' Interests Are Not Adequately Represented.

In this Circuit, courts consider three factors in determining the adequacy of representation: "(1)

13

Gibson, Dunn &
Crutcher LLP

whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a [proposed] intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822. The "burden of showing inadequacy is 'minimal,'" as the party seeking intervention "need only show that representation of its interests by existing parties 'may be' inadequate." *Id.* at 823 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

Applying these factors, the Ninth Circuit has repeatedly allowed intervention as of right for regulated parties where the government also is a party because the governmental entities often have broader interests than private parties. For example, in *Southwest Center for Biological Diversity*, the Ninth Circuit considered a motion to intervene by private developers in a suit brought by an environmental group against federal defendants and the City of San Diego regarding land management plans and related permits that sought to balance the preservation of natural resources with economic growth. *Id.* at 814–17. The district court held that the developers and the City shared the same "ultimate objective" in the preservation of the plans and permits as issued. *Id.* at 823. The Ninth Circuit reversed, reasoning that the private developer's interest "might diverge" from the City in "two ways"—first, that the "City's range of considerations in development [wa]s broader than the profit-motives animating developers"; and second, that "developers ha[d] different duties under the Plans relating to mitigation." *Id.* The Court of Appeals further concluded that the U.S. Fish and Wildlife Service, "a federal agency, … cannot be expected under the circumstances to protect these private interests." *Id.*; *accord Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (the aspiring intervenor's interests "were potentially more narrow and parochial than the interests of the public at large"); *cf. Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) ("The Forest Service is required to represent a broader view than the more narrow, parochial interests of the [state and local government applicant intervenors].").

Other circuits have likewise concluded that private intervenors would not be adequately represented by government entities. Because "the government represents numerous complex and conflicting interests," the "business interests asserted by intervenors" can "become lost in the thicket."

MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG

**2-ER-280**

Gibson, Dunn &
Crutcher LLP

*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 973–74 (3d Cir. 1998). And "[a]lthough it is unlikely that the intervenors' economic interest will change, it is not realistic to assume that the agency's programs will remain static or unaffected by unanticipated policy shifts." *Id.* at 974; *accord Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir. 1994) (the "government must represent the broad public interest, not just the economic concerns of the timber industry"); *Conservation L. Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992) ("The Secretary's judgments are necessarily constrained by his view of the public welfare" and may not account for the "perhaps more parochial" interests of fishermen).

This Court should reach the same conclusion here. To start, the Plaintiffs plainly do not represent Proposed Intervenors' interests. But neither do the federal Defendants. Proposed Intervenors' members face an entirely different set of considerations than the federal Defendants: the economic cost of compliance with the ACC II regulations (regulations which are presently preempted and without legal effect). Although the federal Defendants have an interest in defending the valid use of the CRA and the disapproval of the preemption waiver for ACC II, those Defendants are not at risk of having to comply with the ACC II regulations themselves. *See supra*, Parts I(B)–(C). Because Proposed Intervenors' members are *regulated* parties, and all of the current litigants are *regulators*, Proposed Intervenors' interests are not adequately represented by the litigants themselves. *See Mosbacher*, 966 F.2d at 44 (explaining that the Secretary of Commerce would not adequately represent fishing groups who were "presently regulated by the Secretary" and could "be subjected to even more stringent rules than those presently in effect" as a result of the pending litigation in part because the "Secretary's judgments are necessarily constrained by his view of the public welfare."). Moreover, Proposed Intervenors have a unique interest they seek to protect in the litigation that no other party is equally suited to protect, which is preventing California from retroactively enforcing the ACC II standards in the event it should prevail on the merits of this lawsuit.

If Proposed Intervenors' motion is granted, Proposed Intervenors will contribute to the full presentation of the important issues involved in this action and will ensure representation of the interests of members of the automobile industry who would be adversely affected by adjudication in favor of the Plaintiffs. Because Proposed Intervenors' members' economic interests and interests as

15

regulated parties may not be adequately represented by the Defendants, Auto Innovators and NADA have a right to intervene in the litigation.

## II.    Permissive Intervention

For the same reasons stated above, Proposed Intervenors easily meet the substantially less burdensome requirements for permissive intervention. Proposed Intervenors "ha[ve] a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *supra* Parts I(B)–(D). In addition, this motion is timely and does not prejudice the rights of the existing parties. *See* Fed R. Civ. P. 24(b)(3); *supra* Part I(A). Proposed Intervenors do not raise any state-law counterclaims, *Geithner*, 644 F.3d at 844, or seek different relief, *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1171 (9th Cir. 2024). And because the claims in this case arise from federal law, Proposed Intervenors need not establish an "independent ground for jurisdiction." *Geithner*, 644 F.3d at 843. Therefore, in the alternative, this Court should grant Proposed Intervenors permission to intervene under Rule 24(b).

## CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that this Court grant this motion to intervene in the above-captioned proceeding.

Dated: September 5, 2025                    Respectfully submitted,

/s/    *Sean Howell*
Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice* forthcoming)
Rachel Levick (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036

Gibson, Dunn &
Crutcher LLP

Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-Intervenors The Alliance for Automotive Innovation and The National Automobile Dealers Association*

17

MOTION TO INTERVENE
CASE No. 4:25-cv-04966-HSG                    **2-ER-283**

Gibson, Dunn &
Crutcher LLP

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.   4:25-cv-04966-HSG |
| Plaintiffs, | |
| v. | **DECLARATION OF SEAN HOWELL IN SUPPORT OF MOTION TO INTERVENE BY ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION** |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

DECLARATION OF SEAN HOWELL IN SUPPORT OF MOTION TO INTERVENE BY ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

2-ER-284

Gibson, Dunn &
Crutcher LLP

I, Sean Howell, declare and state as follows:

I am an attorney duly licensed to practice law before the courts of the State of California as well as the United States District Court for the Northern District of California.  I am an associate at the law firm of Gibson, Dunn & Crutcher LLP, and am one of the attorneys representing Alliance for Automotive Innovation and the National Automobile Dealers Association in the above-entitled action.  Unless otherwise stated, I have personal knowledge of the facts stated in this declaration and, if asked to testify to them, I would do so competently.

1.    Attached as **Exhibit A** is a true and correct copy of the Manufacturers Advisory Correspondence ECCD-2025-08, last accessed on September 4, 2025, at https://ww2.arb.ca.gov/sites/default/files/2025-08/MAC%20ECCD-2025-08.pdf.

2.    Attached as **Exhibit B** is the proposed answer by Proposed Intervenors Alliance for Automotive Innovation and the National Automobile Dealers, submitted for the sole purpose of complying with Federal Rule of Civil Procedure 24(c).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of September, 2025, in San Francisco, California.

By: _____

Sean Howell

1

DECLARATION OF SEAN HOWELL IN SUPPORT OF MOTION TO INTERVENE BY ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG          **2-ER-285**

# Exhibit A

2-ER-286



CALIFORNIA
AIR RESOURCES BOARD

Gavin Newsom, Governor
Yana Garcia, CalEPA Secretary
Liane M. Randolph, Chair

## Manufacturers Advisory Correspondence (MAC) ECCD-2025-08

To:      All Manufacturers Of

- Light-Duty Vehicle Test Groups
- Medium-Duty Vehicle Test Groups
- Heavy-Duty Engine Families
- Medium-Duty Engine Families
- Heavy-Duty Greenhouse Gas Vehicle Families and Trailer Families
- Zero-Emission Powertrain Families
- Zero-Emissions Vehicles
- Airport Shuttles
- And All Other Interested Parties

Date:    August 25, 2025

Subject:  Regulatory Guidance for Engine and Vehicle Certification in California

On May 23, 2025, the California Air Resources Board (CARB) released Manufacturers Advisory Correspondence (MAC) ECCD-2025-03. CARB issued this MAC in response to uncertainty and to address concerns raised at the time by vehicle manufacturers about the potential effects of three then-unenacted congressional resolutions of disapproval[1] of three actions by the U.S. Environmental Protection Agency (U.S. EPA) authorizing enforcement of regulations that control emissions from new motor vehicles and engines.[2] On June 12, 2025, the President signed those congressional resolutions. California contends the resolutions are illegal and filed suit the same day to declare them invalid.[3]  Additionally, in August 2025, the federal government and certain manufacturers filed suit to attempt to nullify the Clean Truck Partnership, a June 2023 agreement between CARB, the Truck and Engine Manufacturers Association (EMA), and other major truck manufacturers.[4]  These recent federal actions have created unprecedented uncertainty in the motor vehicle market.

CARB continues to process the certification applications it received for the 2025 and 2026 model years, continues to receive applications for the 2026 model year, and has been

---

[1] H.J. Res. 87, 88, 89 (119th Congress).

[2] CARB's regulations at issue include the Advanced Clean Trucks, Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions, Zero Emission Airport Shuttle, and Zero-Emission Power Train Certification; Advanced Clean Cars II; and Omnibus Low-NOx ("Omnibus") regulations. U.S. EPA's waiver actions that authorized enforcement of California's regulations are at 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025),

[3] *See State of California, et al., v. United States of America, et al.* (N.D. Cal., Case No. 25-cv-04966).

[4] *Daimler Truck North America LLC, et al., v. California Air Resources Board et al.*, (E.D. Cal., Case No. 2:25-cv-02255-DC-AC).

**2-ER-287**

contacted by vehicle and engine manufacturers that are preparing to submit applications to CARB for the 2027 model year. CARB is issuing this MAC, which supersedes MAC ECCD-2025-03, to address continuing questions raised by vehicle and engine manufacturers about statutory provisions for vehicle and engine certification[5] and to provide further clarity on how CARB will process the applications for certifications that it continues to receive, so that vehicle and engine manufacturers may continue to offer, sell, and deliver new vehicles and engines in the state amid the ongoing legal uncertainty caused by the federal government.

Vehicle and engine manufacturers may continue to seek, and CARB will continue to process, applications for CARB certification to the regulations covered by the waivers that were targeted by the congressional resolutions.  Manufacturers who are parties to the Clean Truck Partnership may also continue to seek, and CARB will continue to process, applications for CARB certification on the terms provided for in that agreement. Manufacturers who seek and obtain certification through either of these pathways will have confidence that they are in compliance with their obligations under CARB's regulations (or under the Clean Truck Partnership, as applicable).

In recognition of the uncertainty caused by the recent federal actions, however, CARB will also certify for model year 2025 and subsequent model years through either of the following pathways or combinations thereof:

(1) An approved application for CARB certification to the vehicle and engine emission regulations that immediately preceded those covered by the waivers that were targeted by the congressional resolutions. These include:

   a. The Low-Emission Vehicle (LEV) III regulations, as adopted in 2012;
   b. Heavy Duty In-Use Compliance Regulation, as amended in 2011;
   c. California's 2007 and Subsequent Model Year On-Highway Heavy-Duty Engines and Vehicles regulation;
   d. Amendments to California's Truck Idling Requirements, as amended in 2011; and
   e. Heavy-Duty On-Board Diagnostic (HD OBD) Regulations, as amended in 2013, and the Malfunction and Diagnostic System Requirements–2004 and Subsequent Model-Year Passenger Cars, Light-Duty Trucks and Medium-Duty Vehicles and Engines (OBD II) as amended through 2013.

(2) Submission to CARB of U.S. EPA certification to its motor vehicle emission standards applicable to the given vehicle in the relevant model year, as those regulations are currently codified.

Consistent with MAC ECCD-2025-03, CARB will not implement the annual zero-emission vehicle requirement of the Advanced Clean Cars II regulations for the 2026 model year but will recognize values generated by vehicles certified to title 13, CCR, section 1962.4. CARB

---

[5] *See* Cal. Health & Saf. Code, §§ 43100, 43151-43153.

will continue to accept and process manufacturer sales reports for medium- and heavy-duty engines and vehicles under the requirements of the Advanced Clean Trucks regulations in title 13, CCR, division 3, chapter 1, article 2, sections 1963, 1963.1, 1963.2, 1963.3, 1963.4, and 1963.5. CARB will not implement the fleet requirement to replace a zero-emission airport shuttle with a zero-emission airport shuttle in the Zero-Emission Airport Shuttle regulation for privately owned fleets for calendar year 2026. CARB will continue to accept reports submitted by zero-emission shuttle bus fleets under title 17, CCR, section 95690.4.

Manufacturers who seek certification through the alternative pathways (1) and (2) above will therefore be able to continue to offer to sell and deliver new vehicles and engines in the state in the near term while litigation is pending. Manufacturers choosing these pathways should be advised, however, that CARB reserves its right to enforce the regulations covered by the waivers targeted by the congressional resolutions in the event a court of law holds those resolutions invalid, including with respect to model years that such manufacturers ask CARB to certify under these alternative pathways.[6] Whether CARB opts to pursue such enforcement would be decided if and when that question becomes ripe.

CARB will continue developing programs to reduce vehicle emissions and support the development and application of advanced emission control technologies. In doing so, CARB will consider measures, such as eligibility for procurement and other incentives, that account for whether manufacturers have continued to request certification to the regulations covered by the waivers that were targeted by the congressional resolutions.

If you have any questions regarding this MAC, including regarding the preparation of a particular application for certification, please contact Timothy Antcliff, Vehicle Program Specialist, at *timothy.antcliff@arb.ca.gov*.

Sincerely,

Robin Lang, Chief
Emissions Certification and Compliance Division
California Air Resources Board

---

[6] Accordingly, by issuing this MAC, CARB is not changing or conceding its legal position that the congressional resolutions are illegal and should be held invalid.

**2-ER-289**

February 25, 2026

Respectfully Submitted,

*/s/ Rachel Levick*

Raymond B. Ludwiszewski
Rachel Levick
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
Tel.: (202) 955-8500
Fax: (202) 467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

Sean Howell
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
 Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8355
Fax: (415) 801-7364
showell@gibsondunn.com

*Counsel for The Alliance for
Automotive Innovation and
The National Automobile Dealers
Association*

*/s/ Michael Buschbacher*

Michael Buschbacher
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
 Suite 900
Washington, D.C. 20006
Tel.: (202) 955-0620
mbuschbacher@boydengray.com
jconde@boydengray.com
lruppalt@boydengray.com

*Counsel for American Free
Enterprise Chamber of Commerce,
Illinois Corn Growers Association,
Indiana Corn Growers Association,
Iowa Corn Growers Association,
Kansas Corn Growers Association,
Kentucky Corn Growers Association,
Michigan Corn Growers Association,
Missouri Corn Growers Association,
Nebraska Corn Growers Association,
Tennessee Corn Growers Associa-
tion, Texas Corn Producers,
Wisconsin Corn Growers Associa-
tion, and National Corn Growers
Association*

**2-ER-290**

*/s/ Katherine C. Yarger*

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lkcfirm.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

Steven P. Lehotsky
Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue NW
 Suite 700
Washington, DC 20001
steve@lkcfirm.com
mike@lkcfirm.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

*Counsel for American Fuel &
Petrochemical Manufacturers,
American Petroleum Institute, and
the National Association of
Convenience Stores*